PAID

**FILED**

JAN 0 6 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

| | |
|---|---|
| Name | Mahmood Yoonessi |
| Street Address | 6790 Crest Rd |
| City and County | Rancho Palos Verdes |
| State and Zip Code | Ca 90275 |
| Telephone Number | 3105413937 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

Mahmood Yoonessi

6790 Crest Rd Rancho Palos Verdes Ca 90275

Phone No;3105413937,Email;myoonessi@cox.net

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-against-

Letitia James,WilliamPrasifka,Kyle Wilcox,Merrill Tisch all personally,Medical Boards of California, Ohio,State University of New York At Buffalo,Chase Bank and Does 1-10

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**Complaint for a Civil Case**

Case No. 2:2 3 - CV - 2 3   TLN DB  PS

*(to be filled in by the Clerk's Office)*

Jury Trial:  ☒ Yes   ☐ No
*(check one)*

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach
additional pages if needed.

| | |
|---|---|
| Name | Mahmood Yoonessi,and MYoonessi,MD PC |
| Street Address | 6790 Crest Rd |
| City and County | Rancho Palos Verdes |
| State and Zip Code | Ca 90275 |
| Telephone Number | 3105413937 |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint,
whether the defendant is an individual, a government agency, an organization, or
a corporation. For an individual defendant, include the person's job or title (if
known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Letitia James |
| Job or Title (if known) | Attorney |
| Street Address | 28 Liberty St |
| City and County | New York City, |
| State and Zip Code | New York 10005 |
| Telephone Number | 212.416-6318 |

Defendant No. 2

| | |
|---|---|
| Name | William Prasifka |
| Job or Title (if known) | Attorney |
| Street Address | 455 Golden Gate Ave |
| City and County | San Francisco |
| State and Zip Code | Ca  94102 |
| Telephone Number | 415.229-0109 |

2

Defendant No. 3

| | |
|---|---|
| Name | Kyle Wilcox |
| Job or Title (if known) | Attorney |
| Street Address | 30 East Broad St,26th Floor |
| City and County | Columbus |
| State and Zip Code | Ohio 43215 |
| Telephone Number | 614.466-8600 |

Lynette Antosh for Chase Bank Colubmus Ohio

Defendant No. 4

| | |
|---|---|
| Name | Merrill Tisch |
| Job or Title (if known) | |
| Street Address | 353 Broadway Ave |
| City and County | Albany |
| State and Zip Code | New York 12246 |
| Telephone Number | 212.416-6318 |

## II.  Basis for Jurisdiction

Federal Courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in Federal Court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same state as any plaintiff.

What is the basis for Federal Court jurisdiction? *(check all that apply)*

☒ Federal question                    ☒ Diversity of citizenship

3

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

18 USCA 1519,US constitutional Amendment I,IV, V ,VI ,VII,XIV

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* Mahmood Yoponessi                , is a citizen of the State of *(name)* California               .

b.    If the plaintiff is a corporation

The plaintiff, *(name)* MYoonessi,MD PC           , is incorporated under the laws of the State of *(name)*                       , and has its principal place of business in the State of *(name)*                       .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* Letitia James               , is a citizen of the State of *(name)* New York               . *Or* is a citizen of *(foreign nation)*                       .

4

b.    If the defendant is a corporation

The defendant, *(name)* – Kyle Wilcox
incorporated under the                          *(name)*
___Ohio_____, and has its principal place of
business in the State of *(name)*  ___Ohio_____. *Or* is
incorporated under the laws of *(foreign nation)*
_____, and has its principal place of
business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

two Billion Dollars
_____
_____
_____

**III.**    **Statement of Claim**

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Defendants have produced manufactured Evidence,Altered ,Mutilated Evidence to Courts,

Agencies of United States of America,New York State,State of California,State of Ohio ,State of Texas, deprived petitioner of his Medical License, Took petitioner(s) Office at 355 Linwood Ave,Buffalo Ny 14209,did not pay the Mortgage Loan,in Excess of $220,000 continue harassing persecuting petitioner (Hate Crime, committed Forgery;18 USCA 470-514, Extortion;18 USCA 875-879,Perjury;18USCA 1621,violated 18 USCA 1961(4,5,6) denied petitioner(s) rights to Due Process,violated Sarbanes Oxley Act

5

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

*Re instate petitioner(s) Medical Licenses ;118540;NY,34317;Ohio,50545:California,
~~Compel the Purchasers and State of New York to Pay Money owed~~ him as well as Punitive

~~Damages,as well as "compensatory damages not unreasonably less than 2Billion Dollars~~
*Determine Petitioner(s) status as :Whistleblowers ,entitled to  support and protections,
*Expunge all unfounded accusations against petitioner except those supported by reliable
~~*Determine  that SUNYAB's immunity(Qualified or otherwise)does not entitle it to Murders~~
of  Innocent patients A,C,D,E,JML,M.R

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: Dec 28 ___, 20 22

Signature of Plaintiff

Printed Name of Plaintiff   Mahmood Yoonessi,MYoonessi MD PC

6

1   **Before District Court of California Eastern Division**

2   **Notice of Removal**

3   Mahmood Yoonessi, Myoonessi, MD PC

4   Pro Se

5   6790 Crest Rd, Rancho Palos Verdes Ca 90275

6   Ph: 310.541-3937

7   EMAIL:MYOONESSI@COX.NET

| | |
|---|---|
| Mahmood Yoonessi, <br><br> MYoonessi,MD PC, <br><br><br> Accused Petitioner(s), <br><br> vs., <br><br> Letitia James,William Prasifka, <br><br> Kyle Wilcox,Merrill Tisch All individually,Medical Boards of California,Ohio,State University of New York At Buffalo,Chase Bank <br><br> And Does 1-10 | Case No.;34-22-80003877 <br> Sacramento Ca <br><br><br> NOTICE OF REMOVAL <br> PURSUANT TO 28 USC1332 <br> AND 1331, <br> JURY TRIAL DEMANDED |

8   Mahmood Yoonessi an individual ,personally and on behalf of Myoonessi

9   ,MD PC submits this affirmation,supplement to Court Form Complaint ,

10  in support of removal of The Case:" Writ of Mandamus ,before

11  Department 34,Sacramento County Court a Division of Superior Court

12  Of California ;Case No;34-22-80003677 to the Eastern District Court of

13  California,

1

1  Affiant affirms the following statement to be true under the penalties of

2  perjury:

3      1.    I am a Physician, who formerly practiced in Buffalo, NY

4  (1976-2002).From 1988-2002 my office was located at 355 Linwood Ave a

5  Historical site. I am personally familiar with all of the facts,

6  circumstances, pleadings and proceedings in the matter of  CCP 1094

7  Writ Petition For Re-instatement of my California Medical License

8  No;59545

9      2.    The submission is made in support of the removal for long

10  delayed(over two decades) adjudication of the Case(s),

11                  Undisputed Facts of the case

12  3.On or about April 29/2022,Petitiooner(s); Mahmood Yoonessi,

13  personally and on behalf of M.Yoonessi, M.D PC (hereafter

14  "petitioners"accused) duly sworn, submitted a "writ" petition pursuant

15  to CCP 1094.5 and 1085. A declaration/MOL in support of writ petition

16  was included (Exec Rec pages 001-0041). The Petition statements, were

17  also made under penalty of perjury with regard to the petitioner(s) and

18  upon information and belief regarding all others.

19  4.Petitioner(s) begged the court to command/order  vacating/reversing

20  the  March 2022 decision and order of ALJ Cox( pages 00270-

21  00273),which  denied reinstatement  of revoked Ca Medical License

1  C50545 (required by <u>California Business and Profession Code</u>
2  <u>2307),</u>Revocation based on NY respondents' fabrications(18USC 1519).

3  5. It was further requested the Court to consider Petitioner(s)
4  Whistleblower's claim (15 U.S. Code § 2087 -Whistleblower protection)
5  and grant other relief as considered Just, fair and required by Law.
6  <u>Supportive documents</u> were respectfully submitted as Excerpts from the
7  record. The entirety of the records before the hearing panel was
8  incorporated by reference (mostly sealed; to be unsealed by the court of
9  competent jurisdiction,)

10  6. Respondents Merrill Tisch, D.Kredentser, Andrew Cuomo,
11  W.Prasifka were named personally .Tisch and Prasifka were personally
12  served pursuant to Court's Minute order (H. Mclellan, A.A accepted
13  Service for M.Tisch). The Antitrust Division  office of NY Attorney
14  L.James  filed a "General Demurrer" on behalf of University of
15  Buffalo(not any other NY or Ca respondents named individually),

16  7. Petitioner received an E Mail (Att A) from Yvonne Pinto  Entitled
17  SUNYAB in Case No;34-2022-80006877) ;wrong case No,

18  8. It was claimed  that SUNYAB does not have  minimum Contact with
19  California Forum affirming petitioner(s),claims, denying  California's
20  contention  that all statements ,findings of facts, accusations(including
21  but not limited to Fraud claims) made by Peter Van Buren in 2001-
22  2002(pages82-83) were Fabricated (18 USCA 1519),( Hook, Line &
23  Sinker: Supreme Court Holds (Barely!) that Sarbanes-Oxley's Anti-
24  Shredding Statute Doesn't Apply to Fish"; further admitting they do not

3

1   believe 18 USCA 1519, which States:"18 U.S. Code § 1519 - Destruction,
2   alteration, or falsification of records  does not apply to them(Whoever
3   knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or
4   makes a false entry in any record, document, or tangible object with the
5   intent to impede, obstruct, or influence the investigation or proper
6   administration of any matter within the jurisdiction of any department
7   or agency of the United States or any case filed under title 11, or in
8   relation to or contemplation of any such matter or case, shall be fined
9   under this title, imprisoned not more than 20 years, or both".

10  9. Atty Letitia James further claimed that Second Circuit's Ruling in

11  Morse v. Fusto, No. 13-4074 (2d Cir. 2015), should be disregarded by
12  her and SUNY AB in complete absence of all Jurisdiction

13  10.It was claimed the  Immunity referred to in Morse v.Fusto  is beside
14  the point, even though the same team made the same arguments before
15  the Circuit and was soundly rejected.The Tentative Ruling sustaining
16  the Demurrer in a wrong case (amended writings of Yvonne Pint E Mail
17  dated Aug 19, 2022),did not admittedly apply to California, Ohio parties

18  10. Attorney James's  General Demurrer invokes Eleventh Amendment
19  Immunity, did not deny SUNYAB Agents, Officials murder of Patients
20  A,C,E,G,No1,M.R,by their team(rec pages 68-105) ;

21  *Inchoate crimes of; Solicitation (MPC 5.02,18 USCASection 373, m597,
22  602(Pt A; solicitation to Dr Steve Goodnough (Rec pages, 120-124)

23  *PtE (solicitation to Drs Steve Goodnough, Ian Cohen (Recpages134-
24  145)

4

1   *Conspiracy; MPC section 5.03,18 USCA 371; Patients A, E, G, No1,

2   M.R, Attempts; MP section 5.01,18 USCA 113, 2113, 1541(patients

3   A,C,E,G,,No 1,M.R(Drs M.Rinow,Steve Goodnough,I.Cohen)(Rec pages

4   110-200)

5   11. There is no specific reference, Demurrer to the following causes of

6   actions:

7   11-a1st cause of action; "Withholding Exculpatory Evidence"

8   Euthanasia of Patient E; by Morphine Intoxication"; Brady violation,

9   *Brady v. Maryland*, 373 U.S. 83 (1963); suppression of Evidence

10   11b. Second cause of Action: Libel per se.

11    11c.Third Cause of action: Abuse of the process, Malicious Prosecution,

12   11d.Fourth Cause of action: Conspiracy to defraud; 18 USC 241, 18

13   USC 371,

14   11e.Fifth Cause of action; Hate Crime; 18 USC 245

15   11f. Sixth Cause of Action: Civil rights Violations; Civil Rights

16   violations 42 U.S.C. §1981, §1983, §1985,

17   11g.Seventh Cause of Action: Equal protection violations of Petitioner's

18   property interest under the 14th amendment.

19   11h.Eighth cause of action;    Plaintiff suffered damages related to

20   cancellation of his Medicaid number by Respondents/their agents in

21   contempt of superior court judge's order.  Over $105,000 of money owed

22   the Petitioner by Medicaid remains unpaid. The Seventy Five Thousand

1  Dollars Settlement money of 1996 remains unpaid (embezzled) (ROA pg

2  250).Termination of Employment of Petitioner's tenured appointment at

3  SUNYAB was never approved by the Arbitrator and the Courts, labeled

4  Resignation in State Agencies), Vacation payments, Money owed him

5  from Faculty practice plan remains unpaid (ROA pages 245-247)

6  Accusations against the petitioner, even if arguendo true, violate his

7  immunity under Public Officers Law

8  11i.Ninth cause of action; Petitioner's liberties were violated by lack of

9  due process,

10  11j. Tenth Cause of Action;   Respondents: All could have done things,

11  taken actions/avoided improper actions that would have prevented

12  petitioner's losses.

13  11k.Eleventh Cause of Action; antitrust violation & monopolization;

14  The activities of the New York State "respondents" serve as a reminder

15  of what went on in New York, years ago; here the Players act under the

16  color of Law It is Uncontestable that RPCI now has accomplished its

17  goal; total market control in Gyn Oncology. The state agents'

18  declaration that Standard therapy in 1989 was Carboplatin, and in

19  1990's Taxol-Carboplatin, is unconscionable. This is a Multi-trillion

20  dollar National (interstate) and international Market manipulation,

21  Fraud and violates international, Federal and State Laws (Anti-Trust

22  Laws). The story of Al Hunt who was our BMS Drug Co representative

23  and collected all our Chemotherapy data and disappeared is

24  Unresolved, Dr T. Baker has been promoted as a Gyn Oncologist?

1  *111. Twelfth cause of Action; Prosecutorial Misconduct* When a

2  conviction is obtained by the presentation of testimony known to the

3  prosecuting authorities (I.E ALJ Dash, Atty Reyes) to have been

4  perjured, due process is violated.

5  11m. The 2016 Nat Academy of Sciences confirmed petitioner's position

6  regarding "Heterogeneity of Epithelial ovarian Cancers".

7  11n. Petitioner's proposal for combined Chemotherapy and Radiation in

8  advanced cervical cancer is now universally accepted and RPCI; Hydrea

9  plus Radiation is abandoned

10  11o. The State claimed; by 1989 the standard Ovarian Cancer

11  chemotherapy would have been Cytoxan, Carboplatin, and Carboplatin

12  was not approved by FDA until July 5Th, 1991.

13  11p. 45 CFR § 60.16 required updated Reporting, other adjudicated

14  actions or decisions ignored

15  **12. Violation of Business and Professions Code – BPC § 2234**

16  **Relief Prayer, wherefore:** Petitioner, accused most respectfully

17  request

18  *Reversal of the dismissal of the case against the respondents, each and

19  every one of them, on respective causes of action above,

20  *For general damages according to proof (over $100 Million; to be paid

21  by United States of America, States of New york,

22  California, Ohio, Massachusets, Texas ,

23  *For an order to Expunge/Expurgate all unsupported Defamations,

7

1    *For punitive and exemplary damages, Pre and Post Judgment interest,

2    *For attorneys 'Fees and cost of the suit,

3    *For Default Judgment against defaulted parties,

4    *For protection/Compensation of a "Whistleblower",

5    *For reversal of Tisch, King's decision, made in the absence of all

6    jurisdiction,

7    *For such other relief as the court may deem necessary, just or proper.

8        5. Respectfully submitted

9        6. Mahmood Yoonessi, M.D    (Pro Se plaintiff) *Mahmood Yoonessi*

10        7. Oral Argument, Jury Trial requested

8

1   Your Name Mahmood Yoonessi

2   Address 6790 Crest Rd

3   City, State, Zip Code Rancho Palos Veres,Ca 90275

4   Telephone Number 3105413937

5

6               IN THE UNITED STATES DISTRICT COURT

7                 EASTERN DISTRICT OF CALIFORNIA

8   Your Name, Mahmood Yoonessi

9           Plaintiff,
        L.James,W.Prasifka,K.Wilcox,M.Tisch,L.Antosh
10  VS. SUNYAB,MBOC Et Al                No.

11  Defendant(s),

12          Defendant(s)·Respondents        **PROOF OF SERVICE**

13  _____ /

14      I, the undersigned, hereby certify that I am over the age of eighteen years and

15  on _1,3,2,0,2,3_____, 20_23__, I served a copy of

16  Complaint(NOR),Summons,C Coversheet
    ___X____X_____X_____,

17  by placing a copy in a postage paid envelope addressed to the person hereinafter listed

18  by depositing said envelope in the United States Mail:

19

20  **(List All Defendants and Addresses Served)** Please see attached

21

22  I declare under penalty of perjury that the foregoing is true and correct.

23

24                              Mahmood Yoonessi

25                                  (Signed)

26

                                        Attachment 7

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Mahmood Yoonessi<br>6790 Crest Rd<br>Rancho Palos Verdes Ca 90275<br><br>TELEPHONE NO.: 310.3031671    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* mvoonessi@cox.net<br>ATTORNEY FOR *(Name):* Self&MYoonessi.MDPC | *FOR COURT USE ONLY* |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Sacramento and USCourt Eastern Div
STREET ADDRESS: 720 Ninth St
MAILING ADDRESS: 720 Ninth St Room 102
CITY AND ZIP CODE: Sacramento Ca 95814-1380
BRANCH NAME: Gordon D.Schaber Courthouse

| | |
|---|---|
| PLAINTIFF/PETITIONER: Mahmood Yoonessi&MYoonessi,MDPC<br>DEFENDANT/RESPONDENT: LetitiaJames Et Al | CASE NUMBER:<br>34-22-80003877 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [x] summons
   b. [x] complaint
   c. [ ] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [x] other *(specify documents):* Proceedings,Accusations,Demurrer

3. a. Party served *(specify name of party as shown on documents served):*
      Letitia James,William Prasifka,Kyle Wylcox,Merrill Tisch
   b. [x] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      SUNYAB,MBOC

4. Address where the party was served:
   Please See attached sheet

5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):*                    (2) at *(time):*
   b. [x] **by substituted service.** On *(date):* 01/03/2023    at *(time):*  12;00    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [x] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):* 01/03/2023    from *(city):* Torrance Ca    or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | |
|---|---|
| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER: |

5.  c.  [ **x** ]  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

       (1)  on *(date):*                          (2)  from *(city):*

       (3)  [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*) (Code Civ. Proc., § 415.30.)*

       (4)  [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

    d.  [ ]  **by other means** *(specify means of service and authorizing code section):*

       [ ]  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

    a.  [ **x** ]  as an individual defendant.

    b.  [ ]  as the person sued under the fictitious name of *(specify):*

    c.  [ ]  as occupant.

    d.  [ ]  On behalf of *(specify):*

           under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ **x** ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7.  **Person who served papers**

    a.  Name:  Shams Alemozaffar

    b.  Address:  420S.HamelRd,LosAngelesCa90048

    c.  Telephone number: 310.889-4422

    d.  **The fee** for service was: $

    e.  I am:

       (1) [ ]  not a registered California process server.

       (2) [ ]  exempt from registration under Business and Professions Code section 22350(b).

       (3) [ ]  a registered California process server:

           (i)  [ ] owner  [ ] employee  [ ] independent contractor.

           (ii)  Registration No.:

           (iii)  County:

8.  [ **x** ]  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

      **or**

9.  [ ]  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 01/03/2023

Shams Alemozaffar
_____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ *[signature]*
(SIGNATURE)

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**
[ Print this form ]  [ Save this form ]

# UNITED STATES DISTRICT COURT

for the

Eastern ___ District of ___ California

Mahmood Yoonessi&MYoonessi MDPC

_____  )
*Plaintiff*                                )
                                           )   Civil Action No.
L.James,W.Prasifka,K.Wilcox,M.Tisch,L.Antosh,UB,MBOC )
_____  )
*Defendant*                                )

## WAIVER OF THE SERVICE OF SUMMONS

To: _____
      *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from __1/1/2023_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
                                              *Signature of the attorney or unrepresented party*

_____          _____
*Printed name of party waiving service of summons*        *Printed name*

                                              _____
                                                              *Address*

                                              _____
                                                              *E-mail address*

                                              _____
                                                              *Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Attachment 6

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| MahmoodYoonessi<br>6790 Crest Rd<br>Rancho Palos Verdes Ca 90275<br><br>TELEPHONE NO.: 310-303-1671　　　FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* myoonessi@cox.net<br>ATTORNEY FOR *(Name):* Self&MYoonessi.MDPC | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Sacramento** |
|---|
| STREET ADDRESS: 720 Ninth St |
| MAILING ADDRESS: 720Ninth St |
| CITY AND ZIP CODE: Sacramento Ca 95814-1380 |
| BRANCH NAME: Gordon D.Schaber Courthouse |

| PETITIONER/PLAINTIFF: Mahmood Yoonessi,MYoonessi,MDPC |
|---|
| RESPONDENT/DEFENDANT: Letitia James Et Al |

| **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL** | CASE NUMBER:<br>34-22-80003877 |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1.  I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2.  My residence or business address is:
    420 S. Hamel Rd Los Angeles Ca 90048

3.  On *(date):* 01/03/2023　　　I mailed from *(city and state):*
    the following **documents** *(specify):*
    Notice of Removal,,Proceedings,Accusations

    ☐ The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4.  I served the documents by enclosing them in an envelope and *(check one):*

    a.  ☒ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.

    b.  ☐ **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5.  The envelope was addressed and mailed as follows:

    a.  **Name** of person served: Letitia James　See also attached sheet

    b.  **Address** of person served:
        28 Liberty St ,Ny Ny 10005

    ☐ The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 01/03/2023

Shams Alemozaffar
_____
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)

▶ _Shams Alezoffan_____
(SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>www.courts.ca.gov |
|---|---|---|

# INFORMATION SHEET FOR PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL

*(This information sheet is not part of the Proof of Service and does not need to be copied, served, or filed.)*

**NOTE:** This form should **not** be used for proof of service of a summons and complaint. For that purpose, use *Proof of Service of Summons* (form POS-010).

Use these instructions to complete the Proof of Service by First-Class Mail—Civil (form POS-030).

A person over 18 years of age must serve the documents. There are two main ways to serve documents: (1) by personal delivery and (2) by mail. Certain documents must be personally served. You must determine whether personal service is required for a document. Use the *Proof of Personal Service–Civil* (form POS-020) if the documents were personally served.

The person who served the documents by mail must complete a proof of service form for the documents served. **You cannot serve documents if you are a party to the action.**

## INSTRUCTIONS FOR THE PERSON WHO SERVED THE DOCUMENTS

The proof of service should be printed or typed. If you have Internet access, a fillable version of the Proof of Service form is available at *www.courtinfo.ca.gov/forms*.

Complete the top section of the proof of service form as follows:

<u>First box, left side</u>: In this box print the name, address, and telephone number of the person for whom you served the documents.

<u>Second box, left side</u>: Print the name of the county in which the legal action is filed and the court's address in this box. The address for the court should be the same as on the documents that you served.

<u>Third box, left side</u>: Print the names of the Petitioner/Plaintiff and Respondent/Defendant in this box. Use the same names as are on the documents that you served.

<u>First box, top of form, right side</u>: Leave this box blank for the court's use.

<u>Second box, right side</u>: Print the case number in this box. The case number should be the same as the case number on the documents that you served.

Complete items 1–5 as follows:

1. You are stating that you are over the age of 18 and that you are not a party to this action. You are also stating that you either live in or are employed in the county where the mailing took place.

2. Print your home or business address.

3. Provide the date and place of the mailing and list the name of each document that you mailed. If you need more space to list the documents, check the box in item 3, complete the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)), and attach it to form POS-030.

4. For item 4:

   Check box a if you personally put the documents in the regular U.S. mail.
   Check box b if you put the documents in the mail at your place of business.

5. Provide the name and address of each person to whom you mailed the documents. If you mailed the documents to more than one person, check the box in item 5, complete the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (form POS-030(P)), and attach it to form POS-030.

**At the bottom, fill in the date on which you signed the form, print your name, and sign the form. By signing, you are stating under penalty of perjury that all the information you have provided on form POS-030 is true and correct.**

---

**PROOF OF SERVICE BY FIRST CLASS MAIL—CIVIL**
**(Proof of Service)**

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**    [ Print this form ]    [ Save this form ]    

POS-030(D)

| SHORT TITLE: Yoonessi v.Letitia James Et Al | CASE NUMBER: 34-2022-80003877 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (DOCUMENTS SERVED)

*(This Attachment is for use with form POS-030)*

**The documents that were personally served by first-class mail are as follows** *(describe each document specifically):*

William Prasifka ;455 Golden Gate Ave,San Francisco Ca 84102

Kyle Wilcox;30 East Broad St ,26th Floor,Columbus Ohio 43215

Merrill Tisch;355 Broad way  Ave ,Albany New York 12246

Lynette Antosh;677 N.High St ,Columbus Ohio 43215

SUNYAB;28 Liberty St ,NY10005

MBOC;455 Golde Gate Ave ,SanFrancisco Ca 84102

Chief Justice(judge);Sacramento  GordonD.Schaber Courthouse ,  720 Ninth St Room  102;, Sacramento Ca 95814-1380

Steven Friedland,VP of Caine&Weiner Co;21210Erwin st,Woodland Hills Ca91367    Related case:;2-22-2276 and CVRI2204989
Mark Gillmartin,,1534 17th St,Suite 103,Santa Monica Ca90404 ,Dave Isola;405 W Pine stLodi Ca95240

Jeffrey Bochiechio;;350 Main St Buffalo Ny 14202   Related Case;CV22-6431

Form Approved for Optional Use
Judicial Council of California
POS-030(D) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY
FIRST-CLASS MAIL—CIVIL (DOCUMENTS SERVED)**
**(Proof of Service)**

Page ____ of ____

**For your protection and privacy, please press the Clear
This Form button after you have printed the form.**   | Print this form |  | Save this form |

NO;

*In The*
*United States District Court*
*For the Eastern District of California*

---

**MAHMOOD YOONESSI**,

*Petitioner,*

V.

**LETITIA JAMES Et Al**

*Respondents.*

---

## Excerpts from Record of Writ Petition
## Removal of the case 34-2022-80003877 Superior Court of CA
## County of Sacramento

---

**MAHMOOD YOONESSI**
6790 Crest Road
Rancho Palos Verdes, CA 90275
Telephone: (310) 303-1671
Email: myoonessi@ Cox.net
*"Pro Se"*

# Table of Contents
# Record for removal of Sacramento Writ case to Fed Court 2022

| Exhibit | Document Name | Page Number | Date |
|---|---|---|---|
| A | Proceedings | 1-6 | 2022 |
| B | Pleadings:<br><br>*Writ petition,<br><br>*CMB answer | <br><br>7-41,<br><br>42-47 | June,Aug, Sept 2022 |
| C | Motion in Limine | 48-64 | Sept 2,2022 |
| D | Letitia James ,Pinto ,Al Matar  team<br><br>answer | 65-67 | Aug 18 2022 |
| E | MBOC Case, ,Accusations, Supports,<br><br>Buffalo, and Texas Court cases | 68-105 | Sept 11,2001-<br><br>Sept 2022 |
| F | Motion in Limine ,Sept21-Oct 2022, | 106-109 | Sept 21-Oct 22 |
| G | Exhibits many sealed, concealed, filed<br><br>in<br><br>S.MoskCourthouse,Buffalo,,Columbus<br><br>Ohio,FBI | 110-200 | Sept 11,2001-<br><br>Nov 2002 |
| H; | SUNYAB; Petitioner's Employer | 201-250 | 1976-2022 |
| I | Motion in Limine,Motion to settle the<br><br>records, NY Court of Appeals Rulings | 251-269 | Sept 11 2001-<br><br>Nov 2022 |
| J | D&O of ALJ Cox | 270-273 | 12/1/2021 |
| K | Ny,Ohio,Ca, ,Chase Bank<br><br>manufactured Evidence,<br><br>18USCA1519 | 274-283 | 9/11/2001-<br><br>Nov 2022 |
| L | Decisions and Orders: | 284-302 | |

| | | | |
|---|---|---|---|
| | *Justice Glownia;Nov28,2001, | | 11/28/2001 |
| | Petitioner with NY License No | | |
| | 118540, | | |
| | *NY Review panel members; | | |
| | 2/10/09 | | |
| | NY License No 118540, | 285-289 | 2/10/2009 |
| | *NY COP | | |
| | NY License | | |
| | No:?;manufactured310221, issued | 290-292 | 11/23/2011 |
| | 11/21/73;License holders | | |
| | Malika and Ahern, | | |
| | *NY Merrill Tisch and John King and | | |
| | manufactured License No of 310221 | 293-296 | 2/8/2013 |
| | of two Nurses;uninformed, | | |
| | M Yoonessi,MD PC never charged | | |
| | | 297-302 | Sept 11/2001-<br>Nov  2022 |
| | | | . |
| | | | |

# Table of Contents
# Writ Petition 2022

# Proceedings

# Civil Case Details

## Case Information

**Case Title**
Mahmood Yoonessi, M.D. vs. William Prasifka

**Case Number**
34-2022-80003877-CU-WM-GDS

**Case Type**
Writ of Mandate

**Filing Date**
04/29/2022

**Case Category**
Civil - Unlimited

## Participants

| Participant Name | Role | Represented By |
|---|---|---|
| Andrew Cuomo | Respondent | |
| Daniel Kredentser | Respondent | |
| Does 1-50 | Respondent | |
| M. Yoonessi, M.D, P.C | Petitioner | |
| Mahmood Yoonessi, M.D. | Petitioner | |
| State University of New York At Buffalo (UB) | Respondent | Tal Matar Elmatad |
| The Medical Board Of California | Respondent | Harriet Joelle Newman |
| William Prasifka | Respondent | |

## Scheduled Hearings

| Event Date | Event Time | Event Type | Department | Status |
|---|---|---|---|---|
| No Scheduled Hearings Found... | | | | |

00001

## Past Hearings

**\*\* NOTE:** There is a cost associated with **court reporter transcripts**. When you request a court reporter transcript, you will be contacted by the court reporter regarding the cost and method of payment accepted.

| Event Date | Event Time | Event Type | Department | Status | **\*\*Request Transcript** |
|---|---|---|---|---|---|
| 09/02/2022 | 9:00 AM | Hearing on Demurrer - Writ of Mandate | 32 | Heard | Request |

## Register of Actions

Click the Preview button to see a preview of the document. Previewed documents contain every other page, up to a maximum of five pages. To purchase a full version containing all pages, check the checkbox for the document(s) you want and then click the Document Cart link at the top of the page to review your cart / check out.

| ROA# | ROA Entry | Filed Date | Filed By | Pages |
|---|---|---|---|---|
| 28 | Case disposed with disposition of Court-ordered dismissal . | 09/29/2022 | | |
| 27 | Case dismissed with disposition of Court-ordered dismissal . | 09/29/2022 | | |
| 26 | Petition for Writ of Mandate disposed with disposition of Court-ordered dismissal . | 09/29/2022 | | |
| 25 | Judgment (Judgment of Dismissal Following Sustaining of Demurrer Without Leave to Amend) filed. | 09/29/2022 | William Prasifka(Respondent) | 3 |
| 23 | Motion in Limine submitted by Mahmood Yoonessi, M.D. rejected on 09/07/2022 . | 09/07/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 1 |
| 24 | Minutes finalized for Hearing on Demurrer - Writ of Mandate heard on 09/02/2022 09:00:00 AM . | 09/02/2022 | | 1 |
| 22 | Minutes finalized for Hearing on Demurrer - Writ of Mandate heard on 09/02/2022 09:00:00 AM . | 09/02/2022 | | 1 |
| 21 | Email from Clerk to Parties Confirming Petitioner's Request for Oral Argument for the Hearing on 09/02/22 at 9:00 a.m. | 09/01/2022 | | 1 |
| | Demurrer to Petition for Writ of Mandate-Tentative Ruling | 09/01/2022 | | 4 |
| | Demurrer to Petition for Writ of Mandate-Tentative Ruling | 09/01/2022 | | |

**-00002**

| ROA# | ROA Entry | Filed Date | Filed By | Pages |
|------|-----------|-----------|----------|-------|
| 20 | Tentative Ruling Filed | 09/01/2022 | | 4 |
| 19 | Reply filed. | 08/25/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 23 |
| 18 | Proof of Service filed. | 08/22/2022 | State University of New York At Buffalo (UB)(Respondent) | 2 |
| 17 | Reply (ISO Demurrer) filed. | 08/22/2022 | State University of New York At Buffalo (UB)(Respondent) | 2 |
| 16 | Reply (to MBOC) filed. | 08/03/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 13 |
| 15 | Declaration - Other (and MOPA in Support of Petition for Writ) filed. | 08/03/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 17 |
| 14 | Declaration - Other (in Support of Opposition) filed. | 08/03/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 22 |
| 13 | Opposition (to Demurrer) filed. | 08/03/2022 | Mahmood Yoonessi, M.D.(Petitioner) | 22 |
| 9 | Elmatad, Tal Matar added as a effective 06/16/2022 . | 06/20/2022 | | |
| 12 | Proof of Service filed. | 06/16/2022 | State University of New York At Buffalo (UB)(Respondent) | 2 |
| 11 | Memorandum of Points and Authorities filed. | 06/16/2022 | State University of New York At Buffalo (UB)(Respondent) | 8 |
| 10 | Demurrer filed. | 06/16/2022 | State University of New York At Buffalo (UB)(Respondent) | 2 |
| 8 | Hearing on Demurrer - Writ of Mandate scheduled for 09/02/2022 at 09:00:00 AM in Department 32 at Gordon D Schaber Courthouse . | 06/14/2022 | | |
| 7 | Answer submitted by The Medical Board Of California rejected on 06/13/2022 . | 06/13/2022 | The Medical Board Of California(Respondent) | 1 |
| 6 | Newman, Harriet Joelle added as a effective 06/09/2022 . | 06/10/2022 | | |
| 5 | Answer filed. | 06/09/2022 | The Medical Board Of California(Respondent) | 4 |
| 4 | Order After Hearing (Minute Order) filed. | 05/04/2022 | | 14 |
| 3 | Case initiation form printed . | 05/02/2022 | | 1 |
| 2 | Case assigned to Department 32 . | 04/29/2022 | | |
| 1 | Petition for Writ of Mandate filed. | 04/29/2022 | M. Yoonessi, M.D, P.C(Petitioner); Mahmood Yoonessi, M.D.(Petitioner) | 33 |

00003

OFFICE OF ADMINISTRATIVE HEARINGS CLERK'S RECORD FOR OAH CASE NO. 2021080903
12/31/2021                                                Page 45 of 366



## OFFICE OF ADMINISTRATIVE HEARINGS

State of California

### EXHIBIT / WITNESS LIST
OAH 23 (rev. 2/03)

OAH No. 2021080903

ALJ: Juliet E. Cox

Agency No. 800-2020-073101

| *Agency / Complainant:* Medical Board of California | *Case Name / Respondent:* Mahmood Yoonessi |
| --- | --- |
| *Attorney / Rep.:* Brenda P. Reyes | *Attorney / Rep.:* self |

| Marked for I.D | **Hearing Date: November 18, 2021**<br>Evidence Offered – (via Witness) | Evidence Admitted Date –AH – Jurisdiction | Marked for I.D | Evidence Offered – (via Witness) | Evidence Admitted Date –AH – Jurisdiction |
| --- | --- | --- | --- | --- | --- |
| 1. | License history | X | A. | Not offered | |
| 2. | Notice of Hearing | X | B. | Not offered | |
| 3. | Amended Notice of Hearing | X | C. | Not offered | |
| 4. | Accusation (MBOC #16-2001-128690) | X | D. | Not offered | |
| 5. | State of New York judgment | X | E. | Not offered | |
| 6. | Order (MBOC #16-2001-128690) | X | F. | Not offered | |
| 7. | Decision (MBOC #20-2006-179832) | X | G. | Not offered | |
| 8. | New York order (Case No. CP-11-26) | X | H. | Not offered | |
| 9. | Transcript (January 22, 2021) | X | I. | Not offered | |
| 10. | Petition | X | J. | Not offered | |
| 11 | Statement of Rehabilitative Efforts | X | K. | Not offered | |
| 12 | Amended Narrative Statement | X | L. | Not offered | |
| 13 | Petitioner CV | X | M. | Not offered | |
| 14. | Alemozaffar letter | X | N. | Not offered | |
| 15. | Moayeri letter | X | N-1. | | NO |
| 16 | | | N-2. | | NO |
| 17. | | | N-3. | | NO |
| 18. | | | N-4. | | NO |
| 19. | | | N-5. | | NO |
| 20. | | | N-5a. | | NO |
| 21. | | | N-6. | | NO |
| 22. | | | N-7. | | NO |
| 23. | | | N-8. | | NO |
| 24. | | | N-9. | | NO |
| 25. | | | N-10. | | NO |

00004

# TABLE OF CONTENTS

State Agency Request to Set............................................................................................................ 1

    Petition for Penalty Relief.................................................................................................... 2

Notice of Assigned Hearing Dates.................................................................................................. 5

Agency's Notice of Hearing ............................................................................................................ 6

Amended Notice of Assigned Hearing Dates; Hearing Will Be Held By
Telephone/Videoconference........................................................................................................ 10

    Instructions for Video or Teleconference Proceeding With CaseLines Exhibits ........... 13

Petitioner's Motion in Limine to Exclude All MBOC Submissions ............................................... 16

CaseLines Instructions for Parties................................................................................................ 33

Protective Order Sealing Confidential Records............................................................................ 39

Hearing Exhibits........................................................................................................................... 45

    Hearing Exhibit/Witness List ....................................................................................... 45

    Agency's Exhibits ........................................................................................................ 47

        Exhibit 1: License History ............................................................................. 47

        Exhibit 2: Notice of Hearing.......................................................................... 48

        Exhibit 3: OAH Amended Notice of Hearing ................................................ 52

        Exhibit 4: Accusation (MBOC #16-2001-128690)......................................... 55

        Exhibit 5: State of New York Judgment ...................................................... 169

        Exhibit 6: Order (MBOC #16-2001-128690) ................................................ 177

        Exhibit 7: Decision (MBOC #20-2006-179832)............................................ 182

        Exhibit 8: New York Order (Case No. CP-11-26).......................................... 199

        Exhibit 9: January 22, 2021 Transcript ....................................................... 202

        Exhibit 10: Petition...................................................................................... 229

        Exhibit 11: Statement of Rehabilitative Efforts............................................ 232

        Exhibit 12: Amended Narrative Statement................................................... 248

        Exhibit 13: Petitioner's Curriculum Vitae .................................................... 251

        Exhibit 14: Letter of Recommendation of Shams Alemozaffar, M.D. ........... 265

        Exhibit 15: Letter of Recommendation of H. Moayeri, M.D........................... 268

    Petitioner's Exhibits.................................................................................................... 270

00005

Exhibit N-1: Miscellaneous Documents (SEALED)..........................................270

Exhibit N-2: Miscellaneous Documents (SEALED)..........................................271

Exhibit N-3: Miscellaneous Documents (SEALED)..........................................272

Exhibit N-4: Miscellaneous Documents (SEALED)..........................................273

Exhibit N-5: Miscellaneous Documents (SEALED)..........................................274

Exhibit N-5a: Miscellaneous Documents (SEALED)........................................275

Exhibit N-6: Miscellaneous Documents (SEALED)..........................................276

Exhibit N-7: Miscellaneous Documents (SEALED)..........................................277

Exhibit N-8: Miscellaneous Documents (SEALED)..........................................278

Exhibit N-9: Miscellaneous Documents (SEALED)..........................................279

Exhibit N-10: Miscellaneous Documents (SEALED)........................................280

Exhibit O: Miscellaneous Documents (EXCLUDED) .......................................281

Exhibit P: Miscellaneous Documents (EXCLUDED).......................................302

Exhibit Q: Miscellaneous Documents (EXCLUDED) ......................................305

Exhibit R: Miscellaneous Documents (EXCLUDED) ......................................322

Exhibit S: Miscellaneous Documents (EXCLUDED)......................................328

Exhibit T: Miscellaneous Documents (EXCLUDED) ......................................329

Exhibit U: Miscellaneous Documents (EXCLUDED) ......................................350

Exhibit V: Miscellaneous Documents (EXCLUDED).......................................356

Exhibit W: Miscellaneous Documents (EXCLUDED)......................................358

Proposed Decision..............................................................................................363

Factual Findings.............................................................................................363

Education and Professional Experience ............................................................364

Disciplinary Actions ..............................................................................................364

Rehabilitation.........................................................................................................365

Professional References ........................................................................................365

Legal Conclusions...........................................................................................365

Order ...............................................................................................................366

Certification of the Office of Administrative Hearings Clerk's Record ...................367p

# Table of Contents
# Writ Petition 2022

## Pleadings ;Writ Petition

FILED
Superior Court Of California,
Sacramento
04/29/2022
aturner4
By_____ , Deputy
Case Number:
**34-2022-80003877**

1   Mahmood Yoonessi

2   6790 Crest Rd

3   Rancho Palos Verdes Ca 90275

4   Email: myoonessi75@gmail.com

5   Ph: 3105413937

6   Pro Se Petitioners.

7   **Superior Court of California County of Sacramento**

**Writ Department**

Mahmood Yoonessi, M.D,

M. Yoonessi, M.D, P.C

Petitioners,

VS

William Prasifka Personally,
Andrew Cuomo, Daniel Kredentser,
State University of New York At Buffalo
(UB),The Medical Board of California,
Respondents
and DOES 1-50

Case No :

Application for

**WRIT of ANDAMUS**

(CCP 1094.5)&1085

**Before          Honorable**

**Judge:**

**Oral          argument**

**requested**

**Date:** April     2022

Time :

**Address;** 270 9th St

Rm 102

Sacramento Ca95814

1

~00007

1 ### TABLE OF CONTENTS

2

3 Introduction _____ pg2

4 Statement of Facts; basis for "Revocation"        pg3

5

6 Jurisdictional statement _____ pg16

7                                          Pg 19-21

8 Points of Authority

9 Standard of Review _____ pg21

10 Argument _____ pg27

11 Prayer/conclusion_____ pg30

12

13 ### Introduction

14

15    The undersigned, Mahmood Yoonessi, personally and on behalf of

16 M.Yoonessi, M.D PC (hereafter "petitioners") being duly sworn, hereby

17 submit this "writ" petition pursuant to CCP 1094.5 and 1085.A

18 declaration/MOL in support of writ petition is included. The following

19 statements, are    made under penalty of perjury with regard to the

20 petitioner(s) and upon information and belief regarding all others.

21    Petitioner(s) beg this honorable court to command/order

22 vacating/reversing the  March 2022 decision and order of Medical Board of

23 California( hereafter MBO)approved   by William Prasifka(hereafter ED

24 Prasifka).Respondent(s ) denied reinstatement  of revoked Medical License

25 C50545 (California Business and Profession Code 2307).It is further

26 requested the Court to consider Petitioner(s) Whistleblower's  claim and

1  grant other relief as considered Just and fair and required by Law. Supportive

2  documents are respectfully submitted as Excerpts from the record the

3  entirety of the records before the hearing panel is incorporated by reference

4  (mostly sealed).The court must order the m unsealed

5  ## Statement of Facts; historical aspects of the case

6  1. Shortly after September 11/2001(November 27, 2001, Antonia C. Novello,

7  M.D., then Commissioner of the New York State Health Department, issued

8  an order, attempted to summarily suspend petitioner(S)' practice of medicine

9  in Buffalo New York; in Complete absence of all jurisdiction. The summary

10  suspension and ensuing agencies, Courts proceedings'   have all ignored the

11  fact that:

12  2. at the  time of alleged accusations  petitioner/his employees  were working

13  for M.Yoonessi,M.D PC ,a professional corporation, registered under Sections

14  402 and 1503of the N.Y Business Corporation Law(Federal EIN;16-12583

15  10).Said corporation was never named, charged, served with any documents,

16  did not appear; any judgment against it is void under the laws of void

17  judgments .

18  3. During the years of 1982-1991 petitioner was a "full time, tenured

19  Associate professor "at the State University of New York at Buffalo,

20  represented by United University Professions. Pursuant to NY State Courts,

21  Agencies, petitioner was subjected to and bound by provisions of the policies

22  of the Board of Trustees of the State University of New York and Public

23  Officers Laws. The American Association of University Professors "1940

24  Statement "provides; "After the expiration of a probationary period,

25  teachers . . . should have permanent or continuous tenure, and their service

•. -00009

1  should be terminated only for adequate cause . . . or under extraordinary
2  circumstances because of financial exigencies.",

3  4. The accusation attributed to Attorney Peter Van Buren of New York (pages
4  56-64), recycled by California attorneys Prasifka, Reyes, JZ Simon (Pages 65-
5  82) have never been supported by Reliable Probative Evidence. The
6  underlying Fabricated, mutilated evidence (18 USCA 1519) (pages 150-185)
7  was manufactured, then concealed by a Canadian, and Sealed again by Hon
8  ALJ on Nov 18, 2022,

9  5. The fabrication shielded by Invoking BPC 141, and occasionally 2305 is
10  now exposed,

11  6. Counsel for NY State DOH referred to investigation /review
12  ordered/carried by K. Spooner and Dr Daniel Casey Kredentser, Dated March
13  11, 2001 was submitted as ground for petitioner's /Suspension and later
14  revocation (Pages 116-185) refers to Patients 1-10 were later changed to;
15  cases A-H, two of their cases were deleted and only partial records of the
16  remaining six were produced (Pg 116). Their only witness; Dr Kredentser was
17  available for cross examination of two cases (A&B; altered record)

18  7. on May19, 2004 before NY Federal Court attorney Saraf Accused petitioner
19  of "unethical treatment" of Cervical Cancers. Attorneys in California
20  (including Atty Dash) offered second amended accusation (Eight Gynecologic
21  cancer cases; without any supportive records/document).They used BPC
22  section 141; not sections 2305 and 2230.5(and 11503 G.C)

23  8. Description of the offense that was the basis of the action which
24  prompted the order for New York (Out of State) revocation. The
25  following summarizes the offenses (Pages 65-82):

4

● ‧ ‧00019

Patient #1(no record);(was admitted under the care of Dr L.Sifontes; only evidence of petitioner's involvement of concern, in her care was an unsigned unverified telephonic order pg's 116b-118).The expert reported this patient as being competent ; but autopsy report indicated she had Binswanger disease. And a curable ovarian cyst,

Patient #2 ;G(pg's 180-182) was admitted to Dr Sunquist , allegedly Received Chemotherapy by someone on Jan5,26,Feb26,Feb13,92(pg 180-g2);when she had no cancer, someone wrote in her chart; DNR, attending to sign .

Patient #3; A; there is not a scintilla of evidence that petitioner ever was /became "Physician of the record" for patient A at Digraph Hospital (admitting physician; Dr C.Lewis).She was literally murdered by a drug addict; Dr Steve Goodnough. Petitioner's signature was forged on a Morphine and DNR order sheets; I was never given control of her care (pg's 151-152).

Patient: #4 B; There is not a scintilla of evidence that NY State ever produced her records for 1989-1995 (pg.'s 153-156, her Ex6 was manufactured by Attorney Donovan, reviewed by Dr Kredentser)

Patient  #5 :C   there is not a scintilla of evidence that she was/became petitioner's patient; died as a result of a thoracentesis performed by  State Agents M.R.Admitting physician; Dr Steven Herman. Petitioner was not even listed among seven consultants (pg's157-159).

Patient 6; F: (pg.'s 31-33); A Jehovah's. Witness with ovarian cancer (pg 180)

Patient #7; H (Pg.'s 33-36): Admitting physician Dr T.M   Petitioner was one of eleven consultants.

Patient 8; D: Admitting physician; Dr Sixto Macada (pg.'s 161-165); Petitioner was one of five consultants,

5

1    Patient #9; E (pg.'s 166-176); Admitted to Dr Villacorta's service. Died of

2    Morphine Intoxication; Coroner's report, not "Septic Shock, as NY claimed

3    Patient #10.K.K and, M.R; the only two patients that were advised to go to

4    RPCI; DOD,

5    9. Accusation of Fraud No 1(pg. 176) The NY and CMB report state;

6    "Respondent claimed that the patient, on a February 19, 1986 visit, refused

7    chemo due to a sore porta Cath site"; another example of New York State

8    team's fraud, Deception, record alteration (18 USC 1591, Penal code 115). The

9    record is clear. Petitioner never, ever saw this patient before 1991- 1992.

10    10. Accusation of Fraud No 2(pg. 177-179);It is evident that Dr Maceda Chair

11    of the department at St Joseph invited petitioner and his services, the

12    question, reportedly answered incorrectly  were not even seen  in revised

13    1999/2000 application referred to by Ny Officer; Graziano(pg. 177)

14    11. From Sept 2001-2018 petitioner repeatedly claimed New York OPMC's

15    report was false and politically/financially motivated. A request for

16    secretarial review was ignored for almost two decades.

17    Even then New York did not produce evidence to support their accusations.

18    They concluded their falsehood was reportable and unlawful acts were

19    permanent.

20    12. As of July 2020 the NY Website , MBOC ,NPDB (Pages 186) have all failed

21    to update their information, and  There is not a single reference to;

22    * NY Unanimous Peer Review Committee Report of Feb 10, 2009(Pages 127-

23    130),

24    *NY Committee on the Profession Report and Recommendation (Pages 131-

25    139,

·· -00012

1   *Dr John King's fraudulent report on Oct 2012(Pg.'s 140-143),

2

3   _13 Procedurally NY ALJ Trost was requested by attorneys Sargent and

4   Collins, to recuse himself and Panel Chair; he refused Invoking NY10 CRR

5   51.9 and 17; ignoring the supremacy of 28USC Section 455(b)

6   _14.Petitioner, a tenured associate Professor at the State university of New

7   York at Buffalo was entitled to protection under AAUP (Am Assoc of Unit

8   Professors 1940, Public Officer's Law, and Louder mill's Rights ; enumerated

9   in: Cleveland Board of Education v. Louder mill,470 U.S. 532, 84 L.Ed.2d 494,

10   105 Sc.D. 1487 (1985), Supreme Court

11

12   15. Other mitigating factors; The NY Committee on profession

13   Pointed out that some of these patients were not treated by petitioner, and

14   many were time barred (BPC 2230.5):

15   15a; Case #1; Admitted, treated by Dr L.Sifontes, who ignored petitioner's

16   proper recommendation of 'curative surgery in1996&1997),

17   15b; case #2; was assigned to Dr Suquest; unknown to petitioner; 1992,

18   15c.Case #3; Admitted to DMH by Dr C.Lewis (Pg. 24); 1997,

19   15d; Case 5 ;Admitted by Dr Herman(Pg29);Unknown to petitioner;1993,

20   15e; Case # 7Admitted to SBMH by Dr Malik (Pg33),

21   15f; Case #8; Admitted to St Joseph by Dr Maceda (1994),

22   15g; Case # 9; Admitted by Dr V at SBMH; transferred to Dr Cohen,

23   15h; Case #10; Admitted by Smith to SBMH; went to RPCI,

24   16.To Demonstrate the "Manufactured, altered nature (18 USCA 1519) of the

25   original /subsequent designations of the cases from September11, 2001 and

26   Nov 18, 2022 are shown in the following table:

7

1   Reason for discipline manufactured post 9/11/01 and 2020(P264-271)

| Exhibit No. | Document Name | Page Number | Date |
|---|---|---|---|
| Mboc02 ;800-20 073101;000085-000 | Accusation; no recor PtAKredentser3 No | 000087  BR 0000283DCK | 11/18/2022 03/11/2001 |
| 02 ;MBOC | Accusation;      Pt Kredentser No 4 | 000086 000284 | 11/18/2022 03/11/2001 |
| 02;MBOC | Accusation pt C Kredentser No 5 | 000087 000285 | 11/18/2022 03/11/2001 |
| 02; MBOC | Accusation Pt D Kredentser 8 | 000087 000288 | 11/18/2022 03/11/2001 |
| )2;MBOC | Accusation ;PtE Kredentser  NO 9 | 000087 000289 | 11/18/2022 03/11/2001 |
| 02;MBOC | Accusation; Pt F Kredentser No 6 | 000088 000286 | 11/18/2022 03/11/2001 |
| 02 MBOC | Accusation ;Pt G Kredentser No 2 | 000088 000282 | 11/18/2022 03/11/2001 |
| 02 MBOC | Accusation; pt H Kredentser No 10 | 000088 000290 | 11/18/2022 03/11/2001 |
| 02;MBOC | Accusation; Pt JML Kredentser Pt No 1 | No Record 000281 | 11/18/2022 03/11/2001 |
| 02 MBOC | Auccusation;Pt 8 Kredentser No 10 | No record 000290 | 11/18/2022 03/11/2001 |

2      a) Documents received from Kaleida Health Care System; submitted into

3          evidence; sealed at the OAH office in 2008 by ALJ Dash. Said documents

4          prove the fabricated nature  of all Medical Board of California's

5          accusations against the petitioner(I,e Petitioner's exemplary record

6          keeping and required Consents for Every  chemotherapy and surgery) ,

7      b) The  documents from Medical Board of California, their sole  Witness

8          Dr D.C.Kredentser and their New York collaborators Eliot Spitzer,

9          Andrew Cuomo and Peter Van Buren,any and all documents concealed

10         By MBOC Counsel, ALJ on  Nov 18 2021 confirm the fabricated nature.

11         of Board's case story; heresay,unreliable,not probativeThe Documents

8

1      listed in N1·W currently  in OAH's possession; ,sealed By ALJ require

2      disclosure to prove case fabrication,

3    c) The overwhelming exculpatory evidence ,now sealed, proves that

4      Steven Sample, Merrill Tisch and SUNYAB's Complaints, Disciplinary

5      attempts, fabrication of the instant case prove this case  had nothing  to

6      do with patient care, service teaching, Chemotherapy. It all had to do

7      with SUNYAB's mismanagement of Faculty Practice Plan money.

8    d) Patients A,C,D,E G,H ,JML ,M.R were murdered by NY State agents,

9      their cause of death was covered up by MBOC to avoid penalties and

10    long term prison sentences

11    Respectfully submitted; Mahmood Yoonessi, M.Yoonessi MD PC

12  Superior Court of California for the County of Sacramento

13  Writ Department

Mahmood Yoonessi, M.D,                    Case No :
M. Yoonessi, M.D, P.C                     Petitioner's Declaration, Memor
                                          Law  in support of the "WRIT of
                    Petitioner(s),        MANDAMUS"

VS                                        Before Honorable Judge:
William Prasifka Personally, Andrew Cuomo
Daniel C.Kredentser, State university of NY Date: April   2022
Buffalo(SUNYAB,                           Time : ......PM
UB)The Medical Board of California        Address; 720 9th st,Rm 102,sacr:
And DOES 1-50                             Ca95814

1    17. Petitioner, Mahmood Yoonessi, personally and on behalf of M.Yoonessi,

2    M.D PC Inc submits this "Declaration"/MOL in support of    a "Writ of

3    mandamus" to issue an order pursuant to Ca Code of Civil Procedures 1094.5,

4    1085 setting aside William Prasifka's decision and order on the following

5    grounds:

6    A; It violates California Government Code 11507.6 and 11507.7

7    11507.6. States: The parties to proceedings are allowed to;

00016

1   (2) Inspect and make a copy of all documents in the possession or custody or
2   under the control of the other party:

3   11507.7: Any party claiming the party's request for discovery pursuant to
4   Section 11507.6 has not been complied with may serve and file with the
5   administrative law judge a motion to compel discovery, The MBOC has been
6   asked repeatedly to; unseal the records   under seal in the office of
7   Administrative hearing at 320 West Fourth Street Los Angeles California
8   since 2002. Two decades later the ALJ Chose to seal the records again ,in so
9   doing the court took yet another step in concealing the causes of
10  death(Murder)of the following patients :A,C,D,E,G,H,JML,K.K. It is
11  respectfully requested that this honorable Court must determine that the
12  non-disclosure violates petitioner(s)'said patients 'families constitutionally
13  protected rights under the 1st, Fifth and Sixth Amendment,

14

15  18. It disregards the California Supreme court's Ruling in Hall v.
16  Board examiners; in Hall v. Committee of Bar Examiners, 25 Cal.3d 730 [L.A.
17  No. 31071. Supreme Court of California. November 27, 1979.] Determined:
18  "An individual's courageous adherence to his beliefs, in the face of a judicial
19  or quasi-judicial decision attacking their soundness, may prove One's fitness
20  to practice law rather than the contrary. We therefore question [25 Cal.3d
21  745] the wisdom of denying an applicant admission to the bar if that denial
22  rests on the applicant's choosing to assert his innocence regarding prior
23  charges rather than to acquiesce in a pragmatic confession of guilt, and
24  conclude that Hall should not be denied the opportunity to practice law
25  because he is unwilling to perform an artificial act of contrition." fn. 19,

26

11

1    19. It ignores, repeats the sobering story of Mark Colin Sodersten;

2    53Cal.Rptr.3d572, 146 Cal.App.4th, 146Cal.App.4th1163 (Cal.App.Dist.5 01-

3    17-2007):

4    Lessons learned In Re Mark Sodersten: As the United States Supreme Court

5    has observed, "Society wins not only when the guilty are convicted but when

6    criminal trials are fair; our system of the administration of justice suffers

7    when any accused is treated unfairly." (Brady v. *Maryland* (1963) 373 U.S.

8    83, 87 [10 L.Ed.2d 215, 83 Sc.D. 1194] (Brady).)

9    CONCLUSION; Our review of the record in this case raises fundamental

10   questions about the process used to convict Mark Sodersten. The trier of fact

11   was asked to make a determination of guilt based on evidence that was

12   incomplete because of the state's failure to disclose exculpatory evidence. We

13   do not know — and need not determine — whether petitioner killed Julie

14   Wilson. It is not his burden to establish either that he is factually innocent or

15   that the jury necessarily would have acquitted him had it known of the

16   suppressed evidence. (See *Kyles, supra*, 514 U.S. at p. 453.) "Rather, the

17   question is whether `the favorable evidence could reasonably be taken to put

18   the whole case in such a different light as to undermine confidence in the

19   verdict.' [Citation.]" (Stickler v. *Greene, supra*, 527 U.S. at p. 290.)

20   ...In sum, we conclude that, had the four tape recordings been disclosed to

21   the defense, there is a reasonable probability of a different result.

22   DISPOSITION: This court having received and filed a certified copy of a

23   certificate evidencing the death of petitioner Mark Collin Sodersten during

24   the pendency of these proceedings, the superior court is directed to enter an

25   order to the effect that all proceedings in the cause have permanently abated.

26   (See *People v. Jackson, supra*, 39 Cal.3d at p. 480.)

12

00018

1    20. As the ALJ accused petitioner of asking the MBOC to reinstate his license,

2    just thinking he is "bright" it is worth noting that the 2016 report: Ovarian

3    Cancer; evolving Paradigms in research and Care"

4    Produced by; National Academies of Sciences, Engineering, and

5    Medicine; Institute of Medicine; Board on Health Care Services; Research.

6    Said report concluded;

7    "Researchers now know that ovarian cancer is not a single disease--several

8    distinct subtypes exist with different origins, risk factors, genetic mutations,

9    biological behaviors, and prognoses.

10   2The Biology of Ovarian Cancers;

11   * High grade Serous Carcinomas (hereafter; HGSC) are genetically unstable,

12   which may be due to frequent mutations in the *TP53, BRCA1,*

13   and *BRCA2* tumor suppressor genes. However, data suggest that a

14   substantial portion of HGSCs originate from the epithelium of the fallopian

15   tube rather than of the ovary (please see petitioner's CV,

16

17   Endometrioid Carcinoma: Several genes are characteristically mutated in

18   ECs,                including *CTNNB1, PIK3CA, KRAS, ARID1A, PTEN,*

19   and *PPP2R1A* (McConechy et al., 2014). *CTNNB1* mutations are very

20   common in ECs but rare in all of the other major ovarian carcinoma subtypes.

21   In contrast, genes such as *PIK3CA* and *ARID1A* are frequently mutated in

22   both EC and CCC.

23

24   Clear Cell Carcinoma; although nearly half of CCCs are diagnosed at Stage

25   I, several studies have noted a relatively unfavorable prognosis for women

26   with these tumors (Anglesio et al., 2011; Jenison et al., 1989; Tammela et al.,

13

1    1998). As noted previously, CCC is the other major type of ovarian carcinoma

2    that is associated with endometriosis; approximately 50 percent of CCCs

3    contain mutations in *ARID1A*, and around 36 percent of CCCs harbor

4    mutations of *PIK3CA* (Jones et al., 2010; Matsumoto et al., 2015).

5    CCCs also have mutations in *PPP2R1A, PTEN, KRAS*, and *TP53*, but at a

6    lower frequency (Cho and Shih, 2009; McConechy et al., 2011; I. M. Shih et

7    al., 2011) (please see pt G).

8    Low-Grade Serous Carcinoma

9    Mucinous Carcinoma: Although benign mucinous tumors of the ovary

10   represent approximately 12 percent of all ovarian tumors in the Western

11   world, MCs are the least common of the major types of ovarian carcinoma...

12   Until the 1990s researchers believed that the relative frequency of primary

13   MCs was significantly higher than it is now known to be; in the 1990s and

14   2000s several studies collectively showed that many ovarian MCs are actually

15   metastases from MCs that arose in other sites, such as the gastrointestinal

16   and biliary tracts or Pancreas). *KRAS* and *TP53* mutations are found in

17   roughly half of invasive MCs and frequently co-occur in the same tumors

18   (Rechsteiner et al., 2013). *ERBB2* amplification is found in 19 percent of MCs

19   (Anglesio et al., 2013a). Both *ERBB2* amplification and *KRAS* mutation may

20   be associated with improved survival (Anglesio et al., 2013a).

21   21. These complexities are not submitted as a scientific exercise. The

22   reviewers and the courts are reminded of the labels used to describe

23   petitioner's chemotherapy of ovarian cancer; "Unorthodox" "not randomized',

24   not consistent with GOG protocols111,114,132,ignoring the fact that despite

25   objections raised by petitioner(among others) to this date all reports on

26   Medicinal therapy;Chemo,Hornoes,Immunotherapy,PARP inhibitors have

14

00020

1   lumped these ovarian cancers together; and the taxpayers are paying for ever

2   increasing costly regimens with no relief insight; petitioners claim to

3   "Whistleblower status" is valid

4   22. There is overwhelming evidence that MBOC's attachment 02 labeled

5   "Accusation; page numbered; 6-13; numbers in the L Upper Corner" and

6   Appendix I page numbered twice; 1-9; numbers in the middle at the bottom

7   are manufactured;

8   5a. Attachment 02details; negligence; Pt A; signed by S.Woods

9   dated1/30/2020 attributed to Bill Lockyer, signed by Ronald Joseph on Oct

10  16, 2002,

11  23. The Laws of void judgments; a judgment may not be rendered in violation

12  of constitutional protections. The validity of a judgment may be affected by a

13  failure to give the constitutionally required due process notice and an

14  opportunity to be heard. Earle v. McVeigh, 91 US 503, 23 L Ed 398. See also

15  Restatements, Judgments ' 4(b). Prather v Loyd, 86 Idaho 45, 382 P2d 910.

16  A void judgment is not entitled to the respect accorded a valid adjudication,

17  but may be entirely disregarded, or declared inoperative by any tribunal in

18  which effect is sought to be given to it. It is attended by none of the

19  consequences of a valid adjudication. It has no legal or binding force or

20  efficacy for any purpose or at any place. ... It is not entitled to enforcement ...

21  All proceedings founded on the void judgment are themselves regarded as

22  invalid.

23  Dr John. King, Merrill Tisch have not denied their "Abuse of Discretion", that

24  led them to denial of determinations of "Peer Review Committee" 'and

25  "Committee on Profession" in "Complete Absence of All Jurisdictions",

26  The following causes of Action asserted; never adjudicated:

15

00021

1   * Civil Rights violations; (42 USC 1981-82, 83, 85, 86), Civil Right of 1964,*

2   Civil Rico (18USCA1962, a b c d, 1961, 4, 5&6), Conspiracy to defraud,*

3   Violations of CFR60.6, Cybercrime (18USCA1030-1037),*Constitutional

4   Rights violations (Am1st, IV, V, VI, VII, XIV),*.Forgery (18USCA470-514),

5   *Accusations of "Unspecified Fraud are libelous"; "Libel. California Civil Jury

6   Instructions (CACI); 1704; Defamation per se Essential Factual Elements:

7   Defendants have published in NPDB for the past two decades Claiming

8   appellant has committed unspecified Fraud, was Negligent, incompetent,

9   despite ample evidence in the records that prove beyond doubt, he is one of

10  the most competent, compassionate, Honest, talented Gynecologic

11  Oncologists to ever practice in Western New York, never practiced in

12  California

13  *Petitioner's License must be reinstated in fairness and as a matter of law.

14                              Jurisdiction

15  24. The Superior Court of California; a Court of Competent Jurisdiction has
16          jurisdiction over this case Pursuant to (CCP §1094.5) and Ordinary
17                              Mandate (§ 1085).
18  Administrative mandate is a statutory remedy which enables a petitioner to

19  challenge an administrative decision after an adjudicatory hearing in which

20  the agency performs a fact finding function. The authorizing statute is

21  §1094.5 The Ordinary mandate is a traditional remedy by which a court

22  compels an inferior tribunal to perform a legally required duty. The

23  authorizing statute is CCP §1085 B.

24  25. The underlying issues in the Instant case are all relevant, related to the

25  New York Board of Professional Medical Conduct (hereinafter called

26  BPMC). A petition was submitted by the petitioner to the New York State

00022

1  Education Department for Restoration of Petitioner's New York State

2  license no 118540 in July of 2005 and was processed by the "Peer Review

3  Committee of New York State Education Department(hereafter

4  NYSED),Office of Professional Responsibility OPR),State Board of

5  Medicine(SBOM) (Pages 00000372-00000388-0000393),

6  The Peer review Board Unanimously and COP by majority vote

7  recommended stay of revocation, admitted Petitioner was not "Physician of

8  the record for patients A, C, D, F, H, and JML.

9  26. Petitioner did not request re review, and or appeal/ petition the Board of

10  Regents for intervention. The Board Sua Sponte (Without Standing) wrote a

11  decision, on or about October (2012 Denying application for reinstatement of

12  a License No 310221.Said number reportedly belongs to:

13  A) A Licensed Practical Nurse named MCEACIN NIA Malika, from Upper

14  Montclair New Jersey,

15  B) A Registered Professional Nurse named AHERN MAUREEN M from

16  DEER Park NY

17  The circumstances surrounding the NY  License No Change from 118540 to

18  310221 remains unexplained and despite repeated attempts Former

19  Commissioner John King and Regents' Chief(now SUNY President Merrill

20  Tisch have not shed light on this subject (pages 0000393-0000395)

21  27., Under NY State Ed Laws 6530.11; if the regent exercises Jurisdiction

22  over the case and disagrees with the review panel and cop it must remand

23  the case not reverse or rewrite it.

24  28. Subject Matter Jurisdiction Elements: (1) Jurisdiction over parties

17

1  **(2) Jurisdiction over subject matter, (3) Jurisdictional power to pronounce**

2  **particular judgment that was rendered, (4) Lacks inherent power to enter**

3  **judgment**

4  **Points of authority**

5  **California Codes and Laws**
6  **Freedom of Information Act; 5 USCA§ 552, F.R.C.P 16(d) (2)**
7  **18 U.S.C.A § 1344 (West Supp.1998)**
8  **Perjury under Section 1746 of title 28, United States Code**
9  **Article 183 of the Revised Penal Code (Perjury)**
10  **Federal Cases**
11  **Wisconsin v. Mitchell, 508 U.S. 476 (1993)**
12  **Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).**
13  **United States v. Bagley, No. 84-48, Supreme Court of the United States, 473**
14  **us. 667; 105 s. ct. 3375; 87 l. ed. 2d 481; 1985 us. Lexis 130; 53 u.s.l.w. 5084**
15  **Bristol-Myers Squibb Co. v. Ben Venue Labs. 90 F. Supp. 2d 522, Dist court,**
16  **D. New Jersey (2000)**
17  **Bristol-Myers Squibb Co. v. Ben Venue Labs. 90 F. Supp. 2d 540(2000)**
18  **Bristol-Myers Squibb Co. v. Ben Venue Labs. 246**
19  **F.3d 1368(2001)**
20  **Case Laws; California**
21  **Shalant v. Girardi; 51 Cal. 4th 1164, 253 P.3d 266, 126 Cal. Rptr. 3d**
22  **98(2011)**
23  **People v. Privitera, 23 Cal.3d 697,153 cal.Rptr. 431,591 P.2d 919, 1979 Cal**
24  **Schiff v. Prados, 92 Cal App.4th692; 112 Cal.Rptr.2**
25  **In Re Sodersten, 53 Cal.Rptr.3d 572-Cal Court of Appeals, 5th Appellate**
26  **District (2007)**
27
28  **Federal Statutes**
29  **Title VII of the Civil Rights Act of 1964, 1991, 42 USC, § 2000 E-2,**
30  **Section 16 of the Civil Rights Act of 1987, 42 USC, § 1981, 1982;**
31  **Section 16 of the Civil Rights Act of 1987, 42 USC, § 1983;**
32  **Section 16 of the Civil Rights Act of 1987, 42 USC, § 1985;**
33  **Section 16 of the Civil Rights Act of 1987, 42 USC, § 1986;**
34  **Civil Rights Act of 1964 & 1991.**
35  **Clayton Act 15 USC Sections 12-27, 29 USC, and Sec 52 and 53.**
36  **Amendments to the US Constitution; No I, IV, V, VI, VII, and XIV**

:00024

New York Constitution and case Law

New York State Constitution and Bill of Rights

*People v. Molineux*, 168 N.Y. 264 (1901).

1.Supreme Court Cases

Wisconsin v. Mitchell, 508 U.S. 476 -488.113 S .Ct.2194,124 L.Ed.2d 436(1993)

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

United States v. Bagley, , 473 U.S. 667,105 S. Ct. 3375,87 L. Ed. 2d 481(1985)

New York Cases :Tewari v. Tsoutsouras, 75 NY 2d 1, 550 NYS 2d 572, 549 NE 2d, NY: Court of Appeals, 1989

United States Constitutional Amendments;Amendments to the US Constitution; No I, IV, V, VI, VII, and XIV

### New York State Constitution

1. New York State Constitution: Article I Sections1, 2, 3, 6,8,9,11,12 and New York State Constitution: Article VI (1) (2) (5).

2. United Nations Human Rights Articles 1-30.

3. Federal Statutes

4. Title VII of the Civil Rights Act of 1964, 1991, 42    USC, § 2000 E-2, et.seq.

5. Section 16 of the Civil Rights Act of 1987, 42 USC, § 1981, 1982,1983,1985,1986

6. 3. Clayton Act 15 USC Sections 12-27, 29 USC, and Sections 52 and 53.

7. New York Statutes

8. CPLR § 3012-a

9. PHL Article 29-B , PHL § 2962,PHL § 2963-2966, PHL § 2965(c),PHL § 2968,PHL § 2974

10.    State Administrative Procedure Act § 302,State Administrative Procedure Act § 303

### New York Regulations

13. NYCPR §51.11(e), 10 NYCPR §51. 9

14. Education Law § 6510(3) (c), 6530 § 32

15.State Administrative Procedure Act § 302, § 303

11.    Rules of the Court;

12.    California Business and Profession Codes

13.    Ca B and P codes § 141 and §2229©, 2305,2307  Ca B and P codes § 2230.5, Ca B and P codes § 2310 (c) Ca B and P codes § 2337

00025

14. Ca Government Code§11523.  Judicial review may be had by filing a petition for a writ of mandate in accordance with the provisions of the Code of Civil Procedure 1094.5

15. Table of Medical Authorities; References

16. 1. R.P.C.I. Protocol PPC 862, Weekly CisPlatin followed by Cytoxan, Adriamycin, CisPlatin in Stage III, IV Ovarian Carcinoma,

17. 2. GOG Protocol 111: Surg (suboptimal Cytoreduction) followed by Cytoxan + CisPlatin VS Taxol + CisPlatin followed by 2nd look off study (Opened 4-13-90, closed 3-2-92)

18. 3. GOG Protocol 114: Cytoreductive surgery (no previous chemotherapy or radiation) followed by: a.     CisPlatin + Cytoxan. b.    CisPlatin +Taxol carboplatin followed by CisPlatin + Taxol followed by Reassessment laparotomy and activated 8-3-92 , closed 9-20-93

19. 5. GOG Protocol 132: surgery followed by CisPlatin VS Taxol VS Taxol +CisPlatin followed by 2nd look reassessment. Residual disease of progression: off study GOG Protocol, Activated March 20, 1992, closed May 9, 1994.

*Standard of proof*

28.The standard of proof in California is Clear and convincing.This means the allegations/chagesfiled by Medical Board of California must be proved "So clear as to leave no substantial doubt;sufficiently strong to command the unhesitating assent of every reasonable mind"(accusations Gary Page,M.D Case No 02-2009-197437,OAH No;2010080483 by Judge Rosen man)

... In this case, sections 141 and 2305 do not conflict in those cases where the out-of-state discipline is not a ground for discipline in California, or where the disciplinary action has been taken by a foreign country. In those circumstances, there is no conflict that requires the specific statute to prevail over the general. And in other circumstances where they do conflict—where the out-of-state discipline is a ground for discipline in California—section 2305 is best treated as a qualification (requiring discipline) to the general authorization granted under section 141.

20

1   Accordingly, properly applied, the canon that the specific statute prevails

2   over the general requires that the former be treated as an exception to, not

3   as a replacement for, the latter where both statutes are not so inconsistent

4   that they cannot have concurrent operation. Otherwise, the canon would

5   authorize an implied repeal of a general statute, without satisfying the

6   stringent standards required for such drastic judicial action.

7   2337. Notwithstanding any other provision of law, superior court review of

8   a decision revoking, suspending, or restricting a license shall take

9   preference over all other civil actions in the matter of setting the case for

10   hearing or trial. The hearing or trial shall be set no later than 180 days

11   from the filing of the action. Further continuance shall be granted only on a

12   showing of good cause.

13   Notwithstanding any other provision of law, review of the superior court's

14   decision shall be pursuant to a petition for an extraordinary writ.

15   *(Amended (as amended by Stats. 1994, Ch. 1206, Sec. 22) by Stats. 1995,*

16   *Ch. 708, Sec. 10.5. Effective January 1, 1996.)*

17                            **DISCUSSION**

18   29.Business and Professions Code, section 2337 (section 2337) states:

19   "Notwithstanding any other provision of law, superior court review of a

20   decision revoking, suspending, or restricting a license shall take preference

21   (Void order may be attacked, either directly or collaterally, at any time),

22   Entered in violation of due process of law, (2) Order procured by fraud

23   A void judgment which includes judgment entered by a court which lacks

24   jurisdiction over the parties or the subject matter, or lacks inherent power to

25   enter the particular judgment, or an order procured by fraud, can be attacked

00027

1  at any time, in any court, either directly or collaterally, provided that the

2  party is properly before the court, Long v. Shore bank Developmen2.

3  29.Alteration of the records, manufacturing evidence(18 USCA 1519 ,Penal

4  codes 115) were not considered subject to "Absolute Immunity; In Re M

5  v.Fusto: In the instant Case ,an issue raised before and by members of

6  "Committee on Profession "is and remain; could a physician be disciplined if

7  he/she was not, did not continue  to be a "Physician of the Record?(COP

8  report;171-175 and Dr Kredentser Report and interviews of March

9  11,2001;pages 17-130:t Corp., 182 F.3d 548 (C.A. 7 Ill. 1999).

10  Over all other civil actions in the matter of setting the case for hearing or

11  trial. Linwood I. Rogers, Mireles v. Waco: The Supreme Court Prescribes the

12  Bitter Pill of Judicial Immunity and Summary Reversal, 26 U. Rich. L. Rev.

13  539 (1992):

14  I do not think that all judges, under all circumstances, no matter how

15  outrageous their conduct are immune from suit.... The Court's ruling is not

16  justified by the admitted need for a vigorous and independent judiciary, is

17  not commanded by the common-law doctrine of judicial immunity, and does

18  not follow inexorably from our prior decisions. - Justice William O. Douglas"

19  Mireles v. Waco, 112 S. Ct. 286, 290 (1991) (per curiam) (Scalia, J.,

20  dissenting). 136. Justice Marshall had a similar fear with Tigard to

21  summarily reversed cases: Moreover, by deciding cases summarily, without

22  benefit of oral argument and full briefing, this court runs a great risk of

23  rendering erroneous or ill-advised decisions that may confuse the lower

24  courts: there is no reason to believe that this court is immune from making

25  mistakes, particularly under these kinds of circumstances. Harris v. Rivera,

26  454 U.S. 339, 349 (1981) (per curiam) (Marshall, J., dissenting).

22

30. Judgments entered where the court lacked either subject matter or personal jurisdiction, or that were otherwise entered in violation of due process of law, must be set aside.

31. CFR § 60.16 - Reporting other adjudicated actions or decisions. § 60.16 (d) *Access to documents.* Each state must provide the Secretary (or an entity designated by the Secretary) with access to the documents underlying the actions described in paragraphs (a)(1) through (4) of this section, as may be necessary for the Secretary to determine the facts and circumstances concerning the actions and determinations ...

32. USC; §1519. Destruction, alteration, or falsification of records in Federal investigations and bankruptcy; Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, imprisoned not more than 20 years, or both (William Prasifka).

33. Other Causes of Action; asserted, ignored: 1st cause of action; "Withholding Exculpatory Evidence", Breach of Contract, Second cause of Action: Libel per se, ThirdCause of action: Abuse of the process, Malicious Prosecution

Fourth Cause of action: Conspiracy to defraud

Fifth Cause of action; Hate Crime; Sixth Cause of Action: Civil rights Violations; Civil Rights violations 42 U.S.C. §1981, §1983, §1985, Title VII of the Civil Rights Act of 1994, § 701, et seq., 42 U.S.C. A, § 2000E et.seq. Civil Rights Act of 1991.

00029

1   <u>Seventh Cause of Action</u>: Equal protection violations of plaintiff's property

2   interest under the 14th amendment.

3   Eighth cause of action;   Plaintiff suffered damages related to cancellation of

4   his Medicaid number by Respondents/their agents in contempt of superior

5   court judge's order.  Over $105,000 of money owed the Petitioner by Medicaid

6   remains unpaid. The Seventy Five Thousand Dollars Settlement money of

7   1996 remains unpaid (embezzled)(ROA pg 250).Termination of Employment

8   of  Petitioner's tenured appointment at SUNYAB was never approved by the

9   Arbitrator and the Courts. His Vacation payments, Money owed him from

10   Faculty practice plan remains unpaid (ROA pages 245-247) Accusations

11   against the petitioner, even if arguendo true, violate his immunity under

12   Public Officers Law...

13   Ninth cause of action; Petitioner's liberties were violated by lack of due

14   process and the Respondents: Tenth Cause of Action;  Respondents: All could

15   have done things, taken actions/avoided improper actions that would have

16   prevented petitioner's losses. Respondents could have simply disclosed the

17   truth regarding Dr Kredentser activities at GOG and his false claims. They

18   could have acted responsibly, avoided data torturing, and illegal marketing/

19   promotions of Carboplatin and Taxol. Respondents had the power to prevent

20   or aid in preventing the commission of a wrong mentioned in 42 U.S.C. '1985,"

21   but neglected or refused so to do, in violation of 42 U.S.C. '1986.

22   Eleventh Cause of Action; antitrust violation & monopolization; The activities

23   of the New York State "respondents" serve as a reminder of what went on in

24   New York, years ago; here the Players act under the color of Law.

25   It is Uncontestable that RPCI now has accomplished its goal; total market

26   control in Gyn Oncology. The state agents' declaration that Standard therapy

1     in 1989 was Carboplatin, and in 1990's Taxol-Carboplatin, is unconscionable.

2     This is a Multi-trillion dollar National (interstate) and international Market

3     manipulation, Fraud and violates international, Federal and State Laws

4     (Anti-Trust Laws). The story of Al Hunt who was our BMS Drug Co

5     representative and collected all our Chemotherapy data and disappeared is

6     unresolved

7     *Twelfth  cause of Action; Prosecutorial Misconduct* When a conviction is

8     obtained by the presentation of testimony known to the prosecuting

9     authorities(I.E ALGJ Dash, Atty Reyes) to have been perjured, due process is

10    violated. There is  nothing in Buts that  allows NYSED,DOH,SUNYAB,

11    MBOC, Mr Prasifka, Mrs. Yaroslavsky  to conceal the Evidence that

12    petitioner was a Full time Tenured state university Associate Professor and

13    to charge him with what he did as part of his duty to the State as a "Public

14    Officer"

15    25. Violations of ABA Standards for Criminal Justice ABA Model Rules of

16    Professional Conduct,

17    34. The 2016 Nat Academy of Sciences confirmed petitioner's position

18    regarding "Heterogeneity of Epithelial ovarian Cancers".

19    !0 .Petitioner's proposal for combined Chemotherapy and Radiation is

20    Now universally accepted and RPCI; Hydrae Plus Radiation is abandoned

21    On Page 20; 44: The State and The Panel claim; by 1989 the standard

22    chemotherapy would have been Cytoxan, Carboplatin, on page 21; 53: this

23    standard changes to Cytoxan, Cisplatin, meanwhile RPCI Protocol pp862

24    used Adriamycin, Cytoxan, Cisplatin.

25    Carboplatin was not approved by FDA until July 5Th, 1991. (Exhibit 18,18a)

1  45 CFR § 60.16 - Reporting other adjudicated actions or decisions. § 60.16

2  reporting other adjudicated actions or decisions.

3  (d)*Access to documents.* Each state must provide the Secretary (or an entity

4  designated by the Secretary) with access to the documents underlying the

5  actions described in paragraphs (a)(1) through (4) of this section, as may be

6  necessary for the Secretary to determine the facts and circumstances

7  concerning the actions and determinations ...

8  ___USC; §1519. Destruction, alteration, or falsification of records in Federal

9  investigations and bankruptcy; Whoever knowingly alters, destroys,

10  mutilates, conceals, covers up, falsifies, or makes a false entry in any record,

11  document, or tangible object with the intent to impede, obstruct, or influence

12  the investigation or proper administration of any matter within the

13  jurisdiction of any department or agency of the United States, imprisoned not

14  more than 20 years, or both.

15  2337. Notwithstanding any other provision of law, superior court review of a

16  decision revoking, suspending, or restricting a license shall take preference

17  over all other civil actions in the matter of setting the case for hearing or trial.

18                                Argument

19  Judgments entered where the court lacked either subject matter or

20  personal jurisdiction, or that were otherwise entered in violation of due

21  process of law, must be set aside.(Void order may be attacked, either

22  directly or collaterally, at any time), Entered in violation of due process

23  of law, (2) Order procured by fraud A void judgment which includes

24  judgment entered by a court which lacks jurisdiction over the parties or

25  the subject matter, or lacks inherent power to enter the particular

∴ :00032

1   judgment, or an order procured by fraud, can be attacked at any time, in
2   any court, either directly or collaterally, provided that the party is
3   properly before the court, Long v. Shore bank Developmen2.

4    Alteration of the records, manufacturing evidence(18 USCA 1519 ,Penal
5   codes 115) were not considered subject to "Absolute Immunity; In Re M
6   v.Fusto: In the instant Case ,an issue raised before and by members of
7   "Committee on Profession "is and remain; could a physician be
8   disciplined if he/she was not, did not continue to be a "Physician of the
9   Record?(COP report;171-175 and Dr Kredentser Report and interviews
10  of March 11,2001;pages 17-130:

11  The U.S. C .A code 28, §455(a) states;, even where is the appearance of
12  impropriety, recusal is Preferred, if not for any other reason, for restoring
13  the Public trust in the integrity of the system( The NY ALJ , and the
14  Chair of NY OPMC conduct W. Dillon in NY proceedings,

15  45 CFR § 60.16 - Reporting other adjudicated actions or decisions. § 60.16
16  reporting other adjudicated actions or decisions.

17      USC; §1519. Destruction, alteration, or falsification of records in
18  Federal investigations and bankruptcy; Whoever knowingly alters,
19  destroys, mutilates, conceals, covers up, falsifies, or makes a false entry
20  in any record, document, or tangible object with the intent to impede,
21  obstruct, or influence the investigation or proper administration of any
22  matter within the jurisdiction of any department or agency of the United
23  States, imprisoned not more than 20 years, or both.

24  18 U.S. Code § 1519 - Destruction, alteration, or falsification of records
25  in Federal investigations and bankruptcy

00033

1    Whoever knowingly alters, destroys, mutilates, conceals, covers up,

2    falsifies, or makes a false entry in any record, document, or tangible

3    object with the intent to impede, obstruct, or influence the investigation

4    or proper administration of any matter within the jurisdiction of any

5    department or agency of the United States or any case filed under title

6    11, or in relation to or contemplation of any such matter or case, shall be

7    fined under this title, imprisoned not more than 20 years, or both.

8    California Jury Instruction CACI 3052 Use of Fabricated Evidence—

9    Essential Factual Elements (42 U.S.C. § 1983), CACI civil Jury

10    Instructions; 3052. Use of Fabricated Evidence—Essential Factual

11    Elements (42 U.S.C. § 1983)

12    Petitioner claims that MBOC deliberately fabricated evidence against

13    [him ], and that as a result of this evidence being used against [him] was

14    deprived of [his[ Property; Medical License, privilege, or immunity

15    secured by the Constitution, e.g., liberty] without due process of law:

16    1.The [MBOC] [produced attachment 02 ;labeled accusations and

17    Appendix I; with two identical cover letters attributed to A.Novello,one

18    stamped Public both dated 11/27/2001 ; Signed by Peter D.Vanburen;

19    unknown to Petitioner ;fabricated evidence,Used by D.Thornton,Sharee

20    Woods both from MBOC on NOV /30/2020 informing Ca Attorney

21    General/misrepresenting to  ;Bob Bonita the that said claims against

22    petitioner were not dismissed By New York Supreme Court Judge

23    Glownia on 11/28/2001,

24    2. That Attorney Peter Van Buren never appeared, submitted said

25    document to the court/Agency in Buffalo New York. Statement] was not

26    true];

00034

1   3. That [William Prasifka/S.Woods] knew that the [statement] was not

2   true; and

3   4. That because of [MBOC, Prasifka's]'s conduct, petitioner was deprived

4   of [his/property right; Medical License and liberty].

5                              Conclusion

6   1. The post September 11, 2001 predicament of Muslim Iranian

7      Americans deserves more attention that it receives. Two decade after

8      destroying petitioner's Employment Records at the State university of

9      New York at Buffalo, the States 'persecution of the petitioner is

10     unrelenting.

11  2. FDA has the Authority to approve or disapprove of drugs (Taxol,

12  Carboplatin, Cisplatin, Ifosphamide included), not the New York State

13  Department of Health, California Medical Board, Lawyers. Congress

14  used clear and plain language.

15  3. New York Public Heath Law Immunizes Physicians for DNR decisions

16  taken in good faith.

17  4. Congress rejected broad immunity to avoid Shielding anticompetitive

18  behavior and other Abuse when state immunity laws were avoided. . . .

19  F. The stakes are high and the consequences. Serious—for physicians,

20  Patients, Public Safety and Us Economy

21  5. Compelling reasons exist for the Court to stop the Lawyers, Courts,

22  NYSDOH, and Medical Boards to impose standards of Medical care if the

23  regimens. Drugs are not safe and FDA approved.

24  6. The New York and California Medical Boards revoked petitioner's

25  licenses based on altered /manufactured Evidence and     coached,

29

00035

1    verifiably false testimonies of a Canadian Physician who was represented

2    falsely as having been trained at Stanford in California; this must not

3    stand

4    7. The offices of Erie County District Attorney and Medical Examiner

5    have the Legal Authority and Legal / Ethical obligation/ Duty to

6    investigate conflicting /Contradictory Reports of the Causes of Death of

7    patients. There remains no doubt that the determinations / Statements

8    of New York State Agents are Contradicted By evidence/coroner's report.

9    Only Autopsies Could resolve the Issue and answer the questions

10   /Correct The Death certificates of Patients A,D,F,G and H . It is

11   respectfully requested the Autopsies must be performed in the Interest

12   of Justice.

13   8.  The Statute of limitation applies to accusations against petitioner

14   dating back to 1989, but there is no statute of limitation for murders of

15   patients A, C, D, E, G, H, JML, Dr R. Van Couvering and Dr

16   Slepian.Under

17   9.1360.2. Rehabilitation Criteria for Petitions for Reinstatement, must

18   be respected; 16 CA ADC § 1360. § 1360.2. Rehabilitation Criteria for

19   Petitions for Reinstatement.

20   When considering a petition for reinstatement of a license pursuant to

21   the provisions of Section 2307, 2522, or 3576.1 of the Business and

22   Professions Code, or Section 11522 of the Government Code, as

23   applicable, the board or panel shall evaluate evidence of rehabilitation

24   submitted by the petitioner as follows:

·· ·00036

1    (a) If the revocation was based in part on the conviction of a crime (not

2    applicable) (2) The length(s) of the applicable parole or probation period

3    (N/A)

4    **Sub article 3, Professional Misconduct; §6510 Proceedings in cases of**

5    **professional misconduct: Regents decision and order.** If the board of

6    regents disagrees with the hearing panel's determination of not guilty, it

7    shall remand the matter to the original panel for reconsideration or to a

8    new panel for a new hearing.

9    10. Petitioners 'Faculty Practice money must be accounted for, he is

10    entitled to compensatory and punitive damages,

11    Jury trial demanded ,Oral argument requested

12    **Respectfully submitted; Mahmood Yoonessi, M.Yoonessi MD PC**

13    Dated ;4/26/2022

14

15    a. Word Count:7,240

16

00037

**POS-040**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO. | FOR COURT USE ONLY |
|---|---|---|

NAME: Mahmood Yoonessi

FIRM NAME: NA

STREET ADDRESS: 6790 crest Rd

CITY: Rancho Palos Verdes    STATE: Ca    ZIP CODE: 90275

TELEPHONE NO. 3105413937    FAX NO.: 4242069843

E-MAIL ADDRESS: myoonessi75@gmail.com

ATTORNEY FOR (name): Self Pro se &MYoonessi,MDPC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sacramento**

STREET ADDRESS: 720 9th St

MAILING ADDRESS: GDS courthoue

CITY AND ZIP CODE: Sacramento Ca 95814

BRANCH NAME: GDS

Plaintiff/Petitioner: Mahmood Yoonessi

Defendant/Respondent: William Prasifka et al

CASE NUMBER:

JUDICIAL OFFICER:

## PROOF OF SERVICE—CIVIL

Check method of service *(only one)*:

| ☐ By Personal Service | ☒ By Mail | ☐ By Overnight Delivery |
|---|---|---|
| ☐ By Messenger Service | ☐ By Fax | |

DEPARTMENT: Writ

***Do not use this form to show service of a summons and complaint or for electronic service.***
***See USE OF THIS FORM on page 3.***

1. At the time of service I was over 18 years of age and not a party to this action.

2. My residence or business address is:

   420 S Hamel rd Los angeles Ca 90048

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* 4/26/2020    I served the following documents *(specify):*

   William Prsifca;455 Golde Gate Ave San Francisco Ca94102    Andrew Cuomo,Daniel Kredentser

   ☒ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: William Prasifka

   b. ☐ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service— Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1011, 1013, 1013a, 2015.5; Cal. Rules of Court, rule 2.306
www.courts.ca.gov

00038

**POS-040**

| CASE NAME: | CASE NUMBER: |
|---|---|
| Yoonessi v.Prasifka | |

6. b. ☐ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one):*

   (1) ☒ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   (2) ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

   I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 4/26/2022

Shams Alemozaffar
        (TYPE OR PRINT NAME OF DECLARANT)                          (SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

## DECLARATION OF MESSENGER

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

        (NAME OF DECLARANT)                          (SIGNATURE OF DECLARANT)

00039

1   Mahmood Yoonessi

2   6790 Crest Rd

3   Rancho Palos Verdes Ca 90275

4   Email: myoonessi75@gmail.com

5   Ph.: 3105413937

6   Pro Se Petitioners.

### Superior Court of California County of Sacramento Writ Department

Mahmood Yoonessi, M.D,

M. Yoonessi, M.D, P.C

Petitioners,

VS

William Prasifka Personally,

Andrew Cuomo, Daniel Kredentser, State University of New York At Buffalo (UB , Merrill Tisch personally),The Medical Board of California, Respondents

and DOES 1-50

**Case No : 34-2022-80003877**

**-CU-WM-GDS**

Opposition to UB Demurrer

Reply to UB,MBOC filed 6/9/202

(CCP 1094.5)&1085

**Before Honorable Judge:J.P.Arguelles**

**Dept 32 ;Oral argument**

**requested**

**Date; 9/2/2022**

Time : 9Am

**Address; 270 9th St**

Rm 102Sacramento Ca95814

1

1    Superior Court of California for the County of Sacramento

2    Writ Department

Mahmood Yoonessi, M.D,

M. Yoonessi, M.D, P.C

                    Petitioner(s),

VS

William Prasifka Personally, Andrew
Cuomo, Daniel C.Kredentser, State
university of NY at Buffalo(SUNYAB,
UB)The Medical Board of California
And DOES 1-50

Case No : 34-2022-8000387
-CU-WM-GDS

Petitioner's Declaration,
Memorandum of Law  in
 support of the "WRIT of
MANDAMUS"opposition to
MBOC answer/unfounded claims

 Before Honorable Judge:
J.P.Arguelles
Date:9/2/2022
Time 9Am;oral argument
Requested
Address; 720 9th st,Room
102,sacramento Ca95814

3    17. Petitioner, Mahmood Yoonessi, personally and on behalf of

4    M.Yoonessi, M.D PC Inc.  Submitted a "Declaration"/MOL in support of

5    a "Writ of mandamus" for the court to issue an order pursuant to Ca

6    Code of Civil Procedures 1094.5, 1085 setting aside MBOC's decision

7    and order on the following grounds:

11

*Table of Contents*
*Writ Petition 2022*

*Pleadings ;  CMB answer*

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SACRAMENTO**

720 Ninth Street

**Sacramento, CA 95814-1380**

http://www.saccourt.ca.gov

## NOTICE TO FILING PARTY - RETURNED DOCUMENTS

**Case Title:  Mahmood Yoonessi, M.D. vs. William Prasifka**

**Case Number:  34-2022-80003877-CU-WM-GDS**

We are unable to process the attached papers for the reasons indicated below:
Document Rejected: Answer
Answer previously filed 06/09/2022

It is the responsibility of the filing party to review any applicable statute, California Rules of Court,

California Code of Civil Procedure, and Sacramento Superior Court Local Rules prior to submitting

documents.

This form is to be returned if documents are resubmitted for processing.

Papers returned to:  The Medical Board Of California

Clerk of the Court,

*/s/ M. Valledor*

Date: 06/13/2022                    By: _____,

Returned via:                                                              Deputy

Return By Mail

_____

## Yoonessi, Mahmood v. William Prasifka et al. 34-2022-80003877-CU-WM-GDS

ssage

**Kazzi Figueroa-Lee** <Kazzi.Figueroa-Lee@doj.ca.gov>                                        Wed, Jun 8, 2022 at 11:06 AM
To: "myoonessi75@gmail.com" <myoonessi75@gmail.com>, "Michael.russo@ag.ny.gov" <Michael.russo@ag.ny.gov>
Cc: Harriet Newman <Harriet.Newman@doj.ca.gov>

Good afternoon,

Please find the attached Answer that was sent for filing today in the below mentioned case. Thank you.

Case Name: *Yoonessi, Mahmood v. William Prasifka et al.*

Case No.: **34-2022-80003877-CU-WM-GDS**

Kazzi Figueroa-Lee,

California Department of Justice

Office of the Attorney General

455 Golden Gate Ave., Suite 11000

San Francisco, CA 94102

(415) 229-0109

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information.
It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may
violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact
the sender and destroy all copies of the communication.

📄 **Yoonessi_Answer to Unverified Petition.pdf**
    204K

1 | ROB BONTA
Attorney General of California
2 | MARY S. CAIN-SIMON
Supervising Deputy Attorney General
3 | HARRIET NEWMAN
Deputy Attorney General
4 | State Bar No. 189784
455 Golden Gate Avenue, Suite 11000
5 | San Francisco, CA 94102-7004
Telephone: (415) 510-3744
6 | Fax: (415) 703-5480

7 | *Attorneys for Respondent*
*Medical Board of California*

8

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

### COUNTY OF SACRAMENTO

10

11

12

13

|  |  |
|---|---|
| **MAHMOOD YOONESSI, M.D.** | **Case No. 34-2022-80003877** |
| Petitioner, | **ANSWER TO UNVERIFIED "NOTICE OF PETITION FOR WRIT OF MANDATE"** |
| v. | |
| **MEDICAL BOARD OF CALIFORNIA,** | |
| Respondent. | |

Respondent Medical Board of California (Board), a public entity, answers the unverified

"Notice of Petition for Writ of Mandate" (Petition) as follows:

Generally denies each and every allegation of the unverified Petition.

### AFFIRMATIVE DEFENSES

1.    Petitioner has failed to set forth sufficient facts to constitute a right of action on the

unverified Notice of Petition for Writ of Mandamus.

2.    The Petition is defective as it is not verified as required by Code of Civil Procedure

section 1086.

1

00044

1    3.    Petitioner has an adequate remedy at law other than administrative mandamus.

2    4.    The administrative hearing was fair and did not constitute a denial of due process or

3    any other denial.

4    5.    Respondent has proceeded within its jurisdiction and did not prejudicially abuse its

5    discretion.

6    6.    The discipline imposed by Respondent was an appropriate exercise of discretion and

7    serves to protect the public.

8    7.    Respondent's decision was properly issued to protect the public and was neither

9    arbitrary nor capricious.

10    8.    The claims and issues raised in the Petition are barred by the doctrines of res judicata

11    and collateral estoppel.

12    9.    The claims raised in the Petition are time-barred.

13    10.    The Decisions of the Board are supported by the findings, and the findings are

14    supported by the weight of the evidence.

15                                    **VERIFICATION**

16    This answer to the Unverified Notice of Petition for Writ of Mandate is deemed

17    verified pursuant to Code of Civil Procedure section 446.

18    WHEREFORE, Respondent prays that:

19    1.    The Petition be denied;

20    2.    Petitioner take nothing by this proceeding;

21    3.    Respondent recover its costs in this proceeding; and,

22    4.    The Court award Respondent such other and further relief as it considers just

23    and fair.

24

25

26

27

28

                                            2

1   Dated:  June 8, 2022

Respectfully Submitted,

ROB BONTA
Attorney General of California
MARY S. CAIN-SIMON
Supervising Deputy Attorney General

/s/ Harriet Newman

HARRIET NEWMAN
Deputy Attorney General
*Attorneys for Respondent*
*Medical Board of California*

Answer to Unverified Notice of Petition for Writ of Mandate (34-2022-80003877)

## DECLARATION OF SERVICE BY E-MAIL and U.S. Mail

Case Name: ***Yoonessi, Mahmood v. William Prasifka et al.***
Case No.: **34-2022-80003877-CU-WM-GDS**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On June 8, 2022, I served the attached **ANSWER TO UNVERIFIED "NOTICE OF PETITION FOR WRIT OF MANDATE"** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

**Mahmood Yoonessi**
**6790 Crest Road**
**Rancho Palos Verdes, CA 90275**
**E-mail Address:** myoonessi75@gmail.com
*Served via E-mail and USPS mail*

**Michael Russo**
**E-Mail Address:** Michael.russo@ag.ny.gov
*Served via E-mail*

**Superior Court of California, County of Sacramento**
**Gordon D. Schaber Courthouse**
**720 9th Street**
**Sacramento, CA 95814**
*Served via USPS Mail*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 8, 2022, at San Francisco, California.

| K. Figueroa-Lee | | |
| --- | --- | --- |
| Declarant | | Signature |

SF2022400854 43253625.docx

• · 00047

# Table of Contents
# Writ Petition 2022

# Motion in Limine

Mahmood Yoonessi
6790 Crest Rd
Rancho Palos Verdes Ca 90275
Email: myoonessi75@gmail.com
Ph.: 3105413937
Pro Se Petitioners.

**Superior Court of California**
**County of Sacramento Writ**
**Department**

Mahmood Yoonessi, M.D,
M. Yoonessi, M.D, P.C

Petitioners,

VS

UB , Merrill Tisch
personallyWilliam Prasifka
Personally,Andrew Cuomo, Daniel
Kredentser, State University of New
York At Buffalo ,The Medical Board of
California, Respondents
and DOES 1-50

**Case No : 34-2022-80003877**
**-CU-WM-GD  MOL,**
Oral Argument in support of
sustaining  Petitioner's Motion in
Limine,reversal,revision
of tentative Ruling of Sept 1st 20?

(CCP 1094.5)&1085,18 USC151?
**Before Honorable**
**Judge:J.P.Arguelles**
**Dept 32 ;Oral argument**
                **requested**
**Date; 9/2/2022**
Time : 9Am
**Address; 270 9th St Dept 32**

1

**⌁⌁⌁00048**

Table of Content
Introduction
Statement of Facts
Jurisdiction
Points of Authority
Standard of Review
Argument
Prayer/Conclusion

Introduction; May it please the court

_____On or about April 29/2022,Petitiooner(s); Mahmood Yoonessi, personally and on behalf of M.Yoonessi, M.D PC (hereafter "petitioners") being duly sworn, submitted a "writ" petition pursuant to CCP 1094.5 and 1085. A declaration/MOL in support of writ petition was included. The Petition statements, were  made under penalty of

2

•-• •00049

perjury with regard to the petitioner(s) and upon information and belief regarding all others.

    1.Petitioner(s) begged this honorable court to command/order _vacating/reversing the  March 2022 decision and order of Medical Board of California( hereafter MBO),which  denied reinstatement  of revoked Medical License C50545 (required by California Business and Profession Code 2307),solely based on New Yok respondents' fabrications(18USC 1519).


    2.It was further requested the Court to consider Petitioner(s) Whistleblower's  claim and grant other relief as considered Just ,fair And  required by Law. Supportive documents were respectfully submitted as Excerpts from the record. The entirety of the records before the hearing panel was incorporated by reference (mostly sealed; to be unsealed by this court of competent jurisdiction or other NY ,Ca ,Texas , Ohio, US Auditors, Inspector Generals, Auditors); "15 U.S. Code § 2087 ·Whistleblower protection; which states| next

**"(a)**No manufacturer, private labeler, distributor, or retailer,[1] may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)
**(1)**
provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any other Act enforced by the Commission, or any order, rule, regulation, standard, or ban under any such Acts;

00050

**(2)**
Testified or is about to testify in a proceeding concerning such violation;
**(3)**
Assisted or participated or is about to assist or participate in such a proceeding; or
**(4)**
objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this chapter or any other Act enforced by the Commission, or any order, rule, regulation, standard, or ban under any such Acts.**(b)**
**(1)**
A person who believes that he or she has been discharged or otherwise discriminated against by any person in violation of subsection (a) may, not later than 180 days after the date on which such violation occurs, file (or have any person file on his or her behalf) a complaint ...
**(I)**
The Secretary shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint. .
**(ii)**
Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.
**(iii)**
The Secretary may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.
 **(B)**If, in response to a complaint filed under paragraph (1), the Secretary determines that a violation of subsection (a) has occurred, the Secretary shall order the person who committed such violation—
**(I)**
To take affirmative action to abate the violation;
**(ii)**
to reinstate the complainant to his or her former position together with compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and

00051

**(iii)**

To provide compensatory damages to the complainant.

If such an order is issued under this paragraph, the Secretary, at the request of the complainant, shall assess against the person against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (including attorneys' and expert witness fees) reasonably incurred, as determined by the Secretary, by the complainant for, or in connection with, the bringing of the complaint upon which the order was issued.

**(C)**

If the Secretary finds that a complaint under paragraph (1) is frivolous or has been brought in bad faith, the Secretary may award to the prevailing employer a reasonable attorneys' fee, not exceeding $1,000, to be paid by the complainant.

**(4)**If the Secretary has not issued a final decision within 210 days after the filing of the complaint, or within 90 days after receiving a written determination, the complainant may bring an action at law or equity for *de novo* review in the appropriate district court of the United States with jurisdiction, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury. The proceedings shall be governed by the same legal burdens of proof specified in paragraph (2) (B). The court shall have jurisdiction to grant all relief necessary to make the employee whole, including injunctive relief and compensatory damages, including—

**(A)** Reinstatement with the same seniority status that the employee would have had, but for the discharge or discrimination;

**(B)** The amount of back pay, with interest; and

**(C)**compensation for any special damages sustained as a result of the discharge or discrimination, including litigation costs, expert witness fees, and reasonable attorney's fees.

**(5)(A)**

Unless the complainant brings an action under paragraph (4), any person adversely affected or aggrieved by a final order issued under paragraph (3) may obtain review of the order in the United States Court of Appeals for the circuit in which the violation, with respect to which the order was issued, allegedly occurred or the circuit in which the complainant resided on the date of such violation. The petition for review must be filed not later than 60 days after the date of the issuance of the final order of the Secretary. Review shall conform to chapter 7 of title 5. The commencement of proceedings under this subparagraph shall not, unless ordered by the court, operate as a stay of the order.

**(B)**An order of the Secretary with respect to which review could have been obtained under subparagraph (A) shall not be subject to judicial review in any criminal or other civil proceeding.

**(6)**Whenever any person has failed to comply with an order issued under paragraph (3), the Secretary may file a civil action in the United States district court for the district in which the violation was found to occur, or in the United States district court for the District of Columbia, to enforce such order. In actions brought under this paragraph, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief and compensatory damages.

**(7)(A)**

A person on whose behalf an order was issued under paragraph (3) may commence a civil action against the person to whom such order was issued to require compliance with such order. The appropriate United States district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such order.

**(B)**The court, in issuing any final order under this paragraph, may award costs of litigation (including reasonable attorneys' and expert witness fees) to any party whenever the court determines such award is appropriate.

**(C)**Any nondiscretionary duty imposed by this section shall be enforceable in a mandamus proceeding brought under section 1361 of title 28."

3. Respondents Merrill Tisch, D.Kredentser, Andrew Cuomo, W.Prasifka were named personally .Tisch and Prasifka were personally served pursuant to Court's Minute order (H. Mclellan, A.A accepted Service for M.Tisch). The Antitrust Division office of NY Attorney General filed a "General Demurrer" on behalf of University of Buffalo(not NY respondents named individually),

4.Petitioner received the attached E Mail(Att A) from Yvonne Pinto EntitleSuNYAB in Case No;34-2022-80006877) regarding Case No;34-2022-80003877 where a General Demurrer was filed on behalf of UB(

6

5. It was claimed that SUNYAB does not have minimum Contact with California Forum affirming petitioner(s) contention that all statements ,findings of facts, accusations(including but not limited to Fraud claims) made by Peter Van Buren in 2001-2002 were Fabricated (18 USCA 1519),( Hook, Line & Sinker: Supreme Court Holds (Barely!) that Sarbanes-Oxley's Anti-Shredding Statute Doesn't Apply to Fish"

Reaffirming 18 USCA 1519, which States:"

"18 U.S. Code § 1519 - Destruction, alteration, or falsification of records in Federal investigations and bankruptcy Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both".

6. It is further claimed that Second Circuit's Ruling in Morse v. Fusto, No. 13-4074 (2d Cir. 2015), should be disregarded by SUNY AB I n complete absence of all Jurisdiction "As that Immunity referred to in Morse v.Fusto (2nd circuit2015)804F.3d 538) is beside the point, even though the same team (Former NY governor; AG), made the same arguments before the Circuit and was rejected.The Tentative Ruling sustaining the Demurrer

7

00054

in a wrong case (amended writings of Yvonne Pint E Mail dated Aug 19, 2022)

7. The General Demurrer invokes Eleventh Amendment Immunity, does not deny murder of Patients A,C,E,G,No1,M.R,by their agents;

Inchoate crimes of; Solicitation (MPC 5.02,18 USCASection 373, m597, 602(Pt A; solicitation to Dr Steve Goodnough,

PtE (solicitation to Dry's Steve Goodnough, Ian Cohen and D.Kredentser,

Conspiracy; MPC section 5.03,18 USCA 371; Patients A, E, G, No1, M.R

Attempts; MP section 5.01,18 USCA 113, 2113, 1541(patients

A,C,E,G,,No 1,M.R(Drs M.Rinow,Steve Goodnough,I.Cohen)

5 There is no specific reference, Demurrer to the following causes of actions:

1st cause of action; "Withholding Exculpatory Evidence" Euthanasia of Patient E; by Morphine Intoxication"; Brady violation, *Brady v. Maryland*, 373 U.S. 83 (1963); suppression of Evidence

Second cause of Action: Libel per se. Statutory Definition of Libel; Civ. Code § 45 defines libel as "a false and unprivileged publication by writing, printing, which has a tendency to injure person in his/her occupation." See *Savage v. Pacific Gas & Elec. Co.* (1993) 21; Cal.App.4th 434, 447

00055

Third Cause of action: Abuse of the process, Malicious Prosecution,

Fourth Cause of action: Conspiracy to defraud; 18 USC 241, 18 USC 371,

Fifth Cause of action; Hate Crime; 18 USC 245

Sixth Cause of Action: Civil rights Violations; Civil Rights violations 42 U.S.C. §1981, §1983, §1985, Title VII of the Civil Rights Act of 1994, § 701, et seq., 42 U.S.C. A, § 2000E et.seq. Civil Rights Act of 1991.

Seventh Cause of Action: Equal protection violations of Petitioner's property interest under the 14th amendment.

Eighth cause of action;    Plaintiff suffered damages related to cancellation of his Medicaid number by Respondents/their agents in contempt of superior court judge's order.  Over $105,000 of money owed the Petitioner by Medicaid remains unpaid. The Seventy Five Thousand Dollars Settlement money of 1996 remains unpaid (embezzled) (ROA pg 250).Termination of Employment of Petitioner's tenured appointment at SUNYAB was never approved by the Arbitrator and the Courts, labeled Resignation in State Agencies), Vacation payments, Money owed him from Faculty practice plan remains unpaid (ROA pages 245-247) Accusations against the petitioner, even if arguendo true, violate his immunity under Public Officers Law...

Ninth cause of action; Petitioner's liberties were violated by lack of due process,

9

00056

Tenth Cause of Action;   Respondents: All could have done things, taken actions/avoided improper actions that would have prevented petitioner's losses. Respondents could have simply disclosed the truth regarding Dr Kredentser activities at GOG and his false claims. They could have acted responsibly, avoided data torturing, and illegal marketing/ promotions of Carboplatin and Taxol. Respondents had the power to prevent or aid in preventing the commission of a wrong mentioned in 42 U.S.C. '1985," but neglected or refused so to do, in violation of 42 U.S.C. '1986.

Eleventh Cause of Action; antitrust violation & monopolization; The activities of the New York State "respondents" serve as a reminder of what went on in New York, years ago; here the Players act under the color of Law It is Uncontestable that RPCI now has accomplished its goal; total market control in Gyn Oncology. The state agents' declaration that Standard therapy in 1989 was Carboplatin, and in 1990's Taxol-Carboplatin, is unconscionable. This is a Multi-trillion dollar National (interstate) and international Market manipulation, Fraud and violates international, Federal and State Laws (Anti-Trust Laws). The story of Al Hunt who was our BMS Drug Co representative and collected all our Chemotherapy data and disappeared is Unresolved, Dr T. Baker has been promoted as a Gyn Oncologist?

*Twelfth  cause of Action; Prosecutorial Misconduct* When a conviction is obtained by the presentation of testimony known to the prosecuting authorities(I.E ALJ Dash, Atty Reyes) to have been

10

00057

perjured, due process is violated. There is nothing in law that allows NYSED, DOH, SUNYAB, MBOC, Mr. Prasifka, Mrs. Yaroslavsky to conceal the Evidence that petitioner was a Full time Tenured state university Associate Professor and to charge him with what he did as part of his duty to the State as a "Public Officer"; Violations of ABA Standards for Criminal Justice ABA Model Rules of Professional Conduct,

6. The 2016 Nat Academy of Sciences confirmed petitioner's position regarding "Heterogeneity of Epithelial ovarian Cancers".

7. Petitioner's proposal for combined Chemotherapy and Radiation in advanced cervical cancer is now universally accepted and RPCI; Hydrea plus Radiation is abandoned

8.On Page 20;¶ 44: The State and The Panel claim; by 1989 the standard Ovarian Cancer chemotherapy would have been Cytoxan, Carboplatin, on page 21; 53: this standard changes to Cytoxan, Cisplatin, meanwhile RPCI Protocol pp862 used Adriamycin, Cytoxan, Cisplatin. Carboplatin was not approved by FDA until July 5Th, 1991.

45 CFR § 60.16 required updated Reporting, other adjudicated actions or decisions ignored

9. USC; §1519. Destruction, alteration, or falsification of records in Federal investigations and bankruptcy; Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department

11

or agency of the United States, imprisoned not more than 20 years, or both.

CCP 2337. Notwithstanding any other provision of law, superior court review of a decision revoking, suspending, or restricting a license shall take preference over all other civil actions in the matter of setting the case for hearing or trial.

Violation of Business and Professions Code – BPC § 2234 which states:"

The board shall take action against any licensee who is charged with unprofessional conduct.  In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following:(a)  Violating or attempting to violate, directly or indirectly, assisting in or abetting the violation of, or conspiring to violate any provision of this chapter.

(b)  Gross negligence. (C)  Repeated negligent acts.  To be repeated, there must be two or more negligent acts or omissions.  An initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care shall constitute repeated negligent acts.

(1)  An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.

12

(2)   When the standard of care requires a change in the diagnosis, act, or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, a reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care.

(D)   Incompetence,

(e)   The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon.

(f)   Any action or conduct that would have warranted the denial of a certificate.

(G)   The practice of medicine from this state into another state or country without meeting the legal requirements of that state or country for the practice of medicine.   Section 2314 shall not apply to this subdivision.   This subdivision shall become operative upon the implementation of the proposed registration program described in Section 2052.5.

(H)   The repeated failure by a certificate holder, in the absence of good cause, to attend and participate in an interview by the board.   This subdivision shall only apply to a certificate holder who is the subject of an investigation by the board,

<div align="center">Conclusion</div>

This honorable court must conclude:

<div align="center">13</div>

00060

*In the manner described above, the defendants' conduct was attributable at least in part to persons acting under color of law(Dr King/McCartin,IRSAgents,Kent, Fannie Mae and DUS Lenders ,Cooper,Disaia,K.Brazile(for Jobin Cyrus) and the defendants conduct deprived the Appellant (or aided and abetted in the deprivation) of his Property, Constitutional rights, free speech, to petition the Government for a redress of grievances(under Amendment I) all of  which are implicate interests, rights, privileges, or immunities secured by the Constitution or laws of the United States.

*The acts, omissions, conduct and behavior of the individual defendants and each of them, in willful collaboration with official actors in the deprivation of the Appellant's Federal rights, were performed knowingly, intentionally and maliciously by reason of which plaintiff  is entitled to an award of compensatory and punitive damages,

*Under 42 U.S.C. 1981, all persons within the jurisdiction of the United States are guaranteed equal rights "to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The Appellant is Iranian-American and the member of a minority. The Respondents had an intent to discriminate against Appellant on the basis of race, theRespondents'discrimination concerned one or more of the activities enumerated in US Constitutional Amendments,

*Pursuant to 42 U.S.C. 1982, Federal law guarantees every United States citizen the same right  ... as is enjoyed by white

<center>14</center>

00061

citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property, to petition the Government."   , The Respondents' actions demonstrated a racial animus toward Appellant and others who are members of a racial minority, the Respondents deprived Appellant of his rights because of his race.

    * Under 42 U.S.C. ' 1983, defendants (King, McCartin, IRS Agent, Fannie Mae agents/DUS Lenders, Brazile (for Cyrus),Sakauye ,Kent Key were acting under color of law and violated the Appellant's constitutional or Federal statutory rights.

    *Pursuant to 42 U.S.C. ' 1985(3), the Respondents engaged in a conspiracy between two or more persons for the purpose of depriving Appellant of the equal protection of the laws or of equal privileges and immunities under the law, the actions of the Respondents alleged above were in furtherance of the object of the conspiracy whereby Appellant was deprived of exercising the rights or privileges of a citizen of the United States to due process. , the Respondents' conspiracy was motivated by racial, class-based, invidious, discriminatory animus.

    * pursuant to 42 U.S.C. '1986; Respondents had the power to prevent or aid in preventing the commission of a wrong mentioned in 42 U.S.C. '1985," but neglected or refused so to do, in violation of 42

00062

U.S.C. '1986. *The Respondents further violated the provisions of Sherman Antitrust Act

   * CODE OF CIVIL PROCEDURE SECTION 391(b) (1) was not applicable to Appellant's case on Sept 14, 2009; despite claims to the contrary,

   *CODE OF CIVIL PROCEDURE SECTION 391(b) (1) was not applicable to appellant's case on June 1st 2015; despite claims to the contrary

   *<u>Bivens Claim (Bivens v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971):Federal officials acting in the performance of their official duties are subject to personal liability for any violations of constitutional rights of which a reasonable official in a similar situation would be aware'.

   When <u>Bivens</u> suits are filed against Internal Revenue Service or other government employees, the Department of Justice provides representation of employees who were acting within the scope of their employment if it is in the interest of the United States to do so. 28 CFR § 50.15(a). The Service may pay judgments rendered against IRS employees by reason of anything done in the due performance of their duties. IRC § 7423(2).

   Relief Prayer, wherefore: Appellant most respectfully request +Reversal of the dismissal of the case against the respondents, each and every one of them, on respective causes of action above:
*For general damages according to proof (over $100 Million;to be paid by United States of America, States of New york, Massachusets, Texas

16

00063

And Respondents/C o conspirators, to the alternative;

Allow Honorable Attorney General of the United States to produce a "Scintilla" of Credible Evidence (under Daubert…) to support the Writings, Determinations, Rulings, Internet disseminations (N.P.D.B, I.R.S, Fannie Mae, F.B.I, New York DOH, Ca Med Board, State and Federal Courts of California, New York, Texas, Florida, Massachusets, US Supreme court (and J.R)'sAccusations against the Petitioner since Sept 11/2001(Excerpts pg's 82-227),

*For an order to Expunge/Expurgate all unsupported Defamations,

*For punitive and exemplary damages, Pre and Post Judgment interest,

*For attorneys 'Fees and cost of the suit,

*For Default Judgment against defaulted parties,

*For protection/Compensation of a "Whistleblower",

*For reversal of Dr King's decision in the absence of all jurisdiction,

*For such other relief as the court may deem necessary, just or proper.

Respectfully submitted  ~Mahmood Yoonessi  Date: 9 2 / 2022
S/Mahmood Yoonessi, M.D    (Pro Se plaintiff)

Oral Argument requested

17

.·  00064

*Table of Contents*
*Writ Petition 2022*

*Pleadings;Sunyab ;Letitia Jones &reply*

**LETITIA JAMES, ESQ.**
**Attorney General of the State of New York**
**Tal Matar Elmatad, State Bar No. 320978**
**Assistant Attorney General**
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6318
Fax: (518) 650-9401
E-mail: tal.elmatad@ag.ny.gov

*Attorneys for Respondent State University of New*
*York at Buffalo*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SACRAMENTO

| | |
|---|---|
| **MAHMOOD YOONESSI, M.D. AND M. YOONESSI, M.D., P.C.**<br><br>Petitioners,<br><br>v.<br><br>**WILLIAM PRASIFKA, ANDREW CUOMO, DANIEL KREDENSTER, STATE UNIVERSITY OF NEW YORK AT BUFFALO, THE MEDICAL BOARD OF CALIFORNIA, AND DOES 1-50**<br><br>Respondents. | Case No. 34-2022-80003877<br><br>Assigned to Judge James P. Arguelles<br><br>**REPLY IN SUPPORT OF RESPONDENT'S DEMURRER PURSUANT TO C.C.P. §§ 430.10(a), (d), and (e)**<br><br>Date:    September 2, 2022<br>Time:    9:00 AM<br>Dept:    32<br><br>Trial Date:    none<br>Action Filed:    May 13, 2022 |

Respondent, State University of New York at Buffalo ("SUNY Buffalo"), replies to

Petitioners' Opposition to UB Demurrer at follows:

In its opening Memorandum of Points and Authorities, SUNY Buffalo made two

jurisdictional arguments: (1) this Court does not have personal jurisdiction over SUNY Buffalo

because SUNY Buffalo's contacts with California are insufficient to support general or specific

jurisdiction; and (2), as an integral part of the State of New York, SUNY Buffalo has sovereign

immunity from private suits brought in the courts of California. In their Opposition to UB

Demurrer, Petitioners do not respond to these jurisdictional arguments. Instead, Petitioners

merely reassert the confusing allegations contained in their Writ of Mandamus. None of these

1  allegations address the specific jurisdictional arguments made by SUNY Buffalo. By failing to

2  address SUNY Buffalo's jurisdictional arguments, Petitioners concede that those arguments are

3  correct. *See Nelson v. Pearson Ford Co.*, 186 Cal. App. 4th 983, 1021 (2010) (issues not

4  addressed in opposition brief are conceded to the moving party).

5      For the foregoing reasons, as well as those reasons listed in SUNY Buffalo's opening

6  Memorandum of Points and Authorities, this Court should sustain SUNY Buffalo's demurrers

7  and dismiss the Writ as against SUNY Buffalo.

8  Dated: August 19, 2022

9                                          Respectfully submitted,

10                                         LETITIA JAMES, ESQ.
                                           Attorney General of the State of New York

11

12                                         TAL MATAR ELMATAD
                                           Assistant Attorney General
13                                         California State Bar No. 320978
                                           Attorneys for Respondent State University of New
14                                         York at Buffalo

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Postal Service, directed to the said parties and/or their counsel at the addresses designated by

2   them for that purpose, as follows:

3   **Mahmood Yoonessi**
    **6790 Crest Road**

4   **Rancho Palos Verdes, CA 90275**
    **E-mail Address:** myoonessi75@gmail.com

5   *Served via E-mail and USPS mail*

6   **Harriet Newman**
    **455 Golden Gate Avenue, Suite 11000**

7   **San Francisco, CA 94102-7004**

8   **Email Address:** Harriet.Newman@doj.ca.gov

9   **Superior Court of California, County of Sacramento**
    **Gordon D. Schaber Courthouse**

10  **720 9th Street**
    **Sacramento, CA 95814**

11  *Served via USPS Mail*

12  Dated: August 19, 2022

13      CHRISTINE M. REYNOLDS
        Notary Public. State of New York

14          No. 01RE6346135
        Qualified in Kings County
15      Commission Expires Aug. 5, 29...

16      *Christin M. Reynolds*

17          *8/18/2022*

18

19

20

21

22

23

24

25

26

27

28

*Table of Contents*
*Writ Petition 2022*

*MBOC  Accusations*

# MEDICAL BOARD OF CALIFORNIA

# ATTACHMENT COVER SHEET

## RE:  YOONESSI, MAHMOOD

## CASE NO.: 800-2020-073101

## ATTACHMENT #: 02

Accusation

000252

00068

# MEDICAL BOARD OF CALIFORNIA
# ENFORCEMENT PROGRAM
# COMPLAINT INVESTIGATION OFFICE

2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
(916) 263-2389

## PETITION FOR PENALTY RELIEF

**Case No: 800-2020-073101**
**Special Investigator: J.Medeiros**

### Subject Information

| | |
|---|---|
| **Name:** | YOONESSI, MAHMOOD |
| **AKA:** | N/A |
| **Residence Address:** | 6790 Crest Road |
| | Rancho Palos Verdes, CA 90275 |

| | |
|---|---|
| **Residence Phone:** | (310) 541-3937 |
| **Cell Phone:** | (310) 303-1671 |
| **E-mail:** | myoonessi75@gmail.com |

| | |
|---|---|
| **Business Name:** | MY Montecito |
| **Business Address:** | 6790 Crest Road |
| | Rancho Palos Verdes, CA 90275 |
| **Business Phone:** | (310) 541-3937 |

| | |
|---|---|
| **Description:** | On File |
| **Date of Birth:** | On File |
| **CDL:** | On File |
| **CII/FBI:** | On File |
| **SSN:** | On File |

| | | | |
|---|---|---|---|
| **Profession:** | Physician & Surgeon | **License No.:** | C50545 |
| **License Term:** | **Issued:** 3/1/2001 | **Revoked:** 6/23/2003 | |

| | |
|---|---|
| **Other:** | N/A |
| **Billing Code:** | 03573 |
| **Investigative Costs:** | N/A |
| **Primary Case No.:** | N/A |

**00069**

## PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 2**
**SUBJECT: YOONESSI, MAHMOOD**                    **Case No. 800-2020-073101**

### REASON FOR ORIGINAL DISCIPLINE:

On 8/23/2002, the Medical Board of California (MBC) sent Mahmood Yoonessi (Yoonessi) a letter indicating that his California medical license was being suspended effective immediately **(Attachment 01)**. The reasoning for the suspension was that the MBC received information from the New York State Board for Professional Medical Conduct that Yoonessi's New York license was revoked on 6/10/2002.

On 10/16/2002, the MBC filed an Accusation against Yoonessi **(Attachment 02)**. The Accusation indicated that the action taken in New York was due to Yoonessi's conduct regarding eight patients. Yoonessi, a gynecologic oncologist, committed numerous acts of gross negligence, fraud, moral unfitness, and that he failed to obtain proper informed consent from patients. Additionally, Yoonessi repeatedly failed to maintain adequate medical records, and lacked credibility in his explanations of his actions. Furthermore, Yoonessi was deemed "beyond rehabilitation" by the New York Board. The following is a synopsis of the medical expert's findings concerning the eight patients:

Patient A:
- Negligence: Yoonessi undertook and continued a total abdominal hysterectomy-bilateral despite co-morbid conditions and without adequate indication.
- Negligence: Yoonessi inappropriately planned for and performed a total abdominal hysterectomy on Patient A, who required regular dialysis services, at a hospital which did not provide dialysis on site.
- Negligence/Failure to obtain proper authorization for a patient: Yoonessi failed to obtain appropriate informed consent from Patient A before performing the surgery.
- Negligence: Yoonessi failed to obtain appropriate nephrology and cardiology consults prior to the surgery.
- Negligence: Yoonessi inappropriately ordered and concurred with transfer of Patient A from hospital in unstable condition and without adequate stabilization.

Patient B:
- Negligence: Yoonessi failed to obtain adequate informed consent for the chemotherapy he instituted with Patient B.
- Gross Negligence: Yoonessi inappropriately administered chemotherapy to Patient B.
- Gross Negligence: Yoonessi use of Ergamisol was inappropriate.
- Negligence: Yoonessi performed an exploratory laparotomy and cancer reduction surgery without adequate indication.
- Negligence: Yoonessi performed a second exploratory laparotomy and cancer



## PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 3**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

reduction surgery without adequate indication.

Patient C:
- Negligence/Failure to maintain records: Yoonessi failed to perform and record an adequate pre-operative assessment of Patient C before surgery.
- Negligence/Lack of proper consent: Yoonessi failed to obtain adequate patient consent before surgery.
- Negligence: Yoonessi failed to arrange and designate adequate coverage of Patient C when he did not the patient on successive days.
- Gross Negligence/Moral unfitness: Yoonessi inappropriately made statements to the children of Patient C to the effect that they were being "Kevorkian like," were playing God, and would be responsible for their mother's death due to their decisions concerning their mother's health care during her final days.

Patient D:
- Negligence/Failure to maintain records: Yoonessi failed to perform and record an adequate preoperative assessment of Patient D before surgery.
- Negligence: Yoonessi performed multiple bowel resections without adequate indication.
- Negligence/Lack of proper consent: Yoonessi failed to obtain adequate informed consent for the chemotherapy he instituted with Patient D for ovarian cancer.
- Gross Negligence: Yoonessi administered inappropriate chemotherapy for Patient D.
- Negligence/Failure to keep records: Yoonessi failed to maintain adequate or adequately legible records of his chemotherapy plan, treatment and the patient's response.
- Negligence: Yoonessi failed to adequately determine the origin of the fistula before performing a diverting colostomy.
- Negligence: Yoonessi performed a diverting colostomy without adequate indication on Patient D, the day before the patient died.
- Gross Negligence/Lack of proper consent: Yoonessi inappropriately attempted and ordered resuscitation of Patient D despite the existence of a DNR order.

Patient E:
- Negligence/Lack of proper consent: Yoonessi failed to obtain informed consent for the chemotherapy he ordered for Patient E for ovarian cancer.
- Gross Negligence: Yoonessi instituted inappropriate chemotherapy for Patient E.
- Negligence/Failure to maintain records: Yoonessi failed to appropriately monitor the effects of the chemotherapy.



## PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 4**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

- Negligence/Failure to maintain records: Yoonessi failed to maintain adequate or adequately legible records of his chemotherapy plan, treatments and the patient's response.
- Negligence/Fraud: Yoonessi fraudulently and inappropriately documented that he performed a physical examination of Patient E on a date that the patient was not present.
- Negligence: Yoonessi inappropriately ordered transfer of a patient with major medical issues from a hospital to a psychiatric floor at a different hospital.
- Gross Negligence/Moral unfitness: Yoonessi inappropriately questioned another physician's pain medication order directly with the patient's family.
- Negligence: Yoonessi inappropriately wrote in the patient's chart words to the effect that another physician had stated that Morphine was being used as euthanasia with which the patient's husband agreed.

Patient F:
- Negligence: Yoonessi inappropriately performed an extensive surgery and/or failed to take appropriate steps to minimize blood loss in Patient F, who refused all blood product transfusions.
- Negligence: Yoonessi performed inappropriate tumor reduction surgery on Patient F given her refusal of all blood product transfusions.
- Negligence: Yoonessi inappropriately administered chemotherapy to a patient who was too debilitated.
- Negligence/Lack of proper consent: Yoonessi failed to obtain adequate informed consent for the chemotherapy he instituted with Patient F.
- Gross Negligence: Yoonessi administered inappropriate chemotherapy to Patient F.
- Negligence/Failure to maintain records: Yoonessi's post-operative progress notes were inadequate.

Patient G:
- Negligence/Lack of proper consent:  Yoonessi failed to obtain adequate informed consent for the chemotherapy instituted with Patient G for ovarian cancer.
- Gross Negligence: Yoonessi administered inappropriate chemotherapy to Patient G.
- Negligence: Yoonessi inappropriately administered medroxyprogesterone acetate (Depo Provera) to Patient G.
- Negligence/Failure to maintain records: Yoonessi failed to maintain adequate or adequately legible records of his chemotherapy plan, treatments and the patient's response.
- Negligence: Yoonessi failed to obtain adequate serial left ventricular ejection

## PETITION FOR PENATLY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 5**
**SUBJECT: YOONESSI, MAHMOOD**            **Case No. 800-2020-073101**

fractions and/or follow up CA 125s during chemotherapy.
- Gross Negligence/Lack of proper consent and moral unfitness: Yoonessi inappropriately entered an order in Patient G's medical record canceling her do not resuscitate (DNR) status.

Patient H:
- Negligence: Yoonessi performed cytoreductive surgery and multiple bowel resections without adequate indication.
- Negligence: Yoonessi failed to adequately determine the origin of the patient's increased drainage before performing a colostomy.

In addition to the medical expert's findings concerning the above-mentioned eight patients, Yoonessi's response to each of these findings were included in the documentation.

On 6/23/2003, the MBC issued an Order Denying Petition for Reconsideration and Request for Stay **(Attachment 03)**. Yoonessi's California medical license was revoked effective for this date.

On 11/13/2008, a Decision became effective which denied Yoonessi's Reinstatement of a Revoked Certificate **(Attachment 04)**.


## SUMMARY OF REHABILITATIVE EFFORTS

Nature/ Severity of Acts:                Negligence, Gross Negligence, Moral unfitness, Lack of proper consent, Failure to maintain records, and fraud.

Subsequent Crimes/Acts:                N/A

Date Decision Effective:                6/23/2003

Rehabilitative Efforts:                While Yoonessi supplied a statement of rehabilitative efforts, he failed to adequately articulate any efforts made. Rather, Yoonessi references several court cases, suggests that New York State produced forged documents concerning his case, and states

**00073**

**PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE**

**PAGE: 6**
**SUBJECT: YOONESSI, MAHMOOD**            **Case No. 800-2020-073101**

several times that rehabilitation is a "state of mind."

**PETITION FOR PENALTY RELIEF**

On 7/16/2020, Yoonessi filed a Petition for Penalty Relief **(Attachment 05)**. Yoonessi's Petition for Penalty Relief indicates that he has worked as a paralegal for his own business named, "MY Montecito, Inc." Yoonessi answered, "No" to each question listed in Current Compliance section. Lastly, Yoonessi does not indicate his rehabilitative efforts; rather, he notates deficiencies in response to the "MBOC."

In addition to Yoonessi's Petition for Penalty Relief, he supplied the following documents:

- Curriculum Vitae **(Attachment 06)**
- Printout of CME credit tracker **(Attachment 07)**
- Yoonessi's statement regarding rehabilitative efforts **(Attachment 08)**
- Yoonessi's amended narrative statement **(Attachment 09)**

Yoonessi stated the following in his narrative statement:

> Yoonessi's narrative statement, as with all other statements provided, is in a legal document format. Yoonessi indicated that after his medical license revocation, he earned income through obtaining rental apartment properties in San Diego and other Southern California locations. In regards to rehabilitation efforts that would prevent the recurrence of the events that led to the revocation, Yoonessi's response is the implementation of the newly adopted changes by the MBC in compliance with Assembly Bill 2138. Lastly, Yoonessi stated that he plans to practice in California; however, he does not specify where.

Lastly, Yoonessi supplied several documents has an additional response to his rehabilitation **(Attachment 10)**. These documents include:

- Certification of Incorporation for M. Yoonessi, M.D., P.C.
- Court documentation pertaining to Yoonessi and the New York State Board for Professional Medical Conduct
- Documentation from the University of the State of New York regarding restoration of Yoonessi's medical license
- Notes from a patient's medical record
- Portion of a disposition
- Printout of California Court of Appeals case – Yoonessi, Mahmood v. Edmund G. Brown, Jr. et al

**00074**

## PETITION FOR PENATLY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 7**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

- Correspondence from the Ohio State Medical Board
- Correspondence from the State of New York Department of Health

### LETTERS OF RECOMMENDATION:

1. <u>Alemozzafar, Shams, M.D./ License No. C50483</u> is a licensed doctor of the MBC. Her license is set to expire on 1/31/2022. No disciplinary action was found regarding the license of Sham Alemozzafar, M.D. (Alemozzafar). On 7/27/2020, Alemozzafar wrote a letter of recommendation on behalf of Yoonessi **(Attachment 11)**.

   When I looked up Alemozzafar's license number, the name associated with the license was, "Shams Yoonessi."

   On 12/28/2020, I sent Alemozzafar an email (email address was shamsyoonessi@yahoo.com), asking if we could speak regarding the letter of recommendation she wrote for Yoonessi. On 12/29/2020, we agreed to speak on the morning of 1/1/2020.

   On 1/1/2020, I spoke with Alemozaffar and the following is a summary of our conversation:

   > Alemozaffar confirmed with me that she wrote, signed and dated the letter of recommendation for Yoonessi. When I asked how she knew Yoonessi, Alemozaffar stated that Yoonessi was her husband and they have been married for 43 years. I shared with Alemozaffar that the letter she wrote on behalf of Yoonessi did not state the reasons behind the revocation, or Yoonessi's rehabilitative efforts. With that, I asked Alemozaffar what her knowledge was behind the revocation. In response, Alemozaffar stated that she was not directly involved, the revocation was an unfortunate and unfair situation, and her husband has always put his professional life ahead of his family. Again, I tried asking Alemozaffar what exactly led to Yoonessi's revocation and her response continually was that she did not know all the details. I shared with Alemozaffar that in New York there were eight patients referenced pertaining to the revocation and asked her if she knew anything about this. Alemozaffar responded back that she knew of one patient where Yoonessi kept the patient alive by resuscitating her; however, the family of the patient did not want their relative resuscitated.

   > I asked Alemozaffar if Yoonessi accepted responsibility for the actions that led to his revocation and she responded that the things that happened

## PETITION FOR PENATLY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 8**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

were "minor" and it was unfair how Yoonessi was treated in New York and in California. When I asked if Yoonessi admitted any wrong doing, Alemozaffar indicated that Yoonessi does admit "some" wrong doing.

In regards to Yoonessi's rehabilitative efforts, Alemozaffar shared that her husband goes to medical conferences with her. Additionally, Yoonessi has earned income through various apartment rental properties. In closing, Alemozaffar stated that her husband's medical license should be reinstated in California due to "the time limit." When I asked for clarification on what she meant, Alemozaffar stated that it has been a long time since all of this happened and it is time for her husband to start practicing again.

After the call, I emailed Alemozaffar the Disciplinary document to review. I asked Alemozaffar to review the document and let me know if she still supported the reinstatement of Yoonessi's medical license.

On 1/6/2021, I received an email response from Alemozaffar **(Attachment 12)**. In her email, Alemozaffar stated that she still supports Yoonessi's Petition for Reinstatement.

2.   <u>Moayeri, Houshang, M.D./License No. A37168</u> is a licensed doctor of the MBC. His license is set to expire on 5/31/2021. No disciplinary action was found regarding the license of Houshang Moayeri, M.D. (Moayeri). On 7/28/2020, Moayeri wrote a letter of recommendation on behalf of Yoonessi **(Attachment 13)**.

On 1/7/2021, I sent Moayeri an email asking if we could speak about the letter of recommendation he wrote for Yoonessi. In an email response back, Moayeri indicated that we could speak on this day at 1 p.m **(Attachment 14)**. The following is a summary of our phone conversation:

Moayeri confirmed that he wrote the letter in support of Yoonessi. Moayeri stated that he first met Yoonessi in the 1950's where they both attended medical school in Tehran. In the 1970's the two were reconnected when they were both attending Roswell Park in Buffalo, New York for their fellowship. Since both Moayeri and Yoonessi are in California now, they occasionally get together and their wives are friends.

When I asked Moayeri if he had knowledge about the events that led to Yoonessi's medical license revocation, Moayeri did not know details. Rather, Yoonessi told Moayeri that he was the best doctor, people did not

**PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE**

**PAGE: 9**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

like him, and these people tried to undermine him. In regards to Yoonessi accepting responsibility or admitting wrong doing, Moayeri indicated that he did not know and that others were jealous of him being so successful.

Since Moayeri did not know specifics surrounding the revocation, I asked him if I could email him the MBC's Decision and review the document. Moayeri agreed to review this document. I asked Moayeri to review the document and to let me know if he still supported Yoonessi's Petition for Reinstatement. After our phone conversation, I emailed Moayeri the document **(Attachment 15)**.

On 1/20/2021, I received a phone call from Moayeri who indicated he had reviewed the Decision document that I had emailed him. Moayeri indicated that he did not know what to say about the matter because the Decision document did not include the outcome of the patients mentioned. The outcome of the patient's treatment would be important in determining his stance on Yoonessi's reinstatement. Moayeri went on to say that he thinks Yoonessi is smart and intelligent and maintains that he (Yoonessi) is not a "dummy." Further, Moayeri stated that Yoonessi is 80 years old and does not believe he will even practice medicine if given the opportunity. Moayeri's believes that Yoonessi just wants his reputation salvaged.

## NATIONAL PRACTITIONER DATA BANK

On 12/1/2020, a Response to One-Time Query was run via The National Practitioner Data Bank which yielded the following reports **(Attachment 16)**:

**DCN: 5500000026972449** – Date of Action: 8/23/2002. Filed by the Medical Board of California – Suspension of License

**DCN: 5500000030171606** – Date of Action: 6/23/2003. Filed by the Medical Board of California – Extension of previous licensure action

**DCN: 5500000026124614** – Date of Action: 6/10/2002. Filed by the New York State Department of Health – Revocation of license

**DCN: 5500000081023295** – Date of Action 3/6/2013. Filed by the New York State Department of Health – License restoration or reinstatement denied

## PETITION FOR PENATLY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 10**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

### DEPARTMENT OF MOTOR VEHICLES

The Department of Motor Vehicles reports that Yoonessi was issued a California driver license on 6/23/2016, and expires on 8/1/2021.

### LIVE SCAN RESULTS

Based upon a fingerprint search with the Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI) there are no results to report from either entity.

### CALIFORNIA PHYSICIAN AND SURGEON MEDICAL LICENSE

A Certificate of Licensure was obtained and indicated that Yoonessi was issued a Physician and Surgeon Certificate number C50545 by the Medical Board of California on 3/1/2001 **(Attachment 17)**.  The certificate was revoked.  The Decision became effective on 6/23/2003.

### OUT-OF-STATE LICENSE

New York State Department of Health
License Number: 118540
License Type: Physician
Status: Revoked
Issue Date: 11/21/1973
Revocation Date: 6/10/2002
Disciplinary Status: Revoked for fraud, negligence, gross negligence, moral unfitness, performing services not authorized by the patient, and failure to maintain adequate records.

Ohio Medical Board
License Number: 35.034317
License Type: Doctor of Medicine
Status: Inactive
Issue Date: 1/24/1972
Expiration Date: 12/31/1974
Disciplinary Status: Yoonessi filed an application in July 2020, to restore his medical license in Ohio.  Based on the action taken by New York and California, Yoonessi was denied.  The Ohio State Medical Board mailed Yoonessi a letter for opportunity of a hearing.

In addition to former licensure with New York, Ohio and California, Yoonessi had a medical license in Iran.  This license was issued in 1965 and is inactive status.

## PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 11**
**SUBJECT: YOONESSI, MAHMOOD**        **Case No. 800-2020-073101**

During Yoonessi's interview he indicated that he had temporary medical licenses in Florida and Michigan (these were not written on the Petition for Penalty Relief application). A search for a Florida and a Michigan medical license yielded no results.

### NEW MEDICAL BOARD COMPLAINTS:

On 12/28/2020, Breeze was reviewed and no new or open complaints were found.

### ADDITIONAL INFORMATION:

On 12/31/2020, Civil Index was reviewed. The following civil court cases were found:

- Case No. 401785 with the Los Angeles County Superior Court. This case was filed by Yoonessi against Former Governor Edmund Brown, Eliot Spitzer, and Barbara Yaroslavsky on 11/12/2008.
- Case No. 116210 with the Los Angeles County Superior Court. This case was filed by Yoonessi against Former Governor Edmund Brown, Richard Fantozzi, M.D., Office of Administrative Hearings, the MBC, and Ronald Wender on 8/4/2008.

### INTERVIEW WITH PETITIONER:

On 1/20/2021, I sent Yoonessi an email asking when he would be available for an interview. The next day through email correspondence we agreed to speak the next day at 1 p.m. **(Attachment 18)**.

On 1/22/2021, I interviewed Yoonessi, which was digitally recorded **(Property 01)**. After the interview the recording was uploaded for transcription.

On 1/26/2021, I received a phone message from Yoonessi asking why he had not received a transcript yet of our interview. I called Yoonessi back and told him that I had told him several times before that I could not provide him with a transcript. Yoonessi then proceeded to ask me several questions. Yoonessi asked if he could receive copies of the interview I conducted with Moayeri and his wife. I told him that those interviews were not recorded. Additionally, he asked if the AG's office would receive a transcript and I responded back that they would along with all of the other case materials. Yoonessi questioned why the AG's Office would receive his transcript and why he would not have access. Further, Yoonessi indicated that I had no authority to interview the witnesses (Moayeri and Alemozaffar) or him for his Petition for Penalty. Yoonessi told me that I was not an employee of the Medical Board of California; rather, I was just an employee of the Enforcement Program. I told Yoonessi that I was an employee of the Medical Board of California and I would not

**PETITION FOR PENALTY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE**

**PAGE: 12**
**SUBJECT: YOONESSI, MAHMOOD**          **Case No. 800-2020-073101**

have received his Petition packet if I was not an employee. I further explained to Yoonessi that he needed to familiarize himself with the Petition for Penalty Relief process. I directed Yoonessi to read the procedures on filing a Petition on the MBC's website. Then, Yoonessi expressed his frustration on why there needed to be an investigation for his Petition for Penalty Relief. Again, I directed Yoonessi to educate himself of what the process entails which could be found on our website. In response, Yoonessi told me that I "needed to be educated." Before I could respond back, Yoonessi asked me if I knew how to count from one to eight. At that point, I told Yoonessi that he was being very inappropriate and I was ending our phone conversation. Before I could hang up, Yoonessi had hung up on his end.

On 2/1/2021, I received the interview transcript **(Attachment 19)**.

**Evidence List**

Evidence is maintained at Medical Board of California Headquarters located at 2005 Evergreen Street, Suite 1200, Sacramento, CA 95815.

**Attachments**

1.   Letter to Yooneesi that his California medical license was being suspended
2.   Accusation
3.   Order Denying Petition for Reconsideration and Request for Stay
4.   Decision denying Reinstatement of Revoked Certificate
5.   Yoonessi's Petition for Penalty Relief
6.   Yoonessi's Curriculum Vitae
7.   Printout of CME credit tracker
8.   Yoonessi's statement on rehabilitative efforts
9.   Yoonessi's amended narrative statement
10.  Documentation provided by Yoonessi
11.  Alemozaffar's letter of recommendation
12.  Email correspondence with Alemozaffar
13.  Moayeri's letter of recommendation
14.  Email correspondence with Moayeri
15.  Disciplinary Order to Moayeri
16.  NPDB Reports
17.  Certificate of Licensure
18.  Email correspondence with Yoonessi
19.  Interview transcript

## PETITION FOR PENATLY RELIEF – REINSTATEMENT OF A REVOKED CERTIFICATE

**PAGE: 13**
**SUBJECT: YOONESSI, MAHMOOD**              **Case No. 800-2020-073101**

### Property

1. Interview of Yoonessi, Mahmood on 1.22.2021.ds2

### Witness List

Jillian Medeiros, Special Investigator
Medical Board of California – Complaint Investigation Office
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815                              (916) 576-3219

Shams Alemozaffar, M.D., Wife of Yoonessi/Wrote letter of recommendation
420 S. Hamel Road
Los Angeles, CA 90048
shamsyoonessi@yahoo.com                          (310) 541-3937

Houshang Moayeri, M.D., Wrote a letter of recommendation
No. 9 Rocky Point
Corona Del Mar, CA 92625
moayerih@gmail.com                               (949) 720-1724

### Signatures

Prepared by: _____  Date: 2 ·1· 2021
              Jillian Medeiros, Special Investigator

Approved by: _____  Date: 2/8/2021
              Rashya Henderson, Supervising Special Investigator

STATE OF NEW YORK  :  DEPARTMENT OF HEALTH

STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

-------------------------------------------------------------------X

| | | |
|---|---|---|
| IN THE MATTER | : | STATEMENT |
| OF | : | OF |
| MAHMOOD YOONESSI, M.D. | : | CHARGES |

-------------------------------------------------------------------X

MAHMOOD YOONESSI, M.D., the Respondent, was authorized to practice medicine in New York State on or about November 21, 1973, by the issuance of license number 118540 by the New York State Education Department.

## **FACTUAL ALLEGATIONS**

A.    Respondent provided care for Patient A (patients are identified in Appendix A, attached) at DeGraff Memorial and Buffalo General Hospitals, Buffalo, New York, from on or around August 21, 1997, until her death around August 28, 1997. Respondent's care of Patient A did not meet accepted standards of care in that:

1.    Respondent undertook and/or continued a total abdominal hysterectomy-bilateral salpingo-oophorectomy at DeGraff Memorial Hospital on August 25, 1997, despite co-morbid conditions and/or without adequate indication.

2.    Respondent inappropriately planned for and/or performed on August 25, 1997, a total abdominal hysterectomy, bilateral salpingo-oophorectomy on Patient A, who required regular dialysis services, at a hospital which did not provide dialysis on site.

3.    Respondent failed to obtain appropriate informed consent from Patient A before performing the surgery on August 25, 1997.

4.    Respondent failed to obtain appropriate nephrology and/or cardiology consults prior to the surgery on August 25, 1997.

5.    Respondent inappropriately ordered or concurred with transfer of Patient A from DeGraff Memorial Hospital in unstable condition and/or without adequate stabilization.

1

000092    00082

22.   The facts of paragraphs E and E.1.

23.   The facts of paragraphs F and F.4.

24.   The facts of paragraphs G and G.1 and/or G and G.6.

25.   The facts of paragraphs H and H.4.

## TWENTY SIXTH THROUGH THIRTIETH SPECIFICATIONS
### FAILURE TO MAINTAIN RECORDS

Respondent is charged with committing professional misconduct as defined in

N.Y. Educ. Law § 6530(32) by failing to maintain a record for each patient which

accurately reflects the care and treatment of the patient as set forth in:

26.   The facts of paragraphs C and C.1.

27.   The facts of paragraphs D and D.1, D and D.5 and/or D and D.6.

28.   The facts of paragraphs E and E.3 and/or E and E.4.

29.   The facts of paragraphs F and F.6.

30.   The facts of paragraphs G and G.4.


DATED:   November 26, 2001
         Albany, New York

                          REDACTED
                          PETER D. VAN BUREN
                          Deputy Counsel
                          Bureau of Professional
                            Medical Conduct

9

01/27/03  MON 17:07 FAX 716 855    ZDARSEY SAWICKI AGOSTI



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : THIRD DEPARTMENT

000285

In the Matter of the Application of

MAHMOOD YOONESSI,

                Petitioner,

against

THE STATE BOARD FOR PROFESSIONAL
MEDICAL CONDUCT, A Board Under the
Auspices of the New York State Department of Health,
WILLIAM A. DILLON, M.D., Chairman, and
ANTONIA C. NOVELLO, M.D., Commissioner of
The New York State Department of Health,

                Respondents.

For a Judgment Pursuant to CPLR Article 78

**AFFIDAVIT OF
RICHARD G. COLLINS, ESQ.**

No. 92009

STATE OF NEW YORK    )
COUNTY OF ERIE        )SS.:

    Richard G. Collins, being duly sworn, deposes and says:

    1.    I am an attorney duly licensed to practice in the State of New York.

    2.    I was counsel of record, along with my partner, Nicholas J. Sargent, Esq., in

proceedings before the Board of Professional Medical Conduct initiated in late November 2001

against Mahmood Yoonessi, M.D. I also appeared as counsel of record in an action filed by Dr.

Yoonessi in the State Supreme Court for the County of Erie wherein the Hon. Joseph Glownia

stayed the Department of Health's summary suspension of Dr. Yoonessi's medical license pending

hearings before the Board of Professional Medical Conduct.

    3.    I reviewed the document annexed hereto as Exhibit 1, which purports to be a

document provided by Kevin Donovan, Esq., an attorney from the Department of Health's Office



of Professional Medical Conduct. The document was faxed to me last week by Gerald T. Walsh, Dr. Yoonessi's current counsel.

4.    I have no recollection of ever seeing the document annexed hereto as Exhibit 1, prior to receiving Mr. Walsh's fax. If I had received such a document, I would have provided it to Mr. Walsh, along with other documents provided to him regarding Dr. Yoonessi's case.

5.    On behalf of Dr. Yoonessi, my partner and I objected strenuously to exhibits which were offered by Mr. Donovan at the outset of the case, without authentication on an item-by-item basis. I recall that at a pre-hearing conference, there was a confusing presentation on the record by Mr. Donovan about removing certain pages from the record. The Health Department's lawyer was clearly not interested in being helpful to Dr. Yoonessi's ability to understand or challenge the offered records. In light of our outstanding objections to the exhibits, I am certain that if we had been provided with a copy of the document annexed as Exhibit 1, we would have objected again.

6.    Further, the document attached as Exhibit 1, if it had been presented to me, would also have been presented in front of Administrative Law Judge Timothy Trost in the course of the hearings. There was no occasion where Mr. Donovan ever communicated to me outside the presence of the Administrative Law Judge about removing pages from the records.

Richard G. Collins, Esq.

Subscribed and sworn to before me
this 28 day of January, 2003.

Catherine F. Klinger
Notary Public

CATHERINE F. KLINGER
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 8/25/2003

2

000241

**IN THE MATTER**

**OF**

**MAHMOOD YOONESSI, M.D.**

C 837

## EXHIBITS IN EVIDENCE IN FULL, BUT SOME PAGES OMITTED FROM HEARING COMMITTEE COPIES

| No. | Exhibit Description | Pages in Hearing Committee Member copies |
|---|---|---|
| 7. | Patient B — Buffalo General Hospital record | cover-121, 232-482 |
| 8. | Patient C — Our Lady of Victory Hospital record | cover-140, 268-336 |
| 11. | Patient D — St. Joseph's Hospital record | 1-260, 779-837, 947-1243, 1292-1296, 1976-1977 |
| 18. | Patient F — Our Lady of Victory Hospital record | 1-247, 342-350, 504-510 |
| 20. | Patient G — Buffalo General Hospital record | cover-6, 25-28, 61-69, 94, 99, 149-156, 158-159 190, 215, 279-405 |
| 21. | Patient H — Mercy Hospital of Buffalo record | cover-84, 163-225, 229-275 |

Exhibit 1

T239

00086

*State of New York*
Case 2:23-cv-00023-TLN-SCR   Document 1   Filed 01/06/23   Page 117 of 352
*Supreme Court, Appellate Division*
*Third Judicial Department*

JUN 2 3 2003

Decided and Entered: June 20, 2003                    Case # 92009

_____

In the Matter of MAHMOOD                              **DECISION AND ORDER**
YOONESSI,                                             **ON MOTION**

                    Petitioner,

    v

**STATE BOARD FOR
PROFESSIONAL MEDICAL
CONDUCT et al.,**

                    Respondents.

_____

Motion to strike portions of appendix and for further relief.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is

ORDERED that the motion to strike portions of the appendix is granted, without costs, to the extent that the following pages in the appendix and all references thereto in petitioner's brief are stricken:

Group 1. Pages A482, A488, A493, A509, A513, A549, A574, A776, A879 - A908, A911, A913, A914, A946, A1031, A1054, A1093, A1094, A1114, A1204, A1325 - A1365, A2384 - 2390, A2401, A2402, A2404, A2409, A2417, A2418, A2421, A2434, A2435, A2439 - A2442, A2454, A2500 - A2506, A2533 - A2542, A2563 - A2572, A2602, A2662 - A2666, A2675 - A2699, A2709, A2727, A2736, A2807- A2832, A2837 - A2841, A2850, A2864, A2989 - A2989, A3059 - 3066, A3365 - A3367.

Group 2. Pages A1714 - A1776, A2132 - A2140, A2148 - A2151, A2153 - A2160, A2166 - A2168, A2242 - A2251, A2253, A2255 - A2272, A2280 - A2283, A2286 - A2297, A2302 - A2308, A2314 - A2316, A2319 - A2323, A2328 - A2330, A2530 - A2531, A3386 - A3427, A3437, A3555 - A3562.

Group 3. Pages A2087, A2089 - A2105, A2115 - A2131, A2146, A2165, A2652 - A2653, A3430 - A3436, A3438 - A3440, A3442 - A3446, A3449 - A3466.

Group 4. Pages A455, A1009, A1206, A1429, A1510, A1777, A2086, A2106, A2114, A2141, A2144, A2147, A2152, A2161, A2348, A2382, A2399, A2472, A2582, A2654, A3009, A3152, A3278, A3368.

Group 5. Pages A3639 - A3678. Petitioner shall file and serve a corrected brief and appendix on or before July 7, 2003, and it is further

ORDERED that the proceeding is removed from the September 2003 term and set down for the October 2003 term, and it is further

752

00087

ORDERED that respondent's time to file and serve their brief is extended to August 1, 2003.

CARDONA, P.J., PETERS, MUGGLIN, ROSE and LAHTINEN, JJ., concur.

ENTER:

Michael J. Novack
Clerk of the Court

753



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF PROFESSIONAL DISCIPLINE
(212) 921-3872

1411 BROADWAY – TENTH FLOOR
NEW YORK, NEW YORK 10018

March 1, 2013

Mahmood Yoonessi, Physician
REDACTED

Re: Application for Restoration

Dear Dr. Mahmood:

. Enclosed please find the Commissioner's Order regarding Case No CP-11-26, which is in reference to the restoration of license number 310221. This order and any decision contained therein goes into effect five (5) days after the date of this letter.

Very truly yours,

LOUIS J. CATONE, Director
Office of Professional Discipline

By: REDACTED

ARIANA MILLER
Supervisor

DD/AM/nbm
Enclosure
**CERTIFIED MAIL – RRR**
cc:



<u>Case Number CP-11-26</u>

THE UNIVERSITY OF THE STATE OF NEW YORK
The State Education Department

Determination of the Board of Regents
Application for Restoration of Physician License

Re: Mahmood Yoonessi

A full recitation of the facts and disciplinary history in this matter is set forth in the report and recommendation of the Committee on the Professions and other documentation submitted to the Board of Regents.

We have carefully reviewed the report and recommendation of the Peer Committee dated February 10, 2009, and the report and recommendation of the Committee on the Professions ("COP") dated December 2, 2011. We agree with the minority member of the COP that Dr. Yoonessi is not entitled to restoration of his license to practice medicine, and we reject the recommendations of the Peer Committee and the majority members of the COP that Dr. Yoonessi be placed on probation for a period of five years, with probation terms and (per the COP's recommendation) limitation on practice.

As an initial matter, we are very concerned about the seriousness of the violations of which he was found guilty. In June 2002, a Hearing Committee for the State Board for Professional Medical Conduct ("SBPMC") found Dr. Yoonessi, who was practicing gynecological oncology, to be guilty of 26 of 30 specifications of misconduct involving 8 different patients, and revoked his license to practice medicine. He was found guilty of, among other things, prescribing an unorthodox and inappropriate chemotherapy regime for 5 of the patients; performing unwarranted and contraindicated surgery on at least 8 occasions; failing to obtain adequate informed consents for chemotherapy and surgery; improperly ignoring "Do Not Resuscitate" orders; failing to properly examine or document examinations of some of the patients; and providing fraudulent information on an application for reappointment to a hospital by denying knowledge of an action pending against him by the Office of Professional Medical Conduct.

For example, as to particular patients, the Hearing Committee found that Dr. Yoonessi performed a total abdominal hysterectomy and bilateral salpingo-oophorectomy on Patient A without medical indication and in a hospital that could not provide the dialysis she needed, and needlessly exposed her to a significant reduction in quality of life and an increased risk of infection and death, among other dangers. As to Patient B, Dr. Yoonessi treated her advanced ovarian cancer with a unique drug regimen for which adequate informed consent had not been obtained, and which did not conform to accepted standards of care. He additionally performed an exploratory laparotomy and extensive surgery on her that was not medically indicated. As to Patients C, D and G, he failed to perform and/or document adequate preoperative histories, physical examinations and assessments. There were many other findings of misconduct, involving these and additional patients, documented in the record before us.

MEDICAL BOARD

000349  00090



Dr. Yoonessi disagrees with the findings of the SBPMC, and instead provides a litany of reasons why his care was appropriate, the hearing was unfair and the findings were wrong. We recognize that he is entitled to maintain his innocence, but he appears to have no appreciation for the circumstances that led to the charges, even if he disagrees with them, and does not appear to understand the reasons that his various procedural objections were dismissed by the Appellate Division, Third Department, in his appeal of the SBPMC decision (Yoonessi v. State Board for Professional Medical Conduct, 2 AD3d 1070 [3d Dept 2003], leave denied, 3 NY3d 607 [2004]).    We agree with the minority member of the COP on this point – Dr. Yoonessi still presents no real understanding of the seriousness of the charges or why he was found guilty, regardless of whether he maintains that he did nothing wrong.

Although we do not require that he admit guilt, given the seriousness of the findings against him, we do seek a recognition of what circumstances might have led others even wrongfully to believe that he had acted improperly, and to show us what steps he will take in the future to avoid such circumstances. He displayed no such insight or understanding, and no plan of rehabilitation.

He has consistently displayed an attitude that he is right and will make no changes, thus implicitly stating that he would not even consider any other opinion, or even the findings of misconduct in the disciplinary proceeding against him, in making medical decisions and planning treatment. (See, e.g., "Notably, petitioner stated that he would continue the underlying courses of conduct if allowed to continue practicing medicine" [Yoonessi, 2 AD3d at 1075]; "The applicant steadfastly asserts that his mode of treatment was correct … then went on to question the credentials of the state's expert witness in the original proceeding and further insisted that he used the proper treatment regimen with his patients" [Peer Committee report at p. 10]; letter from Dennis J. Graziano, Director of the Office of Professional Medical Conduct, saying that "[a]pplicant had stated that he would 'not change his chemotherapy regimen," that the SBPMC Hearing Committee had found him to be "incorrigible" and that he must be "stopped from continuing the exultation of his blind beliefs over the needs and safety of his patients" [id. at p. 7]; statement in Office of Professional Discipline investigator's interview with Dr. Yoonessi for this restoration proceeding, that "[i]n said interview the applicant stated that he did not feel that he did anything wrong in his treatment of the patients for which his license was revoked and further added that he would treat them the same way" [id. at p. 6]).

Public protection and safe and competent practice are at the heart of the Board's responsibility in determining whether to restore the license of an applicant who has engaged in conduct serious enough to result in the loss of a professional license. Based on the record before us, we are not convinced that the public would be adequately protected were Dr. Yoonessi's license to be restored. We agree with the conclusion of the minority member of the COP that the applicant has failed to carry his burden of establishing a compelling case for the restoration of his physician license.



MEDICAL BOARD 00091

MAY 13 2020

000350



The **University of the** State of New York
**Education** **Department**

**176**

IN THE MATTER

of the

Application of MAHMOOD
YOONESSI for restoration of his
license to practice as a physician in
the State of New York.

Case No. CP-11-26

It appearing that the license of MAHMOOD YOONESSI, to practice as a physician in the State of New York, was revoked by Order of the State Board for Professional Medical Conduct dated June 5, 2002, and he having petitioned the Board of Regents for restoration of said license, and the Regents having given consideration to said petition and having reviewed the record, and having disagreed with and rejected the recommendations of the Peer Committee and the Committee on the Professions, for the reasons set forth in the attached written decision, now, pursuant to action taken by the Board of Regents on October 9, 2012, it is hereby

ORDERED that the petition for restoration of License No. 310221, authorizing MAHMOOD YOONESSI to practice as a physician in the State of New York, is denied.



IN WITNESS WHEREOF, I, John B. King, Jr., Commissioner of Education of the State of New York for and on behalf of the State Education Department, do hereunto set my hand and affix the seal of the State Education Department, at the City of Albany, this 8th day of February 2013.

REDACTED

Commissioner of Education

**000393**

·· ·0009·

**A1**



 **MEDICAL BOARD**
OF CALIFORNIA

Protecting consumers by advancing high quality, safe medical care.

**Enforcement Program**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone: (916) 263-2525
Fax: (916) 263-2473
www.mbc.ca.gov

Gavin Newsom, Governor, State of California | Business, Consumer Services and Housing Agency | Department of Consumer Affairs

December 7, 2020

TO WHOM IT MAY CONCERN:

I, WILLIAM PRASIFKA, Executive Director of the Medical Board of California, do hereby certify that MAHMOOD YOONESSI, M.D., whose address of record is 9 BOBBIE LANE, WILLIAMSVILLE, NY 14221, was issued Physician's and Surgeon's Certificate Number C 50545 by the Board on March 1, 2001. Said certificate is REVOKED.

I further certify that disciplinary action was taken against this certificate as follows: On August 23, 2002 a FULL OUT OF STATE SUSPENSION ORDER-NO PRACTICE was issued, and on October 16, 2002 an ACCUSATION was filed against Doctor YOONESSI. On June 10, 2003 a PETITION FOR RECONSIDERATION was filed, and on June 23, 2003 an ORDER DENYING PETITION FOR RECONSIDERATION AND REQUEST FOR STAY was issued, and a DECISION became effective which read: REVOKED. On July 22, 2003 a PETITION FOR A WRIT OF MANDATE AND REQUEST FOR A STAY was filed and on December 24, 2003 an ORDER DENYING PETITION FOR WRIT OF MANDATE was issued. On November 29, 2009 a PETITION FOR REINSTATEMENT was filed, and on November 11, 2008 the PETITION FOR REINSTATEMENT WAS DENIED. On November 13, 2008 a DECISION became effective which read: PETITION FOR REINSTATEMENT OF REVOKED CERTIFICATE DENIED.

Respectfully submitted,

*William Prasifka*

WILLIAM PRASIFKA,
Executive Director of the
Medical Board of California

**SECTION 162 OF THE BUSINESS AND PROFESSIONS CODE:**
The certificate of the officer in charge of the records of any board in the department that any person was or was not on a specified date, or during a specified period of time, licensed, certified or registered under the provisions of law administered by the Board, or that the license, certificate or registration of any person was revoked or under suspension, shall be admitted in any court as prima facie evidence of the facts therein recited.



**A1**

Yoonessi. The evidence in the record before the Board is not sufficient to convince the hearing examiner that the New York Supreme Court was incorrect in its determinations.

In addition, Dr. Yoonessi argued that the 2002 New York Order had several instances of false claims concerning dates. However, after review, the hearing examiner believes that those instances are better explained by simple typographical mistakes than a conspiracy to punish Dr. Yoonessi, especially as the correct dates were also contained in the document. Further, Dr. Yoonessi's claim that only six incomplete exhibits were admitted to the record in his New York hearing is not credible given the significant number of exhibits which were cited in the 2002 New York Order.

For several of the patients discussed in the 2002 New York Order, Dr. Yoonessi claimed that he was only a consultant. This defense was also raised during the hearing in New York. The 2002 New York Order addressed this defense at several points and found it to be unpersuasive.

In regard to Dr. Yoonessi's attempt to restore his New York license, the hearing examiner cannot explain why a different license number appears on the order denying restoration. However, that same number also appears on the Committee on the Professions report and recommendation, and that report is clearly addressed to and describes the disciplinary history of the correct Dr. Yoonessi. In addition, the Committee on the Professions report, the Board of Regents report, and the order denying restoration all have the same case number. Also, while Dr. Yoonessi testified that he was not given the opportunity to address the Board of Regents before it issued its decision, there was nothing in evidence showing that he was entitled to address that board. New York appears to have some problems with its data, but the hearing examiner believes that it did deny Dr. Yoonessi's restoration application and not the application of a different Mahmood Yoonessi. While it is unfortunate and no doubt upsetting to Dr. Yoonessi that New York took so many years to make a decision on his restoration application, that is not a matter that the Board can remedy.

The hearing examiner feels that Dr. Yoonessi sincerely believes everything he testified to at hearing. However, Dr. Yoonessi's belief does not make something true. Dr. Yoonessi made many of the same arguments at this hearing that he did in his New York Board hearing, its appeal, and his California actions. No board or court has found his arguments persuasive, and neither does this hearing examiner. The misconduct found by the New York Board was very serious and resulted in serious sanctions in New York and California. So far, both states have refused to reinstate or restore his licenses, although Dr. Yoonessi does have a new application pending in California. Dr. Yoonessi does not have to admit to wrongdoing and obviously believes that his actions were appropriate. However, the 2002 New York Order is more persuasive than Dr. Yoonessi, and, even after all the time that has passed since the order, the hearing examiner believes that the public would be best protected by permanently denying Dr. Yoonessi's application for restoration.

# DEPARTMENT OF HEALTH

584 Delaware Avenue, Buffalo, New York 14202

Antonia C. Novello, M.D., M.P.H.
*Commissioner of Health*

Dennis P. Whalen
*Executive Deputy Commissioner*

July 12, 1999


FCA682

**PERSONAL AND CONFIDENTIAL**

Mahmood Yoonessi, M.D.
355 Linwood Avenue
Buffalo, New York 14209

RE: PMC #: 44B-BU-97-07-3161B

Dear Dr. Yoonessi:

The New York State Department of Health, Office of Professional Medical Conduct, is investigating a complaint filed with this Office against you.

Pursuant to Section 230-10(L) of the Public Health Law (see below), I hereby request a **complete certified copy** of the medical records on the patients listed below:

1. Johnny Mae Lemons
2. Irene Kaluzny
3. Elizabeth Steinbroner
4. Virginia Slisz
5. Betty Pieleck
6. Genevieve Sznolke
7. Faith Wheaton

This request is made pursuant to *Public Health Law Section 230-10(L)* which states:

> The board or its representatives may examine and obtain records of patients in any investigation or proceeding by the board acting within the scope of its authorization.

This should include physician's notes, laboratory tests, physician's orders, medication sheets and all other documents in the patient file. When copying laboratory reports, please ensure that the complete lab report is copied and that all data is visible and legible. Any written explanation of the record may accompany the file but cannot be accepted in lieu of it. **Each medical record must have a separate, signed certification attached to it which attests that the copy being forwarded to this Office is a complete and exact one.** For your convenience, enclosed are certification forms that must be completed and returned with the requested records. **The records are due in this Office by July 26, 1999.** If you have any questions, please contact me at 716-847-4326. Thank you for your attention to this matter.

Sincerely,

*Dorothy Ciccarella*

Dorothy Ciccarella
Investigator
Office of Professional Medical Conduct

DC/bp

Enclosure

00095

 



# Office of the Professions

## Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

---

### License Information *

---

03/16/2021

**Name :** MCEACHIN NIA MALIKA
**Address :** UPPER MONTCLAIR NJ
**Profession :** LICENSED PRACTICAL NURSING
**License No:** 310221
**Date of Licensure :** 06/05/2012
**Additional Qualification :**   Not applicable in this profession
**Status :** NOT REGISTERED
**Registered through last day of :** 07/20

---

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants, or specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.





000395

∿ ( 00096

 

## Office of the Professions

## Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

### License Information *

03/16/2021

**Name :** AHERN MAUREEN M
**Address :** DEER PARK NY
**Profession :** REGISTERED PROFESSIONAL NURSING
**License No:** 310221
**Date of Licensure :** 10/20/1978
**Additional Qualification :**
**Status :** REGISTERED
**Registered through last day of :** 07/23

\* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine)*, *physician assistants*, or *specialist assistants*. The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.



**Date filed:** 11/20/2003
**Date terminated:** 03/22/2005
**Date of last filing:** 05/01/2006



# Case Summary

**Office:** Buffalo
**Jury Demand:** Plaintiff

**Nature of Suit:** 440

**Jurisdiction:** Federal Question

**County:** Erie
**Origin:** 1
**Lead Case:** None
**Related Case:** None

**Filed:** 11/20/2003
**Demand:** $20000000000
**Cause:** 42:1983 Civil Rights (Employment Discrimination)

**Disposition:** Judgment - Other

**Terminated:** 03/22/2005
**Reopened:**

**Other Court Case:** None

**Defendant Custody Status:**
**Flag:** CLOSED_2005

**Plaintiff:** Mahmood M. Yoonessi

| Defendant | | Representation | Contact |
|---|---|---|---|
| **Defendant:** The New York State Board for Professional Medical Conduct | **represented by** | Peter B. Sullivan | **Phone:** (716) 853-8473<br>**Fax:** 716-853-8428<br>**Email:** Peter.Sullivan@oag.state.ny.us |
| **Defendant:** William A. Dillon | **represented by** | Peter B. Sullivan | **Phone:** (716) 853-8473<br>**Fax:** 716-853-8428<br>**Email:** Peter.Sullivan@oag.state.ny.us |
| **Defendant:** Antonia C. Novello | **represented by** | Peter B. Sullivan | **Phone:** (716) 853-8473<br>**Fax:** 716-853-8428<br>**Email:** Peter.Sullivan@oag.state.ny.us |
| **Defendant:** Michael Noe | **represented by** | Aven Rennie | **Phone:** 716-856-3500<br>**Fax:** 716-856-3390<br>**Email:** arennie@magavern.com |
| **Defendant:** Steven Goodnaugh | **represented by** | Amy Archer Flaherty | **Phone:** (716) 856-5500<br>**Email:** aflaherty@damonmorey.com |
| **Defendant:** I. L. Cohen | **represented by** | Aven Rennie | **Phone:** 716-856-3500<br>**Fax:** 716-856-3390<br>**Email:** arennie@magavern.com |
| **Defendant:** Kaleida Health System | **represented by** | Aven Rennie | **Phone:** 716-856-3500<br>**Fax:** 716-856-3390<br>**Email:** arennie@magavern.com |
| **Defendant:** Brian D'Arcy | **represented by** | Mark Andrew Molloy | **Phone:** 716-853-8100<br>**Fax:** 716-283-1380<br>**Email:** mmolloy@nixonpeabody.com |
| **Defendant:** Michelle Marzek | **represented by** | Mark Andrew Molloy | **Phone:** 716-853-8100<br>**Fax:** 716-283-1380<br>**Email:** mmolloy@nixonpeabody.com |
| **Defendant:** The Catholic Health System | **represented by** | Mark Andrew Molloy | **Phone:** 716-853-8100<br>**Fax:** 716-283-1380 |

**Defendant:** Daniel Kredentser    **represented by** Peter B. Sullivan    **Email:** mmolloy@nixonpeabody.com
**Phone:** (716) 853-8473

**Defendant:** Lawrence Sternberg    **represented by** Peter B. Sullivan    **Email:** Peter.Sullivan@oag.state.ny.us
**Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Ann Marie Fricke

**Defendant:** John Choate

**Defendant:** M. Steven Piver    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Shashikant Lele    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** David Marchetti    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Trudy Baker    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** William Greiner    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** William Scheuerman    **represented by** Kevin H. Harren    **Phone:** 518-213-6000
**Fax:** 518-213-6488
**Email:** kharren@nysutmail.org

**Defendant:** William Scheuerman    **represented by** James R. Sandner    **Phone:** (518) 213-6000

**Defendant:** Carol Heckman    **represented by** Paula Ryan Conan    **Phone:** 315-448-0672
**Fax:** 315-448-0646
**Email:** paula.conan@usdoj.gov

**Defendant:** Eliot Spitzer    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Gail Mitchell    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Roswell Park Cancer Institute    **represented by** Peter B. Sullivan    **Phone:** (716) 853-8473
**Fax:** 716-853-8428
**Email:** Peter.Sullivan@oag.state.ny.us

**Defendant:** Albany Medical Center

**Defendant:** American Board of Obstetrics and Gynecology    **represented by** Richard T. Saraf    **Phone:** 716-566-5400
**Fax:** 716-566-5401
**Email:** rsaraf@goldbergsegalla.com

**Defendant:** Gynecologic Oncology Group

**Defendant:** National Cancer Institute of Canada

**Defendant:** Bristol Meyers Squibb Company    **represented by** Daniel L. Keller    **Phone:** 212-422-0202
**Fax:** 212-422-0925
**Email:** daniel.keller@sdma.com

**Defendant:** The Medical Board of California

**Defendant:** Ronald Wender

00099

**17**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Mahmood Yoonessi | ) | CASE NO.   Cv15--09329-SVW (KES) |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER RE RICO CASE |
| V. | ) | STATEMENT |
| | ) | |
| John B.King  (+see  attached) | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

_____ )

In this action, claims have been asserted under the Racketeer Influenced and Corrupt Organizations provisions of the Organized Crime Control Act of 1970 ("RICO"), 18 U.S.C. § 1961 _et seq_. Accordingly,

IT IS HEREBY ORDERED as follows:

Plaintiff[1] shall file, within twenty (20) days hereof, a RICO case statement. The statement shall include the facts relied upon to initiate this RICO complaint as a result of the reasonable inquiry required by Rule 11 of the Federal Rules of Civil

_____

[1] If the party asserting a RICO violation is not the plaintiff, such as a counterclaimant, this requirement applies to such party as well.

Procedure. It shall use the caption numbers and letters set forth below, and shall state in detail and with specificity the following information.

1. **RICO Provision.** State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b) (c), and/or (d). All
   1.Proceeds of embezzled Faculty Practice Plan used for Sat. Club Membership,2. proceeds of faculty Practice plan embezzled, invested in Academic Healthprofessiona Insurance Association;a Reciprocal Insurance,mismanaged became insolvent,

2. **Defendants.** List each RICO defendant and state the alleged misconduct and basis of liability of each defendant.
   1.John B.King;Procuring/Filing/Uttering False documents,Offered to NPDB(Penal Code sec115)2. Michael McCartin;Forgery/Falsifying /Altering documents(Penal Code 470(a),Altering/passing Forged pt Documents(Pt A,B,E,C,GPenal.Code 470(d)

3. **Other RICO Violators.** List all alleged RICO violators. other than the defendants listed above, and state the alleged misconduct of each wrongdoer.
   1.M.McCartin,W. Dillon Embezzlement;$36.376+;pg178(P.code484
   2. M.McCartin,W.Dillon,Joyce villa;Embezzlent of $75,000s.money
   3.M.McCartin,W.Dillon,A.Novello/Medicaid failure to pay1o5Th owed plaintiff,4.Def E.Calm/IRSExtortion of$12,300+(PC523).4.D.Kredenser P.Disaia,M.McCartin,J.King;Perjury(P.C 118)

4. **Victims.** List the alleged victims and state how each victim was allegedly injured. 1.Plaintiff and all University Fac Practice Plan 's Money embezzled,used for partying,Invested in InsPlan(P.C,503)
   2.Patients A,E Euthanized to satisfy narcotic use of Dr S. Goodnaugh;State Agent(pg 139)(P.C 190(b,C)

5. **Pattern of Racketeering Activity.** Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information: 1.Embezzlement in the name of faculty Practice plan (M.MCCartin,W.Dillon;Pg's 178-183)(p.c523),
   2.Banking Fraud(pg 178, 23-24),
   3.Murderby I.Cohen,St Goodnaugh;P.C190(b,C)ptE
   4.Stealing from ECMC;to give to C.H(p.c484)

   a. List the alleged predicate acts and the specific statutes which were allegedly violated; 1.Felony Murder ;Patients,E,C,A(p.C 190(b.C)
   2.Cospiracy to defraud(Penal Code182;pg's 102-210,3.Taxol/Medicaid Fraud(pg's 175-187)(P.C 550(c)(2),4.Mail/Wire Fraud(Pg 183)(13usc 1341-1347)

   b. Provide the dates of the predicate acts. the participants in the predicate acts, and a description of the facts surrounding the predicate acts; 1.Fraud in Administration of Univ Faculty Practice Plan(pg 179;1985-1988),
   2. Retaliation for exposing Taxol Fraud(pg's 184-187),
   3.Perjury,Forgery,retaliation for exercising Civil Rights (pg's 107-141)

2

00101

c.  If the RICO claim is based on the predicate offenses of mail fraud, wire fraud or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place and contents of the alleged failures to disclose and/or misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations and/or failures to disclose were made:

1.Banking/Securities Fraud;TIAA-CREFF(Jeffrey Huston;12/21/2007/Citibank/(pg23-24),2.US Bank/H.Guerena Pg's 26-27,54-55;Penal codes 115/Forgery((P.Code 470(a)3. Key Bank 4. Court Fraud/Forgery;R.Cooper(P.Code 470(d)

d.  State whether there has been a criminal conviction for violation of the predicate acts and if so, provide particulars;

1.Toyota Motor sales,Ca DMV,Bob Wills of of SB Lexus(pg 100-102; Wire Fraud) 2.Taxol Fraud(BMS Co; pg's 175-187;patent Fraud) 3. In Re Ben venue Lab case...

e.  State whether civil litigation has resulted in a judgment with respect to the predicate acts and if so, provide particulars;

BMS Co settlement regarding Taxol Involving numerous States and Atty Generals

f.  Describe how the predicate acts are both "related" and "continuous" within the meaning of *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900 (1989) and its progeny, including *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).

1.McCartin and his former boss(spitzer). King&State university of New York were involved in Phony research and a fraudulent Scheme of embezzlement in the name of Faculty Practice Plan;they silenced/punished critics

6.  <u>Enterprise</u>.  Describe in detail the alleged enterprise for each RICO claim and specify just what structure it had. A description of the enterprise shall include the following information:

1.State University of NY at Buffalo had a master plan;altered for the benefit of William Dillon and his team at Children's hospital.Tim Trost committed fraud;refused To recuse himself and destroyed plaintiff's brilliant career ,made my life miserable

a.  The names of the individuals, partnerships, corporations, associations or other legal entities that allegedly constitute the enterprise;

1State University of New York At Buffalo Dept of Gynecology, 2.Roswell Park Ca Institute 3. Gynecologic Oncology group;all represented by McCartin/King/Tisch/Lippman Z Ring

3

00102

**20**

b.  The purpose, function and course of conduct of the enterprise, and whether its usual and daily activities were part of or separate from the pattern of racketeering activity. See *Chang v. Chen*, 80 F.3d 1293, 1298 (9th Cir. 1996.)

c.  Whether any named defendants are or were employees, officers or directors of the alleged enterprise;

d.  Whether you are alleging that the defendants are or were separate from the alleged enterprise, collectively constitute the enterprise itself, or are or were members of the enterprise; and

The vast majority are members of an extremist sect of a minorreligious group (Steve Piver,Wife S.Piver,L.Sternberg,I.L Cohen,Spitzer,B.Yaroslavsky, Sample ,F.Kavaler,Tisch and King)

e.  Whether (and if so how) the enterprise was affected by or benefitted from the pattern of racketeering activity.

They now have a monopoly over the practice of Gyn Oncology in Western N.Y;although some members(H.Caglar,T.Baker);never became certified

7.  Interstate or Foreign Commerce. Describe the effect of the activities of the enterprise on interstate or foreign commerce.

1.They fraudulently claimedTaxol was the answer to the treatment of ovarian cancer, their research was flawed(choice of histology,size of residual disease,statistical Gimmickery; GOG protocol178);they made billions in interstate/international Taxol sale

8.  Section 1962(a). If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

a.  State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and   1.Steve Piver  2. John Choate 3.T.Baker

b.  Describe the use or investment of such income.

Investment in Academic Health ProfessionalInsurance Co; Insolvent

9.  Section 1962(b). If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any

4

interest in or control of the alleged enterprise.

10.   Section 1962(c).  If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

    a.   State who is employed by or associated with the enterprise; and

    b.   State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).

       Members of the group(Gyn Oncology Group of UB/RPCI)

11.   Section 1962(d).  If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.

    The team(Enterprise)terminated plainttiff;under False Pretenses(termination never approved  within the meaning of law).They manufactured claims against plaintiff for the care of patients never formally transferred to my service/practice

12.   Injury to Business or Property.

    a.   Describe the alleged injury to business or property;

       They drove myoonessi,MD Pc out of business without ever charging the corporation

    b.   Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

       They embezzled funds from Plaintiff's corporation,they took  ownership of computers with my  patients/practice databse;they even murdered my patients to frame me.Then they said the outcome does not matter

13.   Damages.  List the damages sustained for which each defendant is allegedly liable.

    Plaintiff's practice grossed over 1.1 Million dollars/year,
    They have not paid my sick leaves,back pay/Vac pay/Settlement money

14.   State Claims.  List all supplemental state claims, if any.

    Please refer to Federal Complaint(CV 15-09329-SVW(KES)

Dated:   2/24/2016

*[signature]*

- 00104



CAUSE NO. _08-3132-J_

| | | |
|---|---|---|
| THE AMERICAN BOARD OF | § | IN THE DISTRICT COURT |
| OBSTETRICS AND GYNECOLOGY | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| v. | § | |
| | § | |
| MAHMOOD M. YOONESSI, M.D. | § | |
| Defendant. | § | 191ST JUDICIAL DISTRICT |

---

## FINAL SUMMARY JUDGMENT OF PLAINTIFF'S CAUSE OF ACTION

---

After considering Defendant Mahmood M. Yoonessi's Motion for Summary Judgment, the pleadings, the response, the affidavits, letter briefs, other briefs, the other evidence on file, the Clerk's entire file, and the argument of counsel, this Court finds that Defendant Yoonessi's Motion for Summary Judgment shall be and is GRANTED, and makes the following findings:

The Court finds there is no genuine issue of material fact, and that Defendant Yoonessi is entitled to summary judgment as a matter of law on Plaintiff ABOG's claims of breach of contract, abuse of process, and malicious prosecution. Further, all of the Plaintiff ABOG's objections to Defendant Yoonessi's summary judgment evidence are hereby *overruled;* and further

The Court finds that Defendant Yoonessi has asserted a counterclaim against Plaintiff ABOG, and has asserted Third Party Claims; however, Plaintiff ABOG and Defendant Yoonessi have submitted a Joint Motion for Severance of the Plaintiff's claims against the Defendant from Defendant Yoonessi's counterclaim and third party claims; and such Motion for Severance is and has been *granted* by the Court contemporaneously with the signing of this Order, thereby severing

---

FINAL SUMMARY JUDGMENT
Page 1 of 3

000263

this Judgment from the unadjudicated counter claim and third party claims and making this Judgment *final and appealable*.

IT IS THEREFORE ORDERED and DECREED that Defendant's Motion for Summary Judgment is GRANTED on Plaintiff ABOG's entire cause of action against Defendant Yoonessi; and

IT IS FURTHER ORDERED and DECREED that Plaintiff ABOG *take nothing* as to all claims, and its entire cause of action asserted in Plaintiff's Petition against Defendant Yoonessi; and

IT IS FURTHER ORDERED and DECREED that this Judgment disposes of all claims, and the entire cause of action asserted by the Plaintiff ABOG against Defendant Yoonessi and it therefore is a FINAL, APPEALABLE judgment; and

IT IS FURTHER ORDERED and DECREED that Defendant Yoonessi is awarded his Costs of Court against Plaintiff ABOG, and

IT IS FURTHER ORDERED and DECREED that all writ and/or other process necessary to enforce this Final Judgment are hereby authorized, ordered and allowed.

Dated: _April 11, 2008_.

_____
**DISTRICT JUDGE PRESIDING**

P. Gwen Chrisman, 44th District
Court Residing, Sitting for
the _____ District Court

000032
R28

_____
FINAL SUMMARY JUDGMENT
Page 2 of 3

000697
State's Exhibit 2

1655
000070    09106

*Table of Contents*
*Writ Petition 2022*

*MBOC  Accusations &related Motion*

Petitioner's "Motion in Limine  to Exclude All MBOC
Submissions"

00106

**FILED**

OCT 28 2021

Office of Administrative Hearings
By_____

1  Mahmood Yoonessi

2  6790 Crest Rd,

3  Rancho Palos Verdes Ca 90275

4  Myoonessi75@gmail.com

5  Ph: 310.303-1671

6

7  Mahmood Yoonessi,Myoonessi,MD PC,        Case No.:OAH 2021080903

8  Applicants,petitioner and counter          MBOC;800-2020-073101

9  claimant                                   Pleading Title;Motion in limine

        V                                     To exclude all MBOC submissions

10 Medical Board of California,William        Previously ordered excluded by NY

11 Prasifka,D.K Kredentser,Barbara            Appellate division D&O:Grp1.A482-

12 Yaroslavsky ,Andrew Cuomo, State           A3367,Grp2;A1714-A3562,Grp3;A2087-

13 University of New York at Buffalo all       A3466,Grp 4;A456-A3368,Grp5;A3639—

14 individually and Does 1-50                  A3678) EX A; pg's000004- 000136

15 Enforcers /Respondents                     Before Hon Chief ALJ J.Schlichtmann

16 **Introduction**

17 Petitioner received a Notice of hearing (G.C 11509); hearing date set

18 11/18/2021.pursuant to; Ca Gov Code (GC 11509).In relevant parts the GC 11509

19 states:

20 "...You are entitled to represent yourself without legal counsel. You may present any

21 relevant evidence, and will be given full opportunity to cross-examine all witnesses

22 testifying against you. You are entitled to the issuance of subpoenas to compel the

23 attendance of witnesses and the production of books, documents or other things by

   applying to MBOC/OAH":

24 The Medical Board of California (hereafter MBOC) has produced two sets of

25 documents, not accessible online:

26 One Set of documents    fastened starts with a cover page dated May 14, 2021;

27 labeled" Discovery Production, MBOC case No;800-2020-073101.

28                                          1

**-00107**

**000012**

1  .The next set labeled MBOC starts With Attachment No 10.

2  Relevant evidence, completing the records is submitted (Pages 000001-00000518.

3

4  These documents are not paginated they are not certified. A certification

5

6  The attachments No 18 and 19 are accompanied by a document under the heading

7  of MBOC; Enforcement Program, carries Governor Gavin Newsom's name, is signed

8  not sworn to  Mr. William Prasifka.

9

10  The documents submitted by honorable Brenda Reyes is objected to and a motion in

11  limine is filed.

12  Accepting the documents correcting, completing MBOC's s, is requested and this

13  motion in limine is filed on the following grounds:

14      A. Documents submitted by MBOC are  deceptive ,Constitute "Manufactured

15      B. And altered ones (18 USCA 1519); not a "Certified copy of the enclosures",

16      C. It contains a long list of accusations prepared by Atty "Peter Van Buren"

17          dated Nov 26,2011who never appeared in the case before honorable Justice

18          Glownia  or who Stayed the Summary suspension,or original NY panel,

19      D. It is attributed to Dr John Choate :dated6/5/2002Who died shortly thereafter

20          and the cause of his death was never disclosed(?Murder,?Suicide),

21      E. It refers to the case of patient A; whose record was never before the original

22          panel. Her demise was attributed to the insertion of  a right femoral arterial

23          line, damaging her vascular graft by Dr Stephen R.Goodnough ,with history

24          of Drug addiction(murder no 1),

25      F. It refers to Patient E; whose record was not before panel , coroner reported

26          the cause of her death as : Morphine Intoxication, the expert and panel

27          disputed that ;reported it as a Septic Shock despite the fact her cultures were

28          all negative,

2

-00108

000013

G. It refers to the case of patient B and her chemotherapy of the years 1989-1995;her record produced was from1996,

H. It refers to the case of Patient C and lists her death from metabolic derangement due to ovarian cancer; her autopsy report shows she had 2000 ml blood in her R Pleural cavity as a direct result of a "Thoracentesis",

I. It also includes references to Patient K.Kaiser (#10) , J.M.Lemons ,and M.R (M.Rataczak)whose records were never produced.In support of this request a Memorandum of Law and supporting documents/Exhibits are submitted

Respectfully submitted:

Mahmood Yoonessi

6790 Crest Rd,

Rancho Palos Verdes Ca 90275

Myoonessi75@gmail.com

Ph: 310.303-1671

| | |
|---|---|
| Mahmood Yoonessi,Myoonessi,MD PC, Applicants,petitioner and counter claimant<br><br>V<br><br>Medical Board of California,William Prasifka,D.K Kredentser,Barbara Yaroslavsky ,Andrew Cuomo, State University of New York at Buffalo all individually and Does 1-50 Enforcers /Respondents | Case No.:OAH 2021080903<br>MBOC:800-2020-073101<br>Pleading Title;MOL in support of Motion in limine To exclude all MBOC submissions Previously ordered excluded by NY Appellate division D&O:Grp1.A482-A3367,Grp2;A1714-A3562,Grp3;A2087-A3466,Grp 4;A456-A3368,Grp5;A3639—A3678) EX A: pg's000004- 000136<br>Before Hon Chief ALJ J.Schlichtmann |

3

*Table of Contents*
*Writ Petition 2022*

*Exhibits ;sealed & admitted*

 OFFICE OF ADMINISTRATIVE HEARINGS

STATE OF CALIFORNIA

# SEALED EXHIBIT N-1

(See Sealed Confidential Records Pages 1 through 17)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-1: Miscellaneous Documents has been sealed.

# CAPITAL DISTRICT
# HEMATOLOGY ONCOLOGY ASSOCIATES

317 South Manning Blvd • Suite 310 • Albany, New York 12208 • (518) 489-0044 • FAX (518) 489-3591

## EVALUATION OF MEDICAL RECORDS

### Mahmood Yoonessi M.D.

At the request of Mark Fantauzzi, Assistant Counselor for the Office of Professional Medical Conduct, State of New York, I have reviewed 10 case records of patients cared for by Dr. Mahmood Yoonessi. For each case examined the entire hospital record for all the admissions in question were reviewed in detail. In addition for those patients followed in Dr. Yoonessi's office, the office records as provided were reviewed in detail. In addition the report of interviews held between the Office of Professional Medical Conduct and Dr. Yoonessi were also reviewed as were those interviews with patients or other physicians involved with these cases. In addition, in regards to Dr. Yoonessi's chemotherapy protocol, I have reviewed a copy of his paper that had been submitted to the European Journal of Gynecologic Oncology. In a detailed search of the literature using Medline search, I was unable to find any other reference to this chemotherapy regimen. In addition, I reviewed standard texts utilized by gynecologic oncologists from 1979 to the present and found no reference to this specific protocol.

In analyzing the medical records of these 10 cases, the progress notes rendered by Dr. Yoonessi in the medical records charts were often illegible and when they could be deciphered were often uninformative regarding the patients' current condition. The notes were often untimed and their place in the medical record could only be inferred. He often failed to provide an adequate description of the condition of these severely ill patients. His thoughts and treatment plans were often nonexistent or vague. Dr. Yoonessi uses preprinted office forms with check boxes for history and physical examination. As one examines these closely, they seem to be filled out in a proforma manner with little thought to the patient's current condition. Dr. Yoonessi failed to keep any chemotherapy flow charts regarding the patient's treatment, blood counts, or serial physical examinations. This made following the patients clinical course extremely difficult.

Each case will be reviewed separately.

Case #1: Johnny Mae Lemons, MR #960033. Buffalo General Hospital, Buffalo NY.

1. CASE SUMMARY:

The patient was a 74 year old African American woman who was admitted to Buffalo General Hospital on September 16, 1997 with shortness of breath. She was known to have had a large ovarian tumor and had been previously seen by Dr. Yoonessi 6/96 at which time she was noted to have a 34 x 26 x 19 cm cystic pelvic abdominal mass. She had refused treatment for this condition in 1996. She was admitted under the care of Dr. L. Sifontes, who felt that the patient's admitting condition was poor with a guarded prognosis. He felt that the most appropriate care was to make the patient comfortable and try to encourage her to have fluid removed. A Gyn oncology consultation was obtained from Dr. Yoonessi. During her hospitalization she made it clear to the nursing staff and to Dr. Sifontes that she did not want any invasive procedures performed, including placement of an NG tube. She also refused a CT scan of the abdomen and pelvis. On 9/18/97 she was made DNR by her

**DANIEL C. KREDENTSER, MD, FRCSC, FACOG**
Diplomate of the American Board of Obstetrics and Gynecology and Gynecologic Oncology

359-0011

FCA 801

MEDICAL RECORD NUMBER: 960 - 033

PATIENT NAME: LEMONS, JOHNNY Mae

DATE EXPIRED: 9-24-97

000540

TIME OF DEATH: 7:18 p.m.

ADMISSION DATE: 9-16-97

C955

PLEASE CHECK ONE OF THE FOLLOWING:

INPATIENT __V__ OUTPATIENT ____ D.O.A. ____ EMERGENCY ROOM ____

AUTOPSY: YES ____ NO ____

ATTENDING PHYSICIAN Dr. Sifontes, Lionel

---

HOSPITALIZATION. Do not include current hospitalization.

| 20A. BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION: (Specify) | MONTH DAY YEAR | 20B. PLACE OF BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION | 20C. LOCATION: (City or town and state) |
|---|---|---|---|
| 21A. NAME AND ADDRESS OF FUNERAL HOME: | | | 21B. REGISTRATION NUMBER: |
| 22A. NAME OF FUNERAL DIRECTOR: | 22B. SIGNATURE OF FUNERAL DIRECTOR: | | 22C. REGISTRATION NUMBER: |
| 23A. SIGNATURE OF REGISTRAR: | 23B. DATE FILED: MONTH DAY YEAR | 24A. BURIAL OR REMOVAL PERMIT ISSUED BY: | 24B. DATE ISSUED: MONTH DAY YEAR |

ITEMS 25 - 33 COMPLETED BY CERTIFYING PHYSICIAN — OR — ITEMS 25 - 33 COMPLETED BY CORONER OR MEDICAL EXAMINER

25A. TO THE BEST OF MY KNOWLEDGE, DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSES STATED. SIGNATURE: *[signature]* MONTH DAY YEAR 09 26 97

25A. ON THE BASIS OF INVESTIGATION AND SUCH EXAMINATIONS, AS I FELT NECESSARY, IN MY OPINION DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSES STATED. SIGNATURE AND TITLE: ☐ CORONER ☐ CORONER'S PHYSICIAN ☐ MEDICAL EXAMINER

25B. THE PHYSICIAN ATTENDED THE DECEASED FROM MONTH DAY YEAR 19 — 09 24 97  25C. LAST SEEN ALIVE BY ATTENDANT: MONTH DAY YEAR 09 24 97

25B. PRONOUNCED DEAD ON MONTH DAY YEAR  25C. HOUR: m  25D. DATE SIGNED: MONTH DAY YEAR

25D. NAME OF ATTENDING PHYSICIAN: LIONEL A. SIFONTES

25E. SIGNATURE OF CORONER OR CORONER'S PHYSICIAN, IF OTHER THAN CERTIFIER:

25D. ATTENDING PHYSICIAN LICENSE NUMBER 103480  25F. MED/COR. PHYS. LICENSE NUMBER

25. NAME AND ADDRESS OF CERTIFIER WHO SIGNED 25A. 277 MAIN ST. BFLO. N.Y. 14214

| 27. MANNER OF DEATH: | | | | | 28. WAS CASE REFERRED TO CORONER OR MEDICAL EXAMINER? | 29. AUTOPSY? | 29B. IF YES, WERE FINDINGS USED TO DETERMINE CAUSE OF DEATH? |
|---|---|---|---|---|---|---|---|
| NATURAL CAUSE ☒₁ | ACCIDENT ☐₂ | HOMICIDE ☐₃ | SUICIDE ☐₄ | UNDETERMINED CIRCUMSTANCES ☐₅ PENDING INVESTIGATION ☐₆ | NO ☐₁ YES ☐₂ | NO ☐₁ YES ☐₂ MERGED ☐₃ | NO ☐₁ YES ☐₂ |

CONFIDENTIAL    SEE INSTRUCTION SHEET FOR COMPLETING CAUSE OF DEATH    CONFIDENTIAL

| 30. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), AND (C).) | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| PART I. IMMEDIATE CAUSE (A) CARDIORESPIRATORY FAILURE | 4 WKS. |
| DUE TO OR AS A CONSEQUENCE OF: ANASARCA. | 6 MOS |
| DUE TO OR AS A CONSEQUENCE OF: MASSIVE OVARIAN CYST | > 3 years |
| PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A). HYPERTENSION | |

| 31A. IF INJURY, DATE: MONTH DAY YEAR | 31B. HOUR: m | 31D. LOCALITY: (City or town and county and state) | 31C. DESCRIBE HOW INJURY OCCURRED: |
|---|---|---|---|
| | | | 00112 |
| 31D. PLACE OF INJURY: | 31E. INJURY AT WORK? NO ☐₀ YES ☐₁ | 32. WAS DECEDENT HOSPITALIZED IN LAST 2 MONTHS? NO ☒₀ YES ☐₁ | 33A. IF FEMALE, WAS DECEDENT PREGNANT IN LAST 6 MONTHS? NO ☒₀ YES ☐₁ | 33B. DATE OF DELIVERY: MONTH DAY YEAR |

DOH-1961 (1/95)

VS-60

SIFONTES, LICHEL

45

| TIME | ORDERS |
|------|--------|

T.O. Dr Stantes/ W

MSO1  10mg SO' Q 4° ATC

MSO1  5mg  Q 2° SO PRN SOB Pain

Ativan  5mg  IM  Q 8° PRN air hunger, restlmnm

(signature)

177   T.O. DR YoONUSSi

750   #80  ORDER STAT U/S OF ABDOMIN + PELVIS
      IF POCKETS OF FLUID PRESENT, MARK IT.
      #81  2D ECHO (HEART)
                              lues  D. amelt  9/3/97

Obtain consents from patient & niece 9/24
2210  Dr Lewin - introducing a catheter introducing
      a catheter in the vein going to the
      heart chamber & lung for the purposes
      of monitoring fluid & heart/lung
      function, "swan ganz"

Dr Yoonessi - opening abdomen; removal of
      tumor; removal womb/tubes & ovaries;
      biopsy of lymph glands; possible removal
      partial bowel obstruction, & reconnection
      "exploratory laparotomy"
1/23 2230  T.O Dr Yoonessi/ Brenda a M    lues  RN - 00113

PHYSICIAN'S ORDER
(T63)

EXHIBIT
N-10



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-2

### (See Sealed Confidential Records Pages 18 through 24)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-2: Miscellaneous Documents has been sealed.

000121

8645

## Questions

1) Was there appropriate documentation in the chart relative to Dr. Yoonessi's communication with the patient and the family regarding the diagnosis and his plan of treatment? Dr Yoonessi documents in his consultation and in the progress notes that he discussed this situation with the patient and her niece. He did not always document their response.

2) Was there appropriate documentation of consent for surgery by the patient and her family? The only clear documentation in the chart was that the patient refused repeatedly any invasive treatment. There was no documentation for surgical consent.

3) Was there sufficient documentation relative that Dr. Yoonessi's communication with the admitting physician and nursing staff relative to the rationale for surgery? In Dr. Yoonessi's original consultation he recommended exploratory laparotomy. He recommended this as the only medical treatment option. He did not discuss Hospice care or the patient's prior refusal for surgery. It had been clearly documented on 9/18 that the patient did not want any invasive procedure or resuscitation. Dr. Yoonessi does not address this in his consultation. He apparently did communicate with Dr. Sifontes on 9/22/97 at which time Dr.Sifontes felt that the patient needed Swan-Ganz catheter and resuscitation prior to any definitive treatment.

4) Was it appropriate for Dr. Yoonessi to schedule surgery for the patient? No it was not appropriate to schedule surgery on this patient for all of the above reasons. Paramount to this was her constant refusal of any invasive procedure for over a year prior to this presentation. Although Dr. Yoonessi asked for consents from the patient and niece, there is no documentation that surgery was every scheduled.


## Case #2: Irene Kaluzny, MR #388341 Buffalo General Hospital, Buffalo, NY

### 1. CASE SUMMARY

The patient is a 68 year old white female admitted to Buffalo General Hospital with a 3 month history of abdominal swelling. She also reported a 10 lb weight gain over the 2 months prior to admission. She denied any urinary tract or gastrointestinal symptoms. Physical exam on admission revealed a large pelvic abdominal mass. CT Scan showed ascites and bilateral pelvic masses. Barium enema showed a partially obstructing lesion involving the mid-sigmoid. Her pre admission CA 125 was elevated to 1000. The patient underwent exploratory laparotomy on August 20, 1992. At the time of surgery there were 5 liters of ascites noted within the peritoneal cavity. There were small diaphragmatic implants. There was extensive tumor involvement in the omentum and bilateral ovarian mass on the right measuring 5 x 6 inches and the left measuring approximately 5 inches. There were implants on the sigmoid colon and also in the mesentery of the small bowel. The patient underwent a bilateral salpingo oophorectomy, omentectomy, pelvic and periaortic lymphadenectomy and tumor reductive surgery. A portacath catheter was also placed. The patient's post-operative course was unremarkable. She did have problems with recurring ascites. She was started on chemotherapy on the 7th post operative day and this consisted of CisPlatin 50 mgs. Cyclophosphamide 300 mgs and Medroxyprogesterone acetate 500 mgs. The patient was discharged home on the 8th post-operative day. A cardiac ejection fraction obtained during that hospitalization was 46% with no focal wall motion abnormalities. The patient subsequently received a total of 16 cycles of chemotherapy prior to her terminal admission March 1993. It is difficult to ascertain exact treatment regimen that the patient received as Dr. Yoonessi did not keep chemotherapy flow sets, which is standard procedure. However as best can be gleaned from his chart, her chemotherapy is summarized below:

00115



| Cycle # | Date | Cisplatin | Cytoxan | Depopro | Adria | 5FU | HXMM | MTX |
|---------|------|-----------|---------|---------|-------|-----|------|-----|
|  | 8/29/92 | 50 | 300 | 500 | 40 |  |  |  |
|  | 9/4/92 | 50 |  | 100 |  |  |  |  |
|  | 9/11/92 | 50 | 200 | 100 |  |  |  |  |
|  | 9/18/92 | 50 |  | 100 |  |  |  |  |
| 5 | 9/25/92 | 50 | 500 | 100 |  |  |  |  |
| 6 | 10/2/92 |  |  | 100 |  | 500 |  |  |
| 7 | 10/9/92 | 40 |  | 100 | 40 |  | 200X2d |  |
| 8 | 10/16/92 |  |  |  |  |  |  |  |
| 9 | 10/27/92 | 40 |  | 100 |  |  | 200X2d |  |
| 10 | 11/3/92 | 50 |  | 100 | 40 |  | 200X2d |  |
| 11 | 11/24/92 |  | 500 | 100 |  | 500 | 200X2d | 500X2d |
| 12 | 12/16/92 | 70 |  | 100 | 50 | 500 | 200X2d |  |
| 13 | 1/5/92 | 70 | 500 | 100 |  | 500 | 200X2d | 500X2d |
| 14 | 1/26/92 |  |  | 100 | 60 | 500 | 200X2d |  |
| 15 | 2/26/92 |  |  | 100 |  |  | 200X2d | 500X2d |
| 16 | 2/13/92 |  | 500 | 100 |  |  | 200X2d | 500X2d |

Depopro=Depot medroxyprogesterone acetate; Adria=Adriamycin; 5FU=5-fluorouracil;
HXMM=altretamine; MTX=methotrexate

All doses in milligrams

In addition the doses were always prescribed in milligrams rather than expressing milligrams per meter squared, which is the standard of care. There are frequent changes in the patient's doses although the reason for this is not always stated. In addition, this patient had an admission on 10/22/92 for a pulmonary embolism. In spite of this admission, the patient continued to receive Depo-Provera on a weekly basis. It should be noted that active thromboembolic disease is a contraindication to hormonal therapy.

Chemotherapy toxicity was followed with physical examination, blood chemistry and CBC. The success of treatment was monitored by physical examination, no post operative imaging studies or CA 125's are recorded. Her left ventricular ejection fraction was never checked after the original ejection fraction.

The patient was admitted to Buffalo General Hospital 3/1/93 complaining of increasing shortness of breath for 2 days prior to admission. She also complained of marked weakness, lethargy and increasing swelling of her lower extremities. On admission her heart rate was 140 beats per minute with a respiratory rate of 28 per minute. She also was noted to have increased neck veins and decreased breath sounds in the right lung one-third to one half way up the posterior chest with scattered crepitations. There was minimal right upper quadrant tenderness with her liver 2 cm below the right costal margin. Chest x-ray on admission showed a moderate right pleural effusion, borderline cardiomegaly and mild congestive heart failure. Her cardiogram showed a sinus tachycardia. Her admission lab data showed an increase in her BUN and Creatinine to 40 and 2.1 respectively. Her AST was 159, ALT 197, LDH 675, Hgb 9.6. The



Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658

| PATIENT NAME AND ADDRESS | REGISTRATION NUMBER | MEDICAL RECORD NUMBER |
|---|---|---|

ADMIT DATE/TIME ████

REG BY N4025.1

14

BIRTHDATE 07/01/93  AGE 69  SEX F  RACE W  MARITAL STATUS W

GUARANTOR NAME & ADDRESS

EMPLOYER NAME AND ADDRESS: NONE

(G80)

RELN 1

PHONE NUMBER  716-685-4768  RELN D

52 BANCO

1 A05 134076631D    MEDICARE OUTP'A
2 K11 094180958  83500  GM COMPLEMENTA

NOTIFIED: POLICE / CORONER / ADMITTING DOCTOR   BY WHOM   TIME

BROUGHT IN BY: 1 RELATIVE  2 SELF  3 AMB  4 POLICE  5 OTHER    3

FAMILY DOCTOR: YOONESSI, MAHMOOD MD  /685-6394  (716)884-3945   COMPENSATION: YES / NO   COMPENSATION PHYSICIAN

EMERGENCY DOCTOR: FLASCHNER, STEVE MD   S  03/01/93  00:00

CHIEF COMPLAINT: ꓓꓑꓵ BREATHING    517785 2   EVALUATION TIME

PHYSICIAN FINDINGS

TIME: 2350    ALLERGIES: NKA

**HISTORY**
- A ☐ PROBLEM FOCUSED
- B ☐ EXPANDED PROBLEM FOCUSED
- C ☐ DETAILED
- D ☐ COMPREHENSIVE

69 yo wf c̄ hx Metastatic Ovarian Ca last Fall c̄ PE 3 w/o S/P Surgery - Now on Coumadin. Pt is chronically SOB - but much worse last 2 days — presents to ER in severe resp distress.

- Pl.y: Stage III

**EXAMS**
- E ☐ PROBLEM FOCUSED
- F ☐ EXPANDED PROBLEM FOCUSED
- G ☐ DETAILED
- H ☐ COMPREHENSIVE

Presentation to ER: 80/P - 137-28-96⁴
12 am:  109/86 - 137- (L-40)
Elderly wf in mod. severe resp distress
HEENT: AS / NC  PERRLA
NECK: ↑ JVP
CHEST: ↓ BS ℗ base  c̄ diffuse rhonchi
HEART: S₁S₂ tachycar + reg
ABD: BS + Marked abd. distention + tympanitic dull.
EXTR: no CCE, Full ROM.
NEURO: Alert + oriented.

EKG: ST @ 145-150  LAE
nl axis, ↓ T waves I, L, V₅ V₆
poor R wave prog. V₁-V₄ (new in V₃-V₄ since 10/92)
ABG (4LNC): 7.37 /25 /111 /14.4

↑ LFT's  AST 159  ALT 197  LDH 675

**DECISIONS**
- I ☐ STRAIGHT FORWARD
- J ☐ LOW COMPLEXITY
- K ☐ MODERATE COMPLEXITY
- L ☐ HIGH COMPLEXITY

✱ 000313

137
40  2.1  ██  6.5 ██ 100  C97  4/4  9.6  29  90  344  FIO 000195

(PT - 30 ) PTT- 35.3

| DISCHARGE CONDITION | ☐ GOOD ☐ FAIR ☐ POOR ☐ CRITICAL | DISPOSITION | ☐ DISCHARGE X ADMIT ☐ ROOM NO. ☐ DEATH | TIME / DATE | DISCHARGE DIAGNOSIS |
|---|---|---|---|---|---|

CHF, ℗ Pleural Effusion.

DOCTOR'S SIGN ████   NURSES SIGN ████   INSTRUCTIONS GIVEN ☐ YES ☐ NO  00117

EMERGENCY DEPARTMENT    THE BUFFALO GENERAL HOSPITAL    CHART COPY



**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

Robert Scheig, M.D., Head
Department of Medicine
School of Medicine
Faculty of Health Sciences
Buffalo General Hospital
100 High Street
Buffalo, New York 14203
(716) 845-2272

May 19, 1993

Mahmood Yoonessi, M.D.
355 Linwood Avenue
Buffalo, NY 14209

RE:  **Irene Kaluzny**
       **Med. Record #388-341**
       **Date Expired:  3/6/93**

Dear Dr. Yoonessi:

The University Mortality Committee of the Department of Medicine met and
reviewed the chart of Irene Kaluzny, a woman who had been admitted to Dr.
Janet Sundquist's service when you could not be reached.  This patient had
terminal metastatic ovarian carcinoma and a rapid atrial fibrillation.
Without being asked to see the patient, you countermanded a Do Not Resuscitate
Order without the patient's permission and without the knowledge or permission
of the physician caring for the patient.  This is unacceptable and I do not
expect it to occur again.

Sincerely yours,

Robert Scheig, M.D.
Professor of Medicine

RS/ajb

cc:  Richard Kurzel, M.D.
     Ms. Marian Swanson

00118

# THE BUFFALO GENERAL HOSPITAL

REGISTRATION FORM

KALUZMY    IRENE
400 WALDEN AVE
BUFFALO    NY    14211    14

REGISTRATION NO. 5174852

03/01/93    22:44

BIRTHDATE 09/05/23    AGE 69    SEX F    RACE W    MARITAL STATUS W

SOCIAL SECURITY NO. 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
PHONE NUMBER 716-894-1756

EMPLOYER NAME AND ADDRESS NONE

MAIDEN NAME KWIATKOWSKI
MOTHER'S NAME

GUARANTOR NAME AND ADDRESS
KALUZMY    IRENE
400 WALDEN AVE
BUFFALO    NY    14211

PHONE NUMBER

SECOND CONTACT

SOCIAL SECURITY NO. 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
PHONE NUMBER 716-894-1756
RELN 1

NEAREST RELATIVE NAME AND ADDRESS
KACZMARCYZK    JANICE
52 BANCO
DEPEW    NY    14043
716-685-4788    D

**AA256**

Sullivan 3/3, Luetyen-Nikoson 3/4

ATTENDING PHYSICIAN YOUNESSI, MAHMOOD MD
C. O'Neill
ADMITTING PHYSICIAN SULEWSKI, JOAN M. MD
DIAGNOSIS CHF    428.0

#1 A9J 134076631D    MEDICARE ACUTE
#2 K11 094180958    83500    GM COMPLEMENTAR
#1 Z01 134076631D    M/CARE IP PART

RELIGION: CAT    WARD:    TEACH:    SERVICE: GYN
**** DO NOT USE ABBREVIATIONS ON FACE SHEET ****

PRINCIPAL DIAGNOSIS: Congestive heart failure    428.0 ①
Atrial fibrillation/flutter    511.9 ②

SECONDARY DIAGNOSIS: metastatic ovarian cancer    427.32 ③
renal failure    427.31 ④
V12.5 ⑤

PROCEDURES: thoracentesis    3/4    34.41 ①
Plasma    3/4    99.07 ②

000906

ABSTRACTED

**EXHIBIT N-7**

THE FOLLOWING SECTION
TO BE COMPLETED FOR
INPATIENTS ONLY

KnW

000321 P. O'Neill MD

591

MEDICAL RECORD NO. 388341

ATTENDING PHYSICIAN

3-0-93

00119

COMPLETE ✓

DISCHARGE STATUS: ☐ HOME  ☐ EXP DOA  ☐ EXPIRED  ☐ JAIL  ☐ SHR
☐ AGAINST MEDICAL ADVICE  ☐ EXP IN POST OP  ☐ AUTOP  ☐ ME
TRANSFERRED TO: ☐ HOSPITAL  ☐ HOME CARE  ☐ SNF  ☐ HRF  ☐ PSYCH CTR



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-3
### (See Sealed Confidential Records Pages 25 through 28)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-3: Miscellaneous Documents has been sealed.



there were difficulties in reading the order sheets with potential for grave error in nursing. For example, on 9/18 it was difficult to ascertain whether this should have been Cis Platin at 50 mgs or 150 mgs. In addition often times the physical exam was rudimentary and appears to be by rote. Vital signs are often not documented in the chart prior to chemotherapy.

Case #3: Elisabeth Steinbroner, Medical Record #1099960, Buffalo General Hospital, MR #1008245 DeGraff Memorial Hospital

1. CASE SUMMARY

The patient was a 76 year old who presented to DeGraff Memorial Hospital with post menopausal bleeding of less than one days duration. She otherwise was without complaints. The patient's past medical history was remarkable for severe coronary artery disease. She underwent a coronary bypass in 1996. Following this operation the patient developed renal failure and had been on dialysis ever since. She also was suffering from depression after the onset of this complication. She refused to eat for approximately 6 months and was fed through a feeding tube. Physical exam on admission was positive for scattered rhonchi at both lung bases. In addition pelvic examination revealed blood in the vagina and the uterus enlarged to 4 fingerbreadths above the pubis and fixed posteriorly. The patient had mild lower abdominal tenderness and vague adnexal tenderness. The patient's Hgb on admission was 12.9. The patient was described by the admitting nurse as being confused and disoriented. Admitting cardiogram showed normal sinus rhythm with occasional premature ventricular contractions, non specific ST-T wave changes and left ventricular hypertrophy. Her chest x-ray showed cardiomegaly. The patient underwent a D&C with the uterus sounding to 10 cm. Submucosal leiomyomata were felt and there was a large amount of bleeding noted by the operators, Dr. Yoonessi and Dr. Lewis. The pathology was benign with no evidence of carcinoma. On 8/21 post operatively the patient was quite drowsy. The nurses noted that there was only a small amount of vaginal bleeding. However in the note of Dr. Lewis dated 8/22/97 she noted that the patient was still having vaginal bleeding and she discussed this with Dr. Yoonessi and the family. It had been arranged for the patient to undergo dialysis the next day and following that she was going to be readmitted for total abdominal hysterectomy. A note by the nursing staff on 8/22 following Dr. Lewis's note, notes a very scant amount of bloody drainage on the peri pad. The patient was readmitted 8/23 after having undergone dialysis at the Niagara Renal Care Center. A note from the nursing staff dated 11 p.m. to 7 a.m. 8/23 to 8/24 said, "no vaginal bleeding noted this shift". The patient's Hgb was stable throughout. Dr. Yoonessi saw the patient and her family on 8/24/97 and made a recommendation for surgery. His note states, "they seem to understand the proposed procedure". The husband, rather than the patient, signed all consents, although there is no documentation that the patient was incompetent. On 8/25 Dr. Lewis discussed with the family and answered their questions regarding the treatment options and surgery. The patient told Dr. Lewis that she would prefer not to have surgery and to stop her dialysis and to be placed on Hospice care. The patient was seen at 2 p.m. by Dr. Yoonessi. The note from the nurse states that the patient and the family wanted to proceed with surgery as planned. The patient was taken to the operating room on 8/25/97 where she underwent exploratory laparotomy, total abdominal hysterectomy, bilateral salpingo oophorectomy and appendectomy. During the course of her surgery the operators felt that there was purulent ascites. They felt that this may have come from a perforated appendix. The patient was also noted to have leiomyomata. There were no complications during the surgery. Blood loss was noted to be 400 ccs. Final pathology report revealed leiomyomata, focal adenomyosis. The tubes and ovaries were unremarkable. The appendix showed some obliteration of the distal lumen but no evidence of appendicitis. The fluid was negative for infection. The patient was seen by Dr. Yoonessi on 8/26/97 and was noted to have a stable first post op day. The patient, however, is noted by the nursing staff to be quite lethargic. Her pedal pulses were not present. Her feet



```
-PATIENT NAME/ADDRESS--------------------   | PATIENT NO      MED REC NO
   STEINBRONER   ,ELISABETH J .             |      3174844      1008245
   7923 LINDBURGH  AVE                      | ADMIT DATE/TIME     RM-BED
   NIAGARA FALLS     NY    14304      14     | 08/20/97  22:07    553-2
   SS#: 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 . PHONE: 716-283-8998   | DOB     AGE  SEX RACE  MS
   MAIDEN NAME      MOTHERS NAME             | 01/15/21  76   F   W    M
   CLEERBOUT       CLEERBOUD                 |-PATIENT EMPLOYER------------
-GUARANTOR----------------------------------| RET RAMADA INN
   STEINBRONER      , ELISABETH J           |
   7923 LINDBURGH  AVE                      |
   NIAGARA FALLS     NY    14304   RELN: S   |  PHONE:
   SS#: 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  PHONE: 716-283-8998    |  OCCUP:
-EMERGENCY CONTACT--------------------------|-ADVANCE DIRECTIVE-----------
   STEINBRONER      GEORGE                   |
   7923 LINDBURGH  AVE                      | EXECUTED ADVANCE DIRECTIVE? N
   NIAGARA FALLS     NY    14304             | COPY ATTACHED TO MED REC?   N
   PHONE: 716-283-8998   RELN: U            | INFORMATION PROVIDED TO PT? Y
-INSURANCE(S)-------------------------------|----------------------------
   #1 A97 493323131A        MEDICARE ACUTE   | ATTENDING MD:
   #2 B89 493323131    27502  BLUE CROSS I/P |  LEWIS, CLEMENTINA
   #                                         | ADMITTING MD:
   #                                         |  LEWIS, CLEMENTINA
--------------------------------------------| ADMIT DIAGNOSIS:
           TREAT AUTH ID:                    | VAGINAL BLEEDING
--------------------------------------------|----------------------------
   RELIGION: CAT    WARD: N    TEACH:       | SERVICE: MED    ASU LOC: MED
```

PRINCIPAL DIAGNOSIS/_____

IMPRESSION
   OBS @ 2³⁰pm 8/1/97

SECONDARY DIAGNOSIS: 8/23/97 Dach to Niagara Renal Care 3ᵗʰpm
   returned 9³pm 8/23/97 to admit

PROCEDURES/COMMENTS:

DO NOT REMOVE
THIS DOCUMENT
FROM CHART

537

EXHIBIT
N-1

```
ADMIT STATUS: YEO  GAF SCORE:AD    /DS
DISCHARGE STATUS: ATH  ANESTHESIA TYPE: 30
REFERRING MD:  ER
CONSULTING MD: Vanessi
CONSULTING MD:
PCR#               NB WEIGHT:
CODED BY:    J     DNR STATUS:
```

```
              DATE        ATTENDING MD
ACUTE  6   ALC       ALC DT
COMPLETE:           OPC   R   DIA
MED REC NO:   DISCHARGE DATE:
   1008245                8/26/97
```

BUFFALO GENERAL HOSPITAL
BUFFALO, NEW YORK

DNR DOCUMENTATION FORM #6

MINOR PATIENT –
CONSENT BY PARENT/GUARDIAN

his form describes the steps which are to be followed to issue a Do Not Resuscitate order ("DNR" order) for a minor patient.  A DNR order may be issued, with the consent of the patient's custodial parent or legal guardian, when the conditions described below are met.

### Determination by Attending and Concurring Physicians
I have personally examined the patient, and have determined to a reasonable degree of medical certainty that:  (check one or more)

- the patient has a terminal condition (an illness or injury from which there is no recovery, and which reasonably can be expected to cause death within one year):  or
- the patient is permanently unconscious:  or
- resuscitation would be medically futile (i.e. CPR would be unsuccessful, or the patient will experience repeated arrest in a short time period before death occurs):  or
- resuscitation would impose an extraordinary burden on the patient, in light of the patient's medical condition and the expected outcome of resuscitation.

_Younessi_____      _____
Attending Physician                              Date

_____      _____
Concurring Physician                             Date

### Consent by Parent or Guardian
I hereby authorize Dr. _____ to issue a DNR order concerning my child _____.  I understand that this means that cardiopulmonary resuscitation (CPR) will not be attempted in the event of a cardiac or respiratory arrest.  I have been given information concerning the patient's diagnosis and prognosis, the range of available resuscitation measures, and the reasonably foreseeable risks and benefits of CPR, in making this decision.  I have taken into consideration the patient's wishes, including the patient's religious and moral beliefs.

_George P. Steinbrouer_____      _____      _____
Signature of Parent/Guardian        Date          Witness to Signature of Parent/Guardian

_____      _____
Print name and Relationship to Patient        Print Name of Witness

<u>Consent of Patient</u>.  If the attending physician, in consultation with the patient's parent or guardian, determines that the patient has the capacity to make a decision concerning resuscitation, the patient's consent is also necessary before a DNR order is issued.

### Determination of Capacity
In consultation with the patient's parent or guardian, I have determined that: (check one)
- the patient lacks the capacity to make a decision concerning resuscitation: or
- the patient has the capacity to make a decision concerning resuscitation.

### Consent of Minor Patient With Capacity, Attending Physician's Statement
I have provided the patient with information about his/her diagnosis and prognosis, the reasonably foreseeable risks and benefits of CPR, the range of available resuscitation measures and the consequences of a DNR order.  The patient has expressed orally in my presence the decision to consent to a DNR order.

_____      _8\15-8_____
Attending Physician                              Date

_____      _____
Witness to patient's consent                 Date

_____
Print name

<u>Notification</u>.  If the attending physician has reason to believe that there is another parent or a non-custodial parent who has not been informed of a decision to issue a DNR order, diligent efforts are to be made to notify that parent before the order is written.

<u>Disputes</u>.  If the attending physician has actual notice that a parent or a non-custodial parent objects to a DNR order, notify the Medical Director that dispute mediation is needed.

REMINDER:  The DNR order must be reviewed by the attending physician at least every three days to determine if the order is still appropriate in light of the patient's condition.  A notation must be made in the patient's medical record to reflect that review.  It is not necessary to repeat the consent process when the order is reviewed.

WHEN CONSENT IS OBTAINED, WRITE ORDER ON THE PHYSICIAN'S ORDER SHEET.

00121

A HEALTH CARE SYSTEM
**BUFFALO GENERAL HOSPITAL   DEACONESS HOSPITAL**
**COMMUNITY MENTAL HEALTH CENTER**

86634711 #1099960
ELISABETH
08/26/57    01/13/21
YOONESSI, MAHMOOD MD -OR
FC-A

PATIENT ALLERGIES _____

1563

52

C730

| DATE | TIME | ORDERS |
|------|------|--------|
| 6 | 2 $\emptyset$ | $MSO_4$  5—10 $M_g$  IV  Q 10 minutes |
| | | |
| | | |
| | | |
| | | |

A
000220

531

00124

Signature

DRM 150 C



OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

# SEALED EXHIBIT N-4

(See Sealed Confidential Records Pages 29 through 30)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-4:
Miscellaneous Documents has been sealed.

8651 000127

Questions:

Was there adequate evaluation of the patient prior to the surgery of 8/21/97? No, the patient was not evaluated by the appropriate medical consultants. She should have been seen by nephrology and cardiology and perhaps psychiatry to evaluate her mental status. Her competence was never addressed in her medical chart.

2. Was the surgery performed on 8/21/97 indicated? Yes, the patient did require an evaluation of her endometrial cavity by D&C.

3. Was the patient a good candidate for the surgery performed on 8/25/97? No. As discussed above

4. Prior to the surgery of 8/25/97 should alternative options such as hormonal treatment have been utilized? The patient had very little bleeding and a stable Hemoglobin. Given her multiple medical problems the best course of action was probably to do nothing. There was no pathology to treat and therefore I would not have recommended any further treatment at this time.

5. During the surgery of 8/25/97 should Dr. Yoonessi have proceeded with the abdominal hysterectomy? If Dr. Yoonessi felt that there was acute appendicitis requiring appendectomy then he should not have proceeded with TAH, BSO. However this is a rather odd question in the fact that he should not have proceeded with exploratory laparotomy.

6. Was it appropriate to perform the surgery on 8/25/97? No. See discussion above.

7. Taking into account the discussion with the patient and the family on 8/25/97 is the documentation of informed consent clear? The informed consent on this patient is extremely difficult to ascertain. Her husband signed the majority of her documents. There was no documentation however that this patient was incompetent. Furthermore the discussions that had been undertaken between the patient and Dr. Lewis at one time had lead the patient to believe that she had carcinoma and made her refuse any surgery. However when she was approached by Dr. Yoonessi after that discussion and told that she did not have cancer, then she agreed to go forward with the surgery. None of this makes sense from a medical standpoint. Furthermore Dr. Yoonessi did not document his discussion with the patient and her family and the next note in the chart is that of his operative note. Although a patient or her designate may sign a consent form, that does not constitute an informed consent. A patient must be told of the risks and potential benefits and treatment options for this to be a true informed consent. This was never documented on the patient's chart. Based on the patient's prior medical history and her refusal for surgery noted once in this chart, I doubt that she would have proceeded with a surgical remedy. Documentation of the discussions regarding informed consent would have been extremely important in this case because given the lack of any meaningful pathology and the lack of any meaningful bleeding, I am not sure why any person would have agreed to this operation when presented with the risks, benefits and options.

Case #4  Virginia Slisz  MR #662526, Buffalo General Hospital

1. CASE SUMMARY.

The patient, at the time of admission, was a 57 year old white female with a history of ovarian cancer. She underwent a total abdominal hysterectomy and bilateral salpingo oophorectomy, omentectomy and pelvic lymphadenectomy for stage III pap serous adenocarcinoma of the ovary on 6/14/89. Post operatively she received chemotherapy with Dr. Yoonessi's, regimen of Adriamycin, CisPlatin, Cytoxan, 5 FU, Methotrexate, VP 16 and Depot Provera. She received a total of 8 months of chemotherapy and was taken to the operating room for `Second Look` surgery on 2/24/90. At that time she was found to have 2 areas of implants in the upper abdomen and one at the base of the bladder. Following this she received



**69**

RECEIVED

MAY 2 2008

Office of Administrative Hearings

MAY 20 2008

Office of Administrative Hearings
LOS ANGELES

| CASE | ALLEGATIONS | FACTS |
|---|---|---|
| B | 1. Respondent failed to obtain adequate consent for Chemo Therapy he instituted with Pt. B. in the period 1989 through 1995 | Blatantly untrue. See 52 Signed Consent Forms for Chemotherapy. (Pages 1 to 62) ED |
|  | 2. Respondent administered inappropriate ChemoTherapy. | See section on chemotherapy. |
|  | 3. Used Ergamisol inappropriately | Large volume of data was available regarding possible immune stimulating effect of Ergamisol (Pages 91 to 95) |
|  | 4. Respondent performed exploratory laparotomy or cancer reduction surgery on Feb. 6, 1995 without adequate indication. | Indication: A. Rising Ca 125 level (458) B. Abdominal Ultrasound and CT scan: Recent development of ascites. C. Ultrasound guided apiration biopsy: positive for tumor cells. D. Findings at laparotomy: Recurrent Ovarian Carcinoma. (Pages 64 to 80) |
|  | 5. Respondent performed an exploratory laparotomy and or cancer reduction surgery on March 7, 1996 without adequate indication | Indication: A. Rising Ca 125 Level after normalization. B. CT scans suggestive of 2nd recurrence. Chest X-ray negative. Other options and all possibilities discussed. 2nd recurrence confirmed at surgery. (Pages 81 to 90) |

549

K125

00030

**EXHIBIT**



EXHIBIT

Pet. # 6

## Patient B

| Cycle # | Date | Page | Cisplat | Cytoxan | Depo | Adria | 5FU | Hexalan | MTX | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| | 6/20/89 | 18,19 | 60 | | 1000 | 45 | | | | |
| | 6/27/89 | 21,22 | 60 | | 1000 | | 400 | | | |
| | 7/5/89 | 34 | 60 | | 1000 | | | | | Vepesid |
| | 7/12/89 | 45 | 60 | | 1000 | 45 | | | | |
| w/held | 7/26/89 | 53 | | | | | | | | |
| | 8/2/89 | 59 | ? | | 1000 | | 400 | | | |
| | 8/9/89 | 65,66 | 60 | | 1000 | | | | | Vepesid 125 |
| 7 | 8/16/89 | 79 | 60 | | | 40 | 400 | | | |
| 8 | 8/22/89 | 80 | | | 1000 | | 400 | | | |
| | 8/23/89 | 84 | 60 | | | | | | | |
| | 8/29/89 | 89 | | | 1000 | | | | | Vepesid 125 |
| | 8/30/89 | 91 | 60 | | | | | | | |
| 10 | 9/6/89 | 96 | | | | | | | | Vepesid 125 |
| | 9/8/89 | 98 | 60 | | | | | | | |
| w/held | 9/19/89 | 99,105 | | 400x3d | 1000 | | | | 1000 | |
| 11 | 10/3/89 | 105,111 | | 400x3d | 1000 | | | | 1,100 | |
| 12 | 10/25/89 | 105,121, 122 | 75 | | 500 | 70 | 400 | | | |
| w/held | 11/14/89 | 125 | | | | | | | | |
| | 11/24/89 | 130 | | 400x3d | 1000 | | | | 1,100 | |
| | 12/19/89 | 136,137 | 75 | | 500 | 70 | 400 | | | |
| | 1/9/90 | 113,140, 141 | | 350x3d | | | | | 1,000 | |
| P-32 | 3/1/90 | 167,168 | | | | | | | | |
| wk. 2 | 3/7/90 | 178 | 60 | | 100 | | 400 | | | |
| wk. 4 | 3/14/90 | 191,197 | 65 | | 100 | | | | | |
| w/held | 3/21/90 | 176 | | | | | | | | |
| #4 | 4/25/90 | 225,226 | 65 | | 1000 | | | | | |





AA203    C506

: Document Name: untitled

DISPLAY EPISODE DATA IN MASTER PATIENT INDEX                    05/22/03  19
          PT NAME:  SLISZ,VIRGINIA K
          MED REC NO:      662526           BIRTHDATE: 10/25/1938

PROBE ONE LINE THEN PROBE DISPLAY LOCATION  TO VIEW CHART LOCATION

| ADM DATE | PT NO | DSCH DATE | SERVICE CODE | OLD MR/REF #1 | REF #2 | LO |
|---|---|---|---|---|---|---|
| 08/02/89 | 000000047926 | 08/03/89 | INPT | | 2751761 | |
| 07/11/89 | 000000470096 | 07/13/89 | INPT | | 2751723 | |
| 07/05/89 | 000000462242 | 07/06/89 | INPT | | 2751846 | |
| 06/27/89 | 000000456389 | 06/28/89 | INPT | | 2751681 | |
| 06/14/89 | 000000432070 | 06/21/89 | INPT | | 2752090 | |

1 Document Name: untitled

DISPLAY EPISODE DATA IN MASTER PATIENT INDEX                    05/22/03  19
          PT NAME:  SLISZ ,VIRGINIA K
          MED REC NO:      662526           BIRTHDATE: 10/25/1938

PROBE ONE LINE THEN PROBE DISPLAY LOCATION  TO VIEW CHART LOCATION

| ADM DATE | PT NO | DSCH DATE | SERVICE CODE | OLD MR/REF #1 | REF #2 | LO |
|---|---|---|---|---|---|---|
| 05/16/90 | 000004205094 | 05/17/90 | INPT | | 2860069 | |
| 05/09/90 | 000004196321 | 05/10/90 | INPT | | 2860223 | |
| 05/02/90 | 000004191321 | 05/03/90 | INPT | | 2860263 | |
| 04/25/90 | 000004185492 | 04/26/90 | INPT | | 2860301 | |
| 03/14/90 | 000004147062 | 03/15/90 | INPT | | 2860117 | |
| 03/07/90 | 000004141115 | 03/08/90 | INPT | | 2860094 | |
| 02/24/90 | 000004106910 | 03/03/90 | INPT | | 2860346 | |
| 01/10/90 | 000004089207 | 01/14/90 | INPT | | 2860175 | |
| 12/19/89 | 000004072443 | 12/20/89 | INPT | | 2751904 | |
| 11/26/89 | 000004051421 | 11/27/89 | INPT | | 2751944 | |
| 10/25/89 | 000004023313 | 10/26/89 | INPT | | 2752038 | |
| 10/04/89 | 000004004903 | 10/08/89 | INPT | | 2751990 | |
| 08/09/89 | 000000054189 | 08/10/89 | INPT | | 2751802 | |

=============> CHART LOCATION ===>
                  XP734                          OFD MEDICAL RECORDS

1 Document Name: untitled                        05/22/03  19

DISPLAY EPISODE DATA IN MASTER PATIENT INDEX
          PT NAME:  SLISZ ,VIRGINIA K            BIRTHDATE: 10/25/1938
          MED REC NO:      662526

PROBE ONE LINE THEN PROBE DISPLAY LOCATION  TO VIEW CHART LOCATION

| ADM DATE | PT NO | DSCH DATE | SERVICE CODE | OLD MR/REF #1 | REF #2 | LO |
|---|---|---|---|---|---|---|
| 03/19/96 | 000036150098 | 04/26/96 | INPT | | 4361862 | |
| 03/19/96 | 000039411103 | / / | XRAY | | 0014796 | |
| 03/05/96 | 000036132245 | 03/17/96 | INPT | | | |
| 02/29/96 | 000039284385 | / / | CAT SCAN | | | |
| 01/17/96 | 000039757621 | / / | XRAY | | | |
| 12/11/95 | 000038751186 | / / | XRAY | | 7803937 | |
| 12/10/95 | 000005799408 | 03/05/95 | INPT | | 3604129 | |
| 02/06/95 | 000005774297 | 02/13/95 | INPT | | | |
| 01/09/95 | 000037127669 | / / | XRAY | | | |
| 12/08/94 | 000036934762 | / / | XRAY | | | |
| 11/30/94 | 000036934396 | / / | CAT SCAN | | | |
| 03/30/92 | 000031597495 | / / | OP SURG UNIT | | 2860052 | |
| 06/27/90 | 000064243689 | 05/28/90 | INPT | | | |

=====> CHART LOCATION ===>                       OFD MEDICAL RECORDS --->



E505  00129



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-5

### (See Sealed Confidential Records Pages 31 through 40)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-5: Miscellaneous Documents has been sealed.

performed 2/95, the patient was asymptomatic and the abnormality was found on CT Scan. There was ascites that was positive for carcinoma. There was no clear cut indication for the surgery 2/95. Since she was asymptomatic, it would be difficult for the surgery to make her feel any better. Given the fact that she had intraperitoneal radiation therapy, the risks of complications from this surgery were quite high. Predictably the patient did develop a bowel complication requiring a second surgery. In regards to the operation of 3/6/96, again the patient was asymptomatic and was found to have a rising CA 125 indicative of recurrent disease. She had only recently completed chemotherapy. The surgery of 2/95 was not clearly indicated. The surgery of 3/96 was definitely not indicated. There was no clear cut therapeutic goal to be achieved. If she could not undergo optimal tumor reduction 2/95, then there was little chance of her having any benefit from tumor reductive surgery 3/96. Furthermore given the difficulty of the surgery 3/96, any Gyn oncologist would be loathe to take this patient back to the operating room for minimal or no therapeutic benefit. It is interesting to note that Dr. Yoonessi himself did not feel that there were any postoperative therapies that would be of particular benefit to the patient. Even though he carefully describes a discussion with the patient in his operative report, he fails to get a true informed consent in that he did not explain to the patient the possible consequences of further surgery in an abdomen that had already undergone this many insults. If Dr. Yoonessi truly believed that there was no role for post operative chemotherapy or radiation therapy, then the performance of this operation was futile. The decision to perform surgery 3/96 therefore departed from generally accepted standards of care. The standard of care both in 2/95 and 3/96 would have been to re-institute chemotherapy. By moving to exploratory laparotomy in an asymptomatic patient with diffuse intraperitoneal disease, Dr. Yoonessi departed from the generally accepted medical standards for Gyn oncology. Even if we accept secondary tumor reductive surgery as a matter of judgment, when Dr. Yoonessi discovered extensive disease both in the operation on 2/95 and 3/96 he should have simply done a biopsy and closed the abdomen. This would probably have precluded all of the patient's complications. Since the patient was not obstructed at either procedure, he needlessly jeopardized this patient's life and performed extensive bowel resection, which essentially left this patient a bowel cripple. These decisions represent a departure from the generally accepted medical standards.

In addition the choice of chemotherapy given to this patient deviated from the standard of care both in 1989 through 1995 and again from 1995 through 1996. This has been outlined thus far in this report. In addition, Dr. Yoonessi appears to have placed the patient on Ergamisol as maintenance therapy. Ergamisol is not indicated for use in ovarian cancer so this would be an off label indication. In addition, there has never been any documentation that maintenance chemotherapy has any value in the prevention of recurrence. The use of Ergamisol in this situation is a departure from the standard of care.

Questions:

1. **Was the patient a good candidate for surgery on 3/7/96?** The patient was physiologically stable. However a WBC was down to 2.8. Hgb: 9.5. In addition her prior treatment history suggested that this surgery would be extremely difficult with very little benefit as noted above.

2. **Was the surgery indicated?** As noted above, I do not believe that either the surgery of 2/95 or that of 3/96 were indicated and in fact detracted from the patient's quantity and quality of life.

## Case #5. Betty Pieleck. MR #148749 Our Lady of Victory Hospital, Lackawanna NY 14218.

### 1. CASE SUMMARY

The patient is a 67 year old with a 6 month history of increasing lethargy, weight loss and increasing abdominal girth. She was noted to have ascites and a lower abdominal mass on admission to Our Lady of



PIELOCK, BETTY   76   5-07-93

12 MORGAN PKWY HAMBURG NY 14075   627-4195   EMERGENCY

067YBR PIELOCK PA 1770799853

W   DECD   DECD   DECD

HUBER, ST   WED   85   534

PIELOCK, BETTY   12795 MORGAN PKWY HAMBURG NY 14075   627-4195

1770799853   

**ELIGIBLE**   1770799853D   IF MEDICARE

MEDICARE PART B   1770799853D   IF PART B

OTHER INSURANCE   648,920

(No daughter is not)   Paul S Pielock Son - 894-5

549-2313   ENTER CONTACT: CAROL EPPOLITS STR   work

FINAL DX: GASTROINTESTINAL BLEED   648-6300 Carol daughter in law

## CONSENT TO HOSPITAL ADMISSION AND MEDICAL TREATMENT

1. I suffering from a condition requiring hospital care, hereby consent to the rendering of such care, which may include multiple diagnostic procedures and special treatment as the treating attending physician(s) or other of the hospital's medical staff consider to be necessary.

2. I understand that the practice of medicine and surgery is not an exact science and that diagnosis and treatment may involve risks of injury, or even death. I acknowledge that no guarantees have been made to me as to the result of examination or treatment at the hospital.

3. I understand that:

(A) In the absence of emergency or extraordinary circumstances, no substantial procedures are performed upon a patient unless he or she has had an opportunity to discuss them with the physician or other health professional to that patient's satisfaction.

(B) Each patient has the right to consent, or to refuse consent, to any proposed procedure or therapeutic course; and

(C) No patient will be involved in any research or experimental procedure without his or her full knowledge and consent.

4. I understand that many of the physicians on the staff of this hospital, including the attending physician(s) named above, are not employees or agents of the hospital but, rather, are independent contractors who have been granted the privilege of using its facilities for the care and treatment of their patients.

5. This form has been fully explained to me, and I am satisfied that I understand its content and significance.

Patient Representative Appointed   Carol - dtr

X Betty Pielock   Jacqueline Stephenson
(SIGNATURE OF PATIENT)   (SIGNATURE OF WITNESS)

Date _____ Time _____ am _____ pm

[If patient is unable to consent or is a minor, complete the following:]
Patient [is a minor _____ years of age] [is unable to consent because:] _____

(SIGNATURE) _____   RELATIONSHIP _____   (SIGNATURE OF WITNESS) _____

Date _____ Time _____ am _____ pm

CONSULTANTS: P. Lee, Bassaloga, Leung, Caladen, Sequine, Re Leithill

ROUTINE _____   AMA _____   TRANSFERRED _____   DATE 5-7-93 TIME 7 45 X

ORIGINAL   000306   99132

**EXHIBIT**



OUR LADY OF VICTORY
DEPARTMENT of LABORATORY MEDICINE
Thomas O. Daly, M.D., DIRECTOR
55 Melroy, Lackawanna N.Y. 14218

SURGICAL PATHOLOGY AUTOPSY REPORT

**NAME:**    BETTY                                    Acc. #:    6

FINAL ANATOMIC DIAGNOSIS

1. GENERALIZED EDEMA (ANASARCA) WITH MASSIVE ASCITES AND PLEURAL EFFUSION.

2. RIGHT HEMOTHORAX (ESTIMATED BLOOD LOSS AROUND 2000 ML.).

3. GENERALIZED JAUNDICE OF HEMOLYTIC NATURE.

4. STATUS POST HYSTERECTOMY WITH BILATERAL SALPINGO-OOPHORECTOMY, PARTIAL OMENTECTOMY AND REGIONAL LYMPHADENECTOMY FOR PAPILLARY SEROUS CYSTADENOCARCINOMA OF RIGHT OVARY WITH METASTASES TO THE UTERUS, UTERINE TUBES, LEFT OVARY, OMENTUM AND REGIONAL LYMPH NODES.

5. METASTATIC PAPILLARY SEROUS CYSTADENOCARCINOMA INVOLVING PARA-AORTIC LYMPH NODES, PARAPANCREATIC LYMPH NODES AND TAIL OF PANCREAS AND SUBSEROSAL LAYER OF THE COLON (MICROSCOPIC).

6. AORTIC ATHEROSCLEROSIS, MODERATE.

7. BILATERAL BENIGN NEPHROSCLEROSIS, SLIGHT TO MODERATE.

8. KIMMELSTIEL-WILSON'S DISEASE OF BOTH KIDNEYS.

9. STATUS POST COLOSTOMY - RECENT.

10. STATUS POST CYSTOSTOMY - RECENT.

11. DIABETES MELLITUS - CLINICAL.

08/03/93BLmia

AUTOPSY FINDINGS DISCUSSED WITH ATTENDING PHYSICIAN WITHIN 24 HOURS.

REPORTING PATHOLOGIST:

Electronic Signature BEN LEE M.D.

: 00133

000307



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-5A

(See Sealed Confidential Records Pages 41 through 52)

Per Protective Order Sealing Confidential Records
dated  November  18,  2021,  Exhibit  N-5a:
Miscellaneous Documents has been sealed.

 STATE OF NEW YORK
DEPARTMENT OF HEALTH    

584 Delaware Avenue, Buffalo, New York 14202    000200

Antonia C. Novello, M.D., M.P.H.
Commissioner



Dennis P. Whalen
*Executive Deputy Commissioner*



EXHIBIT

16

## CERTIFICATION OF RECORDS

### Case #: 33D-BU-99-07-8437A

I,    JUSTIN M. UKU    , do hereby certify:

that the attached is a true and complete copy of the autopsy report of patient

**Joan Gutkowski, expired 10/25/97**

from the official records at this facility, **Medical Examiner's Office**

• that this document was obtained in the regular course of business of this facility;

• that I have the authority to make this certification; and

• that the original of this document is maintained in the files of this facility in the ordinary

course of its business.

JUSTIN M. UKU    04/19/00
Name    /Date

CHIEF MEDICAL EXAMINER
Title

·· · 00135





EXHIBIT

N-5a

000319

192



GULBU WSKI JOan
Case #ME 785-97

PAGE THREE                                          000202

### LABORATORY DATA

All available samples are submitted for toxicology.

### ANATOMICAL FINDINGS

1. History of ovarian cancer.
2. Presence of a node in the left supraclavicular area.
3. History of morphine IV drip for 15 - 16 hours.
4. Fibrous adhesions between the loops of bowel (previous surgery for ovarian cancer).
5. Hyperosmolar state.
6. History of psychiatric disorder treated by Lithium and Mellaril.
7. Bilateral xanthelasma.

### MICROSCOPIC FINDINGS

1. Acute patch hemorrhagic bronchopneumonia.
2. Advance splenic lymphatic depletion.
3. Pulmonary arteriosclerosis.
4. Renal interstitial fibrosis.
5. Acute mild ischemic myocardial changes.
6. Patchy myocardial fibrosis.
7. Micro-nodular cirrhosis.
8. Micro-vesicular fatty metamorphosis of liver.
9. Virchow nodule with metastic carcinoma from ovary.
10. Chronic dermatitis with scarring (stasis dermatitis).

### CAUSE OF DEATH

L Morphine Intoxication.
II. Fatty Cirrhosis of Liver and Hypertrophic Cardiac Disease.


_____ MD
Dr. Fazlollah Loghmanee
Associate Chief Medical Examiner
Erie County

/asb

E131

# LABORATORY REPORT

## THE BUFFALO GENERAL HOSPITAL
### 100 HIGH STREET/BUFFALO, NY 14203/(716)859-5600
A HEALTH CARE SYSTEM INCLUDING THE DEACONESS CENTER OF BUFFALO

FCA598

Location:  ILCU 21 ILCU BEDS 19-23/SICC
Attending MD: COHEN, IAN L. MD
Consulting MD: YOONESSI, MAHMOOD MD
Admit Date:  10/19/97

Patient:                    JOAN
Medical Record: (0000) 00
DOB: 03/                    65 YRS Sex: FEMA
Discharge Date:  10/25/97
P. Type:

MICROBIOLOGY BLOOD CULTURE

TEST:  BLOOD CULTURE
ACCESSION# 97-
SOURCE:  PORT-A-CATH
++++++++++++++++++ FINAL REPORT ++++++++++++++++++

COLLECTED:   19OCT97   2301
RECEIVED:    20OCT97   0510
STARTED:     20OCT97   0741

NO GROWTH AT 5 DAYS                10/25/97 1457

A  002947

tient: GUTKOWSKI ,JOAN
tient Nbr: 06679781

orted: 10/26/97 at 1935

Medical Records Final
Deliver to Medical Records

00137

The performance of CPR on this patient in the face of a DNR order not only fails to meet the standards of care but is also assault. Dr. Yoonessi was aware of her wishes and failed to abide by these. This is not only unethical but also incomprehensible.

Questions:

1. Was the treatment rendered by Dr. Yoonessi during the admission of 4/24, 12/4/94 and 1/16/95 within the acceptable standards? The treatment rendered by Dr. Yoonessi 12/4/94 was within acceptable standards. The treatment rendered on the admission 1/16/95 was not within acceptable standards as detailed above.

2. Was the chemotherapy regimen for this patient appropriate? The chemotherapy regimen used by Dr. Yoonessi does not meet acceptable standards. This chemotherapy has never been utilized to my knowledge outside of Dr. Yoonessi's practice. It has never been tested in randomized trials. He uses multiple drugs in sub-therapeutic doses. His failure to outline to his patients the alternative treatments including standard chemotherapy every 3 weeks with Cytoxan and Carboplatin were not outlined to the patient and therefore informed consent was not obtained. This fails to meet the standard of care.

3. Were the cardiopulmonary resuscitative efforts by Dr. Yoonessi on 3/7/95 appropriate in view of the DNR order? No these were inappropriate and failed to meet the standard of care as noted above.

## Case #9 Joan Gutkowski , MR #879683 Buffalo General Hospital, MR#541996 Mercy    Hospital

### 1. CASE SUMMARY

The patient is a 65 year old who originally underwent exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy, omentectomy in 1992. This was followed by chemotherapy with the regimen utilized by Dr Yoonessi including CisPlatin, 5 FU, Leucovorin, Adriamycin, Methotrexate and Cytoxan. She underwent a second look procedure on 9/10/92 that was positive for persistent disease. A peritoneal catheter was placed. The patient received intraperitoneal P-32 on 9/24/92. The pretreatment scan showed loculation of the fluid in the pelvis and therefore the patient only received only 15 millicuries of P-32. She also received chemotherapy at the end of 1992. She represented with a left supraclavicular node on 6/13/97. This was aspirated and it was positive for metastatic carcinoma. The patient was restarted on chemotherapy 6/17/97 with essentially the same regimen that she had been treated with in 1992. The patient's last chemotherapy in the office was 9/26/97. The patient was admitted to Mercy Hospital on 10/17/97 with a history of a poor appetite and a one week history of severe throat pain. She also complained of diarrhea, weakness, breathing difficulty and low grade fever. She was admitted to the ICU under the service of Dr. Villacorta. She was seen in consultation by Dr. Yoonessi. Physical exam on admission revealed a Hgb of 6.3, WBC 300.Plts 11,000, Potassium 2.6, CO2 12, Creatinine 2 and BUN 32. Her protime was elevated at 22. The patient was seen in consultation by Infectious Disease and by Medical Oncology. A discussion was undertaken on admission regarding do not resuscitate. The patient seemed agreeable to this. The patient was given the appropriate antibiotic, blood products and treatment at Mercy Hospital. However they requested liquid Lithium and Mellani and this was not available and transfer to Buffalo General Hospital was therefore arranged by Dr. Yoonessi.

The patient was received at Buffalo General Hospital on the Psychiatric Unit. Shortly after her admission she was noted to be physiologically unstable and she was seen by the SICU team. The patient was immediately transferred to the ICU and within 2 hours she was intubated, placed on a ventilator and a Swan-Ganz catheter was placed for monitoring her cardiac function. The patient was maintained on broad spectrum antibiotics and tube feeding. On 10/22/97 the patient was extubated. The family had indicated

00138

000139

82

that if the patient's condition deteriorated they did not want to have her re-intubated. The ICU staff discussed the patient's situation with the family. On 10/23 they agreed to a Hospice consult but were not certain regarding DNR status. On 10/24/97 the patient was transferred to the intermediate care unit with continued supportive measures and a DNR was instituted. Orders were given to keep the patient comfortable but arousable on a Morphine drip infusion. On 10/24/97 there appeared to be a conflict as Dr. Yoonessi was in to see the patient and wanted to change her pain medication. Later that night Dr. Cohen, the ICU attending came over to talk with the family and Dr. Yoonessi. The family stated that Dr. Yoonessi was making them feel guilty about the pain medication and the dosage. At this point Dr. Yoonessi approached the nursing staff regarding the writing of orders in the ICU. The patient was transferred at this time to Dr. Cohen's service. On 10/24/97 at 8 p.m. there is a note from Dr. Yoonessi in which Dr. Yoonessi states that he discussed the options with the patient and her family "the husband has stated that this is a case of euthanasia as reported to him by Dr. Cohen". Dr. Yoonessi then signs the patient over to Dr. Cohen. There was then a long note from Dr. Cohen stating that the patient's and the family's wishes were not to have the patient reintubated or to have CPR. He emphatically states that at no time 'was euthanasia ever raised by myself or the ICU team as a possibility'. He also offered to the family to have another oncologic expert brought in to care for the patient. The patient succumbed to her pneumonia on 10/25/97.


## 2. RECORDS REVIEWED

The records from the patient's hospitalization at Mercy Hospital October 17, 1997 and Buffalo General Hospital on October 19, 1997 were reviewed. In addition the entire office records of Dr. Yoonessi dating back to 1992 were reviewed.


## 3. DEVIATIONS FROM THE STANDARD OF CARE

The chemotherapy regimen given to the patient in 1997 fails to meet the standard of care. For a recurrent ovarian carcinoma in 1997 the patient should have received a combination of Taxol/Carboplatin or Taxol/cisplatin every 3 to 4 weeks. However Dr. Yoonessi chose to treat this patient with his most unusual protocol. In addition she seemed to have intensification in her chemotherapy regimen at the end of September receiving 500 mgs of Cytoxan on September 23 and September 26th as well as 500 mgs of 5 FU and 500 mgs of Methotrexate. On October 8 she received an additional 400 mgs of Cytoxan and 400 mgs of Methotrexate. There are no indications in the chart as to why her regimen had increased so drastically. The chemotherapy regimen chosen and the monitoring of the chemotherapy regimen failed to meet the standards of care. The patient was admitted to Mercy Hospital with neutropenic sepsis and a pharyngitis that was likely secondary to the 5 FU and Methotrexate. She was given appropriate treatment at Mercy Hospital. For better psychiatric support the patient was transferred to Buffalo General Hospital. However the patient could have waited 24 hours to receive her psychiatric drugs or these could have been delivered by a parenteral route. Psychiatric consultation was not obtained at Mercy Hospital. Upon arriving at Buffalo General Hospital the patient developed respiratory failure. There are no notes to describe the patient as being in such condition at Mercy, although the patient was noted to be confused with an altered mental status. Failure to recognize the patient in extremis and to transfer a patient from one institution to another who is not stable fails to meet the standard of care.

Dr. Yoonessi and the ICU staff seem to be at odds regarding the patient's prognosis. It appeared from her admission at Mercy Hospital that Mrs. Gutkowski did not wish to be resuscitated or to undergo heroic measures. It was certainly clear from the family's wishes that once she was without capacity they did not want her re-intubated or resuscitated. The decision to start Morphine in a patient with obvious discomfort and air hunger is indicated and quite humane. Dr. Yoonessi's implication that this was euthanasia and the method with which he communicated with the patient's family to make them feel guilty are most inappropriate. If he had any question regarding the management of this patient he should have taken it to the proper hospital authorities. Physicians should refrain from making unsubstantiated accusations



especially regarding criminal activity) in the hospital chart. This action failed to meet the standard of care for a Gyn oncologist.

## Questions:

1. Was the treatment rendered by Dr. Yoonessi during the admission of 10/17/97 at Mercy Hospital within acceptable standards? In general, his management during the admission at Mercy Hospital was acceptable.

2. Was the treatment rendered by Dr. Yoonessi during the admission of 10/19/97 at Buffalo General Hospital within acceptable standards? Dr. Yoonessi transferred the patient for psychiatric care to Buffalo General Hospital. On arrival there the patient was in respiratory distress and required immediate transfer to the SICU. There appears to be some major inconsistency unless the patient's problems develop during the ride from Mercy to Buffalo General Hospital. While in the ICU the patient was under the care of the ICU team and Dr. Yoonessi essentially did not render care.

3. Was Dr. Yoonessi's order of 10/23/97 to cancel Hospice consult appropriate? No. The patient and her family had previously stated desires for DNR. At this appoint it appeared that the patient would not survive her hospitalization. Hospice consult was definitely appropriate.

4. Does the documentation indicate that there was acceptable and appropriate communication between the Dr. Yoonessi and the other physicians on the case? The documentation at Buffalo General shows a physician, Dr Yoonessi, lacking in common courtesy with a general inability to communicate with his peers. Discussion regarding euthanasia is inappropriate as noted above. It should also be noted that Dr. Yoonessi dictated a 4 page discharge summary on Mrs. Gutkowski dated 2/27/97. In this document he reiterates the entire interaction with the ICU team and the family.

5. Does the documentation indicate that there was acceptable and appropriate communication between Dr. Yoonessi and the family regarding the patient's care? The nursing notes from 10/24/97 relate a picture of Dr. Yoonessi discussing the situation with the family and essentially making them feel guilty regarding their decisions. It is not up to a physician to decide whether a patient or the patient's proxy is making the proper decisions. It is only up to them to give the parties informed consent. His communication with the patient and family was definitely inappropriate.

6. Was the chemotherapy regimen for this patient acceptable? No. Please see discussions regarding other patients.

7. Was the documentation of the chemotherapy regimen adequate? No. Again Dr. Yoonessi failed to keep adequate flow charts, which may have given rise to this patient receiving excess chemotherapy during September and early October.

## Case #10, Kathleen Kaiser, MR#362709, Mercy Hospital of Buffalo.

### 1. CASE SUMMARY

The patient is a 49 year old who presented to the Emergency room at Mercy Hospital on 7/26/00 with acute epigastric pain. Physical exam on admission revealed a morbidly obese female in moderate distress secondary to pain. Her abdomen was distended and she was tender to percussion over the epigastric area and in the left lower quadrant. A CT Scan was performed that showed a 15 cm ovarian mass with extensive intra abdominal carcinomatosis. The patient developed acute respiratory distress 7/27 at 1700 hours and required intubation. She was admitted to the ICU and a Swan-Ganz catheter was placed. The patient was resuscitated and ultimately taken to the operating room on 7/28/00 where she underwent

'32
−DR

BLANK LINES MAY BE USED TO ORDER ITEMS NOT LISTED

| SECTION A IV SOLUTIONS   ADDITIVES | | | | SECTION B MEDICATIONS | | B1 | B2 | B3 | B4 | B5 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOTTLE # | | | | BOTTLE # | | | | | | |
| SITE (PERIPHERAL OR CENTRAL) | | | | SITE (PERIPHERAL OR CENTRAL) | | | | | | |
| RATE ML/HR OR BELOW | 4u/v − titrate to | | | RATE ML/HR OR BELOW | | | | | | |
| D5W 250 ML | | comfort − | | D5W 50 ML | | | | | | |
| D5W 500 ML | | | | D5W 100 ML | | | | | | |
| D5W 1000 ML | | | | D5W 250 ML | | | | | | |
| D5/SALINE 0.9% | | | | D5W 500 ML | | | | | | |
| D5/SALINE 0.45% | | | | D5W 1000 ML | | | | | | |
| | | | | NACL 0.9% 50 ml | | | | | | |

A

695

00141

ASSOCIATED REPORTERS INT'L., INC.    12/04/2001, Buffalo, NY, In the Matter of M. Yoonessi MD    800.523.788¯

Page 235

 1    the thing up, there was written there by Dr.

 2    Yoonessi, and I told him if, if, if trying to

 3    help somebody pass away quiet, quietly, you

 4    know, with no pain like they wanted, if that's

 5    called euthanasia, then I am guilty because

 6    yes, we tried to help her pass away quiet

 7         Q.  Okay.

 8         A.  I did maybe say it that way if you

 9    understand me.  Now, I don't want you to get,

10    you know, me wrong.  I didn't --

11         Q.  But it wasn't your -- was it your

12    intent that morphine was going to be used as a

13    way of ending your wife's life?

14         A.  No, no, no, no, no, not ever.  Nor was

15    it the doctor's intent --

16         Q.  Okay.

17         A.  -- that that was going to end her

18    life.

19              MR. COLLINS:  I'm going to ask that

20    the last part of the witness's answer be

21    stricken from the record when he speaks of the

22    doctor's intent.  The witness isn't competent

23    to speak here today about the doctor's intent.

24              ALJ TROST:  Well, I'm not permitted

25    to strike any matter from the record.  You may,

## I.  Introduction

New York physician Mahmood Yoonessi, a specialist in gynecologic oncology,[1] performed an "extensive surgical procedure" on a 67-year-old patient with advanced ovarian cancer.[2]    Unfortunately, the patient developed problems post-operatively necessitating blood transfusions, and lost decision-making capacity.[3]    The patient's family was then empowered to make treatment decisions on the patient's behalf.[4]  They soon determined that "enough was enough."[5]  So, they authorized the entry of a Do Not Attempt Resuscitation order ("DNR") and directed that the patient receive no further transfusions.[6]

But Dr. Yoonessi rejected these instructions, because he "wanted to further aggressively treat the patient."[7]  He said, "I don't care what the family wants," and ordered blood anyway.[8]  Furthermore, Dr. Yoonessi told the family that "they were being like Jack Kevorkian, that if this was his mother he wouldn't allow this to happen, and that they were playing God by not allowing their mother to have further treatment."[9]  Dr. Yoonessi, in short, deliberately disregarded the wishes of the patient and her authorized surrogates.

This sort of scenario plays out far too often across the United States.  It has been nearly 100 years since Judge Cardozo's famous and oft-quoted statement of individual self-determination: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a [physician] who performs [an intervention] without his patient's consent . . . is liable in damages."[10]  But over the past century, this principle of patient autonomy has, unfortunately, been honored more in word than in deed.

On the one hand, U.S. courts and legislatures have developed a substantial body

---

[1] *In re* Yoonessi, N.Y. Bd. Prof. Med. Conduct, N.Y. Dep't Health, No. BPMC 02-188, 2002 WL 33840948 (N.Y.B.P.M.C. June 5, 2002).

[2] *Id.* at *15.

[3] *Id.* at *16.

[4] *Id.*

[5] *Id.*

[6] *Yoonessi*, 2002 WL 33840948, at *16.

[7] *Id.*

[8] *Id.* at *18.

[9] *Id.* at *16.

[10] Schloendorff v. Soc'y of N.Y. Hosp., 105 N.E. 92, 93 (N.Y. 1914), *abrogated by* Bing v. Thunig, 143 N.E.2d 3 (N.Y. 1957).

00143

000135

THE BUFFALO GENERAL HOSPITAL - REGISTRATION FOR

-PATIENT NAME/ADDRESS-
, JOAN

~~SENECA~~ NY 14220
PHONE:

MAIDEN NAME        MOTHERS NAME
X                  SANGEORGE

-GUARANTOR-
, JOHN F

WEST SENECA    NY    14220    RELN: U
SS#            PHONE:

-EMERGENCY CONTACT-
JOHN

NY    14220
PHONE:        RELN: U

-INSURANCE(S)-
#2 D70 FMR106200393   210   B/C FORD ACUTE
#1 A97    106200393B         MEDICARE ACUTE
#
#

TREAT AUTH ID:

---

PATIENT NO        MED REC

(E134)

ADMIT DATE/TIME       RM-BED
10/19/97  21:59       SICU18
DOB       AGE  SEX RACE   MS
          F    W

-PATIENT EMPLOYER-
X

FCA593

PHONE:  716-823-5584
OCCUP:
-ADVANCE DIRECTIVE-

EXECUTED ADVANCE DIRECTIVE?
COPY ATTACHED TO MED REC?
INFORMATION PROVIDED TO PT?

ATTENDING MD:
YOONESSI, MAHMOOD MD
ADMITTING MD:
YOONESSI, MAHMOOD MD
ADMIT DIAGNOSIS:
RECURRENT OVARIAN CA    183

---

RELIGION: CAT    WARD: N    TEACH:    SERVICE: GYN    ASU LOC: 183

PRINCIPAL DIAGNOSIS/ _Anemia due to ... Neoplasm Sgn_    1  288
(OP) IMPRESSION                                             276.
_Stomatitis_                                             1  298.
                                                            V10.4
SECONDARY DIAGNOSIS: Hx of Relevant Metastatic Ovarian Ca  250.0
_Diabetes Mellitus_  2 Vit. mal... chronic lung dis., Ac   528.
5 _Psychiatric_ Status-Pt Chemo-Rx (Br) Ovarian Carcinoma  V12.
                                                         1  296.5
                                                         2  518.8

PROCEDURES/COMMENTS:    002938    A         1  287.
                                                         1  263.
                                                            599.0
_Transfusions_         m. yoonessi  10-20-97               599.0
                                    10-21-97               599.0
_Feeding Tube_         Goodnough 10-20-97                  96.6
_intubate/ventilate_   m. yoonessi  10-20-97               96.04
                                                           96.71
_Swan Ganz_            Booth  10-20-97                      89.64

---

--ADMIT STATUS: RTM GAF SCORE:AD     /DS
DISCHARGE STATUS: C7N ANESTHESIA TYPE: 10
REFERRING MD: R. Villacorta
CONSULTING MD: C. Brass 10-19
CONSULTING MD: Booth 10-19
PCR# 4924858           NB WEIGHT:
CODED BY: P5           DNR STATUS: yes

11-9-97    DATE    ATTENDING MD
ACUTE    ALC    ALC DT
COMPLETE    OPC  R  DIA
MED REC NO:    DISCHARGE DATE:
879683              10/25/97
                         00144

Catholic Health System

ST JOSEPH HOSPI Homepage | List of Professions | Online Verifications | HELP

OFFICE
OF THE
PROFESSIONS
NEW YORK STATE EDUCATION DEPARTMENT

## License Information *

10/25/2000

**Name :** YOONESSI MAHMOOD
**Address :** WILLIAMSVILLE NY
**Profession :** MEDICINE
**License No:** 118540
**Date of Licensure :** 11/21/73
**Additional Qualification :**
**Status :** REGISTERED
**Registered through :** 07/01
**Medical School:** TEHRAN POLYTECHNIC INST    **Degree Date :** 09/01/1965

(Use your browser's back key to return to licensee list.)

\* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

Note: The Board of Regents does not discipline *physicians, physician assistants,* or *specialist assistants.* To search for discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.

Further information on physicians may be found on the following external sites (The State. Education Department is not responsible for the accuracy or completeness of information located on external Internet addresses.):

American Board of Medical Specialties

American Medical Association:
- For the general public: AMA Physician Select, On-line Doctor Finder
- For organizations that verify physician credentials: AMA Physician Profiles

Association of State Medical Board Executive Directors-(A.I.M."DOCFINDER")

The following sites provide additional information concerning the medical profession:

CLEAR (Council on Licensure, Enforcement and Regulation)

Federation of State Medical Boards



000320

1992. Respondent claimed that the patient on the February 19, 1986 visit refused chemo

due to a sore porta cath site (Answer, Exh. B para. 29). However, Respondent did not

note any soreness or redness on exam, and did not note that chemo was canceled

although that is the practice in his office (T. 2470-2471) (Respondent). Respondent

testified that at the February 19 office visit the patient's dressing was dry and her porta

cath site was sore (T. 2455). The record for that date makes no reference to the patient's

dressing or a sore operative site (Ex. 15 at 74).

Respondent complained that his order to transfer the patient to the floor was not

followed. Respondent's actual order states "May transfer to the floor if the SICU bed is

needed" (Ex. 15 at 170) (emphasis added).

XI.    PATIENT F

   A.    Proposed Findings of Fact

   206.    Patient F was a 66 year old white female who presented at Respondent's

          office on August 30, 1996 (Ex. 17 at 82; T. 716) (Kredentser).

   207.    She presented with a distended abdomen and was found to have ascites

          and an abdominal pelvic mass. Respondent's impression was that she had

          a probable ovarian malignancy (Ex. 17 at 82-83; T. 716) (Kredentser).

   208.    A cytology study found that the ascitic fluid was positive for adenocarcinoma

          (Ex. 17 at 67; T. 717) (Kredentser).

   209    The patient was a Jehovah's Witness and would not accept any transfusions

          (Ex. 17 at 9-12; T. 717) (Kredentser).



00146



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-6

(See Sealed Confidential Records Page 53)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-6:
Miscellaneous Documents has been sealed.

surgical procedure or if she would in fact benefit in anyway from surgical intervention. Failure to evaluate the patient prior to the surgery precludes getting an informed consent for the surgical procedure. Failure to evaluate the patient preoperatively and to explain to her the risks and potential benefits of surgery and the alternatives is a deviation from the standard of care.

The patient was given a full bowel prep in spite of the fact that her barium enema showed a complete bowel obstruction. A bowel obstruction would be an absolute contraindication to the bowel prep and the administration of this bowel prep would be a deviation from the accepted standard of care. Knowing that the patient had a preoperative bowel obstruction would most likely necessitate a colostomy at least temporarily postoperatively.

The patient's colostomy was matured at an interval post op. The generally accepted standard is to mature colostomies at the time of the original surgical procedure. However it has been the practice in the past to mature these later for patients with known bowel obstructions. However the failure to adequately treat the bleeding colostomy edge, failed to meet the standard of care. Dr. Yoonessi did attempt to coagulate this bleeder but he was unsuccessful. However he was not available following this for a period of 4 days. He did not designate coverage either in the progress notes or in the orders. His assumption that the patient would be cared for by the primary physician or the other consultants on this case was misplaced. If Dr. Yoonessi had given proper sign out for coverage, the bleeding colostomy edge would have been handled expeditiously. Failure to designate a covering physician departs from the accepted standards of care. This patient subsequently required several other consultants to correct her bleeding and coagulopathy. This needlessly put her through an upper endoscopy as well.

Questions:

1. **Was the surgery performed on 5/11/93 indicated?** Although this was an extremely high risk patient, the surgery was indicated.

2. **Was the documentation of the operative report of the surgery 5/11/93 adequate?** Yes, the documentation was adequate. Failure to document the amount of residual disease is a major oversight by a Gyn oncology surgeon.

3. **When Dr. Yoonessi was unavailable on 5/15/93 was there sufficient documentation relative to arrangement for coverage?** As noted above there is no documentation regarding coverage during his absence.

4. **Was the treatment rendered by Dr. Yoonessi during the admission of 5/11/93 within accepted standard of treatment?** For the reasons stated above, there were several major deficiencies in the care rendered by Dr. Yoonessi. The failure to adequately evaluate the patient pre operatively, to give appropriate informed consent, and failure to be available for several days post operatively all fail to meet the standard of care.

## Case #6 Genevieve Szmolke, MR #191025 Our Lady of Victory Hospital, Lackawanna NY

### 1. CASE SUMMARY

The patient is a 66 year old white female, Jehovah's Witness who presented with a pelvic abdominal mass and ascites. She was seen in consultation by Dr. Yoonessi and it was recommended to her by Dr. Yoonessi that she undergo exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy for her presumed ovarian carcinoma. In his own operative note Dr. Yoonessi states that he



FCA632 115

OUR LADY OF VICTORY HOSPITAL

DEPARTMENT OF SURGERY
ANALYSIS OF CASE REVIEW

TO:        Dr. M. Yoonessi

FROM:      Leo M. Michalek, MD
           Chief, Dept. Surgery

Case #    191025/749129    was reviewed by the Department of Surgery at their meeting of    12/17/96    .

CONCLUSION:

1.  Case management was satisfactory    xxxxx

2.  Case management was satisfactory with exception as noted

3.  Management is satisfactory but the following alternative method of treatment should be considered in the future

4.  Management is not considered adequate because

RECOMMENDATION:

00149



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-7

(See Sealed Confidential Records Pages 54 through 55)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-7:
Miscellaneous Documents has been sealed.



FCA637

**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

Robert Scheig, M.D., Head
Department of Medicine
School of Medicine
Faculty of Health Sciences
Buffalo General Hospital
100 High Street
Buffalo, New York 14203
(716) 845-2273

May 19, 1993

Mahmood Yoonessi, M.D.
355 Linwood Avenue
Buffalo, NY  14209

RE:  Irene Kaluzny
     Med. Record #388-341
     Date Expired:  3/6/93

Dear Dr. Yoonessi:

The University Mortality Committee of the Department of Medicine met and
reviewed the chart of Irene Kaluzny, a woman who had been admitted to Dr.
Janet Sundquist's service when you could not be reached.  This patient had
terminal metastatic ovarian carcinoma and a rapid atrial fibrillation.
Without being asked to see the patient, you countermanded a Do Not Resuscitate
Order without the patient's permission and without the knowledge or permission
of the physician caring for the patient.  This is unacceptable and I do not
expect it to occur again.

Sincerely yours,

Robert Scheig, M.D.
Professor of Medicine

RS/ajb

cc:  Richard Kurzel, M.D.
     Ms. Marian Swanson

\1092

00151

**FCA654**

BUFFALO GENERAL HOSPITAL
BUFFALO, NEW YORK

DNR DOCUMENTATION FORM #1

CONSENT FOR DO NOT RESUSCITATE ORDER ("DNR" ORDER)
BY ADULT PATIENT WITH CAPACITY

The patient's consent to a DNR order must be obtained at or about the time the order is issued.  The patient's
consent may be either oral or written.  This form must be placed in the Medical Record.

1a—ORAL CONSENT must be given in a hospital only, in the presence of a physician and another witness who is 18
years of age or older.

Attending Physician's Statement
I have provided the patient with information about his/her diagnosis and prognosis, the reasonably
foreseeable risks and benefits of cardiopulmonary resuscitation (" CPR"), the range of available
resuscitation measures, and the consequences of a DNR order.  The patient has expressed the decision to
consent to a DNR order orally in my presence or in the presence of another physician on staff at the
hospital.
_____
                Name of M.D.

_____          _____
Physician Signature                Date

Witness' Statement
The patient has expressed the decision to consent to a DNR order orally in my presence.

_____          _____
Witness Signature                  Date

_____          _____
Print Name                         Title/Relationship to Patient

1b—ALTERNATIVELY, WRITTEN CONSENT may be given whether or not the patient is hospitalized, and must be signed
by the patient and two witnesses 18 years of age or older.  If written consent is obtained, a copy must be
placed in the chart.

Dr. _SUNDQUIST_____ (my attending physician) has provided me information about my diagnosis
and prognosis, the reasonably foreseeable risks and benefits of CPR, and the consequences of a DNR order.

I hereby authorize Dr(s). _SUNDQUIST_____ to enter a Do Not Resuscitate ("DNR") order
on my patient order sheet.  I understand that this means that if I suffer cardiac or respiratory arrest,
cardiopulmonary resuscitation ("CPR") will not be performed by the staff of Buffalo General Hospital or
any physician in attendance.  The following are exceptions to this authorization (specify exceptions):

X _____          _3/5/93_
Patient Signature                        Date

_Janice Kaczmarczyk_ _3 15/93_          _____ _3 15/93_
Witness              Date               Witness      Date
JANICE KACZMARCZYK                      WALTER V. KALUZNY

1c—AFFIRMATION OF PRIOR CONSENT BY PATIENT

I have been informed or personally am aware that this patient has given a properly witnessed consent to a
DNR order.  On this date, I discussed the DNR order with the patient and have been informed by the patient
that his/her intentions and preferences remain unchanged.

_____          _____
Physician Signature                Date

        N.B.  Signature of witness not required for this information.
        N.B.  Attach copy of previously signed consent if available.

N.B.  THIS SIGNED CONSENT MAY BE UTILIZED FOR FUTURE ADMISSIONS.

WHEN CONSENT IS OBTAINED, WRITE ORDER ON PHYSICIAN'S ORDER SHEET.

SEE REVERSE SIDE FOR IMPORTANT DEFINITIONS OF TERMS

Order Form #5073 - White

00152
00152
354

# THE BUFFALO GENERAL HOSPITAL

REGISTRATION FORM

KALUZNY, IRENE
400 WALDEN AVE
BUFFALO        NY    14211        14

PHONE NUMBER
716-894-1756

SOCIAL SECURITY NO.
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

MAIDEN NAME
KWIATKOWSKI

GUARANTOR NAME AND ADDRESS
KALUZMY, IRENE
400 WALDEN AVE
BUFFALO        NY    14211

PHONE NUMBER
716-894-1756        RELN
1

SOCIAL SECURITY NO.
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

NEAREST RELATIVE NAME AND ADDRESS
KACZMARCYZK, JANICE
52 BANCO        NY    14043
DEPEW        716-685-4788        D

1 A93 134076631D
2 K11 094180958    83500
1 Z01 134076631D

03/01/93    22:44

BIRTHDATE    AGE    SEX    RACE    MARITAL STATUS
09/05/23    69    F    W

EMPLOYER NAME AND ADDRESS
NONE

AA256

SECOND CONTACT

Sullivan 3/3, Luetusa-Nikosu 3/4

ATTENDING PHYSICIAN
YOUNESSI, MAHMOOD MD
C. O'neill

ADMITTING PHYSICIAN
SULEWSKI, JOAN M. MD

DIAGNOSIS
CHF        428.0

MEDICARE ACUTE
GM COMPLEMENTAR
M/CARE IP PART

RELIGION: CAT    WARD:        TEACH:        SERVICE: GYN
**** DO NOT USE ABBREVIATIONS ON FACE SHEET ****

PRINCIPAL DIAGNOSIS:    Congestive heart failure        428.0 ①
                         Atrial fibrillation / flutter    511.9 ②
                                                          427.32 ③

SECONDARY DIAGNOSIS:    metastatic ovarian cancer        427.31 ④
                         renal failure                    V12.5 ⑤

PROCEDURES: Thoracentesis                          3/4    34.41 ①
            Plasma                                 3/4    99.07 ②

000906

ABSTRACTED

00153

THE FOLLOWING SECTION
TO BE COMPLETED FOR
INPATIENTS ONLY

RESIDENT PHYSICIAN        DATE        ATTENDING PHYSICIAN
                                     C.P. O'Neill MD        6/7/93

DISCHARGE TIME        MEDICAL RECORD NO.    DISCHARGE DATE
                      388341                3-6-93

COMPLETE ☑

DISCHARGE STATUS: ☐ HOME ☐ EXP DN OP ☐ EXPIRED ☐ +48N ☐ +48N
AGNST MEDICAL ADVICE ☐ EXP IN POST-OP ☐ AUTOP ☐ M.E. DTN
REFERRED TO: ☐ HOSPITAL ☐ HOME CARE ☐ SNF ☐ WRF ☐ PHYCH CTR
☐ OTHER

39007607

THE BUFFALO GENERAL HOSPITAL CORPORATION
A HEALTH CARE SYSTEM
BUFFALO GENERAL HOSPITAL  DEACONESS HOSPITAL
COMMUNITY MENTAL HEALTH CENTER

PATIENT ALLERGIES _____

| DATE | TIME | ORDERS |
|------|------|--------|
| 3/5 | 1500 | Hold Digoxin today |
| | | Hold Lasix 120 mg |
| 3/5 | 1600 | Auten c/s / turn |
| | | bk NPP / por. Target / Deacon Hosp |
| 3/5/93 | | NPO from night - |
| | | Stat Dig level in AM - tx in computer |
| | 3° | CXR in AM (~96) |
| | | (CXR today (~1) / Pergo |
| 3/5/93 | 435p | Start pt on Dopamine 2 mg / Kg / min |
| | | Robert Fakhr  1058 |

ANTIBIOTICS TO BE ORDERED IN THE SECTION BELOW

| 3/5/93 | 520p | 1° ↑ 16 DNR attending to reorg ~ 24 hrs |

REASON FOR USE
☐ A) PROPHYLAXIS for ☐ 24 hrs ☐ 48 hrs ☐ other _____ (check one) 00154
☐ B) EMPIRIC THERAPY
☐ C) THERAPEUTIC USE (reorder required after 7 days)

* IF REASON B or C IS CHECKED, PLEASE INDICATE BELOW IF ANY OF THE FACTORS LISTED ARE PRESENT
☐ FEVER ☐ GRANULOCYTES < 1000 PMN ☐ RESISTANT ORGANISMS ☐ OTHER
FORM 150 C
REV. 5/88

Signature

PHYSICIAN'S ORDER          CHART COPY  1058 400

000100

MERCY HOSPITAL — BUFFALO, N.Y.



CLINICAL RECORDS

| | | | | FAITH | | | | SEX | AGE | DATE OF BIRTH | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | WHEATON | | | | | | M | 059Y | 6/30/34 | 6336149 | |

ADMISSION DATE 11/15/93  14:04  726  GYN  531  ATTENDING MD MALIK, TARIQ  REFERRING MD/HOSPITAL MALIK, TARIQ

PREV. ADM. DATE  6W  0628  B  5  28  UNITED METHODIST  RACE W  HOW ADMITTED AMBULATORY

PATIENT ADDRESS 198 CANADA STREET  HOLLAND  NY 14080  COUNTY 14  TELEPHONE 537-2304  PATIENT S.S. # 065281012

FATHERS NAME: MAIDEN NAME

EMERGENCY CONTACT: RICHARD—HUSBAND

FINANCIALLY RESPONSIBLE PARTY: WHEATON, RICHARD  FINANCIALLY RESPONSIBLE PARTY STREET ADDRESS 198 CANADA STREET

HOLLAND  NY  14080  HOME TELEPHONE 718-537-2304  PATIENT PLACE OF BIRTH HOLLAND, N.Y.

EMPLOYER NAME AND ADDRESS OF INSURED: BETHLEHEM STEEL  BUFFALO  NY

MEDICAID CLIENT NAME

INSURANCE CO BC CLASSIC  EB1430  SUBSCRIBER WHEATON, RICHARD  RELATIONSHIP SPOUSE  SUBSCRIBER S.S. # 10224571-02

ADM. DIAGNOSIS / COMPLAINT: PELVIC MASS, GASTROENTERITIS, DEHYDRATION, BILATERAL HYDRONEPHRITIS, ASCITES

**ALLERGIES— NONE **  (54)  ICU 2

## DIAGNOSES

| | ICD 9 CM CODES | DISCHARGE STATUS |
|---|---|---|

PRINCIPAL DX: Condition established AFTER STUDY to be chiefly responsible for the patient's admission.

Pelvi mium, ascites  —  200 08

SECONDARY DIAGNOSES COMPLICATIONS/COMORBIDITIES Conditions which develop after admission or exist at the time of admission and affect treatment or LOS.

Non Hodgkins Lceld cell lymphoma  0337  5679  5959  5361

Bilateral stein & histonitic

Enterocrital & Enterocutaneous fistulas

malnutrition, Hydronephrosis  2851  2760

Fluid blood labs anemic

hypoproteinm, colon i or uretural  2578  E9786

anastomosis Leak?

DATE | PROCEDURES-OPERATIONS

PRINCIPAL PROCEDURE: Procedure most closely related to the Principal Dx.

11/20/9  Examination Under anesthesia, laparotomy, total abdominal hysterectomy, bilateral salpingo-oophorectomy

DISCHARGE DATE 12/16/9

CONSULTATIONS

Jonnessi, M.  Perrapto S.
Jeyapalan S.  Coches I.
Frost  Bach T.
Samie  Alvarez, J.
Perfetto

I certify that the narrative descriptions of the principal and secondary diagnoses and the main procedures performed are accurate and complete to the best of my knowledge.

EXHIBIT  N-8

000323

000155



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-8

(See Sealed Confidential Records Pages 56 through 58)

Per Protective Order Sealing Confidential Records
dated   November   18,   2021,   Exhibit   N-8:
Miscellaneous Documents has been sealed.

| ADDRESS | | | LEANOR | A | 02/ 1926 | | IN | 42702 | 000 | |
| CITY · STATE | | | | | | ZIP CODE | | | | VET STATUS |
| | | DR | WEST SENECA | | NY | 14 | 14224 | | | 0 |
| SEX | RACE | M S | PHONE 716 | BIRTHPLACE | FORMER OR MAIDEN NAME | FORMER ADM. | | TYPE | | RELATION CHURCH |
| F | C M | 6 | 9 | BFLO | | 04/19/94 | | | | |
| DATE ADM | TIME | DISCHARGED | TIME | PATIENT EMPLOYER | | PATIENT SOC SEC NO | | | | Billing # |
| 4/94 | 08:12 | 6/2/94 | 2 PM | | | | | | | 18    687 |
| ATTENDING PHYSICIAN | | | | | REFERRING PHYSICIAN | | | | THRU ER | |
| MACEDA, SIXTO R MD | | | MACEDA, SIXTO R | | | | | | | |
| ADMITTING DIAGNOSIS | | | | | | | | | ICD9-CM CODE | |
| ASCITES, R/O OVARIAN CA | | | | | | | | | 1 3 0 | |

FINANCIALLY RESPONSIBLE PERSON'S NAME: , ELEANOR    RESPONSIBLE PERSON'S ADDRESS:

| RESPONSIBLE PERSON'S CITY · STATE · ZIP CODE | | RESP. PERSON'S PHONE | RELATION TO PATIENT |
| WEST SENECA    NY    14224 | | | 01 |
| RESPONSIBLE PERSON'S EMPLOYER | RESPONSIBLE PERSON'S EMPLOYER CITY | RESP. PERSON'S SOC. SEC NO. |

PRIMARY INSURANCE
| CA | Medicare | | |
| | A | ELEANOR A | 01 |

SECONDARY INSURANCE
| CP | Medicare Pt B | | |
| L1148296A | | ELEANOR | 01 |

| CASE OF EMERGENCY NOTIFY | PHONE | ADDRESS | RELATION |
| | , EDWARD | 0000000000 | 2 |

SECOND EMERG. CONTACT: 668- Colleen Daughter  0000000000

☐ EXPIRED  ☐ MEDICAL EXAMINER  ☐ AUTOPSY

PRINCIPAL DIAGNOSIS:  III OVARIAN - INTRAABDOMINAL Carcinomatosis

ADDITIONAL DIAGNOSIS:  SMALL BOWEL Partial Bowel Obstruction

PRINCIPAL SURGICAL PROCEDURE:
1) TOTAL ABDOMINAL HYSTERECTOMY (EXTENDED)    DATE 4.25.94

ADDITIONAL SURGICAL PROCEDURE:
BILATERAL SALPINGO-OOPHORECTOMY
2) TOTAL OMENTECTOMY
3) CYSTOSTOMY - REPAIR
4) SIGMOID resection and entero anastomosis    4.25.94
5) ILEAL - APPENDIX resection and ILEAL ASCENDING COLON ANASTOMOSIS
   6) ILIAC and AORTIC node sampling    G) INTRAABDOMINAL fluid
   AMDS.    enion 4-25-94  6.194

SIGNATURE OF ATTENDING MD    (Smith 6194)    DATE

PATIENTS (NAME AND HOSPITAL SERVICE):
Dr Giancuramo (med-cardi)  Dr Iconozzi (Gyn)  Dr Hrelic (ID med)  Dr Vazquez 00157
(thoracic)    560    000310  N-4

EXHIBIT
N-4

CONDITION ON DISCHARGE:
☐ IMPROVED  ☒ RECOVERED  ☐ UNIMPROVED  ☐ DIED

FCA591



OFFICE OF ADMINISTRATIVE HEARINGS CLERK'S RECORD FOR OAH CASE NO. 2021080903
12/31/2021                                                          Page 279 of 366



### OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-9

### (See Sealed Confidential Records Page 59)

Per Protective Order Sealing Confidential Records
dated    November    18,    2021,    Exhibit    N-9:
Miscellaneous Documents has been sealed.

00159

000 326



FC A675

000543

C 958

**KAISER—Kathleen E.**
August 3, 2001. Of Marilla, NY; Daughter of the late Robert and Madeline Kaiser; dearest sister of Christine Golia, Paul, Karen and Claudia Kaiser; beloved aunt of Jeffrey and Andrew Golia and Paul and Benjamin Kaiser. No prior visitation. Relatives and friends are invited to a Memorial Mass from Annunciation Church, Clinton St. and Girdle Rd., Elma, NY Thursday morning at 10 AM. Flowers gratefully declined. Memorials in Kathleen's memory may be made to Buffalo General Hospital SICU, Bertrand/Chaffee Hospital in Springville, NY or Hospice Buffalo, Inc. Arrangements by HOY FUNERAL HOME.

000776

00160

**EXHIBIT**

**N-9**

 OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

# SEALED EXHIBIT N-10

(See Sealed Confidential Records Pages 60 through 64)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-10: Miscellaneous Documents has been sealed.

# MERCY HOSPITAL OF BUFFALO



565 Abbott Road, Buffalo, New York 14220, (716) 826-7000

**FCA657**

MEMBER
AMERICAN HOSPITAL
ASSOCIATION
CATHOLIC HEALTH
ASSOCIATION
THE HOSPITAL
ASSOCIATION OF
NEW YORK STATE

ACCREDITED BY
JOINT COMMISSION
ON ACCREDITATION
OF HEALTHCARE
ORGANIZATIONS

*OB/GYN PEER REVIEW/QUALITY ASSURANCE*

*March 14, 1994*



*Mahmood M. Yoonessi, M.D.*
*100 High Street*
*Buffalo, NY 14203*

*Dear Dr. Yoonessi:*

*At the February 17, 1994 meeting of the Obstetric/Gynecologic Department, your chart(s) listed below were discussed as part of the Generic Screen Review/Concurrent Review. The following comments/recommendations were made:*

*F.W. - Case #6336149*
*Date - 11/15/93*
*Doctor #521/527*

*Information - A long seven-page discharge summary of Doctor #527's was read to the Committee. In summary, this was a 59 year old, gravida 3, para 3, who had menopause at age 49. She had been on ERT until one year ago. She presented with a history of abdominal and pelvic discomfort. On examination, patient was found to have an obvious pelvic tumor with a picture of a frozen pelvis. Patient was seen in consultation by Doctor #527. She did have a bowel prep pre-operatively. Preoperative sonogram showed a non-visualization of the gallbladder, considerable hydronephrosis and a moderate amount of ascites. A thickening of the bladder wall was also noted and in the pelvis the uterus appeared to be enlarged, as was the left ovary. Chest x-ray did show small bilateral pleural effusions. Her C.A 125 was 756. The findings at the time of surgery were disseminated intra-abdominal malignancy, which appeared to involve the genital organs, paravaginal tissues, as well as small bowel, large bowel and retroperitoneal nodes, with liver metastasis. The initial frozen sections of the tumor did not result in definitive diagnosis. The Pathologist did remark that there was poorly differentiated malignancy. The total surgical procedure consisted*



**Compassion. Hospitality. Commitment to Excellence**

001600092'

*Mahmood M. Yoonessi, M.D*
*Page 2*
*March 14, 1994*



*of an extended abdominal hysterectomy with bilateral salpingo-*
*oophorectomy, a small bowel resection and reanastomosis type 5,*
*resection of right colon with ileotransverse enterocolostomy, pelvic*
*lymphadenectomy, cystostomy with insertion of ureteral catheters, left*
*ureteral neocystostomy, right ureteral ileoneocystostomy, liver biopsy,*
*sigmoid colon resection with reanastomosis and insertion of CVP line.*
*From that point on the patient's post-operative course became very*
*rocky with suspected leaks from several of the anastomosis sites.*
*Doctor #104 was seen by the patient in consultation as the infectious*
*disease specialist. He, in turn, consulted a medical oncologist, as well*
*as a general surgeon, without first discussing the reason for the*
*consultation with the gynecological oncologist. The patient*
*subsequently had three more surgeries on 11/18/93, 11/20/93 and*
*11/28/93. On 12/16/93, the family feeling that the outlook was bleak,*
*did not wish to pursue any further aggressive diagnostic or therapeutic*
*measures. The possibility of another opinion at Roswell Park Memorial*
*Institute was discussed with the patient and the family. However, the*
*family decided to discontinue all supportive therapy and on 12/16/93*
*the patient was discharged from the hospital and arrangement were*
*made for the hospice service to follow the patient.*

*Peer Review/Action - The discussion of the Committee centered around*
*several points: 1) Indications for surgery - It was felt by all in*
*attendance that with the findings on the pelvic examination, as well as*
*the sonogram, that a large pelvic mass is considered an ovarian*
*malignancy until proven otherwise. Therefore, there was no descending*
*opinion that an exploratory laparotomy was indicated. 2) Surgery that*
*was done - It was questioned with the amount of tumor that was*
*present whether it would not have been more advisable to do biopsies*
*for tissue diagnosis and no further surgery, feeling that it would be*
*impossible to debulk the entire tumor. There were influencing factors,*
*namely that the initial frozen sections were read as showing a poorly*
*differentiated malignancy, but it was not until several frozen sections*
*had been sent to the lab that a diagnosis of a non-Hodgkin's*
*lymphoma could be made. It was felt, however, even with that*
*diagnosis, that the bowel seemed to be so extensively involved and*
*radiation therapy to the bowel would have only caused necrosis with*
*fistula formation. It was pointed out by the attending that the part of*
*the bowel that was left did not seem to be involved with tumor*
*Another school of thought, however, was presented, feeling that*
*radiation therapy or chemotherapy would have been the proper mode of*
*therapy. 3) Interaction of the physicians in the care of this patient - It*

A 093366

001630928

FCA 659

*Mahmood M Yoonessi, M.D.*
*Page 3*
*March 14, 1994*

*did appear that there was some lack of communication between the physicians primarily responsible for the patient's care and the consultants. Certainly, optimal care occurs when those lines of communication are kept open.*

*In summary, it was felt that the indications for surgery were definitely present. The diagnosis was certainly in question until some time into the procedure. Even knowing the diagnosis, with the degree of widespread disease which was present, the proper surgery was done. Some contrary views could be expressed in retrospect. But faced with the conditions the surgeon faced at the time of laparotomy, it was felt that there was no cause for action.*

*We realize that methods of treatment are often individualized. If you do not agree with the above actions or recommendations, or if there is some further information in the above case(s) that you feel we should be aware of, please let the Committee know, so that we may review the case(s) again.*

*A copy of this letter will kept in your confidential Peer Review Profile Folder in the Quality Assurance Department.*

*Sincerely yours,*

A003367

Bernard C. Muscato, M.D.
*Quality Assurance Coordinator*
*Department of Obstetrics & Gynecology*

*BCM/loc*

000929

00164

01/27/03  MON 17:07 FAX 716 855 .   L          ZDARSEY SAWICKI AGOSTIN                     002



SUPREME COURT OF THE STATE OF NEW YORK  53
APPELLATE DIVISION : THIRD DEPARTMENT                         000285

In the Matter of the Application of

MAHMOOD YOONESSI,

                              Petitioner,          AFFIDAVIT OF
                                                   RICHARD G. COLLINS, ESQ.
against
                                                   No. 92009
THE STATE BOARD FOR PROFESSIONAL
MEDICAL CONDUCT, A Board Under the
Auspices of the New York State Department of Health,
WILLIAM A. DILLON, M.D., Chairman, and
ANTONIA C. NOVELLO, M.D., Commissioner of
The New York State Department of Health,

                              Respondents.

For a Judgment Pursuant to CPLR Article 78

STATE OF NEW YORK    )
COUNTY OF ERIE       )SS.:

    Richard G. Collins, being duly sworn, deposes and says:

    1.    I am an attorney duly licensed to practice in the State of New York.

    2.    I was counsel of record, along with my partner, Nicholas J. Sargent, Esq., in

proceedings before the Board of Professional Medical Conduct initiated in late November 2001

against Mahmood Yoonessi, M.D. I also appeared as counsel of record in an action filed by Dr.

Yoonessi in the State Supreme Court for the County of Erie wherein the Hon. Joseph Glownia

stayed the Department of Health's summary suspension of Dr. Yoonessi's medical license pending

hearings before the Board of Professional Medical Conduct.

    3.    I reviewed the document annexed hereto as Exhibit 1, which purports to be a

document provided by Kevin Donovan, Esq., an attorney from the Department of Health's Office






of Professional Medical Conduct. The document was faxed to me last week by Gerald T. Walsh, Dr. Yoonessi's current counsel.

4. I have no recollection of ever seeing the document annexed hereto as Exhibit 1, prior to receiving Mr. Walsh's fax. If I had received such a document, I would have provided it to Mr. Walsh, along with other documents provided to him regarding Dr. Yoonessi's case.

5. On behalf of Dr. Yoonessi, my partner and I objected strenuously to exhibits which were offered by Mr. Donovan at the outset of the case, without authentication on an item-by-item basis. I recall that at a pre-hearing conference, there was a confusing presentation on the record by Mr. Donovan about removing certain pages from the record. The Health Department's lawyer was clearly not interested in being helpful to Dr. Yoonessi's ability to understand or challenge the offered records. In light of our outstanding objections to the exhibits, I am certain that if we had been provided with a copy of the document annexed as Exhibit 1, we would have objected again.

6. Further, the document attached as Exhibit 1, if it had been presented to me, would also have been presented in front of Administrative Law Judge Timothy Trost in the course of the hearings. There was no occasion where Mr. Donovan ever communicated to me outside the presence of the Administrative Law Judge about removing pages from the records.

                                        Richard G. Collins, Esq.

Subscribed and sworn to before me
this 28 day of January, 2003.

_Catherine F. Klinger_
Notary Public

CATHERINE F. KLINGER
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 8/25/2003

2

000241

**IN THE MATTER**

OF

**MAHMOOD YOONESSI, M.D.**

C 837

## EXHIBITS IN EVIDENCE IN FULL, BUT SOME PAGES OMITTED FROM HEARING COMMITTEE COPIES

| No. | Exhibit Description | Pages In Hearing Committee Member copies |
|---|---|---|
| 7. | Patient B – Buffalo General Hospital record | cover-121, 232-482 |
| 8. | Patient C – Our Lady of Victory Hospital record | cover-140, 268-336 |
| 11. | Patient D – St. Joseph's Hospital record | 1-260, 779-837, 947-1243, 1292-1296, 1976-1977 |
| 18. | Patient F – Our Lady of Victory Hospital record | 1-247, 342-350, 504-510 |
| 20. | Patient G – Buffalo General Hospital record | cover-6, 25-28, 61-69, 94, 89, 149-156, 158-159, 190, 215, 279-405 |
| 21. | Patient H – Mercy Hospital of Buffalo record | cover-84, 163-225, 229-275 |

Exhibit 1

T239  00167

1          MR. COLLINS:   I just want to be clear

2     that in other words that the documents -- some

3     of the documents that have now been received

4     into evidence are not the same -- I just want

5     to be clear -- not the same as the documents

6     that were provided either to your office or

7     Tarantino's office.

8          MR. DONOVAN:   No, they're the same.

9     The committee members will be getting fewer

10    pages.  You'll see in some of them --

11         MR. COLLINS:   Judge, you just

12    instructed him -- excuse me.  I didn't mean to

13    interrupt you.

14         MR. DONOVAN:   No.  Go ahead.

15         MR. COLLINS:   So we're going to be

16    getting a list from Mr. Donovan of those pages

17    that have been removed from the exhibits.

18         ALJ TROST:   Before you leave, you can

19    get that list from him so you have it tonight,

20    but I ask you to prepare a better list for

21    tomorrow for the panel members, as well.

22         MR. DONOVAN:   Right.

23         ALJ TROST:   He's speaking about the

24    copies that the panel members take home with

25    them.

County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:47 PM-21CV001658

*Supreme Court, Appellate Division*

*Third Judicial Department*

**AA 53**

**FCA 4**



Filed and Entered: June 20, 2003

Case # 92009

---

In the Matter of MAHMOOD
YOONESSI,

                                          Petitioner,

    v

STATE BOARD FOR
PROFESSIONAL MEDICAL
CONDUCT et al.,

                              Respondents.

**DECISION AND ORDER
ON MOTION**

---

Motion to strike portions of appendix and for further relief.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is

ORDERED that the motion to strike portions of the appendix is granted, without costs, to the extent that the following pages in the appendix and all references thereto in petitioner's brief are stricken:

Group 1. Pages A482, A488, A493, A509, A513, A549, A574, A776, A879 - A908, A911, A913, A914, A946, A1031, A1054, A1093, A1094, A1114, A1204, A1325 - A1365, A2384 - 2390, A2401, A2402, A2404, A2409, A2417, A2421, A2434, A2435, A2439 - A2442, A2454, A2500 - A2506, A2533 - A2542, A2563 - A2572, A2602, A2662 - A2666, A2675 - A2699, A2709, A2727, A2736, A2807 - A2832, A2837 - A2841, A2850, A2864, A2988, A2989, A3059 - 3066, A3365 - A3367.

Group 2. Pages A1714 - A1776, A2132 - A2140, A2148 - A2151, A2153 - A2160, A2166 - A2168, A2242 - A2251, A2253, A2255 - A2272, A2280 - A2283, A2286 - A2297, A2302 - A2308, A2314 - A2316, A2319    A2323, A2328 - A2330, A2530 - A2531, A3386 - A3427, A3437, A3555 - A3562.

Group 3. Pages A2087, A2089 - A2105, A2115 - A2131, A2146, A2165, A2652 - A2653, A3430 - A3436, A3438 - A3440, A3442 - A3446, A3449 - A3466.

Group 4. Pages A455, A1009, A1206, A1429, A1510, A1777, A2086, A2106, A2114, A2141, A2144, A2147, A2152, A2161, A2348, A2382, A2399, A2472, A2582, A2654, A3009, A3152, A3278, A3368.

Group 5. Pages A3639 - A3678. Petitioner shall file and serve a corrected brief and appendix on or before July 7, 2003, and it is further

ORDERED that the proceeding is removed from the September 2003 term and set down for the October 2003 term, and it is further

FCA 44

ORDERED that respondent's time to file and serve their brief is extended to August 1, 2003.

CARDONA, P.J., PETERS, MUGGLIN, ROSE and LAHTINEN, JJ., concur

ENTER:

Michael J. Novack
Clerk of the Court

000369

00170

000014



**The 176**

**University of the Education**   **State of New York Department**

IN THE MATTER

of the

Application of **MAHMOOD YOONESSI** for restoration of his license to practice as a physician in the State of New York.

Case No. CP-11-26

It appearing that the license of MAHMOOD YOONESSI, to practice as a physician in the State of New York, was revoked by Order of the State Board for Professional Medical Conduct dated June 5, 2002, and he having petitioned the Board of Regents for restoration of said license, and the Regents having given consideration to said petition and having reviewed the record, and having disagreed with and rejected the recommendations of the Peer Committee and the Committee on the Professions, for the reasons set forth in the attached written decision, now, pursuant to action taken by the Board of Regents on October 9, 2012, it is hereby

ORDERED that the petition for restoration of License No. 310221, authorizing MAHMOOD YOONESSI to practice as a physician in the State of New York, is denied.



IN WITNESS WHEREOF, I, John B. King, Jr., Commissioner of Education of the State of New York for and on behalf of the State Education Department, do hereunto set my hand and affix the seal of the State Education Department, at the City of Albany, this 8th day of February 2013.

REDACTED

Commissioner of Education

000393 · 00171



THE UNIVERSITY OF THE STATE OF NEW YORK
The State Education Department

Determination of the Board of Regents
Application for Restoration of Physician License

Re: Mahmood Yoonessi

A full recitation of the facts and disciplinary history in this matter is set forth in the report and recommendation of the Committee on the Professions and other documentation submitted to the Board of Regents.

We have carefully reviewed the report and recommendation of the Peer Committee dated February 10, 2009, and the report and recommendation of the Committee on the Professions ("COP") dated December 2, 2011. We agree with the minority member of the COP that Dr. Yoonessi is not entitled to restoration of his license to practice medicine, and we reject the recommendations of the Peer Committee and the majority members of the COP that Dr. Yoonessi be placed on probation for a period of five years, with probation terms and (per the COP's recommendation) limitation on practice.

As an initial matter, we are very concerned about the seriousness of the violations of which he was found guilty. In June 2002, a Hearing Committee for the State Board for Professional Medical Conduct ("SBPMC") found Dr. Yoonessi, who was practicing gynecological oncology, to be guilty of 26 of 30 specifications of misconduct involving 8 different patients, and revoked his license to practice medicine. He was found guilty of, among other things, prescribing an unorthodox and inappropriate chemotherapy regime for 5 of the patients; performing unwarranted and contraindicated surgery on at least 8 occasions; failing to obtain adequate informed consents for chemotherapy and surgery; improperly ignoring "Do Not Resuscitate" orders; failing to properly examine or document examinations of some of the patients; and providing fraudulent information on an application for reappointment to a hospital by denying knowledge of an action pending against him by the Office of Professional Medical Conduct.

For example, as to particular patients, the Hearing Committee found that Dr. Yoonessi performed a total abdominal hysterectomy and bilateral salpingo-oophorectomy on Patient A without medical indication and in a hospital that could not provide the dialysis she needed, and needlessly exposed her to a significant reduction in quality of life and an increased risk of infection and death, among other dangers. As to Patient B, Dr. Yoonessi treated her advanced ovarian cancer with a unique drug regimen for which adequate informed consent had not been obtained, and which did not conform to accepted standards of care. He additionally performed an exploratory laparotomy and extensive surgery on her that was not medically indicated. As to Patients C, D and G, he failed to perform and/or document adequate preoperative histories, physical examinations and assessments. There were many other findings of misconduct, involving these and additional patients, documented in the record before us.

MEDICAL BOARD

000349

00172



Dr. Yoonessi disagrees with the findings of the SBPMC, and instead provides a litany of reasons why his care was appropriate, the hearing was unfair and the findings were wrong. We recognize that he is entitled to maintain his innocence, but he appears to have no appreciation for the circumstances that led to the charges, even if he disagrees with them, and does not appear to understand the reasons that his various procedural objections were dismissed by the Appellate Division, Third Department, in his appeal of the SBPMC decision (Yoonessi v. State Board for Professional Medical Conduct, 2 AD3d 1070 [3d Dept 2003], leave denied, 3 NY3d 607 [2004]). We agree with the minority member of the COP on this point – Dr. Yoonessi still presents no real understanding of the seriousness of the charges or why he was found guilty, regardless of whether he maintains that he did nothing wrong.

Although we do not require that he admit guilt, given the seriousness of the findings against him, we do seek a recognition of what circumstances might have led others even wrongfully to believe that he had acted improperly, and to show us what steps he will take in the future to avoid such circumstances. He displayed no such insight or understanding, and no plan of rehabilitation.

He has consistently displayed an attitude that he is right and will make no changes, thus implicitly stating that he would not even consider any other opinion, or even the findings of misconduct in the disciplinary proceeding against him, in making medical decisions and planning treatment. (See, e.g., "Notably, petitioner stated that he would continue the underlying courses of conduct if allowed to continue practicing medicine" [Yoonessi, 2 AD3d at 1075]; "The applicant steadfastly asserts that his mode of treatment was correct ... then went on to question the credentials of the state's expert witness in the original proceeding and further insisted that he used the proper treatment regimen with his patients" [Peer Committee report at p. 10]; letter from Dennis J. Graziano, Director of the Office of Professional Medical Conduct, saying that "[a]pplicant had stated that he would 'not change his chemotherapy regimen," that the SBPMC Hearing Committee had found him to be "incorrigible" and that he must be "stopped from continuing the exultation of his blind beliefs over the needs and safety of his patients" [id. at p. 7]; statement in Office of Professional Discipline investigator's interview with Dr. Yoonessi for this restoration proceeding, that "[i]n said interview the applicant stated that he did not feel that he did anything wrong in his treatment of the patients for which his license was revoked and further added that he would treat them the same way" [id. at p. 6]).

Public protection and safe and competent practice are at the heart of the Board's responsibility in determining whether to restore the license of an applicant who has engaged in conduct serious enough to result in the loss of a professional license. Based on the record before us, we are not convinced that the public would be adequately protected were Dr. Yoonessi's license to be restored. We agree with the conclusion of the minority member of the COP that the applicant has failed to carry his burden of establishing a compelling case for the restoration of his physician license.



MEDICAL BOARD 00173

MAY 3 2009

000350

State's Exhibit

 

## Office of the Professions

# Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

## License Information *

03/16/2021

**Name :** MCEACHIN NIA MALIKA
**Address :** UPPER MONTCLAIR NJ
**Profession :** LICENSED PRACTICAL NURSING
**License No:** 310221
**Date of Licensure :** 06/05/2012
**Additional Qualification :** Not applicable in this profession
**Status :** NOT REGISTERED
**Registered through last day of :** 07/20

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants,* or *specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.



000395

00174

 



# Office of the Professions

## Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

### License Information *

03/16/2021

**Name :** AHERN MAUREEN M
**Address :** DEER PARK NY
**Profession :** REGISTERED PROFESSIONAL NURSING
**License No:** 310221
**Date of Licensure :** 10/20/1978
**Additional Qualification :**
**Status :** REGISTERED
**Registered through last day of :** 07/23

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants, or specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.



000396
00175

CAUSE NO. _08-3132-J_

| | | |
|---|---|---|
| THE AMERICAN BOARD OF | § | IN THE DISTRICT COURT |
| OBSTETRICS AND GYNECOLOGY | § | |
| Plaintiff, | § | |
| | § | DALLAS COUNTY, TEXAS |
| v. | § | |
| | § | |
| MAHMOOD M. YOONESSI, M.D. | § | |
| Defendant. | § | 191ST JUDICIAL DISTRICT |

---

### FINAL SUMMARY JUDGMENT OF PLAINTIFF'S CAUSE OF ACTION

---

After considering Defendant Mahmood M. Yoonessi's Motion for Summary Judgment, the pleadings, the response, the affidavits, letter briefs, other briefs, the other evidence on file, the Clerk's entire file, and the argument of counsel, this Court finds that Defendant Yoonessi's Motion for Summary Judgment shall be and is GRANTED, and makes the following findings:

The Court finds there is no genuine issue of material fact, and that Defendant Yoonessi is entitled to summary judgment as a matter of law on Plaintiff ABOG's claims of breach of contract, abuse of process, and malicious prosecution. Further, all of the Plaintiff ABOG's objections to Defendant Yoonessi's summary judgment evidence are hereby *overruled;* and further

The Court finds that Defendant Yoonessi has asserted a counterclaim against Plaintiff ABOG, and has asserted Third Party Claims; however, Plaintiff ABOG and Defendant Yoonessi have submitted a Joint Motion for Severance of the Plaintiff's claims against the Defendant from Defendant Yoonessi's counterclaim and third party claims; and such Motion for Severance is and has been *granted* by the Court contemporaneously with the signing of this Order, thereby severing

State's Exhibit 2

000263

this Judgment from the unadjudicated counter claim and third party claims and making this

Judgment *final and appealable.*

IT IS THEREFORE ORDERED and DECREED that Defendant's Motion for Summary

Judgment is GRANTED on Plaintiff ABOG's entire cause of action against Defendant Yoonessi;

and

IT IS FURTHER ORDERED and DECREED that Plaintiff ABOG *take nothing* as to all

claims, and its entire cause of action asserted in Plaintiff's Petition against Defendant Yoonessi;

and

IT IS FURTHER ORDERED and DECREED that this Judgment disposes of all claims,

and the entire cause of action asserted by the Plaintiff ABOG against Defendant Yoonessi and it

therefore is a FINAL, APPEALABLE judgment; and

IT IS FURTHER ORDERED and DECREED that Defendant Yoonessi is awarded his

Costs of Court against Plaintiff ABOG, and

IT IS FURTHER ORDERED and DECREED that all writ and/or other process necessary

to enforce this Final Judgment are hereby authorized, ordered and allowed.

Dated: _April 11, 2008_.

_____
**DISTRICT JUDGE PRESIDING**

000032

P. Crain Chrisman, 44th District
Court Retired, Sitting for
the _191_ District Court

000697
State's Exhibit 2

000070   00177



ZDARSKY, SAWICKI & AGOSTINELLI
ATTORNEYS AT LAW

OSEPH E. ZDARSKY
. MICHAEL SAWICKI
UY J. AGOSTINELLI
ERALD T. WALSH
ARK J. SCHLANT
ATRICK A. DUDLEY
HOMAS P. FITCH
ONALD G. POWELL

404 CATHEDRAL PLACE
298 MAIN STREET
BUFFALO, N.Y. 14202
716-855-3200

TELECOPIER: 716-855-3101

July 29, 2002

Ms. Tina Kaplan
Director of Field Services
United University of Professions
P.O. 15143
Albany, New York 12212-5143

     RE:    Mahmood Yoonessi, M.D.

Dear Ms. Kaplan:

     Pursuant to a voice mail message and letter dated July 16, 2002 from Edward J. Giblin, Labor Relations Specialist of the UUP Western New York Regional Office, I am writing to you regarding the status of a $75,000 settlement payable to Dr. Yoonessi, pursuant to a 1996 settlement. Following that settlement offer, Dr. Yoonessi proceeded with a lawsuit in the Court of Claims, based on his claim that he was entitled to more and that the UUP's settlement offer was not negotiated fairly and constituted breach of the duty of fair representation. That matter has been finally determined in the New York courts with a denial of leave to appeal by the New York Court of Appeals and entry of a judgment in the Court of Claims (see enclosed judgment). The basis of the dismissal of the lawsuit, for breach of the duty of fair representation, was that the $75,000 offer negotiated by UUP was Dr. Yoonessi's only remedy. We are now investigating the status of that $75,000 payment. Please contact me to advise where the funds are located.

     Thank you for your kind attention to this request. I look forward to hearing from you at your first opportunity.

                Very truly yours,

                Gerald T. Walsh

GTW/dhs
cc:    Mahmood Yoonessi, M.D.

727

00178

 **Office of the Inspector General**
**U.S. Department of Justice** 

Search

**HOME    ABOUT    REPORTS    ONGOING WORK    NEWS    HOTLINE**

Home » Hotline » Whistleblower Rights and Protection

# Whistleblower Rights and Protection

### Overview of the OIG's Whistleblower Ombudsperson Program

Employees of DOJ and its contractors, subcontractors, and grantees perform an important service by reporting what they reasonably believe to be evidence of wrongdoing, and they should never be subject to or threatened with reprisal for doing so. The OIG's Whistleblower Ombudsperson program carries out a number of key functions, including:

- Educating DOJ employees and managers about prohibitions on retaliation for protected disclosures, and employees who have made or are contemplating making a protected disclosure about the rights and remedies against retaliation for protected disclosures;

- Ensuring that the OIG is promptly and thoroughly reviewing complaints that it receives, and that it is getting back to whistleblowers in a timely fashion; and

- Coordinating with the U.S. Office of Special Counsel, other agencies, and non-governmental organizations on relevant matters.

The OIG Whistleblower Ombudsperson program cannot act as a legal representative, agent, or advocate for any individual whistleblower.

Reports concerning wrongdoing in DOJ employees or programs should be submitted directly to the OIG Hotline.

For more information on whistleblower rights and protections, please see the the pamphlet prepared by the U.S. Office of Special Counsel, "Know Your Rights When Reporting Wrongs" and the following topics from the video entitled "Reporting Wrongdoing:  Whistleblowers and their Rights and Protections," prepared by the OIG Whistleblower Ombudsperson program:

- Where do I report wrongdoing?

- What sort of disclosures are protected?

- What if I am wrong?

- What sort of personnel actions are prohibited in response to a protected disclosure?

- Who should I contact if I think someone has taken a personnel action against me in reprisal for making a protected disclosure?

- Can I report wrongdoing anonymously?  Will a request for confidentiality be honored?

- What are my remedies if someone has retaliated against me for a protected disclosure?

- Can anything happen to a supervisor who retaliates against me?

For more information, you may contact the OIG Whistleblower Ombudsperson program.

### How to File Whistleblower Reprisal Complaints

If an adverse personnel action has been taken or threatened against you in reprisal for making a disclosure of wrongdoing within your component, to the OIG, or elsewhere, you may submit a complaint to the OIG Hotline, or to the U.S. Office of Special Counsel.  If you submit your complaint to the OIG, we will review it and let you know whether it is appropriate for the OIG to investigate or whether it should be referred elsewhere. Allegations of reprisal regarding EEO matters generally should be addressed through the EEO process.

### FBI Whistleblowers

C00338

00179 263

There are separate procedures for employees of the FBI who wish to make a protected disclosure, and also for making a claim of reprisal for having made a protected disclosure. Claims of reprisal may be submitted to the OIG Hotline, or to the DOJ Office of Professional Responsibility (OPR). The OIG or the OPR will review reprisal complaints made by FBI employees, conduct investigation of such complaints in appropriate cases, and, if they find reasonable grounds to believe that there has been or will be reprisal for a protected disclosure, report their findings to the DOJ Office of Attorney Recruitment and Management (OARM) for disposition. More information on OARM's procedures is available at http://www.justice.gov/oarm/usdoj-oarm-fbi-whistleblowers.

## Nondisclosure Agreements

Pursuant to the Whistleblower Protection Enhancement Act of 2012, the following statement applies to non-disclosure policies, forms, or agreements of the federal government with current or former employees, including those in effect before the Act's effective date of December 27, 2012:

> "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive Orders and statutory provisions are incorporated into this agreement and are controlling."

The controlling Executive Orders and statutory provisions in the event of any conflict with a non-disclosure policy, form, or agreement include, as of March 14, 2013:

- Executive Order No. 13526 (governing classified national security information);

- Section 7211 of Title 5, United States Code (governing disclosures to Congress);

- Section 1034 of Title 10, United States Code as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military);

- Section 2302(b)(8) of Title 5, United States Code, as amended by the Whistleblower Protection Act of 1989 and the Whistleblower Protection Enhancement Act of 2012 (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats);

- Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents);

- The statutes which protect against disclosure that may compromise the national security, including Sections 641, 793, 794, 798, and 952 of Title 18, United States Code; and

- Section 4(b) of the Subversive Activities Control Act of 1950 (50 U.S.C. 783(b)).

C00339





Oncology Group (GOG) database of patients with small-volume disease provided some support for this view.[11] Operative notes on the population in the database were reviewed to separate the patients into two groups: those who had stage IIIA or IIIB disease, and those who had stage IIIC disease that was successfully surgically cytoreduced to small-volume residual disease. Patients who required surgical cytoreduction had an inferior survival as compared with those who already had small-volume disease at the time the abdomen was opened. While this investigation shows a difference between these two patient groups, however, it does not prove that surgical cytoreduction has no value, in the absence of a population for comparison in which chemotherapy was started with large-volume disease.

The only way to address the question of the value of cytoreductive surgery is to conduct a randomized trial in which all patients are randomized to surgical cytoreduction or no surgical cytoreduction and then analyzed by intent to treat. No such study has been successfully completed. A European study, however, has evaluated the role of interval cytoreduction[18] (Table 73-5). Patients with advanced disease received three courses of cisplatin plus cyclophosphamide and were then randomized to receive either three more courses of the same chemotherapy or interval cytoreductive surgery, followed by three more cycles of cisplatin plus cyclophosphamide. The group receiving interval cytoreductive surgery demonstrated a statistically significantly superior progression-free and overall survival. A GOG study to attempt to confirm these data is nearing completion.

Based on the weight of current evidence, patients, except for those with obvious stage IV disease, should undergo an initial laparotomy with intent to carry out maximal surgical cytoreduction. This should improve response to chemotherapy as well as survival.

### Management of Advanced Disease

Patients with stage III or IV disease, upon completion of initial surgery, should receive systemic therapy for control of disease. Fortunately, celomic epithelial carcinoma is a chemosensitive disease, hence the significant therapeutic options for patients with advanced disease.

#### SINGLE-AGENT THERAPY

A number of cytotoxic agents as well as biologic and hormonal agents have activity against celomic epithelial neoplasms[6-13,17-28] (Table 73-6). Response rates reported for each of the active agents vary as a result of several factors: (1) volume of residual disease in the patient population at the initiation of therapy; (2) dose and schedule of the agent under study; and (3) whether the patient population has received prior cytotoxic therapy to which the neoplasm has become clinically resistant as evidenced by clinical progression during therapy. With the reservation that these factors cannot be sorted out in many of the single-agent studies reported, it is possible to point to at least the following active drugs of major interest: the platinum com-

| TABLE 73-5 RESULTS OF EORTC: INTERVAL SURGICAL CYTOREDUCTION* | | | |
| --- | --- | --- | --- |
| PARAMETER | ALL | IDS | NO IDS |
| Patients | 408 | 150 | 149 |
| Response after 3 cycles | | | |
| Complete response | 1% | 15 mo | 12.5 mo |
| Partial response | 55% | 27 mo | 19.0 mo |
| Progression-free survival | | | |
| Survival | | | |

*Data from van der Burg MEL, van Lent M, Buyse M, et al: The effect of debulking surgery after induction chemotherapy on the prognosis in advanced epithelial ovarian cancer. N Engl J Med 332:629, 1995.
Abbreviation: IDS, interval debulking surgery.

pounds, the alkylating agents, the anthracyclines, paclitaxel, oral etoposide, topotecan, gemcitabine, navelbine, doxil, and hexamethylmelamine. In addition, among hormonal and biologic agents, interferon and tamoxifen display activity. Among these, the platinum compounds and paclitaxel deserve specific comment.

*Platinum analogues.* The platinum analogues are the most systematically evaluated and active cytotoxic drugs. Cisplatin demonstrates clear-cut activity in patients with no prior chemotherapy, as well as in those refractory to prior alkylating agents.[29-34] Carboplatin produces less neurotoxicity and nephrotoxicity than cisplatin in exchange for thrombocytopenia as the dose-limiting adverse effect and exhibits activity[31] similar to that seen with cisplatin.[32]

*Paclitaxel.* Paclitaxel, a diterpenoid extracted from the bark of *Taxus brevifolia* (the Pacific yew tree), acts

| TABLE 73-6 SINGLE-AGENT ACTIVITY IN CELOMIC EPITHELIAL CARCINOMA OF THE OVARY* | | |
| --- | --- | --- |
| | PATIENTS | |
| DRUG | N | %[†] |
| Older agents | | |
| Alkylating agents | 1,371 | 33 |
| Ifosfamide | 37 | 22 |
| Cisplatin | 190 | 32 |
| Carboplatin | 82 | 24 |
| Paclitaxel | 41 | 36 |
| Doxorubicin | 102 | 33 |
| 5-Fluorouracil | 126 | 29 |
| Methotrexate | 34 | 18 |
| Mitomycin | 49 | 16 |
| Hexamethylmelamine | 215 | 24 |
| Progestins | 176 | 12 |
| Antiestrogens | 105 | 18 |
| Newer agents | | |
| Prednimustine | 36 | 28 |
| Dihydroxybusulfan | 26 | 27 |
| Galactitol | 39 | 15 |
| Oral etoposide | 70 | 30 |
| Topotecan | 112 | 21 |
| Gemcitabine | 73 | 16 |
| Navelbine | 24 | 21 |
| Doxil | 35 | 26 |
| Biologic agents | | |
| Interferon-α | 21 | 19 |
| Interferon-γ | 14 | 29 |

*Data from references 6-13, 17-28.
[†]Response rate percentage.

00181

**This was printed from Business First**

# Dunkelman tops nonprofit salary list

**Business First by Tracey Drury, Business First**

Date: Wednesday, November 12, 2008, 9:33am EST

The top executives at Western New York's largest nonprofit agencies receive top dollar for their work.

More than 800 nonprofit executives earn salaries of $50,000 or more, with 150 receiving more than $100,000. At the top of the list is David Dunkelman, who received a salary of $513,504 in fiscal 2006, according to the 2008 Million Dollar Nonprofits report.

The report, Business First's annual report on the region's largest nonprofit agencies with revenues of at least $1 million, appears in the 2008 All About Nonprofits special publication. Business First analyzed financial data for nearly 300 nonprofit agencies and private foundations in the eight-county region using tax returns for the 2006 and 2007 fiscal years.

Dunkelman, the only executive who received more than $500,000, is president of Weinberg Campus. He oversees nine separate nonprofit agencies, including five on the Million Dollar Nonprofits list with combined revenues over $55 million, all providing health care and housing to seniors.

Other executives paid more than $250 million include: Andrew Rudnick, president and CEO at the Buffalo Niagara Partnership, $337,237; Donald Boswell, president and CEO at WNY Public Broadcasting Association, $272,785; Janet Maher, former president at Buffalo Hearing & Speech Center Inc., $270,103; Robert Milch, medical director of Hospice Buffalo Inc., $267,004; Thomas Kucharski, president of Buffalo Niagara Enterprise, $263,257; William Finn, president and CEO at the Center for Hospice and Palliative Care, $255,858; Joann Falletta, staff conductor for the Buffalo Philharmonic Orchestra Society Inc.; and Louis Grachos, director of the Albright Knox Art Gallery.

- Page 1
- 2

|View All



CC0335

258    00182



**182**

Office of the Inspector-General
U.S. Department of Justice

Search

**HOME     ABOUT     REPORTS     ONGOING WORK     NEWS     HOTLINE**

Home » Hotline » Whistleblower Rights and Protection

# Whistleblower Rights and Protection

### Overview of the OIG's Whistleblower Ombudsperson Program

Employees of DOJ and its contractors, subcontractors, and grantees perform an important service by reporting what they reasonably believe to be evidence of wrongdoing, and they should never be subject to or threatened with reprisal for doing so. The OIG's Whistleblower Ombudsperson program carries out a number of key functions, including:

- Educating DOJ employees and managers about prohibitions on retaliation for protected disclosures, and employees who have made or are contemplating making a protected disclosure about the rights and remedies against retaliation for protected disclosures;

- Ensuring that the OIG is promptly and thoroughly reviewing complaints that it receives, and that it is getting back to whistleblowers in a timely fashion; and

- Coordinating with the U.S. Office of Special Counsel, other agencies, and non-governmental organizations on relevant matters.

The OIG Whistleblower Ombudsperson program cannot act as a legal representative, agent, or advocate for any individual whistleblower.

Reports concerning wrongdoing in DOJ employees or programs should be submitted directly to the OIG Hotline.

For more information on whistleblower rights and protections, please see the the pamphlet prepared by the U.S. Office of Special Counsel, "Know Your Rights When Reporting Wrongs" and the following topics from the video entitled "Reporting Wrongdoing: Whistleblowers and their Rights and Protections," prepared by the OIG Whistleblower Ombudsperson program:

- Where do I report wrongdoing?

- What sort of disclosures are protected?

- What if I am wrong?

- What sort of personnel actions are prohibited in response to a protected disclosure?

- Who should I contact if I think someone has taken a personnel action against me in reprisal for making a protected disclosure?

- Can I report wrongdoing anonymously? Will a request for confidentiality be honored?

- What are my remedies if someone has retaliated against me for a protected disclosure?

- Can anything happen to a supervisor who retaliates against me?

For more information, you may contact the OIG Whistleblower Ombudsperson program.

### How to File Whistleblower Reprisal Complaints

If an adverse personnel action has been taken or threatened against you in reprisal for a disclosure of wrongdoing within your component, to the OIG, or elsewhere, you may submit a complaint to the OIG Hotline, or to the U.S. Office of Special Counsel. If you submit your complaint to the OIG, we will review it and let you know whether it is appropriate for the OIG to investigate or whether it should be referred elsewhere. Allegations of reprisal regarding EEO matters generally should be addressed through the EEO process.

### FBI Whistleblowers

CC0338

001831263

There are separate procedures for employees of the FBI who wish to make a protected disclosure, and also for making a claim of reprisal for having made a protected disclosure. Claims of reprisal may be submitted to the OIG Hotline, or to the DOJ Office of Professional Responsibility (OPR). The OIG or the OPR will review reprisal complaints made by FBI employees, conduct investigation of such complaints in appropriate cases, and, if they find reasonable grounds to believe that there has been or will be reprisal for a protected disclosure, report their findings to the DOJ Office of Attorney Recruitment and Management (OARM) for disposition. More information on OARM's procedures is available athttp://www.justice.gov/oarm/usdoj-oarm-fbi-whistleblowers.

## Nondisclosure Agreements

Pursuant to the Whistleblower Protection Enhancement Act of 2012, the following statement applies to non-disclosure policies, forms, or agreements of the federal government with current or former employees, including those in effect before the Act's effective date of December 27, 2012:

> "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive Orders and statutory provisions are incorporated into this agreement and are controlling."

The controlling Executive Orders and statutory provisions in the event of any conflict with a non-disclosure policy, form, or agreement include, as of March 14, 2013:

- Executive Order No. 13526 (governing classified national security information);

- Section 7211 of Title 5, United States Code (governing disclosures to Congress);

- Section 1034 of Title 10, United States Code as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military);

- Section 2302(b)(8) of Title 5, United States Code, as amended by the Whistleblower Protection Act of 1989 and the Whistleblower Protection Enhancement Act of 2012 (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats);

- Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents);

- The statutes which protect against disclosure that may compromise the national security, including Sections 641, 793, 794, 798, and 952 of Title 18, United States Code; and

- Section 4(b) of the Subversive Activities Control Act of 1950 (50 U.S.C. 783(b)).

C00339





B481



151

# The University of the State of New York

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF PROFESSIONAL RESPONSIBILITY
STATE BOARD FOR MEDICINE
-----------------------------------------X

In the Matter of the Application of

**MAHMOOD YOONESSI**

for the restoration of his license to
practice as a physician in the State of
New York.

-----------------------------------------X

REPORT OF
THE PEER
COMMITTEE
CAL. NO. 22853

MAHMOOD YOONESSI, hereinafter known as the applicant, was previously licensed to practice as a physician in the State of New York by the New York State Education Department on or about November 21, 1973. Said license was revoked, effective June 13, 2002, by the Office of Professional Medical Conduct (OPMC), New York State Health Department (DOH), as the result of a professional misconduct proceeding.

The applicant has applied for restoration of his license.

## BACKGROUND INFORMATION

The written application, supporting papers provided by the applicant and papers resulting from the investigation conducted by the Office of Professional Discipline (OPD) have been compiled by the prosecutor from OPD into a packet that has been distributed to this Peer Committee in advance of its meeting and also provided to the applicant.

EXHIBIT
B481
Q
806
00185    000388

**MAHMOOD YOONESSI    (22853)**

the terms of probation annexed hereto; made a part hereof, and
marked as Exhibit A.    Said terms shall include; among other
things, a restriction on performing surgery during the period of
probation, and that any practice of medicine during that period
be confined to an Article 28 facility as defined by the New York
Public Health Law.

We also unanimously recommend that said stay of revocation
and period of probation shall only commence if and when the
applicant returns to the practice of medicine in the State of New
York, and that the applicant shall notify the Director, Office of
Professional Medical Conduct (OPMC), of his intention to return
to the practice of medicine in the State of New York, by
certified mail, return receipt requested, addressed to said
Director at OPMC 433 River Street - Suite 303, Troy, New York
12180-2299 at least thirty (30) days prior to his return to
practice.

Respectfully submitted,

Florence Kavaler, M.D.,
                    Chairperson
Joyce H. Lowinson, M.D.

Krishna RS Gujavarty, M.D.

Chairperson                    Dated    2/10/09

`822`

`00186`

B498





November 23, 2011

Mahmood Yoonessi, M.D; 6790 Crest Road
Rancho Palos Verdes, Ca. 90275

Dear Dr. Yoonessi:

The Committee on the Professions considered your application for the restoration of your physician license at its December 9, 2009 meeting.

The Committee has completed its draft report and recommendations. That recommendation is set forth in the enclosed draft report.

Section 24.7(a) (2) (i) of the Rules of the Board of Regents allows you, if you wish, to submit a written response to the Committee's recommendation to the Board of Regents. Such response must be received in this office no later than 15 calendar days from the postmark of this letter and may not contain any new evidentiary material.

I want to emphasize that the Committee action constitutes a recommendation. I anticipate that, at its meeting on December 12 -13, 2011, the Board of Regents will review the entire matter and make a final determination. You will be notified shortly thereafter in writing of the Board's decision.

As noted above, I have enclosed a draft version of the written report of the Committee on the Professions. You will receive the final report along with the Commissioner's Order after the Regents have made their determination.

Sincerely, Kathleen L. Werther, Esq.

Enclosures                                          cc: Walter Ramos

Case Number; CP-11-26              December 2, 2011

THE UNIVERSITY OF THE STATE OF NEW YORK   the State Education
Department

Report of the Committee on the Professions Application for Restoration of Physician
License

Re: Mahmood Yoonessi

Mahmood Yoonessi, Rancho Palos Verdes, California, 90275, petitioned for restoration of his physician license. The chronology of events is as follows:

08/19/69    Issued license to practice medicine in Iran

11/21/73    Issued license number 310221 to practice as a  physician in New York State.





EXHIBIT
R

B498

00187

000405



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-6

(See Sealed Confidential Records Page 53)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-6:
Miscellaneous Documents has been sealed.



## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-7

(See Sealed Confidential Records Pages 54 through 55)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-7:
Miscellaneous Documents has been sealed.

open to confusion due to their chicken scratch nature. It was extremely difficult for me to follow his -hemotherapy protocol. In addition the informed consent was more perfunctory than informed.

o. **Was there adequate monitoring of the patient while receiving chemotherapy?** There appears to have been adequate monitoring.

## Case #7 Faith Wheaton, MR #255963, Mercy Hospital.

### 1. CASE SUMMARY

The patient is a 59 year old who was admitted to Mercy Hospital under the care Dr. Tariq Malik. She had been seen June 1992 at which time her exam was negative. She was admitted 12/16/93 with a history of abdominal and pelvic discomfort. She was noted to have a large pelvic mass and a 'frozen' pelvis. An ultrasound was obtained which showed bilateral hydronephrosis consistent with obstructive uropathy. There was ascites noted and there was thickening of the bladder wall, an enlarged uterus and a left ovary enlarged to approximately 4 cm in size. The right ovary appeared normal. CT Scan showed small bilateral pleural effusions, ascites, and bilateral hydronephrosis. There was a large pelvic mass noted, the size not detailed on CT Scan. After undergoing preoperative clearance and a full bowel prep, the patient was taken to the operating room on 11/23/93 by Dr. Yoonessi and Dr. Malik. At the time of surgery, the patient was noted to have ascites. She had multiple tumor implants on the surface of the liver and tumor implants in the omentum. In the recto-sigmoid area there was tumor appearing to invade the bowel and compromising the lumen of the recto-sigmoid. The distal part of the small bowel was massively involved with tumor and the wall was infiltrated by tumor. Both ovaries were enlarged and had the appearance of metastatic tumors according to Dr. Yoonessi's note. The patient underwent extended hysterectomy, bilateral salpingo oophorectomy. As noted above, the distal ureters were obstructed with marked hydronephrosis. The ovaries were sent for frozen section and unfortunately the site of origin of the tumor could not be delineated. It was felt that the sigmoid colon could be the site of origin and the patient underwent a resection of the sigmoid colon. The patient then underwent a resection of the distal ileum and right colon. It is interesting to note however that the sequence of events dictated in the operative report are not the same sequence that the pathologist recorded the specimens. She noted that the right ovarian tumor contained a malignant neoplasm, differential diagnosis including ovarian stromal tumor, metastatic carcinoma and hematopoietic malignancy. The second frozen section was from the proximal ileum and the pathologist commented that the malignant neoplasm differential diagnosis included hematopoietic malignancy. A metastatic lesion could not be excluded. The next two frozens were from the ileum and cecum and the right iliac lymph nodes. These were reported as malignant neoplasm favoring lymphoma. Finally the colon was received and labeled "F" and frozen section was returned as malignant neoplasm favoring hematopoietic malignancy such as lymphoma. The omentum and liver were then biopsied by Dr. Yoonessi. At that time he was about to close the patient but the anesthesiologist noted that the patient was not putting out any urine. Dr. Yoonessi felt that the patient had undergone intraoperative obstruction of her ureters. The bladder was opened and attempts to insert catheters into the ureters were made. There was no urine output from the ureters and Dr. Yoonessi felt that both ureters needed to be re-implanted into the bladder. Dr Yoonessi was able to reimplant the left ureter into the bladder, however the right ureter could not reach the bladder and therefore he interposed a loop of small bowel. This left the patient with 4 bowel anastomoses.

Final pathology report showed a high grade, non Hodgkin's, large cell lymphoma in all the specimens. The patient did well initially post operatively but on 11/26/93 she developed a fever. She progressed to having a greenish out put from her pelvic drain. IVP, gastrographic intestinal studies and CT Scan showed no convincing evidence of a leak in any of the anastomosis. On 11/28/93 the patient had some left lower quadrant tenderness and crepitations and increasing drainage from the pelvic drain. Dr.



000100

MERCY HOSPITAL — BUFFALO, N.Y.



AA275|
104

CLINICAL RECORDS

| WHEATON | FAITH | | 1 | M | F | 059Y | 6/30/34 | 6336140 | |
|---|---|---|---|---|---|---|---|---|---|
| 11/15/93 | 14:04 | 4726 | GYN | 531 | MALIK, TARIO | | MALIK, TARIO | | |

198 CANADA STREET — HOLLAND — NY 14080 — COUNTY 14 — 537-2304 — PATIENT S.S.# 063281012

Emergency Contact: WHEATON, RICHARD — HUSBAND

Financially Responsible Party: WHEATON, RICHARD — 198 CANADA STREET

HOLLAND NY 14080 — 716-537-2304 — BUFFALO, N.Y.

Insured: BETHLEHEM STEEL — BUFFALO NY

Insurance Co: CB CLASSIC  LB1430 — Subscriber: WHEATON, RICHARD — SPOUSE — 10-224(57)-00

ADM CHIEF COMPLAINT/DIAGNOSIS: PELVIC MASS, GASTROENTERITIS, DEHYDRATION, BILATERAL HYDRONEPHRITIS, ASCITES

**ALLERGIES— NONE ** (34) ICU 2

## DIAGNOSES

| | ICD-9-CM CODES | DISCHARGE STATUS |
|---|---|---|
| PRINCIPAL DX: Pelvic mass, ascites | 200 08 | |
| SECONDARY DIAGNOSES: Non Hodgkins, Left cell lymphome | 0337 5679 | |
| Bilateral schmo & peritonitis | 562 91 | |
| Enterocristal & Enterocutaneous fistula | 5761 | |
| malnutrition, Hydronephrosis | 1971 | |
| Acute blood loss anemia | 2710 | |
| Hypokalemia, colonic or ureteral anastomosis leak | E9786 | DISCHARGE DATE 12/16/9 |

## PROCEDURES/OPERATIONS

| DATE | | ICD-9-CM CODES |
|---|---|---|
| 11/20/9 | PRINCIPAL PROCEDURE: Examination under anesthesia, Exploratory total abdominal hysterectomy, bilateral salpingo-oophorectomy | 6851 |
| 11/20/9 | Resection of pelvic tumor & excision of tumor from pelvic wall, resection of the pelvic tumor | 5441 |
| | Resection of small bowel & enterostomy, ileostomy, peritoneostomy, permanent stoma of bowel, colostomy repair | 5441 |
| 11/8/9 | Examination under OR, attempt at uterine sounding, colposcopy, cervical bx | 5411 |

## CONSULTATIONS

| | |
|---|---|
| Vanessi, M | Perrapato, S |
| Jerapalan, S | Gaches, T |
| Frost | Rach, T |
| Samie | Alvarez, J |
| Perfetto | |

DR MALIK / DR JUNESSE

EXHIBIT N-2

00191

000323



# OFFICE OF ADMINISTRATIVE HEARINGS
## STATE OF CALIFORNIA

# SEALED EXHIBIT N-8

(See Sealed Confidential Records Pages 56 through 58)

Per Protective Order Sealing Confidential Records dated November 18, 2021, Exhibit N-8: Miscellaneous Documents has been sealed.

family. This made a difficult situation almost unbearable for the family. They ultimately fired Dr Yoonessi from this case probably for the above reasons. In addition, all of the consultants should have realized that the fever and leukocytosis could have been on the basis of lymphoma alone. In addition preoperative evaluation prior to the first surgery and prior to the colostomy were substandard.

4. Does the documentation indicate that there was acceptable appropriate communication between Dr. Yoonessi and the other physicians involved in this case? No. It appears that they communicated but it does not appear that they understood what each other was saying. They seem to be constantly at odds with one another. Towards the end of the hospitalization it appears that Dr. Yoonessi was not realistic regarding the prognosis of this patient. In addition Dr. Yoonessi fails to take personal responsibility for many of the situations and blames the other consultants for the deteriorating condition of his patient. This certainly did not improve the communications. However the post operative care of the patient is a moot point. Once Dr. Yoonessi had decided to proceed with this extensive procedure on this obviously advanced lymphoma, the ultimate poor outcome of this case was already decided.


Case #8  Eleanor Josefiak, MR #064250 ST. Joseph Hospital, Cheektowaga, NY


1. CASE SUMMARY

The patient is a 68 year old originally admitted 4/25/94 with the presumptive diagnosis of ovarian carcinoma based on positive cytology. Physical exam was remarkable for ascites, abdominal mass and pleural effusions. The patient was taken to the operating room 4/25/94 where she underwent exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy, small bowel resection, sigmoid resection, pelvic and periaortic node dissection and omentectomy. At the time of surgery she was noted to have 5 liters of ascites present. The omentum was infiltrated with tumor. There was extensive seeding of the right hemidiaphragm. The sigmoid colon was infiltrated with tumor causing narrowing of this segment. The distal ileum and the appendix also showed extensive carcinomatosis with "evidence of invasion and obstruction". Although the amount of residual disease was not noted, it states that 95% of the gross tumor was removed. Final pathology report revealed a papillary serous adenocarcinoma of the ovary with extensive metastases throughout the abdomen. Again I did not see evidence of a pre operative assessment in the chart by Dr. Yoonessi. The patient had an extremely rocky postoperative course. She required bilateral chest tube placement for her pleural effusions. These unfortunately were placed on post op day 0 and 1 rather than intra operatively. The patient's postoperative course was complicated by bowel obstruction that eventually resolved with conservative management and she was discharged home on the 41st postoperative day. She was started on chemotherapy while hospitalized, receiving her first dose of chemotherapy on 5/17/94 and 5/24/94 consisting of CisPlatin and Cyclophosphamide. She also received DepoProvera. The patient then received chemotherapy on a weekly basis as per the following chart.



| Date | Cisplatin | 5 FU | Adria | Cytoxan | Hexalen | Ifex | MTX | Depopro |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 100 |
| 5/25/94 | 50 | 500 | 40 | | | | | |
| | | | | | | | | 100 |
| 5/30 | 40 | | | | | | | |
| | | | | | | | | 100 |
| 6/15 | 40 | 500 | | | | | | |
| | | | | | | | | 100 |
| 6/18 | 50 | | | 200 | | | | |
| | | | | | | | | 100 |
| 6/22 | 40 | 500 | | | | | | |
| | | | | | | | | 100 |
| 7/6 | 40 | | | 200 | 200x2d | | | |
| | | | | | | | | 100 |
| 7/20 | 40 | | 40 | | 200x2d | | | |
| | | | | | | | | 100 |
| 7/27 | | | | 200 | 200x2d | | | |
| | | | | | | | | 100 |
| 7/31 | | 500 | 40 | | | | | |
| | | | | 500 | | | 1000 | 100 |
| 8/9 | | | | | | | | |
| | | 500 | | | | | | 100 |
| 8/10 | | | | | | | | |
| | | | | | | 2000 | | 100 |
| 8/12 | | | | | | | | |
| | | | 50 | | 200x2d | | | 100 |
| 8/13 | 70 | | | | | | | |
| | | | 60 | | | | | 100 |
| 9/20 | 70 | | | | | | | |
| | | | | 500 | | | 1000 | 100 |
| 10/4 | | | | | | | | |
| | | | | | | 2000 | | 100 |
| 10/14 | | | | | | | | |
| | | | 60 | | 200x2d | | | 100 |
| 11/2/94 | 70 | | | | | | | |

5-FU=5fluorouracil:    Adria=adriamycin:    Cytoxan=cyclophosphamide:    Hexalen=altretamine:    Ifex=ifosfamide:
MTX=methotrexate, Depo-Provera=depot medroxyprogesterone acetate

On December 4, 1994 the patient was admitted to St. Joseph Hospital for a second look laparotomy. She underwent this procedure 12/5/94 with multiple biopsies and a small bowel resection and reanastomosis. An intraperitoneal catheter was placed. Final pathology revealed microscopic foci of adenocarcinoma in the soft tissue of the right abdominal wall, mesentery, and sub diaphragmatic area. The patient was discharged home on the 9th postoperative day. On 12/16/94 the patient was given intraperitoneal P-32. The preoperative nuclear medicine examination at Buffalo General Hospital showed a study that demonstrated localized concentration of the nuclear tracer in the pelvis on the right following the intraperitoneal injection. This was in contrast to Dr. Vongtama's note in which he states that there was good distribution of uptake at the time of the injection of the P-32.    The patient continued on chemotherapy through January of 1995. She was seen by Dr. Yoonessi 11/95 at which time his note states that the patient was without complaints and physical exam was completely normal. She received Taxol, CisPlatinum, DepoProvera chemotherapy. The patient was subsequently admitted January 16, 1995 with a diagnosis of pneumonia and was seen in consultation by pulmonary medicine. The pulmonary consultant notes that the patient and the family issued a DNR order. They also refused transfer to the ICU and intubation at that time.





## OFFICE OF ADMINISTRATIVE HEARINGS
### STATE OF CALIFORNIA

# SEALED EXHIBIT N-9

(See Sealed Confidential Records Page 59)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-9:
Miscellaneous Documents has been sealed.

The performance of CPR on this patient in the face of a DNR order not only fails to meet the standards of care but is also assault. Dr. Yoonessi was aware of her wishes and failed to abide by these. This is not only unethical but also incomprehensible.

Questions:

1. Was the treatment rendered by Dr. Yoonessi during the admission of 4/24, 12/4/94 and 1/16/95 within the acceptable standards? The treatment rendered by Dr. Yoonessi 12/4/94 was within acceptable standards. The treatment rendered on the admission 1/16/95 was not within acceptable standards as detailed above.

2. Was the chemotherapy regimen for this patient appropriate? The chemotherapy regimen used by Dr. Yoonessi does not meet acceptable standards. This chemotherapy has never been utilized to my knowledge outside of Dr. Yoonessi's practice. It has never been tested in randomized trials. He uses multiple drugs in sub-therapeutic doses. His failure to outline to his patients the alternative treatments including standard chemotherapy every 3 weeks with Cytoxan and Carboplatin were not outlined to the patient and therefore informed consent was not obtained. This fails to meet the standard of care.

3. Were the cardiopulmonary resuscitative efforts by Dr. Yoonessi on 3/7/95 appropriate in view of the DNR order? No these were inappropriate and failed to meet the standard of care as noted above.

Case #9 Joan Gutkowski , MR #879683 Buffalo General Hospital, MR#541996 Mercy    Hospital

1. CASE SUMMARY

The patient is a 65 year old who originally underwent exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy, omentectomy in 1992. This was followed by chemotherapy with the regimen utilized by Dr Yoonessi including CisPlatin, 5 FU, Leucovorin, Adriamycin, Methotrexate and Cytoxan. She underwent a second look procedure on 9/10/92 that was positive for persistent disease. A peritoneal catheter was placed. The patient received intraperitoneal P-32 on 9/24/92. The pretreatment scan showed loculation of the fluid in the pelvis and therefore the patient only received only 15 millicuries of P-32. She also received chemotherapy at the end of 1992. She represented with a left supraclavicular node on 6/13/97. This was aspirated and it was positive for metastatic carcinoma. The patient was restarted on chemotherapy 6/17/97 with essentially the same regimen that she had been treated with in 1992. The patient's last chemotherapy in the office was 9/26/97. The patient was admitted to Mercy Hospital on 10/17/97 with a history of a poor appetite and a one week history of severe throat pain. She also complained of diarrhea, weakness, breathing difficulty and low grade fever. She was admitted to the ICU under the service of Dr. Villacorta. She was seen in consultation by Dr. Yoonessi. Physical exam on admission revealed a Hgb of 6.3, WBC 300.Plts 11,000, Potassium 2.6, CO2 12, Creatinine 2 and BUN 32. Her protime was elevated at 22. The patient was seen in consultation by Infectious Disease and by Medical Oncology. A discussion was undertaken on admission regarding do not resuscitate. The patient seemed agreeable to this. The patient was given the appropriate antibiotic, blood products and treatment at Mercy Hospital. However they requested liquid Lithium and Mellanl and this was not available and transfer to Buffalo General Hospital was therefore arranged by Dr. Yoonessi.

The patient was received at Buffalo General Hospital on the Psychiatric Unit. Shortly after her admission she was noted to be physiologically unstable and she was seen by the SICU team. The patient was immediately transferred to the ICU and within 2 hours she was intubated, placed on a ventilator and a Swan-Ganz catheter was placed for monitoring her cardiac function. The patient was maintained on broad spectrum antibiotics and tube feeding. On 10/22/97 the patient was extubated. The family had indicated



OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

# SEALED EXHIBIT N-10

(See Sealed Confidential Records Pages 60 through 64)

Per Protective Order Sealing Confidential Records
dated November 18, 2021, Exhibit N-10:
Miscellaneous Documents has been sealed.

regarding criminal activity) in the hospital chart. This action failed to meet the standard of Gyn oncologist.

**CONCLUSIONS**

1. Was the treatment rendered by Dr. Yoonessi during the admission of 10/17/97 at Mercy Hospital within acceptable standards? In general, his management during the admission at Mercy Hospital was acceptable.

2. Was the treatment rendered by Dr. Yoonessi during the admission of 10/19/97 at Buffalo General Hospital within acceptable standards? Dr. Yoonessi transferred the patient for psychiatric care to Buffalo General Hospital. On arrival there the patient was in respiratory distress and required immediate transfer to the SICU. There appears to be some major inconsistency unless the patient's problems develop during the ride from Mercy to Buffalo General Hospital. While in the ICU the patient was under the care of the ICU team and Dr. Yoonessi essentially did not render care.

3. Was Dr. Yoonessi's order of 10/23/97 to cancel Hospice consult appropriate? No. The patient and her family had previously stated desires for DNR. At this appoint it appeared that the patient would not survive her hospitalization. Hospice consult was definitely appropriate.

4. Does the documentation indicate that there was acceptable and appropriate communication between the Dr. Yoonessi and the other physicians on the case? The documentation at Buffalo General shows a physician, Dr Yoonessi, lacking in common courtesy with a general inability to communicate with his peers. Discussion regarding euthanasia is inappropriate as noted above. It should also be noted that Dr. Yoonessi dictated a 4 page discharge summary on Mrs. Gutkowski dated 2/27/97. In this document he reiterates the entire interaction with the ICU team and the family.

5. Does the documentation indicate that there was acceptable and appropriate communication between Dr. Yoonessi and the family regarding the patient's care? The nursing notes from 10/24/97 relate a picture of Dr. Yoonessi discussing the situation with the family and essentially making them feel guilty regarding their decisions. It is not up to a physician to decide whether a patient or the patient's proxy is making the proper decisions. It is only up to them to give the parties informed consent. His communication with the patient and family was definitely inappropriate.

6. Was the chemotherapy regimen for this patient acceptable? No. Please see discussions regarding other patients.

7. Was the documentation of the chemotherapy regimen adequate? No. Again Dr. Yoonessi failed to keep adequate flow charts, which may have given rise to this patient receiving excess chemotherapy during September and early October.

## Case #10. Kathleen Kaiser, MR#362709.Mercy Hospital of Buffalo.

### 1. CASE SUMMARY

The patient is a 49 year old who presented to the Emergency room at Mercy Hospital on 7/26/00 with acute epigastric pain. Physical exam on admission revealed a morbidly obese female in moderate distress secondary to pain. Her abdomen was distended and she was tender to percussion over the epigastric area and in the left lower quadrant. A CT Scan was performed that showed a 15 cm ovarian mass with extensive intra abdominal carcinomatosis. The patient developed acute respiratory distress 7/27 at 1700 hours and required intubation. She was admitted to the ICU and a Swan-Ganz catheter was placed. The patient was resuscitated and ultimately taken to the operating room on 7/28/00 where she underwent







**KAISER - Kathleen E.**
August 3, 2001. Of Marilla, NY. Daughter
of the late Robert and Madeline Kaiser;
dearest sister of Christine Golia, Paul, Ka-
ren and Claudia Kaiser; beloved aunt of
Jeffrey and Andrew Golia and Paul and
Benjamin Kaiser. No prior visitation. Rela-
tives and friends are invited to a Memorial
Mass from Annunciation Church, Clinton
St. and Girdle Rd., Elma, NY Thursday
morning at 10 AM. Flowers gratefully de-
clined. Memorials in Kathleen's memory
may be made to Buffalo General Hospital
SICU, Bertrand/Chaffee Hospital in
Springville, NY or Hospice Buffalo, Inc.
Arrangements by HOY FUNERAL HOME.

000776

00199



529

KALEIDA HEALTH

☐ Buffalo General Hospital
☐ Children's Hospital of Buffalo
☐ DeGraff Memorial Hospital
☐ Millard Fillmore Gates Circle Hospital
☐ Millard Fillmore Suburban Hospital
☐ Others:

RATAJCZAK    MARY
MR: 702408                PT: 92488601
DOB: 01/08/1943           AGE: 58    SEX: F
ATT: PATEL, VINOD R MO
REF: UNKNOWN, DOCTOR
FC: A              ET   ADM DT 12/14/01
THE BUFFALO GENERAL HOSPITAL

**EMERGENCY DEPARTMENT PHYSICIAN'S**
**HISTORY & TREATMENT RECORD** Page 2 of 4

Medical Decision Making: Vaginal bleeding 109
CBC

Imaging:

Interpreted by _____

EKG:

Procedure/Treatment/Additional Notes:
Called Dr. Sulausta would be here to do biopsy

MONITOR:

| CBC | | BLOOD GAS | | CSF | |
|---|---|---|---|---|---|
| WBC | | FIO₂ | | WBC | |
| HGB | | pH | | RBC | |
| HCT | | PCO₂ | | GLUCOSE | |
| PLAT | | PO₂ | | PROTEIN | |
| **CHEM** | | HCO₃ | | **URINALYSIS** | |
| Na | | TCO₂ | | ☐ BLOOD | |
| K | | BE | | ☐ URINE | |
| Cl | | SAT | | ☐ SPUTUM | |
| TCO₂ | | **URINALYSIS** | | ☐ CSF | |
| CA | | ☐ CC ☐ CATH | | ☐ THROAT | |
| BUN | | LEUKS | | ☐ SCICHLANYDIA | |
| CREAT | | NITRITES | | Other | |
| GLUCOSE | | UROS U | | | |
| ALK PHOS | | PROTEIN | | | |
| SGOT/AST | | PH | | | |
| SGPT/ALT | | BLOOD | | | |
| LIPASE | | SP. GRAV | | | |
| AMYLASE | | KETONES | | | |
| TROPONIN | | BILI | | | |
| TOTAL BILI | | GLUCOSE | | | |
| CK | | | | | |
| **COAGS** | | **PREGNANCY** | | | |
| PT | | HCG | | | |
| INR | | ☐ Serum ☐ Urine | | | |
| PTT | | QUANT | | | |

Impression:

Rx:

Primary Physician: _____   Notified ☐ Yes ☐ No   Time paged: ____   Time answered: ____

Consultant: _____   Time paged: ____   Time answered: ____   Time arrived: ____

Condition on Disposition: ☐ Good/Improved ☐ Critical   ☐ Home ☐ Transfer ☐ Expired   ☐ Admit: Floor   Attending: ____

Disposition time: ____   Time patient left department ____

00200

00123

*Table of Contents*
*Writ Petition 2022*

*SUNYAB; Petitioner's Employer*

1      It's the doctor's position that he was

2   a full-time faculty member at the State

3   University of New York at Buffalo during the

4   time periods when he rendered services to some

5   or all of these patients, and on that basis

6   he's requesting reimbursement for his defense

7   costs based upon his position as a public

8   officer under the Public Officer's Law.

9          ALJ TROST:    And you are aware that

10   that exceeds my jurisdiction, so I'll make no

11   ruling on that, but your remarks are noted for

12   the record.

13          MS. FAHEY:    Thank you.

14          ALJ TROST:    Anything else?

15          MS. FAHEY:    Not right now.   Thank

16   you.

17          ALJ TROST:    Did you show Mr. Donovan

18   the --

19          MS. FAHEY:    Sure.

20          (Whereupon, Respondent's Exhibit E, a

21   document, was then received and marked for

22   identification.)

23          MR. DONOVAN:    So C is a receipt that

24   says it's to Yoonessi from Ira Clark.   It

25   doesn't say what it was.



800.523.7887

1  be the best source for the committee's

2  consideration in determining what, what          21:4

3  chemotherapy regimens were given and when they

4  were given and other details that are outlined

5  on these summaries.

6         Also, we have no representations to us

7  with regard to how these were compiled or who

8  compiled them or who, who created these

9  documents, and on those bases I would object to

10  them.

11         ALJ TROST:   Do you have any response

12  to that?

13         MR. DONOVAN:   Well, they were sent to

14  his lawyer December 14th.

15         ALJ TROST:   Regarding the question of

16  who prepared them.

17         MR. DONOVAN:   They were -- they were

18  prepared initially by me, and they were checked

19  by Dr. Kredentser.

20         ALJ TROST:   Okay.  I'm going to admit

21  them.  You will have an opportunity to inspect

22  them before the next hearing date and to do

23  whatever you need to do to satisfy yourself

24  that they're reliable and correct, and if you

25  find otherwise, you will bring that to my       00202

ASSOCIATED REPORTERS INT'L., INC.          800.523.7887

**University at Buffalo**
*The State University of New York*

University Human Resources

## EMPLOYMENT VERIFICATION

The following is provided to the request for employment information regarding an employee of the State University of New York at Buffalo.

Name: Mahmood Yoonessi

Social Security No.: XXX-XX-4607

Department: Gynecology - Obstetrics

Dates of Employment:  From    07/01/82    To    03/28/91

Comments or other information: Held title of Associate Professor/Tenure Appointment at a

salary of $85,497.00 - Resigned.

February 24, 2010    Gloria L. Meyer    *Gloria L. Meyer*
Date    Personnel Clerk

**Bertha L. Hill**
Administrative Staff Assistant
University At Buffalo, Human Resources
120 Crofts Hall
Buffalo, NY 14260-7022
Tel:(716)645-5000 Ext 1010  645-4455
Fax:(716)645-2724
E-mail:blhill@buffalo.edu

000025

00203

An Equal Opportunity/Affirmative Action Employer
University Human Resources: 120 Crofts Hall, Buffalo, NY 14260-7022  Tel: (716) 645-7777  Fax: (716) 645-2724
Website: hr.buffalo.edu

TOTAL P.02



# UNIVERSITY AT BUFFALO
STATE UNIVERSITY OF NEW YORK

Office of the President
Cape Hall
Buffalo, New York 14260
(Tel) 636-2901

## CERTIFIED MAIL
## NOTICE OF DISCIPLINE

August 30, 1988

Dr. Mahmood Yoonessi
Department of Gynecology
  and Obstetrics
Buffalo General Hospital
100 High Street
Buffalo, New York   14203

      and

212 Crestwood
Amherst, New York   14221

Dear Dr. Yoonessi:

     This communication constitutes a formal Notice of Discipline under the provisions of Article 19 of the 1988-1991 Agreement Between the State of New York and United University Professions, Inc.  The following penalty will be imposed upon you ten (10) working days from the date you receive this Notice of Discipline:  termination of employment with the State University of New York at Buffalo.

     The specific acts and conduct for which this Discipline is being imposed are as follows:

MISCONDUCT

1.     You have not, as you were directed on June 22, 1988 by Dr. Myroslaw M. Hreshchyshyn, Chairman of the Department of Gynecology and Obstetrics, and Dr. Donald A. Larson, Associate Vice President for Clinical Affairs, resumed billing for your patient services through the Faculty Practice Plan billing agency approved by Dr. Daniel A. Mariniello, Clinical Chief of the Buffalo General Hospital, and Dr. Hreshchyshyn.

2.     You have not, as you were directed on June 22, 1988 by Dr. Hreshchyshyn and Dr. Larson, abided by the Practice Plan and departmental rules for receiving payments, and for banking and disbursing Practice Plan monies.

3.     You have not, as you were directed on June 22, 1988 by Dr. Hreshchyshyn and Dr. Larson, provided the billing agency for the Department Practice Plan all of the monies that you have collected from patient billings since January 1, 1988.

00204

253



4.    You have not, as you were directed on June 22, 1988 by
Dr. Hreshchyshyn and Dr. Larson, provided the billing
agency for the Department Practice Plan with the records
necessary for them to maintain your accounts from
January 1, 1988.

5.    You have not ceased, as you were directed in
Dr. Hreshchyshyn's letter of June 23, 1988, the
performance of medical procedures in non-University
affiliated hospitals.

        You have the right to object to this Notice of Discipline by
filing a disciplinary grievance with Mr. Raymond L. Haines, Jr.,
Director of Employee Relations, State University of New York,
State University Plaza, Albany, New York  12246.

                            Sincerely,

                            Steven B. Sample
                            President


xc:    Provost William R. Greiner
       Dean John P. Naughton
       Dr. Donald A. Larson
       Dr. Myroslaw M. Hreshchyshyn
       Mr. Clifford B. Wilson
       Mr. Raymond L. Haines, Jr.

254



**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

Office of the President
Capen H.
Buffalo, New York 1421
Tel. (716) 636-291
Fax. (716) 636-37;



**CERTIFIED MAIL**

March 20, 1991

Dr. Mahmood M. Yoonessi
212 Crestwood
Amherst, New York  14221

Dear Dr. Yoonessi:

In accordance with Arbitrator Rinaldo's arbitration award,
you are hereby terminated, effective today, from your employment
at the State University of New York at Buffalo.

Sincerely,

William R. Greiner
Interim President

xc:  Acting Provost Kenneth J. Levy
     Dean John P. Naughton
     Dr. Myroslaw M. Hreshchyshyn
     Mr. Clifford B. Wilson
     Ms. Pam Williams



00206

WebCivil Supreme - Appearance 2 - 14



# WebCivil Supreme - Appearance Detail

**Court:** Erie Civil Supreme
**Index Number:** 004509/1991
**Case Name:** YOONESSI, MAHMOOD M. vs. STATE OF NEW YORK
**Case Type:** Other
**Track:** Unknown

## Appearance Information:

| Appearance Date | Time | On For | Appearance Outcome | Justice / Part | Comments | Motion Seq |
|---|---|---|---|---|---|---|
| 04/27/1992 | | Motion | Decision Reserved | THOMAS P. FLAHERTY (MOTION PART) | | 005 |
| 04/27/1992 | | Motion | Decision Reserved | THOMAS P. FLAHERTY (MOTION PART) | | 004 |
| 03/19/1992 | | Supreme Trial | Case Restored Via Appearance | THOMAS P. FLAHERTY OFFICE PART(FOR RESTORE) | PET.DISM. BY NJW | |
| 11/26/1991 | | Supreme Initial (first time on) | Other Final Disp. Pre-Note | THOMAS P. FLAHERTY (TRIAL PART) | | |
| 10/07/1991 | | Motion | Motion Granted## | NORMAN J. WOLF, JR. (MOTION PART) | WOP | 003 |
| 10/07/1991 | | Motion | Motion Granted## | NORMAN J. WOLF, JR. (MOTION PART) | WOP | 002 |
| 09/09/1991 | | Motion | Adjourned | NORMAN J. WOLF, JR. (MOTION PART) | | 003 |
| 09/09/1991 | | Motion | Adjourned | NORMAN J. WOLF, JR. (MOTION PART) | | 002 |
| 08/26/1991 | | Motion | Adjourned | NORMAN J. WOLF, JR. (MOTION PART) | | 003 |
| 08/26/1991 | | Motion | Adjourned | NORMAN J. WOLF, JR. (MOTION PART) | | 002 |
| 07/08/1991 | | Motion | No Show | THOMAS P. FLAHERTY (MOTION PART) | VACATE ARBITRAT.AWARD | 001 |
| 06/10/1991 | | Motion | Adjourned | THOMAS P. FLAHERTY (MOTION PART) | VACATE ARBITRAT.AWARD | 001 |

Close



MAY 3 1989

DEC 7 1987



**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

OFFICE OF EMPLOYEE RELATIONS

U. U. P.

Personnel Department
Employee Relations
108 Crofts Hall
Buffalo, New York 14260
(716) 636-2655

STATE UNIVERSITY OF NEW YORK AT BUFFALO
STEP ONE DECISION
FOR GRIEVANCE FILED UNDER THE UUP AGREEMENT

NAME OF GRIEVANT:
RECEIVED
NYSUT
W.N.Y. REG OFFICE

Dr. Mahmood M. Yoonessi
Associate Professor
Gynecology and Obstetrics

DATE OF OCCURRENCE:                      June 1, 1987

NOV 2 4 1987

DATE FILED AT STEP ONE:                  July 13, 1987

DATE OF STEP ONE MEETINGS:               August 24, September 21,
                                         October 20, 1987

PROVISIONS(S) OF AGREEMENT
INVOLVED:                    UUP Agreement

   Article 1 – Recognition, Article 3 – Exclusive Negotiations,
   Article 5 – Policies, Article 6 – Benefits Preserved, Article
   7.2(B) – Grievance Procedure, Article 9 – Academic Freedom,
   Article 10 – No Discrimination, Article 19 – Discipline,
   Article 29 – Clinical Practice, Article 30 – Appointment,
   Evaluation and Promotion, Appendix A-13, A-14

                    Policies of Board of Trustees

           Article XI, Article XII, Article XVI

DATE OF DECISION:                        November 20, 1987

POSITION OF THE GRIEVANT:

   Dr. Yoonessi is a tenured Associate Professor in the Department of
Gynecology and Obstetrics, Division of Gynecological Oncology, State
University of New York at Buffalo, and was appointed in July 1976.  He and
his representatives, Ms. Jan Moritz, Dr. Joan Sulewski, and Dr. Norman
Corah, allege that the Department's Clinical Practice Plan is not in com-
pliance with Policies of the Board of Trustees and that Dr. Yoonessi's
rights to perform his academic obligation have been violated.

   Ms. Moritz alleges that the Department's Faculty Practice Plan,
written in December 1982 and amended July 1984, is not consistent with
   endix A-13 of the UUP Agreement or Article XVI of the Policies of the
Board of Trustees since it does not comply with the 1974 Guidelines
referenced therein, e.g., the Department Plan specifies a ceiling of 200
percent of the maximum of the participant's salary rank (as opposed to

00208

*Drs. Lippes & Enhorning not seeing patients at present time;
if this changes, they are allowed to earn up to Maximum
Allowable compensation for their rank.

# CLINICAL PRACTICE MANAGEMENT PLAN ROSTER
## SCHEDULE OF MAXIMUM ALLOWABLE COMPENSATION FOR REQUIRED PARTICIPANTS
### FOR THE PLAN YEAR : Jan. 1, 1988 - Dec. 31, 1988

CAMPU State University of NY at Buff  SCHOOL of Medicine & Biomedical Sciences  DEPARTMENT Gynecology/Obstetrics   INITIAL  X   INTERIM ___   FINAL ___

| Name | Title | Maximum Allowable Compensation Authorized | State Annual FTE | State Basic Annual Salary | Maximum Allowable Affiliated Institution Salary | Clinical Component | Research | Other | Maximum Allowable Component |
|---|---|---|---|---|---|---|---|---|---|
| Presineynshyn | Prof. & Chairman | 240,875 | 1.0 | 92,652 | 140,687 | 7,536 | - | - | 240,875 |
| Lambrus | Research Professor | NO MALPRACTICE | .15 | 6,300 | - | - | - | - | - |
| Courey | Clinical Professor | 225,500 | .39 GFT | 34,322 | 22,020 | 169,158 | - | - | 225,500 |
| Enhorning* | Clinical Professor | NO MALPRACTICE | 1.0 | 52,500 | - | - | 50,000 | - | - |
| Lippes* | Professor | NO MALPRACTICE | 1.0 | 70,195 | - | - | - | - | - |
| Goeppel | Clinical Professor | 225,500 | .39 GFT | 54,000 | 96,709 | 74,791 | - | - | 225,500 |
| Caglar | Clinical Professor | 225,500 | - | 30,179 | 22,020 | 173,301 | - | - | 225,500 |
| Prickard | Associate Prof. | 206,845 | 1.0 | 50,923 | 17,856 | 140,066 | - | - | 206,845 |
| Dillon | Associate Prof. | 206,845 | 1.0 | 74,996 | 56,208 | 77,641 | - | - | 206,845 |
| Tele | Associate Prof. | 206,845 | 1.0 | 65,253 | - | 143,592 | - | - | 206,845 |
| Coudalier | Cl. Assoc. Prof. | 206,845 | 1.0 | 56,539 | - | 127,109 | - | 29,197 | 206,845 |
| Patterson | Cl. Assoc. Prof. | 206,845 | .49 GFT | 55,910 | - | 153,935 | - | - | 206,845 |
| Sulewski | Cl. Assoc. Prof. | 206,845 | 1.0 | 25,501 | - | 133,344 | - | - | 206,845 |
| Winner | Cl. Assoc. Prof. | 206,845 | 1.0 | 76,830 | 45,877 | 82,136 | 6,000 | - | 206,845 |
| Goodess | Associate Prof. | 206,845 | .25 | 15,000 | 36,639 | 155,206 | - | - | 206,845 |
| Baker | Assistant Prof. | 206,845 | 1.0 | 73,504 | 20,304 | 113,037 | - | - | 206,845 |
| Baiola | Cl. Asst. Prof. | 184,500 | .50 GFT | 37,350 | 33,673 | 113,477 | - | - | 184,500 |
| Doctor | Cl. Asst. Prof. | 184,500 | - | - | 43,489 | 141,011 | - | - | 184,500 |
| Cote | Cl. Asst. Prof. | 184,500 | - | - | 27,403 | 157,097 | - | - | 184,500 |
| Guntengan | Cl. Asst. Prof. | 184,500 | .35 GFT | 26,250 | 50,000 | 108,250 | - | - | 184,500 |
| Marinellc | Cl. Asst. Prof. | 184,500 | .36 GFT | 37,887 | 26,557 | 116,056 | - | - | 184,500 |
| | Cl. Asst. Prof. | 184,500 | - | - | 101,500 | 83,000 | - | - | 184,500 |
| Rodgers | Assistant Prof. | 184,500 | 1.0 | 49,613 | - | 134,887 | - | - | 184,500 |

Marginal notes: NON-COMPLIANCE · NON-COMPLIANCE · SPACE NOT AVAIL. PLEASE · IF TRANSITION

Form D...
000179
00209
C00319

Case 1:23-cv-00023-TLN-SCR  Document 1  Filed 01/06/23  Page 244 of 352

608000

# STATE UNIVERSITY OF NEW YORK AT BUFFALO

## Semi-Annual Time and Attendance Reporting Form

### For Use by Faculty and Professional Employees

MAHMOOD YOONESSI, M.D.

Employment Date __7/2/76__  Soc. Sec. No. __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__  Department __GYNECOLOGY/OBSTETRICS__

Line No. __28869__  F.T.E. __1.0__

| MONTH 1985 | VACATION DAYS | | | SICK LEAVE DAYS | | | | HOLIDAY COMPENSATORY LEAVE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | EARNED | USED | BALANCE | EARNED | USED Regular | USED Family | BALANCE | EARNED | USED | BALANCE |
| Balance Brought Forward | | | 40 | | | | 189 | | | |
| July | REACHED MAXIMUM | " | | 1 3/4 | | | 190 3/4 | | | |
| August | " | " | 40 | 1 3/4 | | | 192 1/2 | | | |
| September | " | " | | 1 3/4 | | | 194 1/4 | | | |
| October | " | " | | 1 3/4 | | | 196 | | | |
| November | " | " | | 1 3/4 | | | 197 3/4 | | | |
| December | " | " | 40 | 1 3/4 | | | 199 1/2 | | | |

The above data must be supported by monthly attendance reports. Records are required to be kept by the department for at least six years from the date of this certification.

Certified Correct:

Employee signature and date _____

Supervisor/Department Chair signature and date _____

262

00210

**ZDARSKY, SAWICKI & AGOSTINELLI**

ATTORNEYS AT LAW

SEPH E. ZDARSKY
MICHAEL SAWICKI
Y J.     TINELLI
RAL.     ALSH
RK J. SCHLANT
TRICK A. DUDLEY
OMAS P. FITCH
INALD G. POWELL

404 CATHEDRAL PLACE
298 MAIN STREET
BUFFALO, N.Y. 14202
716-855-3200

TELECOPIER: 716-855-3101

July 29, 2002

Ms. Tina Kaplan
Director of Field Services
United University of Professions
P.O. 15143
Albany, New York 12212-5143

      RE:    Mahmood Yoonessi, M.D.

Dear Ms. Kaplan:

      Pursuant to a voice mail message and letter dated July 16, 2002 from Edward J. Giblin, Labor Relations Specialist of the UUP Western New York Regional Office, I am writing to you regarding the status of a $75,000 settlement payable to Dr. Yoonessi, pursuant to a 1996 settlement. Following that settlement offer, Dr. Yoonessi proceeded with a lawsuit in the Court Claims, based on his claim that he was entitled to more and that the UUP's settlement offer was not negotiated fairly and constituted breach of the duty of fair representation. That matter has been finally determined in the New York courts with a denial of leave to appeal by the New York Court of Appeals and entry of a judgment in the Court of Claims (see enclosed judgment). The basis of the dismissal of the lawsuit, for breach of the duty of fair representation, was that the $75,000 offer negotiated by UUP was Dr. Yoonessi's only remedy. We are now investigating the status of that $75,000 payment. Please contact me to advise where the funds are located.

      Thank you for your kind attention to this request. I look forward to hearing from you at your first opportunity.

              Very truly yours,

              Gerald T. Walsh

GTW/dhs
cc:    Mahmood Yoonessi, M.D.

263

00211

# MEMORANDUM OF UNDERSTANDING  MARCH 2, 1999

~ Suspends Article XVI of the Policies of the Board of Trustees for the clinical practice members of the Department of Gynecology and Obstetrics at the University at Buffalo.

~ The memorandum was signed without the knowledge of the faculty of the department. The faculty had asked UUP not to intervene in their crisis because the solutions offered by UUP involved long term (grievances) processes.

~ The crisis which the faculty faced was as a result of a February 4, 1999 letter they received from Drs. Bernardino and Wright to terminate their clinical practice income or face disciplinary process.

~ The faculty hired their own lawyer to negotiate a solution to their crisis, but any attempt by Mr. Jim Kelly to provide an alternative to the Memorandum of Understanding given to the department by Dr. Bernardino was dismissed. The department Memorandum of Understanding was signed by the interim chair with the knowledge that no alternative existed. UUP had already agreed to the circumstances to which they had no choice.

~ The financial insolvency of the Department of Gynecology and Obstetrics was a direct result of the practices within that department practice plan. The practice plan was run as a non-profit sole member corporation. The sole member was the University-appointed chairperson. the non-profit corporation, UGO, and its practices which were non-compliant with Article XVI of the Policies of the Board of Trustees, were the subject of several grievances (98-0015-08, 97-0056-08, 97-0009-08, 97-0112-08, 97-0086-08, 98-0002-08) which remain at Step 3 for the past year.

~ One consequence of the financial insolvency of the department was that from almost 40 plan members, approximately 12 remain as others have left or given notice of leaving the department.

~ Another consequence is that Dr. Sulewski, as a direct result of the Memorandum of Understanding March 2, 1999, receives no clinical practice income regardless of how many patients she sees or how much is generated in clinical practice income, and her right under Article XVI of the Policies to receive income has been suspended. (Note that UUP 97-0005-09, 97-0112-08, 98-0002-08, 98-0015-08 are grievances at Step 3 for the past year and which were filed in part because of improper distribution of clinical practice income before the March 2, 1999 Memorandum of Understanding.) Dr. Sulewski received a total of three (3) checks from 1996-1999 from clinical practice income.

00212



**A** 002144

**Schedule of Documents**

In the Matter of Mahmood M. Yoonessi. M.D.

1. Follow-up information on Kathleen Kahraman with results of her most recent surgery done by Dr. J. Celik;

2. Follow-up Information and Death Summary of Katherine Kaiser; a certified copy of her chemotherapy order sheet from South Buffalo Mercy Hospital, signed by the defendant;

3. The Morbidity and Mortality/Death Summary Report on Gloria Kalinowski from E.C.M.C. MR# 02-07-83;

4. Morbidity/Mortality/Complication/Surgery reports on the following cases:

   Clara Boler          MR# 564282 E.C.M.C.
   Joanne Queeno        MR# 233031 E.C.M.C.
   Dianne Hamilton      MR# 702983 E.C.M.C.
   Mildred Murphy       MR# 661714 E.C.M.C.

5. Mary Dixon DOB 03/19/28, Millard Fillmore Hospital Surgery and Pathology Reports; M&M Report;

6. Mary Witulski, Millard Fillmore Hospital, 70 yrs old;

7. All intraoperative death cases at Sisters Hospital, Millard Fillmore Hospital, Buffalo General Hospital including, not limited to, G. McGuire;

8. Morbidity/Mortality Conference Report on patients referred to in an article that appeared in Cancer - 39(3): 1243-6-March 1977.

ND29

**HealthPort.**
**INVOICE**

ealthPort
P. Box 409740
lanta, Georgia 30384-9740
ed Tax ID 58 - 2659941
'70) 754 - 6000

Invoice #: 0048157073
Date:        06/02/2008
Customer #: 1449404

| hip to: |
| --- |

MAHMOOD YONNESSI
MAHMOOD YOONESSI
6790 CREST RD
RANCHO PALOS VERDE, CA 90275

| Bill to: |
| --- |

MAHMOOD YONNESSI
MAHMOOD YOONESSI
6790 CREST RD
RANCHO PALOS VERDE, CA 90275

| Records from: |
| --- |

BUFFALO GENERAL HOSPITAL
100 HIGH STREET
BUFFALO, NY 14203

**Requested By:** MAHMOOD YOONESSI          **OTHER:**        NA

**Patient Name:** SLISZ VIRGINIA

| Description | Quantity | Unit Price | Amount |
| --- | --- | --- | --- |
| Basic Fee | | | 0.00 |
| Retrieval Fee | | | 0.00 |
| Per Page Copy (Paper) 1 | 1670 | 0.75 | 1,252.50 |
| Shipping/Handling | | | 34.53 |
| Subtotal | | | 1,287.03 |
| Sales Tax | | | 103.33 |
| Invoice Total | | | 1,390.36 |
| Balance Due | | | 1,390.36 |

**Pay your invoice online at www.HealthPortPay.com**

Terms: Net 30 days          **Please remit this amount : $ 1,390.36 (USD)**

- - - - - - - - - - - - - - - ✂ - - - - - - - - - - - - - - - - - - - - - -

**HealthPort**
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

Invoice #:  **0048157073**

Check #  00154580

Payment Amount $ 1,390.36

**ease return stub with payment.**
ase include invoice number on check.
Day invoice online, please go to **www.HealthPortPay.com** or call (770) 754 6000.

00214

1   **LETITIA JAMES, ESQ.**
**Attorney General of the State of New York**

2   **Tal Matar Elmatad, State Bar No. 320978**
**Assistant Attorney General**

3   28 Liberty Street
New York, NY 10005

4   Telephone: (212) 416-6318
Fax: (518) 650-9401

5   E-mail: tal.elmatad@ag.ny.gov

6   *Attorneys for Respondent State University of New*
*York at Buffalo*

7         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8             **COUNTY OF SACRAMENTO**

9

10  **MAHMOOD YOONESSI, M.D. AND M.**
**YOONESSI, M.D., P.C.**

11                Petitioners,

12      v.                  Case No. 34-2022-80003877

13  **WILLIAM PRASIFKA, ANDREW CUOMO,**  Assigned to Judge James P.
**DANIEL KREDENSTER, STATE UNIVERSITY**  Arguelles

14  **OF NEW YORK AT BUFFALO, THE MEDICAL**
**BOARD OF CALIFORNIA, AND DOES 1-50**  **JUDGMENT OF DISMISSAL**

15                 **FOLLOWING SUSTAINING**
               Respondents.  **OF DEMURRER WITHOUT**

16                 **LEAVE TO AMEND**

17

18

19       Pursuant to the Court's Order dated September 2, 2022, sustaining Respondent State

20  University of New York at Buffalo's Demurrer to Petitioners' Write of Mandamus without leave

21  to amend:

22       **IT IS ORDERED, ADJUDGED, AND DECREED** that Petitioners' Mahmood

23  Yoonessi, M.D., and M. Yoonessi, M.D., P.C.'s Writ of Mandamus is dismissed with prejudice

24  as to Respondent State University of New York at Buffalo, and that judgment be entered in favor

25  of Respondent State University of New York at Buffalo.

26  Dated:

27                By: _____

28                   Hon. James P. Arguelles
                    Judge of the Superior Court

00215

Judgement of Dismissal Following Sustaining of Demurrer Without Leave to Amend

# NEWS

## uffalo Health Sciences Center
### ate University of New York at Buffalo

**OL. XX    No. 3**                                    **April 1998**

### nical Practice

*Joan Sulewski*

*f the Chapter Office if you have any*
*tems with Clinical Practice—related*
*w. Call 829-2595, fax us at 829-3211 or*
*ail us: joslewsk@acsu.buffalo.edu*

the chapter has sought assistance from our
wide UUP President William Scheuerman
sure a solution to the many concerns
h clinical faculty have raised about the
ice plan. A meeting with the Governor's
e is scheduled for Monday, May 4, 1998.

nical faculty have been notifying the
er office that they are not receiving their
al practice earnings. They have reported
illings are not being done for services they
m. They have not received an accounting
at bills are submitted, for which services
re submitted, and which bills for services
been paid or have not been paid.

nical practice earnings are important to
al faculty. Approximately half of the
al faculty at UB do not receive a state
. Of those who receive state salaries,
receive salaries of less than $10,000.

inical faculty are expected to earn clinical

practice earnings to generate the remainder of
their base salaries. When billings are not done,
clinical faculty do not earn enough to make a
living wage. Approximately half the clinical
faculty in my department, Gynecology-
Obstetrics, have left in the past 6-8 months.

Clinical faculty also endure other harsh
circumstances. They are assessed exorbitant
fees for clinical practice expenses often
without justification. Accountability of roles in
the expenditures. When they have clinical
practice-related expenses, they may not be
reimbursed. At any moment in time, their line
of practice, may be discontinued or changed
without any regard to their practice or their
patients. Some are excluded from a retirement
plan provided for by the practice plan.

The President of the University ultimately
holds responsibility for the practice plan. Day-
to-day management of the practice plan is the
responsibility of the Governing Board. The
President has been made aware of the
difficulties which clinical faculty have been
encountering with the Practice Plan. The UUP
Buffalo Health Sciences Chapter apprised for
months with assignees of the President to
resolve clinical practice problems. These efforts
were futile because the President lost his power
to settle matters locally.

* * * *

### BACKGROUND ON GRIEVANCES:                     6-10-99

– November 5, 1998 letter of Mr. Wildman returns grievances at Step 3 to
Step 1, campus level in an unprecedented move for the purpose of securing a
decision at Step 1 which was considered "essential." At the end of February 1999,
the grievances are moved back to Step 3 without obtaining a decision at Step 1.

– Between 1986-1996, approximately 25 clinical practice grievances were filed
by Sulewski et all, Sulewski, Egan, and Yonessi. Except for 88-08-1285 (Egan)
which had a favorable arbitration award to the grievant in 1991, no other grievances
completed the arbitration process. Instead all others including those already in arbitration
were submitted to mediation process and resulted in a Memorandum of Understanding
of 1996. The grievants, the chapter, the labor specialist representing the grievants - all
were essentially excluded from the process which took place from 1992-1996.

– To date, almost 50 grievances will have been filed on clinical practice: 25 before 1996,
14 now at Step 3, and 6 more moved to Step 3 recently. Except for the Egan case,
88-08-1285, none have gone through arbitration, nor has a letter been sent indicating
lack of merit for arbitration.

– None of the grievances ever filed by Sulewski have gone to arbitration or have been
denied merit for arbitration. Most of these grievances are filed on behalf of others
who do not have job security as term, part-time, or temporary appointment faculty
and staff.

– Dr. Egan has engaged in a lawsuit on duty of fair representation as a result of
the mediation settlement of 1996.

– Dr. Yonessi has engaged in lawsuits similarly as a result of the mediation
settlement of 1996 and his ultimate termination as a faculty member.

---

### 12 Grievances appealed to Arbitration   5-10-99

A list of arbitrators, an arbitrator, or a hearing date has yet to be secured

Sulewski et all:

| UUP | 96-3131-08 | Appeal to Step 3 | 7-1-98 | Clinical Practice |
|---|---|---|---|---|
| | 97-0003-08 | " | 7-7-98 | Clinical Practice |
| | 97-0112-08 | " | 7-7-98 | Clinical Practice |
| | 97-0086-08 | " | 7-9-98 | Clinical Practice |
| | 98-0002-08 | " | 7-28-98 | Clinical Practice |
| | 98-0015-08 | " | 7-28-98 | Clinical Practice |
| | 97-0056-08 | " | 7-1-98 | Clinical Practice |
| | 97-0056-08 | " | 7-1-98 | Clinical Practice |

Sellar:
| UUP | 98-0009-08 | " | 7-23-98 | Clinical Practice |
|---|---|---|---|---|

Sulewski:
| UUP | 97-0109-08 | " | 7-6-98 | Discipline, procedure |
|---|---|---|---|---|
| | 97-0093-08 | " | 7-1-98 | Hiring, appointment |

Sulewski, et all:
| UUP | 97-0087-08 | " | 7-6-98 | Clinical Practice Dentistry |
|---|---|---|---|---|
| | 97-0076-08 | " | 8-19-98 | Hiring practices |

### 7 Grievances appealed to Step 3:

A letter of appeal or denial to appeal to arbitration has yet to be received.

Broisky:
| UUP | 98-0089-08 | Appeal to Step 3 | 5-20-99 | Termination |
|---|---|---|---|---|

Egan:
| UUP | 99-0004-08 | Appeal to Step 3 | 5-12-99 | Clinical Practice |
|---|---|---|---|---|

Sulewski et all:
| UUP | 98-0087-08 | Appeal to Step 3 | 5-12-99 | Clinical Practice |
|---|---|---|---|---|

Sulewski, et all:
| UUP | 98-0085-08 | Appeal to Step 3 | 5-12-99 | Clinical Practice |
|---|---|---|---|---|
| UUP | 99-0006-08 | " | 5-12-99 | Clinical Practice |
| UUP | 99-0001-08 | " | 5-12-99 | Clinical Practice |
| UUP | 99-0002-08 | " | 5-12-99 | Discretionary Awards |

---

### IMPROPER PRACTICE
### Failure of Duty to Represent

1) Unduly prolonged access to arbitration for grievances at Step 3.

2) Subjected bargaining unit members to prolonged endurement of terms and conditions
of employment disallowed under provisions of the Agreement between UUP and
New York State and for which they filed grievances.

3) Subjected bargaining unit members to bear financial responsibility for costs not
provided for in the Agreement and Article XVI of Policies of the Board of Trustees.

4) Denied access to plan members of Department of Obstetrics and Gynecology
to provisions and rights of Article XVI of Policies which all others in the bargaining
unit are entitled.

5) Denied clinical practice income as provided in Article XVI of the Policies to which
all other practice plan members are entitled.

6) Hold liable UUP and University at Buffalo for any expenses, costs, loss of clinical
practice income or professional growth opportunity as a result of the delay in
processing the grievances at Step 3 to arbitration, and as a result of the Memorandum
of Understanding, March 2, 1999.

7) Hold liable UUP for any costs incurred to the Buffalo Health Sciences Chapter and its
bargaining unit members for seeking representation delayed or denied its bargaining
unit members.

L 322

L 324

INDEPENDENT AUDITOR'S REPORT

To the Governing Board and Clinical Practice Plan Participants:
State University of New York at Buffalo
School of Medicine and Biomedical Sciences
Department of Gynecology - Obstetrics

We have audited the accompanying special-purpose statement of reported revenue collected and reported expenses paid of the State University of New York at Buffalo's School of Medicine and Biomedical Sciences, Department of Gynecology - Obstetrics Clinical Practice Plan (as defined in Note 1) for the year ended December 31, 1986. This financial statement is the responsibility of the Department's management and Plan participants. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

The accompanying special-purpose financial statement was prepared to comply with requirements of Article XVI of the State University of New York's Policies of the Board of Trustees for the Management of Clinical Practice. This special-purpose financial statement is not intended to be a presentation in conformity with generally accepted accounting principles.

In our opinion, the special-purpose financial statement referred to above presents fairly, in all material respects, the reported revenue collected and reported expenses paid of the State University of New York at Buffalo's School of Medicine and Biomedical Sciences, Department of Gynecology - Obstetrics Clinical Practice Plan for the year ended December 31, 1986, on the basis of accounting described in Note 1.

This report is intended solely for the information and use of the State University of New York's Board of Trustees, the governing board, and clinical practice plan participants of the State University of New York at Buffalo School of Medicine and Biomedical Sciences Clinical Practice Plan, and should not be used for any other purpose.

*Urbach Kahn & Werlin PC*

Buffalo, New York
July 16, 1990

1

See Notes to Financial Statement

---

REVENUE COLLECTED:

| | |
|---|---|
| Patient fees | $ 1,594,303 |
| Other income | 3,670 |
| Total revenue | 1,597,973 |

EXPENSES PAID:

| | |
|---|---|
| Dean's fund | $ 93,770 |
| Hospital overhead | 38,948 |
| Insurance | 103,899 |
| Salaries reimbursement | 57,711 |
| Department fund | 37,392 |
| Professional and billing services | 31,409 |
| Travel | 5,673 |
| Books, dues and subscriptions | 14,448 |
| Other professional expenses | 37,413 |
| Total expenses paid | 420,463 |

Excess of reported revenues collected over
reported expenses paid                          $ 1,149,510

2

---

REVENUE COLLECTED:

| | |
|---|---|
| Patient fees | $ 1,975,121 |

EXPENSES PAID:

| | |
|---|---|
| Dean's fund | $ 87,501 |
| Hospital overhead | 61,590 |
| Insurance | 204,806 |
| Department fund | 35,000 |
| Professional and billing services | 28,741 |
| Salaries reimbursements | 113,558 |
| Books, dues and subscriptions | 24,082 |
| Other professional expenses | 118,129 |
| Total expenses paid | 673,407 |

Excess of reported revenues collected over
reported expenses paid                          $ 1,301,714

2

See Notes to Financial Statement

---

2837

University Gynecologists & Obstetricians

MARINE MIDLAND BANK
ELMWOOD - UTICA OFFICE, BUFFALO, NEW YORK   14222

00217

Authors
Piver MS. Barlow JJ.

Title

High dose irradiation to biopsy confirmed aortic node metastases from carcinoma of the uterine cervix.

Source

Cancer. 39(3):1243-6, 1977 Mar.

FcA311

Abstract

Twenty-one women with biopsy proven aortic node metastases from previously untreated carcinoma of the uterine cervix were treated with high dose irradiation to the pelvis and para-aortic areas. The majority received 6000 rads to the pelvis and para-aortic nodes by split course therapy plus 2500 rads by intracavitary radium to point A; 57.1% sustained severe complications to the stomach, small intestine or colon. Only 14.2% are surviving over 2 years free of recurrence. Though approximately 40% of women with Stages III and IV cervical cancer will have metastases to the para-aortic nodes, to date there is no satisfactory therapy that results in a significant number of such women surviving free of recurrent cervical cancer.

Piver MS. Jishi MF. Tsukada Y. Nava G.

Institution

Department of Gynecologic Oncology, Roswell Park Cancer Institute, Buffalo, New York 14263.

Title

Primary peritoneal carcinoma after prophylactic oophorectomy in women with a family history of ovarian cancer. A report of the Gilda Radner Familial Ovarian Cancer Registry.

Source

Cancer. 71(9):2751-5, 1993 May 1.

Abstract

BACKGROUND. According to previous reports, primary peritoneal carcinoma indistinguishable from primary ovarian adenocarcinoma had developed in five women with a history of familial ovarian cancer who had undergone prophylactic oophorectomy. METHODS. The records from the Gilda Radner Familial Ovarian Cancer Registry were reviewed for instances of prophylactic oophorectomy and cases of primary peritoneal carcinoma occurring after prophylactic oophorectomy. RESULTS. From 1981 through July 1992, the Gilda Radner Familial Ovarian Cancer Registry accessioned 931 families (a total of 2221 cases of familial ovarian cancer). Currently, 324 women in these families have undergone prophylactic oophorectomy as a preventive measure against the subsequent development of ovarian cancer. Primary peritoneal carcinoma indistinguishable histologically from primary ovarian adenocarcinoma has developed in six of these women 1-27 years after prophylactic oophorectomy. CONCLUSIONS. Based on this finding and other reports of such primary peritoneal carcinoma, a prospective international study is planned. This study will compare the incidence of peritoneal carcinoma in first- or second-degree relatives who underwent prophylactic oophorectomy because of a family history of ovarian cancer with that of those who did not undergo prophylactic oophorectomy.

Authors
Piver MS. Baker TR. Jishi MF. Sandecki AM. Tsukada Y. Natarajan N. Mettlin CJ.
Institution
Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Cancer Institute, Buffalo, New York 14263.
Title
Familial ovarian cancer. A report of 658 families from the Gilda Radner Familial Ovarian Cancer Registry 1981-1991.
Source
Cancer. 71(2 Suppl):582-8, 1993 Jan 15.

Abstract

BACKGROUND. Because of the small number of cases (five) reported between 1929 1969 and a significant increase reported in the decade of the 1970s, the Familial Ovarian Cancer Registry was established in 1981 to study the occurrence of familial ovarian cancer in the United States. METHODS. Any woman (with or without ovarian cancer herself) contacted the Registry and demonstrated a familial history of ovarian cancer was added... Registry as an index case. RESULTS. From 1981 through May 31, 1991, 658 families a total of 1568 cases of familial ovarian cancer were accessioned into the Registry. Of mothers and 251 daughters with familial ovarian cancer, the mean (58.5 years) and (57.0 years) age at diagnosis of the mothers was significantly older than the mean (and median (49.0 years) ages of their daughters with ovarian cancer. Significantly cases without ovarian cancer had used oral contraceptives as compared to index case ovarian cancer (P < 0.001). Significantly more index cases with ovarian cancer use estrogens as compared to index cases without ovarian cancer (P < 0.001). The Registry exhibited a higher proportion of serous adenocarcinoma, poorly differentiated adenocarcinoma, and gonadoblastoma as compared in the 1978 SEER data. A minimum of one daughter was the most common relationship and was represented the families with familial ovarian cancer. Sister-sister relationships were the second frequent and accounted for 38.5% of the 658 families. CONCLUSIONS. Familial o cancer occurs most frequently in mother-daughter relationships followed by sister-s appears to be an autosomal dominant inheritance with variable penetrance.

Authors
Eltabbakh GH. Piver MS. Hempling RE. Recio FO. Lele SB. Marchetti DL. Baker TR. Blumenson LE.
Institution
Department of Gynecologic Oncology, Roswell Park Cancer Institute, Buffalo, New York, USA.
Title
Correlation between extreme drug resistance assay and response to primary paclitaxel and cisplatin in patients with epithelial ovarian cancer. [see comments].
Comments
Comment in: Gynecol Oncol. 2000 Jan;76(1):143 ; 10620464
Source
Gynecologic Oncology. 70(3):392-7, 1998 Sep.

Abstract

OBJECTIVE: The extreme drug resistance (EDR) assay has been correlated with failure of response to chemotherapy in greater than 99% of patients. The goal of this study is to correlate the results of the EDR assay to response to first-line paclitaxel/cisplatin among patients with epithelial ovarian cancer. METHODS: Seventy-five of 100 patients with epithelial ovarian cancer for whom EDR assay was performed were treated with weekly induction cisplatin (1 g/kg body wt) x 4, followed by monthly paclitaxel (135 mg/m2) and cisplatin (75 mg/m2) x 6 and were evaluable for correlation of response to chemotherapy and EDR assay. Specimens for EDR assay were obtained at primary surgery and the EDR assay was performed by Oncotech, Inc. Response to chemotherapy was correlated to EDR assay results regarding paclitaxel and cisplatin. RESULTS: Among 75 evaluable patients, the prevalence of EDR to paclitaxel was 9.0% (n = 15) and to cisplatin it was 2.7% (n = 2). Only 1 patient (1.3%) exhibited EDR to both paclitaxel and cisplatin. Surgical assessment of response was performed in 42 patients; 33 patients were clinically evaluable. The overall response rate was 85.3%. The overall response rate for patients whose tumors demonstrated no EDR to either paclitaxel or cisplatin did not differ significantly from that for patients whose tumors demonstrated EDR to at least one of these two drugs (86.4% versus 81.3%, respectively, P = 0.62). Similarly, the complete surgical response rate for both groups did not differ significantly (25.4% versus 12.5%, respectively, P = 0.34). A single patient whose tumor exhibited EDR to both paclitaxel and cisplatin had tumor progression. The sensitivity, specificity, positive predictive value, and negative predictive value of the EDR assay were 79.6, 27.0, 86.0, and 19.0%, respectively. CONCLUSIONS: EDR to paclitaxel does not preclude response to the combination of paclitaxel and cisplatin as primary therapy for patients with epithelial ovarian cancer. The role of the EDR assay in the primary management of patients with epithelial ovarian cancer remains

Baker TR. Piver MS. Hempling RE.
Institution
Department of Gynecologic Oncology, Roswell Park Cancer Institute, Buffalo, NY 14263.
Title
Long term survival by cytoreductive surgery to less than 1 cm, induction weekly cisplatin and monthly cisplatin, doxorubicin, and cyclophosphamide therapy in advanced ovarian adenocarcinoma.
Source
Cancer. 74(2):656-63, 1994 Jul 15.

Abstract

BACKGROUND. Survival rates for patients with advanced epithelial ovarian cancer remain low despite improved chemotherapy regimens and cytoreductive surgery. METHODS. One hundred thirty-six patients with Stage III or IV ovarian cancer were treated with primary cytoreductive surgery followed by cisplatin induction, 1 mg/kg weekly x 4 followed by 10 cycles of cisplatin (50 mg/m2), doxorubicin (50 mg/m2), and cyclophosphamide (750 mg/m2). Second-look surgery was performed on those patients who were clinically without evidence of disease at the end of the planned chemotherapy course. Survival and progression-free survival were calculated, and prognostic factors regarding survival and progression-free survival were evaluated by both univariate and multivariate analyses. RESULTS. Cytoreductive surgery to less than or equal to 2 cm was performed on 83% of patients and to less than 1 cm in 40%. A surgical complete response (SCR) rate of 34.9% and surgical partial response (SPR) rate of 47.6% were noted. Of the SCRs, recurrences decreased in 52.7% of the patients. Estimated 5-year survival for all 136 patients was 31.2% and 21.5%, and 5- and 8-year progression-free survival was 23.9% and 20.6%, respectively. Those patients with less than 1-cm residual disease after primary surgery had significantly improved survival compared with those with 1-cm or greater (P < 0.001). Multivariate analysis identified residual disease status and age as the most significant prognostic factors associated with survival and progression-free survival. CONCLUSION. Compared with those patients with greater than 1-cm residuum after initial surgery, a statistically significant improvement in long term survival was noted for those patients whose cancers were cytoreduced ' less than 1-cm residuum.

# 53

# chemotherapy of gynecological malignancy

*MYROSLAW M. HRESHCHYSHYN, M.D.,*
*AND MAHMOOD YOONESSI, M.D.*

Elucidation of tumor cell kinetics and the successes with combined drug therapy of leukemia left a strong imprint on developments in the field of gynecological cancer chemotherapy during the last decade. These developments are characterized by an attempt to rationalize the design of drug regimens in treatment of clinical problems, not solely in the light of experience gained from trial and error, but to relate it to the newly established concepts of tumor kinetics, drug interference with the cell cycle, and tumor immunology.

Briefly stated, a malignant tumor follows a Gompertzian growth curve (exponentially decreasing function) with the resultant shift of the cells from the proliferating (in the cell cycle) to nonproliferating ($G_0$ phase or resting cells) component. Thus, as the tumor mass increases, the tumor doubling time lengthens. The clonogenic cell fraction capable of sustained reproduction assures the tumor's survival. Significant reduction in tumor size, by whatever means, e.g. surgery, radiation, or chemotherapy, causes reverse shift in the cell population (from nonproliferating to proliferating). This results in greater susceptibility of the tumor to drugs which may be primarily or exclusively effective on proliferating cells. Combinations of several drugs with different modes of action or different times of action as it relates to the cell cycle may augment the tumor destruction. The relatively greater susceptibility of malignant cells, as opposed to benign cells, to drugs may not be the outcome of more rapid proliferation of tumor cells, as frequently assumed, but rather a much slower recovery from the drug effect as opposed to normal cells. Thus, by the time the next dose of the drug is administered, the normal tissues (e.g. bone marrow) have virtually recovered, whereas the tumor tissues are still in a state of diminution, resulting in a stepladder decrease in the number of surviving cells until, theoretically, the last cell has been destroyed.

In practice, however, drug resistance frequently develops prior to complete tumor eradication. It is at the stage of marked tumor diminution that one may have to rely on immune responses for the destruction of residual cancer cells. However, chemotherapy, in itself, is frequently immunosuppressive and as with bone marrow toxicity, it is essential to space drug administration so as to minimize immunosuppression.

## ANTICANCER DRUGS

Compounds which inhibit cancer growth can be grouped into two categories: cytotoxic drugs and hormones. Hormones frequently have a selective antineoplastic effect on tumors arising from benign tissues that are responsive to that particular hormone. Their effect on tumors is usually direct, causing a modification of DNA functions resulting in RNA changes. They may also act via the feedback to higher endocrine centers or other host systems.

Cytotoxic drugs affect all metabolically active tissues. Differences in metabolic requirements, structures, and cell kinetics of benign and malignant tissues give rise to the therapeutic usefulness of these drugs. They

665

**618**

**VAGINAL BRACHYTHERAPY TO REDUCE CENTRAL RECURRENCE AFTER RADICAL HYSTERECTOMY FOR CARCINOMA OF THE CERVIX.** G. Photopulos and R. Vander Zwaag. University of Tennessee-Memphis, Department of OB/GYN, Memphis, TN 38163, and Baptist Memorial Hospital, Human Services Research Department, Memphis, TN 38146.

Seventeen (20%) of 86 patients were treated with brachytherapy to the proximal vagina to reduce the possibility of central pelvic recurrence after radical hysterectomy for carcinoma of the cervix; they did not receive external pelvic irradiation. These patients were considered at greater risk to develop recurrent cancer in the center of the pelvis because histologic cancer extended over half way through, but not beyond, the cervix. They did not have metastases to lymph nodes and the surgical margins were uninvolved. The 17 patients with brachytherapy were compared with 61 who had smaller cancer not invading over half way through the cervix and did not receive brachytherapy - 8 patients received whole pelvic irradiation for positive nodes and were not considered. The patients with brachytherapy were of similar age, weight, and operative characteristics as those without brachytherapy; the proportions of squamous and of adenocarcinoma were also similar. There were no recurrences among the patients with brachytherapy, and no complications were attributed to the brachytherapy. Brachytherapy following radical hysterectomy in selected patients was safely administered and reduced the risk of central pelvic recurrence.

**619**

TREATMENT OF ADVANCED EPITHELIAL OVARIAN TUMORS: ACHIEVEMENTS AND CHALLENGES: M. YOONESSI, BUFFALO NEW YORK This report updates the results of our multimorality treatment of ovarian adenocarcinomas; The drug therapy began eraly following Cyto-reductive surgery. Patients received 4-8 weekly courses of CisPlatin (1mg/Kg). Adriomycin (30mg/M2) was added on weeks number 1,3,5&7,and Leucovorin (100mg/M2 IV) followed by 5 FU (300mg/M2 IV) was added on weeks #2,4,6,&8. After 2-3 weeks rest, patients received alternating courses of: high dose Methotrexate (750mg/M2) L.C.V Rescue + Cytoxan (250mg/M2/d IVx3) and Leucovorin (100mg/M2) _ 5FU (300mg/M2)+ D.D.P(50mg/M2) + Adria(50mg/M2). Depo-Provera 1gm/IM was given with each course of herapy. After6 months, patients were advised to have 2nd look laparatomy.Those with no residual disease received oral C.T.X 50mg b.i.d. x3-12 months. Those left with small residual disease were given I.P P32 and along with those with large residual disease received further chemotherapy.61 patients have been treated (average age 53); 47 had Stage III, 5 had Stage IV, three had Stage II, two had Stage IC and 4 had recurrent disease. 39 had serous cystadenoca and 31 had Gr. 3 lesions. 41 had large and twenty had small residual disease. 60 had initial complete C.R and one had a partial response. 30 of 50 (60%) second look laparotomies were negative and 15 had small residual disease (30%). With a follow up of 6 months to 5 years, 13 patients have died: Four without cancer. 5 . with intraperitoneal failure (2 of these developed sarcoma), and four had extraperitoneal failures (2 following negative 2nd look). Based on our analysis of the data we conclude: A: This regimen is highly effective. B: Some treatment failures may relate to the development of 2nd primaries. C: Treatment of negative 2nd look cases, as well as control of the metastatic disease in uncommon sanctuary sites (ie. brain) may constitute a significant future challenge in the quest for curative treatment of ovarian carcinoma.

**620**

PHASE I EVALUATION OF THIOTEPA IN COMBINATION WITH CISPLATIN IN ADVANCED GYNECOLOGIC MALIGNANCIES. LG Sandles; RS Freedman; HN Raber; J. Kavanagh; CL Edwards; VR Scott; JT Wharton, M.D. Anderson Cancer Center, Houston, TX 77030

Thirty-seven patients with advanced gynecologic malignancies were entered into a phase I study of cisplatin (50mg/m²) and thiotepa given I.V. every 4 weeks. Thirty patients were evaluable for toxicity and response, 4 were evaluable for toxicity only. The median age was 53 (range 28-72), performance status $\leq$ 2 for all patients. Prior treatment included chemotherapy in 21, radiation therapy in 15, hormonal therapy in 3, and immunotherapy in 1. Thiotepa was given to at least 3 patients at each of the following dose levels: 15, 20, 25, 30, 40, 50 and 60 mg/m². The primary toxicity was myelosuppression; at a dose of 50 mg/m² of thiotepa, grade 3 or 4 granulocytopenia occurred in 11 of 16 cycles, and grade 3 or 4 thrombocytopenia occurred in 8 of 16 cycles. The MTD of thiotepa was 40 mg/m²; at this dose, grade 3 or 4 granulocytopenia occurred in 12 of 30 cycles, and grade 3 or 4 thrombocytopenia occurred in 5 of 30 cycles; median granulocyte nadir was 1,100 (range 110 to 3,600) and median platelet nadir was 81,000 (range 10,000 to 289,000). Eight patients have been treated at the MTD. Seven patients received $\geq$ 3 cycles at or above the MTD; the cumulative toxicity was prolonged myelosuppression in five. Two cases of partial alopecia occurred at 40 and 60 mg/m² of thiotepa. Responses were as follows: CR-1, PR-7, NC-14, and PD-8. Of 14 evaluable patients with ovarian cancer (13 previously treated with cisplatin), there was 1 CR and 4 PR, for an overall response rate of 36%. The dosage of thiotepa recommended for phase II trials in combination with cisplatin (50 mg/m²) is 40 mg/m². Cumulative hematologic toxicity may occur with this regimen.

**621**

PHASE II TRIAL WITH CARBOPLATIN/IFOSFAMIDE IN PREVIOUSLY UNTREATED PATIENTS WITH ADVANCED SQUAMOUS CELL CARCINOMA OF THE CERVIX. W. Eiermann, H. Kuehnle, H.G. Meerpohl, W. Achterrath, L. Lenaz, P. Preusser. Gynecol. University Hospitals Munich, Goettingen, Freiburg. Bristol-Myers International Group. University Hospital Muenster.

Twenty-four previously untreated patients (pts) with histologically proven squamous cell carcinoma of the cervix stage IIb-IVb acc. to FIGO classification were consecutively admitted into an ongoing phase II trial with carboplatin 300 mg/m² i.v. day 1 and ifosfamide 5 g/m² day 1 given as i.v. infusion over 24 hours every 4 weeks. All pts received at least 1 course of chemotherapy (CT) and are evaluable for response and toxicity. Median age is 50 years (31-66), median performance status acc. to WHO 1 (0-2). Twenty-four pts received a median of 2 courses (1-5) of CT. Response and toxicity were assessed acc. to WHO criteria. Results after 1-5 courses of CT: 3(19%) CR, 16(67%) CR+ PR, 5 NC, 3 PD (95% confidence limits CR 3-35%, CR+PR 47-87%). Worst toxicities after all courses per patient: WBC grade 4: 8%; WBC, platelets, Hb grade 3: 38%, 8% and 4%, respectively; nausea/vomiting and alopecia grade 3: 33% and 75%. No other toxicities of grade $\geq$ 3 were observed.

Pts with PD or NC after 1-4 cycles of CT and pts with irresectable cPR after 2-3 cycles of CT underwent radiation (RT). Pts with cCR or operable cPR after 2-3 cycles of CT underwent surgery. Up to now, 12 pts (6 cPR, 4 NC, 2 PD) received RT, in 10 pts with cPR or NC 3 cCR, 4 cPR and 3 NC were achieved, in 2 pts with PD 1 cPR and 1 NC were obtained. One cCR was surgically confirmed as pCR and 3 pts with cPR were disease free after surgery. These pts received 3 further cycles of CT.

00220

CLINICAL INVESTIGATIONS

## 1149

Taxol: A Phase II Study In Patients With Metas-
tatic Melanoma. Sewa S. Legha, Sigrid Ring,
Nicholas Papadopoulos, Martin Raber and Robert
Benjamin. The University of Texas M. D. Ander-
son Cancer Center, Houston, Texas 77030
    Taxol is a plant alkaloid currently undergo-
ing phase II trials in various human tumors.
Based on reports of its activity in patients
(pts) with recurrent melanoma in early clinical
trials, we have conducted a phase II study in 25
previously untreated pts with metastatic
melanoma. Patients included 17 males and 8
females, with Zubrod performance status of 0-1.
All are evaluable for response. Taxol was ad-
ministered in a dose of 250 mg/m² given as a
continuous infusion over 24 hrs Q3 wks. One pt
achieved a partial response (PR) lasting 12 mos,
5 pts had <PR's lasting 6 to 14+ mos and 5 pts
had stable disease for 3 to 10 mos. The dose
limiting toxicity of taxol was neutropenia with
a nadir count of 100/mm³ which led to fever
requiring antibiotics in 17 pts following the
first course. Other side effects included mild
stomatitis in 75%, diarrhea in 65% and alopecia
in 100% of the pts. A neuromuscular pain syn-
drome, predominantly affecting the legs, oc-
curred 2-3 days following taxol administration
in all pts and required analgesics in 60%.
There was minimal sensory deficit associated
with the pain. All these symptoms generally
decreased in severity despite repeated adminis-
tration of the drug. We conclude that taxol has
a rather low level of activity against metas-
tatic melanoma although the responding pts expe-
rienced unusually long durations of response.

## 1150

HISTOPATHOLOGIC VARIABLES AND OUTCOME OF PATIENTS
WITH EPITHELIAL OVARIAN TUMORS FOLLOWING NEGATIVE
AND POSITIVE 2ND LOOK LAPAROTOMY: M. YOONESSI, S.
CELIK, BUFFALO, N.Y. We analyzed the
histopathologic variables and outcome of 20
patients with negative and 14 patients with
positive 2nd look laparotomy, all treated for
advanced/ recurrent ovarian adenocarcinomas. The
treatment regimen utilizing 5 drugs (Adriamycin,
CisPlatin, 5FU, Methotrexate, Cytoxan) Combination
chemotherapy and progetin therapy following
cyto-reductive surgery has been described in our
prior communications (E.J. GYN Oncol. 1988). The
histologic sub-types (serous, mucinous,
endometrioid, clear cell and undifferentiated),
grades, lymphocytic infiltration in the 2 groups
were not statiscally different. 3 Patients in the
negative 2nd look laparotomy died (2 with CA) and
two are alive with resumed reactivation (rising Ca
125 levels). Among 4 patients who died or
developed recurrence 3 had serous and one had clear
cell adenocarcinoma. 2 had Grade III and 2 had Gr.
II lesions. All had poor lymphocytic infiltration
and negative nodes. Seven patients in the group
with residual disease at 2nd look have died of
cancer (2 developed mixed mesodermal tumors) and 2
are alive with disease. All cases had poor
lymphocytic infiltration and 3 had positive nodes.
Based on our analysis, We conclude: a.) Patients
with advanced epithelial ovarian tumors and
histologice complete treatment responses should be
considered for consolidation therapy, (b) some
ovarian adenocarcinoma treatment failures are due
to the development of 2nd primaries and/or tumor
heterogeneity.

00221

PROCEEDINGS OF THE AMERICAN ASSOCIATION FOR CANCER RESEARCH



# STATE UNIVERSITY OF NEW YORK

**OFFICE OF THE SENIOR VICE CHANCELLOR FOR FINANCE AND MANAGEMENT**

Human Resources, Personnel and Employee Relations

System Administration
State University Plaza
Albany, NY 12246

518/443-5684
FAX: 518/443-5785

INTERNET:
VILLAJY@
SYSADM.SUNY.EDU

November 5, 1996

Dr. Mahmood Yoonessi
355 Linwood Avenue
Buffalo, New York   14209

Dear Dr. Yoonessi:

We have been advised that you have returned check # P154145 to the University Foundation Activities Inc.  Since there appears to be some confusion on your part as to the reason the check was sent to you, this is to provide you with background information.

In 1987, you filed the first in a series of grievances pursuant to Article 7 of the State/UUP Agreement.  That grievance and other related grievances were reviewed at various levels of the grievance process, finally culminating in a protracted arbitration which included more than 20 hearing dates.  Due to the complexity of the issues raised in numerous grievances involving the University at Buffalo's School of Medicine and Biomedical Sciences, a forum was agreed to under which the parties explored settlement discussions in an effort to resolve the issues before us.  We were ultimately successful in resolving the series of cases.  One element of the settlement included a cash payment to you.  Contrary to the implication of your October 15 letter, UUP is not required to obtain the authorization of a particular grievant to enter into a settlement of this nature. Pursuant to Article 7 of the Agreement, the union retains control of the appeal of any grievance following Step 1.  The Agreement does not require that a grievant acquiesce to a given settlement.

Upon receipt, the funds were redeposited with University Foundation Activities.  They will recut the check and it will be forwarded to you under separate cover.

Sincerely,

Joyce Villa

Joyce Yaple Villa
Assistant Vice Chancellor
for Employee Relations

c:   Mr. Wildman

00222

55

# Official Records: Document Search Results

[Search Criteria --> Party Name: "CASTLE&PALACE LLC"]
Search Results: 6 Records - VERIFIED AS OF 03-31-2017 - 4/10/2017 7:23 AM

| Party Code | Name | Date | Type | Book Type | Book | Page | Legal | Instr# | Status | #Pages |
|---|---|---|---|---|---|---|---|---|---|---|
| R | CASTLE&PALACE LLC | 7/29/2014 9:00 PM | DEED | D | 11267 | 1943 | CTY 58 11/8 | 201414956G | V | 5 |
| D | CASTLE&PALACE LLC | 7/29/2014 9:00 PM | MTG | M | 13689 | 6487 | CTY 58 11/8 | 201414956? | V | 5 |
| R | CASTLE&PALACE LLC | 10/12/2016 9:00 PM | 744 | D | 11303 | 3661 | | 2016216081 | V | 2 |
| D | CASTLE&PALACE LLC | 10/12/2016 9:00 PM | DEED | D | 11303 | 3663 | | 2016216082 | V | 4 |
| R | CASTLE&PALACE LLC | 1/18/2017 9:00 PM | 200 | K | 496 | 9079 | CTY 58 11/8 | 201701405B | R | 0 |
| D | CASTLE&PALACE LLC | 1/23/2017 9:00 PM | 3CR | M | 13798 | 8673 | | 201701720G | V | 5 |



**33'**

UNIVERSITAT BUFFALO
STATE UNIVERSITY OF NEW YORK

Department of Gynecol
Scho
Faculty of M

Buffalo,



December 29, 1987

## The Buffalo News — Local News

### Audit faults UB on fees of doctors

#### School neglected to collect millions

By JON R. SORENSEN
Next Albany Bureau

ALBANY — The University failed to bill last millions of dollars in a lowing hundreds of faculty doctors, it says too much of their salary ... State Comptroller Edward V. Regan said Tuesday.

An audit by Regan's staff also found that other funds generated by doctors have paid for a department head's membership in the Saturn Club, a private club in Buffalo, and Christmas parties for some departments in the School of Medicine and Biomedical Sciences.

These funds are supposed to help pay for the operations of the school's 17 departments, including the recruitment of new physicians.

Regan estimates that the medical school lost at least $900,000 in 1988 because UB and the medical school failed to follow SUNY policies for limiting private fees earned by faculty doctors.

The limits are imposed to ensure that doctors spend enough time teaching students.

In addition to reimbursing the school for the actual expenses incurred in private practice, doctors also must pay the medical school any fees they earn over the fee limit.

By raising the fee limit over the SUNY standard without permission, the medical school lost at least $400,000 in 1987, Regan said.

Another $500,000 was lost when the school improperly allowed doctors to exempt certain income from the limit.

That lowered the 3 percent annual contribution that must be paid to the medical school from the income generated by the school's faculty with private practices.

In 1987, that 3 percent contribution should have yielded $1.73 million from the $53 million generated that year. But only $1.15 million was deposited according ...

— See UB Page B4

*Wednesday, February 12, 1992*

---

**M E M O R A N D U M**

TO:   William P. Dillon, M.D.

FROM: M. M. Hreshchyshyn, M.D.
      By Toni Canazzi

Enclosed please find the General Ledger print out for January - November, 1987, together with Professional Economics Participants' Financial Statement, reflecting the income and receipts for the current period. For the year-to-date information, please refer to the January - November, 1987 sheet prepared by myself to reflect adjustments for the overhead retained from earnings during the year.

At the bottom of the sheet under "Overhead", you will see that I withheld $13,555.05 from earnings. Of this amount, $9,434.83 per individual will be reimbursed to you as it is your share of the actual expense credited against the overhead. The balance remaining, 4,120.22, properly belongs to Children's for overhead costs for the January - November, 1987 period. You will note on the same sheet that Fund Assessments have been adjusted by the $9,434.83 figure, thereby increasing your net earnings to date. Your total check for $27,938.01 is enclosed.

Please also note that your maximum allowable earnings of $208,845 is also your cap on earnings for 1988. When and if a salary increase is negotiated by UUP and the State, adjustments to salary and allowables will occur when directed by the Dean's office.

Please indicate by returning a copy of this letter whether the overhead may be paid to the hospital(s). In cases where faculty are working at 2-3 sites, we have asked the Dean's office to direct us on how to prorate the overhead.

If you have any questions regarding the above, please feel free to call me.

Signature

---

### UNIVERSITY GYNECOLOGISTS & OBSTETRICIANS
#### STATEMENT OF REVENUE & EXPENSE
#### FOR THE YEAR ENDED DECEMBER 31, 1987

Assessments:
  Chairman's Fund                    $ 4,391
  Dean's Fund                         10,977
  Hospital Reimbursement               -0-
    Total Assessments
Receipts after assessments                       230.

Expenses:
  Books, dues & subscriptions        $ 2,229
  Insurance                           21,593
  Professional and billings           2,324
  Salaries                            6,243
  Travel                              1,050
  Miscellaneous                       8,549
    Total Expenses                                 42.
  Adjusted Gross                                  174.

Net overage after Retirement allowance           15.
  Final not due Doctor                           162.
  Draw to date                                   172.
  Balance due Doctors (plan)                       8.59

Computation of net overage after Retirement Allowance:
Adjusted Gross                                   #178.

Maximum earnings allowed:
  Maximum allowed for your University rating  #208.845
  Less: Salaries - other sources               67.557
    Net allowable earnings                       111.
  Excess earnings                                .26
  Retirement allowance                           .21
  Net overage after Retirement allowance        $ 15

---

**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

June 15, 1970

Dr. Ted Stibberds
President
Children's Hospital
219 Bryant Street
Buffalo, NY 14222

Dear Dr. Stibberds:

In view of the fact that Children's Hospital does provide me with malpractice insurance as per our discussion, I will designate Children's Hospital as my primary faculty practice site effective July 1, 1990. Accordingly, Children's Hospital will receive the reimbursement due per the overhead formula.

I will assume this arrangement will be satisfactory.

Sincerely,

M. M. Hreshchyshyn, MD
Professor and Chairman

MMH/pjk
cc: Dr. John Naughton
    Dr. Charles Pruet
    Dr. Robert Patterson

00224

the clinical practice plan.

I ... the Board of Governors of the Medical School's Clinical Practice Plan, Bill Dillon, may not want the union to pursue these grievances because their actions may, and rightfully so, be questioned.

As you are aware, it is not unusual for the actions of some of the members of the PSNU to be questioned in grievances that are filed by the bargaining unit, i.e. immediate supervisors' actions, in grievance issues involving evaluation. Therefore, I think we ought to look at Bill Dillon's concerns in this same light. The union (OUP) is, as you know, obligated to uphold and enforce the negotiated Agreement.

SUNY at Buffalo
School of Medicine and Biomedical Sciences
Clinical Practice Plan
1985-1987

| DEPARTMENT | GROSS REVENUES | | | DEAN'S FUND | | |
|---|---|---|---|---|---|---|
| | 1985 | 1986 | 1987 | 1985 | 1986 | 1987 |
| ANESTHESIOLOGY | $900,000 | $1,039,523 | $997,299 | $34,000 | $32,983 | $41,713 |
| DERMATOLOGY | $150,835 | $295,604 | $245,977 | $6,467 | $13,415 | $10,659 |
| FAMILY MEDICINE | $162,381 | $256,344 | $341,096 | $18,360 | $12,197 | $11,250 |
| GYN/OBSTETRICS | $1,158,666 | $1,595,065 | $1,967,811 | $39,715 | $71,403 | $187,601 |
| MEDICINE | $1,817,931 | $2,004,354 | $2,457,701 | $38,071 | $66,101 | $372,105 |
| NEUROLOGY | $347,269 | $395,716 | $1,208,632 | $19,392 | $17,926 | $117,633 |
| NEUROSURGERY | $353,035 | $481,483 | $376,673 | $12,665 | $20,760 | $123,559 |
| NUCLEAR MEDICINE | $10 | $561,611 | $747,135 | $0 | $10,512 | $15,873 |
| ORTHOPAEDICS | $10 | $1,919,360 | $2,032,963 | $22,977 | $63,747 | $78,669 |
| OTOLARYNGOLOGY | $896,006 | $963,290 | $1,092,408 | $35,308 | $42,624 | $46,208 |
| PEDIATRICS | $2,586,275 | $2,853,682 | $2,400,256 | $162,480 | $101,799 | $172,299 |
| PSYCHIATRY | $555,575 | $700,523 | $838,685 | $23,922 | $21,066 | $27,007 |
| RADIOLOGY | $1,295,589 | $1,504,249 | $1,818,195 | $44,562 | $50,291 | $69,470 |
| REHAB MEDICINE | $468,167 | $593,047 | $860,446 | $15,739 | $21,596 | $30,276 |
| SURGERY | $3,167,906 | $2,655,420 | $2,929,911 | $80,000 | $138,573 | $127,308 |
| UROLOGY | $319,954 | $397,186 | $446,185 | $8,977 | $11,712 | $115,425 |
| TOTAL | $14,169,519 | $18,216,437 | $20,768,563 | $149,633 | $647,645 | $752,214 |

MARINE MIDLAND PAYMENT SERVICES, INC.

No.W 0067860

University Gynecologists & Obstetricians

PAY

U.S. Foundation
Account #0010-109838

COPY – NOT NEGOTIABLE

DEPARTMENT OF GYNECOLOGY-OBSTETRICS
DIVISION OF GYNECOLOGY/ONCOLOGY
3 Gates Circle, Buffalo,
New York, 14209

TO: Sharon Green Faculty Practice Plan Manager

FROM: Shashi Lele, M.D. and David L. Marchetti, M.D.

Date: December 12, 1990

Re: Sharing of Income

To clarify this subject we are sharing the expenses as well as the revenue of this partnership.

Shashi Lele, M.D.

00225

1   **ERIC T. SCHNEIDERMAN, ESQ.**
    **Attorney General of the State of New York**
2   **MICHAEL G. McCARTIN, State Bar No. 183189**
    **Assistant Attorney General**
3   The Capitol
    Albany, New York 12224
4   Telephone: (518) 474-7856
    Fax: (518) 473-1572
5   E-mail: michael.mccartin@ag.ny.gov

6   *Attorneys for Cross-Defendant the Hon. Jonathan*
    *Lippman, Chief Judge of the NY Court of Appeals*

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                     **COUNTY OF LOS ANGELES**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  **TEXAS AUTOMOBILE LEASING, DBA LEXUS**
    **OF GLENDALE,**

12
                                    Plaintiff,
13         v.                                      Case No. BC519765

14  **MAHMOOD YOONESSI and LILA M. YOONESSI,**      Assigned to Judge Gregory Alarcon

15                                  Defendants       **MEMORANDUM OF POINTS**
                                                     **AND AUTHORITIES IN**
16  **MAHMOOD YOONESSI,**                           **SUPPORT OF MOTION TO**
                                                     **DISMISS CROSS-COMPLAINT**
17                             Cross-Complainant,    **PURSUANT TO C.C.P. §**
                                                     **418.10(a)(2)**
18         v.

19  **PLAINTIFF AND HERBERT SAMUELS,**             Date:    May 20, 2014
    **TOYOTA MOTOR SALES, U.S.A. INC. LEXUS**      Time:    8:30 AM
20  **DIVISION AND MARK TEMPLIN, GM,**             Dept:    36
    **MICHELIN NORTH AMERICA, INC. AND PETE**
21  **SELLECK, BARBARA YAROSLAVSKY, AND**          Trial Date:   none
    **MEDICAL BOARD OF CALIFORNIA, STEVEN**        Action Filed: Aug. 29, 2013
22  **SAMPLE, JONATHAN LIPPMAN, ERIC**
    **HOLDER, ESQ/AG, BOB WILLS, ARBIE**           Cross-Complt. Filed: Mar. 11, 2014
23  **KRIKORIAN, AND DOES 1-26,**

24
                              Cross-Defendants.
25

26                         **INTRODUCTION**

27      The Hon. Jonathan Lippman, Chief Judge of the New York State Court of Appeals, a cross-

28  defendant herein and New York State resident, asks this Court to dismiss the Cross-Complaint (the

                                    00226

                                     1.
    Motion to Dismiss the Cross-Complaint Against Cross-Defendant Lippmann

1  "CC") filed on March 11, 2014 on the grounds that this Court has no personal jurisdiction over

2  him, making this forum inconvenient as a matter of law.  For the reasons more fully discussed

3  below, Chief Judge Lippman asks that this Court dismiss the CC against him.

4  ### STATEMENT OF FACTS

5      In September 2009, pursuant to C.C.P. § 391, Cross-Complainant Mahmood Yoonessi

6  ("Yoonessi") was declared a vexatious litigant by the Hon. Aurelio Munoz because Yoonessi had

7  "brought more than 18 unsuccessful actions in propria persona."  See attachments to the CC, pg.

8  171-72.  Now Yoonessi appears to be back at it.  After being sued in this Court in a civil matter

9  related to a disputed automobile sale or lease in Los Angeles County, Yoonessi attempts to file this

10  CC against, among others, the U.S. Attorney General, Eric Holder, and Chief Judge Lippman.

11  Yoonessi absurdly alleges that the Chief Judge was a "Ring Leader" who somehow attempted to

12  destroy Yoonessi's "brilliant career" as a medical doctor by "using manufactured evidence".  CC,

13  ¶¶ 26, 31(B), 36.  Although the CC is devoid of further particulars, the attachments to the CC make

14  it clear that Yoonessi is attempting to sue Chief Judge Lippman because he was the Presiding

15  Judge when, on January 9, 2014, New York's highest court *sua sponte* dismissed matters in which

16  Yoonessi was a litigant.  See attachments to the CC, pp. 273-74 (which are the two summary

17  orders found at Matter of Yoonessi v. Tisch, 22 N.Y.3d 1051 (N.Y. 2014) and Matter of Yoonessi

18  v. King, 22 N.Y.3d 1051 (N.Y. 2014)).  These matters ultimately are related to Yoonessi's

19  challenge of lower court decisions upholding the New York State Board for Professional Medical

20  Conduct's decision to revoke Yoonessi's medical license for the commission of numerous acts of

21  professional misconduct.  See, e.g., Yoonessi v. State Bd. for Prof'l Med. Conduct, 2 A.D.3d 1070

22  (3d Dep't 2003), lv. denied, 3 N.Y.3d 607 (N.Y. 2004); Yoonessi v. New York State Bd. for Prof'l

23  Med. Conduct, 2005 U.S. Dist. LEXIS 40035 (W.D.N.Y., Mar. 21, 2005), aff'd, 162 Fed. Appx.

24  63 (2d Cir. 2006) (summary order).

25      As discussed more fully below, Chief Judge Lippman seeks dismissal of the CC on the

26  grounds that this Court lacks either general or specific personal jurisdiction over him rendering

27  this proceeding in this forum inconvenient as a matter of law since the CC fails to allege the

28  requisite minimum contacts with California to justify, in accordance with a Due Process analysis

2.

**00227**

1  forum, not California.

2      In sum, it would be unreasonable to subject Chief Judge Lippman to the jurisdiction of this

3  Court, and his motion to dismiss the CC because California is an inconvenient forum as a matter of

4  law should be granted.

5      **C.  Yoonessi Fails to Establish General Personal Jurisdiction**

6      Yoonessi also fails to satisfy the requirements of general personal jurisdiction, requiring the

7  dismissal of the CC.  General jurisdiction may be established over a non-resident defendant when

8  the cross-defendant's contacts with the forum state are "substantial" or "continuous and

9  systematic." Vons, 14 Cal. 4th at 445 (quoting Perkins v. Benguet Mining Co., 342 U.S. 437,

10  445-46 (1952)).  The cause of action need not be related to the cross-defendant's contacts with the

11  forum when the "contacts are so wide-ranging that they take the place of physical presence in the

12  forum as a basis for jurisdiction." Vons, 14 Cal. 4th at 445-46, 58 Cal. Rptr. 2d 899, 926 P.2d

13  1085.  Yoonessi has not alleged – nor could he – any facts sufficient to satisfy these requirements

14  underlying a finding of personal jurisdiction over Chief Judge Lippman.  Thus, as a matter of law,

15  it would be inconsistent with Due Process principles to allow Yoonessi to hale Chief Judge

16  Lippman into this California Court.

17                              **CONCLUSION**

18      For all the foregoing reasons, this Court should dismiss the CC against Chief Judge Lippman.

19  Dated: April 11, 2014

                                    Respectfully submitted,
20
                                    ERIC T. SCHNEIDERMAN,
21                                  Attorney General of the State of New York

22

23

                                    MICHAEL G. McCARTIN
24                                  Assistant Attorney General
                                    California State Bar No. 183189
25                                  *Attorneys for Cross-Defendant*
                                    *the Hon. Jonathan Lippman*
26

27

28

                                                    00228
                                6.

UNITED STATES DICTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---

MAHMOOD M. YOONESSI, M.D., *pro se,*

        Plaintiff,

vs.

                                Civil Action No.
                                03 CV 0871 S(F)

THE NEW YORK STATE BOARD FOR PROFESSIONAL
MEDICAL CONDUCT, A Board Under the Auspices of the
New York State Department of Health, WILLIAM A. DILLON,
M.D., Chairman, personally and ANTONIA C. NOVELLO,
M.D., Commissioner of The New York State Department of
Health, personally, Michael Noe M.D., Steven Goodnaught M.D.,
I.L. Cohen M.D., each and everyone personally, Kaleida Health
System, a New York State Corporation, Brian D'arcy M.D.,
Michelle Marzek, R.N., both personally, and the Catholic Health
System, a New York State corporation, Daniel Kredenster M.D.,
Lawrence Sternberg M.D., Ann Marie Fricke, John Choate M.D.,
M. Steven Piver M.D., Shashikrant Lele M.D. Davide Marchetti M.D.,
Trudy Baker M.D., William Greiner Esq., William Scheuerman,
Carol Heckman Esq., Eliot Spitzer Esq., Gail Mitchell Esq., each and
every one personally, and Roswell Park Cancer Institute, a State
institution, Albany Medical Center, American Board of Obstetrics
and Gynecology, Gynecologic Oncology Group, "National Cancer
Institute of Canada", "Bristol Meyers Squibb Company," Rich Newburg
and News Channel 4, Matt Gryta Buffalo News,

                    Defendants,

THE MEDICAL BOARD OF CALIFORNIA,
RONALD WENDER M.D., Chair of Panel B, and
Ronald Joseph Executive Director, both personally,

                    Codefendants.

---

## DEFENDANT AMERICAN BOARD OF OBSTETRICS AND GYNECOLOGY'S MEMORANDUM IN SUPPORT OF MOTION FOR RULE 11 SANCTIONS

Defendant American Board of Obstetrics and Gynecology respectfully asks this Court to impose sanctions against Petitioner Mahmood M. Yoonessi, appearing *pro se*, for filing a frivolous pleading in violation of Rule 11(b) of the Federal Rules of Civil Procedure and for

cause would show:



laint clearly demonstrates that his license was revoked because he engaged in the proved and unethical treatment of cervical cancer patients.[31] Despite the New York ising board's obvious justification for the revocation of his medical license, Yoonessi etheless named each and every person whom he believed had any involvement in or ponsibility for, no matter how remote, the revocation of his medical license.[32] Notably, nessi has more than a ten-year history of filing lawsuits that fail to state cognizable claims which reflect a serious failure to conduct an investigation into the sufficiency of the gations.[33] It is apparent that Yoonessi seeks to unnecessarily harass and punish ABOG in te of its extremely remote relationship to Dr. Kredentser's participation in his medical license pcation hearing.[34]

## B.    Imposition of Sanctions

13.    Prior to imposing sanctions, the court should determine whether the party made a easonable inquiry into the facts or law before signing and presenting the frivolous pleading.[35]

---

[31] Id. at pp. 9-10, ¶¶ 13-17.

[32] Id. at p. 6, ¶ 5; See also, FED. R. CIV. P. 11(b)(1); Hall v. Dworkin, 829 F. Supp. 1403, 1414 (N.D.N.Y. 1993) (Plaintiff in this case had a long history of filing baseless *pro se* complaints alleging racial discrimination and Civil rights violations).

[33] See, Yoonessi v. State University of New York, et. al. 862 F. Supp. 1005 (W.D.N.Y. 1994); Yoonessi v. State University of New York, et. al. 56 F.3d 10 (2nd Cir. 1995); Yoonessi v. State University of New York, 164 F.3d 620 (2nd Cir. 1998) (reported in full text format at 1998 U.S. Lexis 24671); Yoonessi v. New York, 537 U.S. 1047, 123 S.Ct. 602 (2002). See also, Matter of Mahmood Yoonessi v. Sample, 171 A.2d 1086 (N.Y. App. Div. 1991); Yoonessi v. State of New York, 289 A.D.2d 998 (N.Y. App. Div. 2001); Yoonessi v. State of New York, 742 N.Y.S.2d 591 (N.Y. App. Div. 2002); Yoonessi v. State Board of New York, 98 N.Y.S.2d 609 (N.Y. App. Div. 2002); In the Matter of Mahmood Yoonessi v. State Board For Professional Medical Conduct, 2 A.D.3d 1070 (N.Y. App. Div. 2003). In addition to the present suit filed in this court, plaintiff filed an almost identical suit on March 8, 2004 in the Central District of California, alleging the same causes of action against most of the same parties. That case is styled, Yoonessi v. The Medical Board of California, et.al., Docket No. 04-01884, Central District of California.

[34] Petitioner's Complaint at p. 10, ¶ 18 and p. 63, ¶ 115.

[35] FED. R. CIV. P. 11(b); Four Star Financial Services, L.L.C. v. Commonwealth Management Assoc., 166 F. Supp. 2d 805, 809 (S.D.N.Y. 2001).



000076

## CONCLUSION

18.  Yoonessi's claims alleging constitutional rights violations against ABOG, including civil rights and Sherman Anti-Trust Act violations, are utterly and completely baseless and without merit.  Yoonessi has failed to state any cognizable claim against ABOG. He also failed to investigate the merits of or chose to ignore the deficiencies in his claims prior to bringing this action.  Further, Yoonessi has a history of filing frivolous lawsuits against remotely related parties and alleging a host of constitutional rights violations, without success.  Moreover, unless punished by an appropriate sanction, Yoonessi will continue to bring these kinds of actions against innocent defendants such as ABOG, who must then incur the time and expense of defending such frivolous suits.

FOR THESE REASONS, ABOG asks the Court to award the sanctions of dismissing Yoonessi's complaint and awarding expenses to ABOG for the costs associated with defending this suit, including all attorney's fees and costs of court.

DATED:    Buffalo, New York 14203
          May 19, 2004

Respectfully submitted,

s/Stephen L. Tatum                    s/Richard T. Saraf
Stephen L. Tatum                      Richard T. Saraf
State Bar No. 19674500                GOLDBERG SEGALLA, L.L.P.
CANTEY & HANGER, L.L.P.               665 Main Street, Suite 400
801 Cherry Street, Suite 2100        Buffalo, New York 14203
Fort Worth, Texas 76102              (716) 566-5400 phone
(817) 877-2829 phone                 (716) 566-5401 fax
(817) 877-2807 fax                   rsaraf@goldbergsegalla.com
statum@cantyhaner.com

ATTORNEYS FOR DEFENDANT
AMERICAN BOARD OF OBSTETRICS AND GYNECOLOGY



## ONE HUNDRED NINETY-FIRST DISTRICT COURT

### GEORGE L. ALLEN, SR., COURTS BUILDING
### SUITE 740, 7TH FLOOR NEW TOWER
### DALLAS, TEXAS 75202-4606

CHAMBERS OF
**NA N. SLAUGHTER**

Court Administrator
Shirley Chowritmootoo

February 14, 2008                    214-855-6609

STEPHEN L TATUM                  RICHARD DEARING
FAX: 817-877-2807                FAX: 214-416-8962
WILLIAM PAUL ROSSINI             Mohamad Said, Esq.
FAX: 214-979-7301               FAX: 972-789-1665
JOHN S POLZER

FAX: 817-877-2807

RE:   Cause No. DC-05-05532
      AMERICAN BOARD OF OBSTETR vs. YOONESSI MAHMOOD M MD

Dear Counsel:

I have thoroughly reviewed Defendant Mahmood M Yoonessi, M.D.'s Motion for Summary Judgment (Corrected) filed on January 17, 2008. In addition to the Motion itself, I have also reviewed the following pleadings:

1.   Plaintiff's Response to Defendant's Motion for Summary Judgment filed on January 25, 2008;
2.   Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment filed on January 31, 2008;
3.   Plaintiff's Letter Brief of February 6, 2008;
4.   Defendant's Reply to Plaintiff's Letter Brief in Opposition to Defendant's Motion for Summary Judgment filed February 11, 2008;
5.   Defendant's Letter Brief filed February 12, 2008;
6.   Plaintiff's Letter Brief filed February 12, 2008; and
7.   Plaintiff's Objections to Defendant's February 11, 2008 Brief filed on February 13, 2008.

First, I am ruling on Defendant's Motion for Summary Judgment as a "traditional" motion under Texas Rule of Civil Procedure 166a. Defendant's Motion is not clear. However, in light of any ambiguity, I believe the Motion is not specific enough to qualify as a "no-evidence" motion for summary judgment under Tex. R. Civ. P. 166a(i). In fact, the first time the Defendant even refers to Tex. R. Civ. P. 166a(i) is in his Reply to Plaintiff's Response to Motion for Summary Judgment filed on January 31, 2008.

**328**

Second, Plaintiff objects that Defendant has failed to bring forth properly authenticated summary judgment evidence to support his motion. Defendant's motion relies on Dr. Yoonessi's Application to Take the Written Examination in 1973 (which both parties refer to as the "Contract"), the Bulletin for 2003 from the American Board of Obstetrics and Gynecology, Inc. ("ABOG") and the Bulletin for 2004 from ABOG. And, in fact, while specifically referring to these documents, Defendant did not attach them to his motion. However, Plaintiff attached these exact documents to its response and relied upon them in its response. Plaintiff filed these documents with the court and Defendant did not object.

Tex. R. Civ. P. 166a states that judgment shall be rendered upon documents "on file at the time of the hearing." While the documents in question were filed by the Plantiff and not the Defendant, the documents were properly on file with the court before the hearing and therefore, can properly be considered in ruling on this summary judgment. Plaintiff's objections on this issue are overruled.

Defendant has filed for summary judgment on all three causes of action brought by Plaintiff: breach of contract, abuse of process, and malicious prosecution. Finding that there is no genuine issue as to any material fact, the court grants summary judgment to Defendant Mahmood M. Yoonessi, M.D. on all three causes of action. Defendant's counsel should supply the court with an order reflecting these rulings as soon as possible.

Yours truly,

_Gena N Slaughter (with permission)_

_____
Gena N. Slaughter

329

00233

**SUNY at Buffalo**
**School of Medicine and Biomedical Sciences**
**Clinical Practice Plan**
**1985-1987**

| DEPARTMENT | GROSS REVENUES | | | DEAN'S FUND | | |
|---|---|---|---|---|---|---|
| | 1985 | 1986 | 1987 | 1985 | 1986 | 1987 |
| ANESTHESIOLOGY | $900,000 | $1,039,523 | $997,299 | $34,000 | $32,983 | $41,713 |
| DERMATOLOGY | $150,835 | $295,604 | $245,977 | $6,467 | $13,415 | $10,659 |
| FAMILY MEDICINE | $162,381 | $256,344 | $341,096 | $8,360 | $12,197 | $11,259 |
| GYN/OBSTETRICS | $1,158,666 | $1,595,055 | $1,967,811 | $39,715 | $71,403 | $87,501 |
| MEDICINE | $1,817,931 | $2,004,354 | $2,457,701 | $38,071 | $66,101 | $72,105 |
| NEUROLOGY | $347,269 | $395,716 | $1,208,632 | $9,392 | $7,926 | $17,633 |
| NEUROSURGERY | $353,035 | $481,483 | $376,873 | $12,663 | $20,750 | $23,559 |
| NUCLEAR MEDICINE | $0 | $581,611 | $747,135 | $0 | $10,512 | $15,873 |
| ORTHOPAEDICS | $0 | $1,979,380 | $2,039,953 | $22,977 | $64,747 | $78,889 |
| OTOLARYNGOLOGY | $896,006 | $943,290 | $1,092,408 | $35,308 | $42,624 | $46,288 |
| PEDIATRICS | $2,586,225 | $2,853,652 | $2,400,256 | $69,480 | $101,799 | $27,299 |
| PSYCHIATRY | $555,575 | $700,523 | $838,685 | $23,922 | $21,066 | $27,007 |
| RADIOLOGY | $1,295,589 | $1,504,249 | $1,818,195 | $44,562 | $50,291 | $69,470 |
| REHAB MEDICINE | $468,167 | $593,047 | $860,446 | $15,739 | $21,596 | $30,226 |
| SURGERY | $3,157,906 | $2,655,420 | $2,929,911 | $80,000 | $98,523 | $127,308 |
| UROLOGY | $319,934 | $397,186 | $446,185 | $8,977 | $11,712 | $15,425 |
| TOTAL | $14,169,519 | $18,216,437 | $20,760,563 | $449,633 | $647,615 | $752,214 |

275

00234



Case 1:11-cv-00211-WMS Document 1 Filed 01/06/23 Page 269 of 352

OF THE SENIOR
£ CHANCELLOR
R FINANCE AND
MANAGEMENT

gan Resources,
Personnel and
Joyce Relations

em Administration
le University Plaza
Albany, NY 12246

518/443-5684
UX: 518/443-5785

INTERNET:
VILLAJY@
SAOM.SUNY.EDU

November 5, 1996

Dr. Mahmood Yoonessi
355 Linwood Avenue
Buffalo, New York   14209

Dear Dr. Yoonessi:

We have been advised that you have returned check # P154145 to the University Foundation Activities Inc.  Since there appears to be some confusion on your part as to the reason the check was sent to you, this is to provide you with background information.

In 1987, you filed the first in a series of grievances pursuant to Article 7 of the State/UUP Agreement.  That grievance and other related grievances were reviewed at various levels of the grievance process, finally culminating in a protracted arbitration which included more than 20 hearing dates.  Due to the complexity of the issues raised in numerous grievances involving the University at Buffalo's School of Medicine and Biomedical Sciences, a forum was agreed to under which the parties explored settlement discussions in an effort to resolve the issues before us.  We were ultimately successful in resolving the series of cases.  One element of the settlement included a cash payment to you.  Contrary to the implication of your October 15 letter, UUP is not required to obtain the authorization of a particular grievant to enter into a settlement of this nature.  Pursuant to Article 7 of the Agreement, the union retains control of the appeal of any grievance following Step 1.  The Agreement does not require that a grievant acquiesce to a given settlement.

Upon receipt, the funds were redeposited with University Foundation Activities.  They will recut the check and it will be forwarded to you under separate cover.

Sincerely,

Joyce Yaple Villa
Assistant Vice Chancellor
for Employee Relations

c:    Mr. Wildman

# MEDICAID
### MANAGEMENT
### INFORMATION SYSTEM

YOONESSI MAHMOOD           MD

DATE 08-19-2002
REMITTANCE NO 02081909776
PROVIDER ID      00646451

BAL. TO RECOVER

TOTAL PENDED                    105,010.99
AMOUNT PAID                          .00

EASE BE ADVISED THAT DUE TO SPECIAL PROCESSING REQUIREMENTS, CYCLE
8 WILL BE CLOSED ON TUESDAY, SEPTEMBER 10, 2002, BY NOONTIME. PLEASE
JUST YOUR SUBMISSION SCHEDULE ACCORDINGLY. FOR QUESTIONS, PLEASE
LL CSC'S PROVIDER RELATIONS.

00646451   08-19-2002
YOONESSI MAHMOOD                     MD

355 LINWOOD AVE
BUFFALO                  , NY 14209

00646451   08-19-2002
YOONESSI MAHMOOD             MD

355 LINWOOD AVE
BUFFALO           , NY 14209

247

00236

**HealthPort.**
INVOICE

HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

Invoice #: 0048157073
Date:     06/02/2008
Customer #: 1449404

| Ship to: | Bill to: | Records from: |
|---|---|---|
| MAHMOOD YONNESSI | MAHMOOD YONNESSI | BUFFALO GENERAL HOSPITAL |
| MAHMOOD YOONESSI | MAHMOOD YOONESSI | 100 HIGH STREET |
| 6790 CREST RD | 6790 CREST RD | BUFFALO, NY 14203 |
| RANCHO PALOS VERDE, CA 90275 | RANCHO PALOS VERDE, CA 90275 | |

Requested By: MAHMOOD YOONESSI            OTHER:        NA

Patient Name: SLISZ VIRGINIA

| Description | Quantity | Unit Price | Amount |
|---|---|---|---|
| Basic Fee | | | 0.00 |
| Retrieval Fee | | | 0.00 |
| Per Page Copy (Paper) 1 | 1670 | 0.75 | 1,252.50 |
| Shipping/Handling | | | 34.53 |
| Subtotal | | | 1,287.03 |
| Sales Tax | | | 103.33 |
| Invoice Total | | | 1,390.36 |
| Balance Due | | | 1,390.36 |

Pay your invoice online at www.HealthPortPay.com

Terms: Net 30 days          Please remit this amount : $ 1,390.36 (USD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

Invoice #: 0048157073

Check # 00154580

Payment Amount $ 1,390.36

**Please return stub with payment.**
Please include invoice number on check.
To pay invoice online, please go to www.HealthPortPay.com or call (770) 754 6000.

00237

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)*:

Mahmood Yoonessi,M.D
6790 Crest Rd; Rancho Palos Verdes ,Ca 90275

TELEPHONE NO.: 310.541-3937    FAX NO.: 310.750-6537
E-MAIL ADDRESS: myoonessi@cox.net
ATTORNEY FOR: Self(Pro Se)

☐ COURT OF APPEAL,    APPELLATE DISTRICT,DIVISION
☒ SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los angeles
STREET ADDRESS: 111 North Hill St
MAILING ADDRESS: 111 North Hill St
CITY AND ZIP CODE: Los Angeles Ca 90012
BRANCH NAME: Stanley Mosk

PLAINTIFF/PETITIONER:
Texas Auto Leasing Inc dba Lexus of Glendale

**APPLICATION FOR ORDER TO VACATE PREFILING ORDER AND REMOVE PLAINTIFF/PETITIONER FROM JUDICIAL COUNCIL VEXATIOUS LITIGANT LIST**

CASE NUMBER:
BC 519765

FILED
Superior Court Of California
County Of Los Angeles

APR 22 2014

Sherri R. _____ _____re Officer/Cl
By _____ Deputy
   Josh Lara

---

Important, please read: This application must be filed in the court that entered the prefiling order, either in the action in which the prefiling order was entered or in conjunction with a request to the presiding justice or presiding judge to file new litigation under Code of Civil Procedure section 391.7. If you have made an application to vacate a prefiling order that was denied, you may not make another application to vacate in any California court until at least 12 months after the denial.

1. I have been determined to be a vexatious litigant under the California Code of Civil Procedure section 391. This application requests that the court vacate its prefiling order and order my name removed from the statewide vexatious litigant list.

2. The prefiling order or orders were issued in the following case or cases *(list all)*:

Court: Los Angeles County Superior Court    Court: _____

Case Name: Yoonessi v. Brown et Al    Case Name: _____

Case Number: BC401785    Case Number: _____

Date prefiling order entered: Aug 7 ,2009    Date prefiling order entered: _____

☒ Continued on *Attachment* (form MC-025).

3. I request that the prefiling order be vacated under Code of Civil Procedure section 391.8. (Describe below the material change the facts on which the order was granted and how the ends of justice would be served by vacating the order.)

1.Attorney Robert Cooper represented Dr Philip J. Disaia ; failed to file a timely response. A notice of Default was filed again: his client.2.Rather than filing an answer; he filed the attached request for judicial Notice in support of his Fraudulent claim:He listed 19 Exhibits ;all with defective citations:1.Yoonessi V.ABOG Lexis 3911.,2.Yoonessi v.ABOG Lexis 158 3.Yoonessi V.D Lexis 8800, 4.Petition for Reinstatement OAH 5.Writ of Mandate Yoonessi V.MBOC, 6.Yoonessi V.skretny Lexis 29343 7.Yoonessi v.NY BOPMC ;Lexis 959 ,8.Yoonessi v.GOG Lexis 19700, 9. Yoonessi V.Skretny Lexis 24625, 10.Yoonessi V.A Lexis 551,11. Yoonessi v.GOG? 12.Yoonessi V.SBpmc; Motion for leave to appeal toApp Lexis 2263 ,13.Yoonessi v.OPMC 40035, 14.Yoonessi v.OPMC, 15.Petition for reconsideration MBOC ,16.Petition for Mandamus,17.Petition for Writ of Certior USSCT 18.Yoonessi v.opmc Ny ;Ct of Appeals, 19.Yoonessi v. State of NY.Fact:a)Citations do not conform to the requireme of Blue Book. b) Persecution of defendant started after 9/11/2001.c)Exculpatory Evidence has been concealed (sealed;in COA LA) d)Defendant has spent close to half a million dollars to fight Frivolous claims of Spitzer,Disaia and Kredentser.e)Respond was represented by attorneys Walsh,Judge Farrel,Blaie,Sargent,Kaplan,Rossini,Modjarrad,... and won in Ny and Texas(See attached).Indeed NY Peer Reviewers,COP recommended Restoration ofmy license to no avail.

☒ Continued on *Attachment* (form MC-025).

---

**APPLICATION FOR ORDER TO VACATE PREFILING ORDER AND REMOVE PLAINTIFF/PETITIONER FROM JUDICIAL COUNCIL VEXATIOUS LITIGANT LIST**

Code of Civil Proced
www.c

00238

**504**

Delaware Avenue    Buffalo, New York 14202

Karen Schmist
Deputy Commissioner

July 22, 199[_]

RECEIVED
JUL 2 9 1998

**17.**

**AA85**

[_] Street
[_]th St.
[_]ugmon Street
New York 14203

Dr. Yoonessi

Re: Office of Professional Medical Conduct
Case #: 44B-BU-97-07-3161B
Patients: Johnes Mae Lemmons?
Irene Kukutny – MR # 338[_]41?
E.S. – MR # 1099960    to Dr. D[_]?
Virginia Skart – MR # 662526
Admission Date: 3/6/96
Carolyn Adacao – MR # 813967
Admission Date: 12/96
(Buffalo General Hospital)

Friedlander:

[_]rsuant to Section 230 of the Public Health Law, please provide this office by August 5, [_]h a complete, certified copy of the medical record of the patients named above (patient [_]tion is not required).

[_]ease make a complete copy of the entire record, certify that it is a true, exact and [_] copy, and forward to my attention. I can be reached at (716) 847-4326.

[_] certification form is enclosed for your convenience.

Sincerely,

Dorothy Ciccirella
Investigator
Office of Professional Medical Conduct

Completed Information to
Annunziata Professional Affairs by
[_] Thos. A Smith

83

Claim: DiNunzio vs Children's Hospital of Buffalo et al.

[_]te: October 8.1992

[_]preme Court of New York, County of Erie

[_] Company: Frontier Insurance Company

[_]tances: I provided a single consultation to a child who presented with s[_]:
[_]ry stenosis. The child developed multiple medical complications while on the
[_]ogy service and died while awaiting surgery.

Claim: Mahmood M. Yoonessi vs SUNY et al.

[_] of Process: February 4th 1893

[_]nited States District Court

[_]    [_] to be defended by the State of New York Department of Law

[_]    Suit brought by the Plaintiff against multiple members of the credentials
committee of Childrens Hospital, President of SUNYAB, Dean of Medical
School SUNYAB, Department Chair of OB-GYN, Millard Fillmore Hospital
ECMC, and secretaries of the Medical Staff etc. for allegedly not being able
to obtain recredentialling.

**2905**

occurred if the plaintiff had alleged that the manner in which he was treated in the grievance process was discriminatory. Id. at 857.

Applying these principles to the present case, plaintiff needs to have alleged more than what he has here to show that a separate discriminatory employment practice occurred. All he has alleged in support of his claim that defendants violated Title VII is that they reached an agreement that he thought was too low, and that SUNY badmouthed him to other area hospitals. Aside from conclusory statements that these events were discriminatory, plaintiff has not alleged one fact that shows that the settlement offer was low because he is Iranian. Since he has not raised any material fact showing that the settlement was reached in a discriminatory fashion, the Court finds that this is not a separate and distinct discriminatory action that triggers the 300 day clock. Thus, the 300 day period began when plaintiff was notified of his termination, and since he did not file within the 300 days, his claim must be dismissed.

Accordingly, for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, defendants' motions to dismiss are granted, and summary judgment is granted in favor of defendants and the complaint dismissed in its entirety.

IT IS SO ORDERED.

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

Dated: November /, 1997

(85)

## Sisters Hospital
### Answering the Call

MEDICAL STAFF OFFICE

FAX NUMBER:    (716) 862-1971
OFFICE NUMBER:    (716) 862-1910

DATE:    7-16-96

FROM:    Dr. Mandie's Office

TO:    Dr. Yoonessi

COMPANY:

FAX NO:    884-3946

Total Number of Pages Including Cover #5

MESSAGE

000063



his information was sent to us at the
time of reappointment in 1993 by
the [_] of General. In January
199[_] the [_] General reporting on [_]ending
[_] Please see [_]tter included with

00235

Exhibit K - Letter (Hreshchyshyn - 6/15/90)



**UNIVERSITY AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

Department of Gynecology-Obstetrics
School of Medicine
Faculty of Health Sciences
Children's Hospital
219 Bryant Street
Buffalo, New York 14222
(716) 878-7138

Myroslaw M. Hreshchyshyn, M.D.
Professor and Chairman

June 15, 1990

Dr. Ted Stibbards
President
Children's Hospital
219 Bryant Street
Buffalo, NY  14222

Dear Dr. Stibbards:

In view of the fact that Children's Hospital does
provide me with malpractice insurance as per our
discussion, I will designate Children's Hospital
as my primary faculty practice site effective
July 1, 1990. Accordingly, Children's Hospital
will receive the reimbursement due per the overhead
formula.

I will assume this arrangement will be satisfactory.

Sincerely,

M. M. Hreshchyshyn, MD
Professor and Chairman

MMH/pjk
cc:  Dr. John Naughton
     Dr. Charles Pruet
     Dr. Robert Patterson

*Exhibit K*

00240

1   **ERIC T. SCHNEIDERMAN, ESQ.**
    Attorney General of the State of New York
2   **MICHAEL G. McCARTIN, State Bar No. 183189**
    **Assistant Attorney General**
3   The Capitol
    Albany, New York  12224
4   Telephone: (518) 474-7856
    Fax: (518) 473-1572
5   E-mail:  michael.mccartin@ag.ny.gov

6   *Attorneys for Cross-Defendant the Steven B. Sample*

7                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                       **COUNTY OF LOS ANGELES**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10  |  |  |
    |---|---|
11  | **TEXAS AUTOMOBILE LEASING, DBA LEXUS OF GLENDALE,** | Case No. BC519765 |
12  |  | Assigned For All Purposes To: The Honorable Gregory W. Alarcon |
    | Plaintiff, |  |
13  | v. | Department 36 |
14  | **MAHMOOD YOONESSI and LILA M. YOONESSI,** | **NOTICE THAT CROSS-COMPLAINANT MAHMOOD YOONESSI IS A VEXATIOUS LITIGANT** |
15  | Defendants | **SUBJECT TO A PRE-FILING ORDER** |
16  |  |  |
17  | **AND RELATED CROSS-ACTIONS** | Complaint Filed: August 29, 2013 Trial Date: September 24, 2014 |
18  |  |  |

19           **TO THE COURT, TO ALL INTERESTED PARTIES:**

20

21       **PLEASE TAKE NOTICE** that, on October 2, 2009, in Department 47 of the Los Angeles

22  County Superior Court, Central District, the Court entered a pre-filing order pursuant to Code of

    Civil Procedure § 391.7, which prohibits MAHMOOD YOONESSI ("Yoonessi"), the

23  cross-complainant in the above-captioned action, from filing new lawsuits in any California court

24  without first obtaining leave of the Presiding Judge of the Court.  A copy of the order is attached

25  hereto as Exhibit A and incorporated herein by reference.

26       **PLEASE TAKE FURTHER NOTICE** that Yoonessi violated the above-specified order

27  by filing, in propia persona, his Cross-Complaint and "First amended answer and Cross

    Complaint" [sic.] in this action on October 16, 2013 and March 10, 2014, respectively.

28
                                    1.                              00241

1

2     **PLEASE TAKE FURTHER NOTICE** that, pursuant to Code of Civil Procedure §

3 391.7(c), Yoonessi's cross-action shall be automatically dismissed unless Yoonessi obtains an

4 order from the Presiding Judge of the Court permitting the filing of the litigation with ten days of

5 the filing of this Notice.

6 Dated: May 7, 2014

7                           Respectfully submitted,

8                           ERIC T. SCHNEIDERMAN,
                          Attorney General of the State of New York

9

10

11                           MICHAEL G. McCARTIN
                          Assistant Attorney General

12                           California State Bar No. 183189
                          *Attorneys for Cross-Defendant*

13                           *Steven B. Sample*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                     **6 0 3**                   **00242**

Notice That Cross-Complaint Mahmood Yoonessi is a Vexatious Litigant
Subject to a Pre-Filing Order

MAHMOOD YOONESSI v. S.C. (YAROSLAVSKY) ...

19. Yoonessi (Mahmood) v. S.C. (Yaroslavsky), S179171, SUPREME COURT OF
CALIFORNIA, 2010 Cal. LEXIS 1958, February 19, 2010, Filed, Petition denied by
Mahmood Yoonessi v. S.C., 2010 Cal. LEXIS 2708 (Cal., Mar. 10, 2010)

MAHMOOD YOONESSI v. S.C. (YAROSLAVSKY) ...

20. Yoonessi v. Yaroslavsky, B218588, COURT OF APPEAL OF CALIFORNIA,
SECOND APPELLATE DISTRICT, DIVISION FOUR, 2010 Cal. App. LEXIS 1288,
July 19, 2010, Filed, Petition denied by Yoonessi (Mahmood) v. Brown, Jr., (Edmund
G.), 2010 Cal. LEXIS 9871 (Cal., Sept. 15, 2010)

Yoonessi v. Yaroslavsky, et al. ...

21. Yoonessi v. Brown, B218588, COURT OF APPEAL OF CALIFORNIA, SECOND
APPELLATE DISTRICT, DIVISION FOUR, 2010 Cal. App. Unpub. LEXIS 5042, July
2, 2010, Filed,  NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA
RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM
CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR
ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS
OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED
PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

MAHMOOD YOONESSI, Plaintiff and Appellant, v. EDMUND G. BROWN,  ...

22. Matter of Yoonessi v. Tisch, [NO NUMBER IN ORIGINAL], COURT OF APPEALS
OF NEW YORK, 22 N.Y.3d 1051; 4 N.E.3d 370; 981 N.Y.S.2d 358; 2014 N.Y. LEXIS
33; 2014 NY Slip Op 60363, January 9, 2014, Decided,  DECISION WITHOUT
PUBLISHED OPINION

In the Matter of Mahmood Yoonessi, Appellant, v Merryl H. Tisch, et al.,  ...

23. Matter of Yoonessi v. King, [NO NUMBER IN ORIGINAL], COURT OF APPEALS
OF NEW YORK, 22 N.Y.3d 1051; 4 N.E.3d 369; 981 N.Y.S.2d 358; 2014 N.Y. LEXIS
28; 2014 NY Slip Op 60362, January 9, 2014, Decided,  DECISION WITHOUT
PUBLISHED OPINION

In the Matter of Mahmood Yoonessi, Appellant, v John King et al., Respondents. ...

24. Yoonessi v. Givens, Motion No: 2011-1077, COURT OF APPEALS OF NEW YORK,
17 N.Y.3d 718; 959 N.E.2d 1024; 936 N.Y.S.2d 75; 2011 N.Y. LEXIS 3295; 2011 NY
Slip Op 90334, November 22, 2011, Decided,  DECISION WITHOUT PUBLISHED
OPINION

608

00243



**UNIVERSIT  AT BUFFALO**
STATE UNIVERSITY OF NEW YORK

Department of Gynecology-Obstetric·
School of Medicin·
Faculty of Health Science·
Children's Hospit·
140 Hodge Avenu·
Buffalo, New York 142··
(716) 878-773·

December 29, 1987

M E M O R A N D U M

TO:   William P. Dillon, M.D.

FROM:  M. M. Hreshchyshyn, M.D.
       By Toni Canazzi

Enclosed please find the General Ledger print out for January –
November, 1987, together with Professional Economics Participants'
Financial Statement, reflecting the income and receipts for the
current period.  For the year-to-date information, please refer to the
January – November, 1987 sheet prepared by myself to reflect
adjustments for the overhead retained from earnings during the year.

At the bottom of the sheet under "Overhead", you will see that I –
withheld $13,555.05 from earnings.  Of this amount, $9,434.83 per
individual will be reimbursed to you as it is your share of the actual
expense credited against the overhead.  The balance remaining,
4,120.22, properly belongs to Children's for overhead costs for the
January – November, 1987 period.  You will note on the same sheet that
'und Assessments have been adjusted by the $9,434.83 figure, thereby
increasing your net earnings to date.  Your total check for $27,938.88
is enclosed.

Please also note that your maximum allowable earnings of $208,845 is
also your cap on earnings for 1988.  When and if a salary increase is
negotiated by UUP and the State, adjustments to salary and allowables
will occur when directed by the Dean's office.

Please indicate by returning a copy of this letter whether the
overhead may be paid to the hospital(s).  In cases where faculty are
working at 2-3 sites, we have asked the Dean's office to direct us on
how to prorate the overhead.

If you have any questions regarding the above, please feel free to
call me.

_____
Signature

MMH/TC/pjo
Enclosures

00244

# LAW & ASSOCIATES

2727 Broadway Street
Suite 3
Buffalo, New York 14227
TEL 716.895.8018
FAX 716.895.8110

March 10, 1999

Mahmood Yoonessi, M.D.
355 Linwood Avenue
Buffalo, New York 14209

Dear Dr. Yoonessi,

This letter is in response to your request to analyze financial activity associated with your involvement in the SUNY Faculty Practice Plan (FPP). We have reviewed the materials you have provided and our findings are based upon this information. It is very important to note that there is additional material that has not yet been provided to you that is relevant to your position. Furthermore, certain information that has been provided by the FPP needs additional clarification. These items are so noted in our report that follows. We have reported all dollar amounts in whole dollars in this report.

### 1985

Income reported on the statement labeled Monthly Income Analysis for the 1985 calendar year indicates total receipts of $242,605. The Statement Of Income And Expense reports receipts of $210,989. **This discrepancy should increase fees to you of $31,616.**

The FPP does not include income received while on vacation. You were entitled to one month's vacation annually. Because we do not have the data to correlate when your income was received, **we have divided the total of $242,605 by 12 months to arrive at an increase in fees to you of $20,217.**

Per the FPP Manual, there is no provision for deduction of a "2% Contribution". **This results in an increase in fees to you of $4,401.**

The balance in "Participants Equity" was never returned to you. **This increases fees due to you of $12,266.**

Total increase in fees due to you for 1985 - $68,500.



00245

Dr. Mahmood Yoonessi
Faculty Practice Plan Report
March 10, 1999
Page 2

<u>1986</u>

From the Statement of Professional Income, Line 10A. shows a deduction for Dean's Fund of $38,667. Based on the FPP Manual this calcufation should be based on Gross Clinical Income of $246,066, less vacation earnings of $20,506 (as explained below), less Maximum Salary Base For Rank of $79,500, which equals $146,060 times 5% for a total of $7,303. **This increases fees due to you of $31,364.**

There is no provision in the FPP Manual for "Department Enrichment Fund" (Line 10D.) and, therefore, **you should receive an increase of $21,443.**

Within the provisions of the FPP Manual, allowable deductions for IRS purposes are deductible as expenses. The FPP did not fully allow your deductions, which were in excess of the $38,328 (Line 15). **Therefore you should receive an increase of $38,328.**

Again, as explained in the 1985 analysis, vacation pay is excludable. **We have divided the total fees of $246,066 by 12 months to arrive at an increase to you of $20,506.**

Additionally, and this will require further explanation from the FPP, we have reviewed a report which shows fees through 10/31/86 of $821,463 less what we assume was collected in the amount of $596,944 resulting in $224,518. **We are unable to determine the income from 11/1/86 through 12/31/86, but it appears that you should receive an increase of at least $224,518.**

**Total increase in fees due to you for 1986 - $336,159.**

<u>1987</u>

The vacation pay exclusion is based on fees of $275,477 divided by 12 months for **an increase to you of $22,956.**

Per the FPP Manual, there is no provision for "Chairman's Fund". **Therefore you should receive an increase of $5,509.**

The FPP Manual formula for the "Dean's Fund" is allocated receipts of $275,477, less excluded vacation earnings of $22,956, less your maximum salary base for rank of $79,500 equals $173,021 times 5% equals $8,651. The deduction on the Statement Of Revenue And Expense is $13,774. **This results in additional income to you of $5,123.**

Per your inquiry, the amount withheld from you of $21,558 for Hospital Reimbursement was never remitted to any hospital. **This results in additional income to you of $21,558.**



Dr. Mahmood Youcessi
Faculty Practice Plan Report
March 10, 1999
Page 3

The Net Overage of $36,195 should be off-set by allowable deductions that were not included in the statement. **This results in an increase to you of $36,195.**

Total increase in fees due to you for 1987 - $91,341.

### 1988

We have reviewed a report, dated 8/12/88, that indicates billings on your behalf of $282,930. We require additional information from the FPP to provide a position on this item, but it would appear that money could be due to you.

### Additional Items

ECMC – Because of your wrongful termination, you should be entitled to salary from 7/1/89 which we calculate to be $131,039.

BGH – salary should have been paid from 2/1/89 which we calculate to be $52,500.

SUNY – vacation pay of 10 months was never paid to you. We calculate this to be $66,667.

SUNY- unused sick leave of 10 months was never paid to you. We calculate this to be $66,667.

SUNY – unfair termination as of 3/91 results in pay of $690,2750.

Interest - interest income should be computed on all of the foregoing when final determinations can be made.

The foregoing assessment is accurate based on the information made available to us. However, there is significant information unavailable that could increase the amount due to you. Please call if we may be of any further assistance in this regard.

Sincerely,

Law & Associates,

By

Francis R. Law



431        00247

```
                                                        500·00  *
                                                         00·00  *
                                                        504·00  *
                                                      1,127·00  *
                                                        520·00  *
                          ·00                           250·00  *
                                    ·                    00·00·  *
                                0· 00                  1,104·00  *
                                0·  0                  1,008·00  *
                        114·00  +                       413·00  +
                      4,326·21  *                       070·00  +
                        450·00  *                     1,105·00  +
                        038·00  *                       521·00  +
                        413·00  *                       307·00  +
                        390·00  *                     1,553·00  *
                        522·00  *                       107·00  +
                        035·00  +                       471·00  *
                        104·00  *                     1,510·00  +
                        573·00  *                       10·00  +
                        520·50  +                        00·00  +
                        304·00  *                       224·00  *
                        057·00  +                     1,543·00  *
                        050·50  *                     1,721·00  *
                        300·00  +                       217·00  +
                        340·00  *                        00·00  +
                        542·00  *                     1,352·20  *
                        130·00  +                     1,075·20  *
                        700·00  *                       150·00  +
                        057·00  *                     1,323·00  +
                        ·00·00  *                        00·00  +
                        400·00  +           0S1         ··
                        103·00  +                    42,452·81  *
                      1,373·00  *                    1 5 8 4.53
                        057·00  +                    36 6 21·2 8
                        250·00  *
                        ·00·00  *
```

000438

450

254

00248

C00426

1: Eur J Gynaecol Oncol.  2001;22(5):315-8.

The use of lymphadenectomy in clinical stage I endometrial adenocarcinoma at a large community hospital.

Strittmatter CA, Piver MS.

Department of Obstetrics and Gynecology, Sisters of Charity Hospital, Buffalo, NY 14214, USA.

PURPOSE AND MATERIALS AND METHODS: Because of the inaccuracies in clinical staging of endometrial cancer, the International Federation of Gynecology and Obstetrics (FIGO) in 1988 changed the staging of endometrial cancer to surgical staging consisting of intraoperative findings and histologic evaluation of the specimen. A decade later, 1998, the United States Society of Gynecologic Oncologists published Practice Guidelines for the surgical staging of endometrial cancer. The purpose of this study was to review the use of lymph node sampling and peritoneal washings in 100 consecutive cases of clinical stage I endometrial cancer and compare these results to the Practice Guidelines of the Society of Gynecologic Oncologists. RESULTS: The vast majority of patients (86 had peritoneal washings and frozen section (69%) of the uterus. However, only slightly more than half (52%) had palpitation of the pelvic and/or para-aortic lymph nodes. Most encouraging and consistent with the Society of Gynecologic Oncologists' Guidelines is that 87% of the patients with histologically more aggressive cancers (grade III or deep myometrial invasion), had lymph node sampling as did 90.5% with more aggressive histologic subtypes. CONCLUSION: Notwithstanding these results, there is still the need in the 21st century for more uniform guidelines for the surgical staging of endometrial cancer.

PMID: 11766728 [PubMed - indexed for MEDLINE]

650

4/22/2004 9:29 AM



**Buildings**

## PW6: Certificate of Occupancy
## Inspection Application

*Must be typewritten.*

Affix BIS job number label here.

---

**1 | Location Information** *Required for all applications.*

| House No(s) 230 | Street Name 10TH STREET | Work Proposed on Floor No(s) CEL, 01, 02, 03, ROF |
|---|---|---|

| Borough BROOKLYN | Block 1015 | Lot 16 | BIN 3337641 | CB No. 306 |
|---|---|---|---|---|

---

**2 | Filing Representative**

| Last Name MARTARELLA III | First Name FRANK | Middle Initial |
|---|---|---|
| Business Name THINK DESIGN ARCHITECTURE | | Business Telephone (718) 987-3729 |
| Business Address 1000 SOUTH AVENUE, SUITE 104 | | Business Fax |
| City STATEN ISLAND    State NY    Zip 10314 | | Mobile Telephone |
| E-Mail FRANK@THINKDESIGNARCH.COM | | Registration Number A10839 |

---

**3 | Related Jobs** *Required for all applications.*

**Electrical:** I hereby state that electrical work has been performed in conjunction with this job/application.
☒ Yes    ☐ No        *If yes, please provide electrical control number(s) below:*

| B264437 | B00312602 | | | |
|---|---|---|---|---|
| B209453 | | | | |

**Plumbing/Boiler:** I hereby state that plumbing work, including house connection, septic and/or boiler work has been performed (under separate job number(s)) in conjunction with this job/application.
☐ Yes    ☒ No        *If yes, provide BIS job number(s) below:*

| | | | | |
|---|---|---|---|---|
| | | | | |

**Elevator:** I hereby state that elevator work has been performed (under separate job number(s)) in conjunction with this job/application.
☐ Yes    ☒ No        *If yes, provide BIS job number(s) below:*

| | | | | |
|---|---|---|---|---|
| | | | | |

**Other (demolition, sign, fence, etc.):** I hereby state that other work has been performed (under separate job number(s)) in conjunction with this job/application.
☒ Yes    ☐ No        *If yes, provide BIS job number(s) below:*

| 320932452 | 320376847 | 301270050 | | |
|---|---|---|---|---|
| 320932461 | 301680517 | | | |

---

**4 | Verification of NB/Alt-1 Job Filing Data** *Required for all applications.*

I hereby state that all job filing data (i. e. address, block, lot, Schedule A, etc.) is accurate in the Building Information System (BIS).
I am aware that this data will appear on the Certificate of Occupancy:  ☒ Yes  ☐ No
*To review job data, please refer to the CP Preview Page on BISWeb.*

00250
4/11

*Table of Contents*
*Writ Petition 2022*

*Motion in Limine & NY COA Rulings*



A153



THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF PROFESSIONAL DISCIPLINE
(212) 951-6972

1411 BROADWAY - TENTH FLOOR
NEW YORK, NEW YORK 10018

March 1, 2013

Mahmood Yoomessi, Physician
REDACTED

Re: Application for Restoration

Dear Dr. Mahmood:

Enclosed please find the Commissioner's Order regarding Case No. CP-11-26, which is in reference to the restoration of license number 310221. This order and any decision contained therein goes into effect five (5) days after the date of this letter.

Very truly yours,

LOUIS J. CATONE, Director
Office of Professional Discipline

By: REDACTED

ARIANA MILLER
Supervisor

DD/AM/nbm
Enclosure
**CERTIFIED MAIL - RRR**
cc

A1**

Petitioner's "Motion in Limine  to Exclude All MBOC Submissions"

00252

1  Mahmood Yoonessi

2  6790 Crest Rd,

3  Rancho Palos Verdes Ca 90275

4  Myoonessi75@gmail.com

5  Ph; 310-303-1671

6

7  Mahmood Yoonessi,Myoonessi,MD PC,

8  Applicants,petitioner and counter

9  claimant

10                    V

11 Medical Board of California,William

12 Prasifka,D.K Kredentser,Barbara

13 Yaroslavsky ,Andrew Cuomo, State

14 University of New York at Buffalo all

15 individually and Does 1-50

16 Enforcers /Respondents

**FILED**

**OCT 2 8 2021**

Office of Administrative Hearings
By_____

Case No.:OAH 2021080903

MBOC;800-2020-073101

Pleading Title;Motion in limine

To exclude all MBOC submissions

Previously ordered excluded by NY

Appellate division D&O:Grp1.A482-
A3367,Grp2;A1714-A3562,Grp3;A2087-
A3466,Grp 4;A456-A3368,Grp5;A3639—
A3678) EX A; pg's000004- 000136

Before Hon Chief ALJ J.Schlichtmann

16 **Introduction**

17 Petitioner received a Notice of hearing (G.C 11509); hearing date set

18 11/18/2021.pursuant to; Ca Gov Code (GC 11509).In relevant parts the GC 11509

19 states:

20 "...You are entitled to represent yourself without legal counsel. You may present any

21 relevant evidence, and will be given full opportunity to cross-examine all witnesses

22 testifying against you. You are entitled to the issuance of subpoenas to compel the

23 attendance of witnesses and the production of books, documents or other things by

24 applying to MBOC/OAH":

25 The Medical Board of California (hereafter MBOC) has produced two sets of

26 documents, not accessible online:

27 One Set of documents   fastened starts with a cover page dated May 14, 2021;

28 labeled" Discovery Production, MBOC case No;800-2020-073101.

1

00253

000012

1 .The next set labeled MBOC starts With Attachment No 10.

2 Relevant evidence, completing the records is submitted (Pages 000001-00000518.

3

4 These documents are not paginated they are not certified. A certification

5

6 The attachments No 18 and 19 are accompanied by a document under the heading

7 of MBOC; Enforcement Program, carries Governor Gavin Newsom's name, is signed

8 not sworn to   Mr. William Prasifka.

9

10 The documents submitted by honorable Brenda Reyes is objected to and a motion in

11 limine is filed.

12 Accepting the documents correcting, completing MBOC's s, is requested and this

13 motion in limine is filed on the following grounds:

   A. Documents submitted by MBOC are deceptive ,Constitute "Manufactured

   B. And altered ones (18 USCA 1519); not a "Certified copy of the enclosures",

   C. It contains a long list of accusations prepared by Atty "Peter Van Buren"

      dated Nov 26,2011who never appeared in the case before honorable Justice

      Glownia  or who Stayed the Summary suspension,or original NY panel,

   D. It is attributed to Dr John Choate :dated6/5/2002Who died shortly thereafter

      and the cause of his death was never disclosed(?Murder,?Suicide),

   E. It refers to the case of patient A; whose record was never before the original

      panel. Her demise was attributed to the insertion of  a right femoral arterial

      line, damaging her vascular graft by Dr Stephen R.Goodnough ,with history

      of Drug addiction(murder no 1),

   F. It refers to Patient E; whose record was not before panel , coroner reported

      the cause of her death as : Morphine Intoxication, the expert and panel

      disputed that ;reported it as a Septic Shock despite the fact her cultures were

      all negative,

2

G. It refers to the case of patient B and her chemotherapy of the years 1989-1995;her record produced was from1996,

H. It refers to the case of Patient C and lists her death from metabolic derangement due to ovarian cancer; her autopsy report shows she had 2000 ml blood in her R Pleural cavity as a direct result of a "Thoracentesis",

I. It also includes references to Patient K.Kaiser (#10) , J.M.Lemons ,and M.R (M.Rataczak)whose records were never produced.In support of this request a Memorandum of Law and supporting documents/Exhibits are submitted

Respectfully submitted;

Mahmood Yoonessi

6790 Crest Rd,

Rancho Palos Verdes Ca 90275

Myoonessi75@gmail.com

Ph; 310.303-1671

| | |
|---|---|
| Mahmood Yoonessi,Myoonessi,MD PC, Applicants,petitioner and counter claimant<br><br>V<br><br>Medical Board of California,William Prasifka,D.K Kredentser,Barbara Yaroslavsky ,Andrew Cuomo, State University of New York at Buffalo all individually and Does 1-50 Enforcers /Respondents | Case No.:OAH 2021080903<br>MBOC;800-2020-073101<br>Pleading Title;MOL in support of Motion in limine To exclude all MBOC submissions Previously ordered excluded by NY Appellate division D&O;Grp1.A482-A3367,Grp2;A1714-A3562,Grp3;A2087-A3466,Grp 4;A456-A3368,Grp5;A3639—A3678) EX A; pg's000004- 000136<br>Before Hon Chief ALJ J.Schlichtmann |

3

1  In U.S. law, a **motion** *in limine* (Latin: [ɪn ˈliːmɪne]; "at the start", literally, "on the

2  threshold") is a motion, discussed outside the presence of the jury, to request that

3  certain testimony be excluded. A motion *in limine* can also be used to get a ruling to

4  allow for the inclusion of evidence. The motion is decided by a judge in

5  both civil and criminal proceedings. It is frequently used at pre-trial hearings or

6  during trial, and it can be used at both the state and federal levels.

7  The reasons for the motions are wide and varied, some arise under the Federal

8  Rules of Civil Procedure for failure to comply with discovery.[2] [3] [4]

9  Other proper subjects for motions in limine stem from the court's power to "Provide

10  for the orderly conduct of proceedings before it"[5] and to "[c]ontrol its process and

11  orders so as to make them conform to law and

12  Justice".[6][7] These procedural motions in limine may include motions to control the

13  conduct of the prosecutor,[8] motions for separate trials on counts, prior convictions,

14  and/or enhancements,[9] motions to control the courtroom environment,[10] motions

15  to control jury conduct,[11] and other such motions.

16  *Black's Law Dictionary* (8th ed. 2004) defines "motion *in limine*" as "a pretrial

17  request that certain inadmissible evidence not be referred to or offered at trial."

18  They are made "preliminary", and it is presented for consideration of the

19  judge, arbitrator or hearing officer, to be decided without the merits being reached

20  first.[12]:791

21  A motion *in limine* is distinct from a motion for a protective order, which is a

22  request to prevent the discovery of evidence, and a motion to suppress, which can be

23  raised by the defense in American criminal trials to prevent the admission of

24  evidence that was obtained unconstitutionally.

25

26  The courts in MBOC proceedings have indicated: Our inquiry commences with an

27  examination of the purpose and effect of a motion *in limine*. A "motion *in limine*" is

28                                      4

1  defined in Black's Law Dictionary (5 Ed. 1979) 914, as "[a] written motion which is
2  usually made before or after the beginning of a jury trial for a protective order
3  against prejudicial questions and statements * * * to avoid injection into trial of
4  matters which are irrelevant, inadmissible and prejudicial[,] and granting of [the]
5  motion is not a ruling on evidence and, where properly drawn, granting of [the]
6  motion cannot be error. *Redding* v. *Ferguson*, Tex. Civ. App. [1973], 501 S.W.2d 717,
7  724." It is noteworthy that the rationale of the *Redding* case, upon which Black's
8  Law Dictionary predicates its definition, has previously been adopted by this court.
9  See *State* v. *Maurer* (1984), 15 Ohio St.3d 239, 259.

10  As was recognized in *Riverside Methodist Hosp. Assn.* v. *Guthrie* (1982), 3 Ohio
11  App.3d 308, 310, although the motion receives widespread use in Ohio courts, "* * *
12  it is frequently misused and misunderstood. * * *" In *State* v. *Spar* (1976), 47 Ohio
13  App.2d 221 [1 O.O.3d 289], the court reasoned in paragraph one of the syllabus:
14  "As related to trial, a motion *in limine* is a precautionary request, directed to the
15  inherent discretion of the trial judge, to limit the examination of witnesses by
16  opposing counsel in a specified area until its admissibility is determined by the
17  court outside the presence of the jury." The power to grant the motion is not
18  conferred by rule or statute, but instead lies within the inherent power and
19  discretion of a trial court to control its proceedings. *Id.* at 224. *Riverside Methodist
20  Hosp. Assn.* v. *Guthrie, supra*, at 310. See, also, Evid. R. 103(A) and 611(A). The
21  function of the motion as a precautionary instruction is to avoid error, prejudice,
22  and possibly a mistrial by prohibiting opposing counsel from raising or making
23  reference to an evidentiary issue until the trial court is better able to rule upon its
24  admissibility outside the presence of a jury once the trial has commenced. In this
25  sense, use of the motion serves the interests of judicial economy, as well as the
26  interests of counsel and the parties, by helping to reduce the possibility of the
27  injection of error or prejudice into the proceedings. Accord Annotation (1975), 63
28  A.L.R. 3d 311.

5

1   ... The question necessarily arises whether the granting of a motion *in*
2   *limine* relieves opposing counsel of the burden of making a proffer of the evidence
3   when the issue becomes ripe for consideration during the course of the trial. Stated
4   otherwise, does the issuance of a motion *in limine*, in and of itself, preserve the
5   record for opposing counsel on appeal? We conclude that it does not, except where
6   the exclusion of the evidence affects a substantial right *and* the substance of the
7   excluded evidence is apparent from the context of questioning by counsel who later
8   seeks to predicate as error the exclusion of the evidence.
9   Cf. *State* v. *Gilmore* (1986), 28 Ohio St.3d 190.

10  ... Successfully Developing and Litigating Prosecution Errors at Trial & beyond a
11  criminal trial is not an experimental forum for prosecutors to test the outer limits of
12  ethical advocacy. "The prosecutor's job isn't just to win, but to win fairly, staying
13  well within the rules." (U.S.v. Kojayan (9th Cir. 1993) 8 F.3d 1315, 1323; italics
14  added.) "It's the easiest thing in the world for people trained in the adversarial
15  ethic to think a prosecutor's job is simply to win.' [Citation] It is not." (United States
16  v. Blueford (9th Cir. 2002) 312 F.3d 962, 968.) The function of the prosecutor under
17  the federal Constitution is not to tack as many skins of victims as possible to the
18  wall. His function is to vindicate the right of the people as expressed in the laws and
19  give those accused of crime a fair trial." (Donnelly v. DeChristoforo (1974) 416 U.S.
20  637. 648-49 (dis.opn. of Douglas, J.).) "[S]trict adherence to the rules of evidence and
21  appropriate prosecutorial conduct is required to ensure a fair trial." (Martin v.
22  Parker (6th Cir. 1993) 11 F.3d 613, 616-617.) "A prosecutor is held to a standard
23  higher than that imposed on other attorneys because of the unique function he or
24  she performs in representing the interests, and in exercising the sovereign power, of
25  the state." (People v. Roldan (2005) 35 Cal.4th 646, 719 (quotations and citations
26  omitted.) Charles M. Sevilla Law Office of Charles Sevilla 402 West Broadway,
27  Suite 720 San Diego, CA 92101

28                                    6

00258

000017

...Wrongly convicted Database Record: IN Re Sodersten, 146 Cal.App.4th

1163(Cal.Ct.App.2007)California Court of Appeal

ARDAIZ, P.J.More than 20 years ago, petitioner Mark Collin Sodersten was

convicted of the special circumstance murder of Julie Wilson and related offenses.

... When a defendant is convicted, we conclude that the jury has resolved what the

truth is for purposes of imposing the consequences the law demands. In that sense,

a trial is a search for the truth (See, e.g., *Arizona v.*

*Fulminante* (1991) 499 U.S. 279, 295, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (dis. opn. of

White, J.).) However, what is fundamental to this search is that it "is not served but

hindered by the concealment of relevant and material evidence." (*In re*

*Ferguson* (1971) 5 Cal. 3d 525, 531, 96 Cal. Rptr. 594, 487 P.2d 1234.) If we expect

jurors to do their job, they must be presented with all the evidence that is relevant

and legally admissible for them to consider. It is then their duty to sift through that

body of evidence to resolve what they can accept and believe. The withholding of

admissible evidence from them can result in them drawing wrong conclusions and

can undermine the certainty of their belief in other evidence that never had to be

reconciled with the undisclosed information.

For the public to have confidence in the result, they must have confidence in the

process. As the United States Supreme court has observed. "Society wins not only

when the guilty are convicted but when criminal trials are fair; our system of the

administration of justice suffers when any accused is treated unfairly." (*Brady v.*

*Maryland* (1963) 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L.Ed.2d 215. *(Brady).)*

...This case calls to account the American system of justice. For that system to have

credibility we must respond....

... *Defense:* Defendant did not testify on his own behalf. Defense counsel offered the

testimony of defense witnesses to (1) establish an alibi for defendant on the night

Julie Wilson was murdered; (2) show Mark Dare, rather than defendant, was Julie

Wilson's killer; and (3) impeach various pieces of prosecution evidence.

7

... This case raises the one issue that is the most feared aspect of our system—that an innocent man might be convicted. While that consequence unfortunately does occur in the most protective justice system ever devised by man, it cannot be allowed to occur as a result of a dereliction of their duty by law enforcement and prosecutorial authorities sworn to protect that system. And, it should not be cloaked in silence if scrutiny by the justice system is to stand as a reminder of that duty." (In re Sodersten, 53 Cal.Rptr.3d 572, 146 Cal.App.4th 1164, 146 Cal.App.4th 1163 (Cal.App. Dist.5 01-17-2007))"

... Perjured testimony by the State's star eyewitness and the prosecution's failure to disclose four exculpatory audio tapes of witness interviews.

... "On January 17, 2007 the California Court of Appeals granted Sodersten's habeas petition and posthumously vacated his conviction."

...Even under such circumstances, however, a court retains discretion to apply an exception to the rules regarding mootness. (See In re Jackson, supra, 39 Cal.3d at p. 468, fn. 3, 216 Cal.Rptr. 760, 703 P.2d 100.) Thus, "[w]here questions of general public concern are involved, particularly in the area of the supervision of the administration of criminal justice, we may reject mootness as a bar to a decision on the merits. [Citations.]" (In re Walters (1975) 15 Cal.3d 738, 744, 126 Cal.Rptr. 239, 543 P.2d 607; see also In re Newbern (1961) 55 Cal.2d 500, 505, 11 Cal.Rptr. 547, 360 P.2d 43.) "Review of a moot issue is appropriate where it is 'of great public import and transcend[s] the concerns of these particular parties.' [Citation.] Even when moot, a novel question of continuing public interest is often deserving of consideration by an appellate court [Citations.]" (In re Stevens (2004) 119 Cal.App.4th 1228, 1232, 15 Cal.Rptr.3d 168; see In re William M. (1970) 3 Cal.3d 16, 23-24, 89 Cal.Rptr. 33, 473 P.2d 737.)

**Brady and Bagley violations:**

00260

000019

1  We turn now to the effect of the prosecution's failure to disclose the four tapes.  "A
2  Brady violation occurs when the government fails to disclose evidence materially
3  favorable to the accused.  [Citation.]"  (Youngblood v. West Virginia (2006) 547
4  U.S. 867, 869, 126 Sc.D. 2188, 2190, 165 L.Ed.2d 269; Brady, supra, 373 U.S. at p.
5  87, 83 Sc.D. 1194.)  "The Brady rule is based on the requirement of due process.
6  Its purpose is not to displace the adversary system as the primary means by which
7  truth is uncovered, but to ensure that a miscarriage of justice does not occur.
8  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but
9  only to disclose evidence favorable to the accused that, if suppressed, would deprive
10 the defendant of a fair trial."  (United States v. Bagley (1985) 473 U.S. 667, 675,
11 105 Sc.D. 3375, 87 L.Ed.2d 481, fans. omitted (Bagley); see In re Ambler (1963) 60
12 Cal.2d 554, 567-568, 35 Cal.Rptr. 293, 387 P.2d 6.)    The Brady duty extends to
13 evidence that is both favorable to the accused and material either to guilt or to
14 punishment (Bagley, supra, at p. 674, 105 S.Ct. 3375; Brady, supra, at p. 87, 83
15 S.Ct. 1194), and to impeachment evidence as well as to exculpatory evidence
16 (Youngblood v. West Virginia, supra, 547 U.S. at p. 870, 126 S.Ct. at p. 2190;
17 Bagley, supra, at p. 676, 105 S.Ct. 3375; see Giglio v. United States (1972) 405 U.S.
18 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104).    Because "the individual prosecutor has a
19 duty to learn of any favorable evidence known to the others acting on the
20 government's behalf in the case, including the police" (Kyles v. Whitley (1995) 514
21 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (Kyles)), "Brady suppression occurs
22 when the government fails to turn over even evidence that is 'known only to police
23 investigators and not to the prosecutor'" (Youngblood v. West Virginia, supra, 547
24 U.S. at p. 870, 126 S.Ct. at p. 2190; Kyles, supra, at p. 438, 115 S.Ct. 1555).
25 Moreover, the duty to disclose exists regardless of whether there has been a request
26 by the accused, and the suppression of evidence that is materially favorable to the
27 accused violates due process regardless of whether it was intentional, negligent, or
28 inadvertent.  (People v. Salazar (2005) 35 Cal.4th 1031, 1042, 29 Cal.Rptr.3d 16,

9

00261

000020

1  112 P.3d 14; People v. Kasim (1997) 56 Cal.App.4th 1360, 1381, 66 Cal.Rptr.2d 494;

2  see Strickler v. Greene, supra, 527 U.S. at p. 275, fn. 12, 119 S.Ct. 1936; United

3  States v. Agurs, supra, 427 U.S. at p. 107, 96 S.Ct. 2392; Brady, supra, 373 U.S. at p.

4  87, 83 S.Ct. 1194.)

5  The United States Supreme Court has observed:

6  "Four aspects of materiality under Bagley bear emphasis.    Although the

7  constitutional duty is triggered by the potential impact of favorable but undisclosed

8  evidence, a showing of materiality does not require demonstration by a

9  preponderance that disclosure of the suppressed evidence would have resulted

10  ultimately in the defendant's acquittal ....    A 'reasonable probability' of a different

11  result is accordingly shown when the government's evidentiary suppression

12  'undermines confidence in the outcome of the trial.' [Citation.]

13  "The second aspect of Bagley materiality bearing emphasis here is that it is not a

14  sufficiency of evidence test.    ....    One does not show a Brady violation by

15  demonstrating that some of the inculpatory evidence should have been excluded,

16  but by showing that the favorable evidence could reasonably be taken to put the

17  whole case in such a different light as to undermine confidence in the verdict.

18  "Third, ., once a reviewing court applying Bagley has found constitutional error

19  there is no need for further harmless-error review.    ...

20  "The fourth and final aspect of Bagley materiality to be stressed here is its

21  definition in terms of suppressed evidence considered collectively, not item by item."

22  (Kyles, supra, 514 U.S. at pp. 434-437, 115 S.Ct. 1555, fns. omitted.)

23  Fabricated Evidence Law and Legal Definition; Fabricated Evidence is fictitious

24  testimony or documents offered to a court or jury in order to mislead them.

25  Fabricating evidence involves arranging or manufacturing circumstances or

26  evidences    , after the act is committed with the intention to use them as evidence

27  and make it appear accidental. Such evidence may be wholly forged and artificial, or

28                                      10

1  it may consist in so warping and distorting real facts to create, quotings

2  favorably Ricciuti v. New York City Transit Authority (2d Cir. 1997) 124 F.3d 123, 130.)

3  **Sources and Authority**

4  • "Substantive due process protects individuals from arbitrary deprivation of their

5  liberty by government." (Costanich v. Dep't of Soc. & Health Servs. (9th Cir. 2010)

6  627 F.3d 1101, 1110.)

7  • "[T]here is a clearly established constitutional due process right not to be subjected

8  to criminal charges on the basis of false evidence that was deliberately fabricated by

9  the government." (Devereaux v. Abbey (9th Cir. 2001) 263 F.3d 1070, 1074–1075.)

10 • "In order to prevail on a judicial deception claim, a plaintiff must prove that '(1)

11 the defendant official deliberately fabricated evidence and (2) the deliberate

12 fabrication caused the plaintiff's deprivation of liberty.'" (Keates v. Koile (9th Cir.

13 2018) 883 F.3d 1228, 1240.)

14 • "To establish causation, [plaintiff] Mahmood Yoonessi and Myoonessi MD PC must

15 raise a triable issue that the fabricated evidence was the cause in fact and

16 proximate cause of his injury. Like in any proximate cause analysis, an intervening

17 event may break the chain of causation between the allegedly wrongful act and the

18 plaintiff's injury." (Caldwell v. City & County of San Francisco (9th Cir. 2018) 889

19 F.3d 1105, 1115, internal citation omitted.)

20 …Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a

21 police officer's fabrication and forwarding to prosecutors of known false evidence

22 works an unacceptable "corruption of the truth-seeking function of the trial

23 process." [Citations.]'" (Ricciuti, supra, 124 F.3d at p. 130.)

24 … These are questions of fact which defendants appear to concede are material to

25 the issue of causation, and which cannot be determined without weighing the

26 evidence presented and conclusions reached at the preliminary hearing. Defendants'

27 statement of undisputed facts does not establish lack of causation as a matter of

28 law." (Kerkeles, supra, 199 Cal.App.4th at p. 1013.)

11

:00263

000022

1 • "There is no authority for defendants' argument that a due process claim cannot be
2 established unless the false evidence is used to convict the plaintiff. ... [T]he right to
3 be free from criminal charges, not necessarily the right to be free from conviction, is
4 a clearly established constitutional right supporting a section 1983 claim."
5 (Kerkeles, supra, 199 Cal.App.4th at p. 1010.)
6 • "[T]here is no such thing as a minor amount of actionable perjury or of false
7 evidence that is somehow permissible. Why? Because government perjury and the
8 knowing use of false evidence are absolutely and obviously irreconcilable with
9 the Fourteenth Amendment's guarantee of Due Process in our courts.
10 ...There are no circumstances in a dependency proceeding that would permit
11 government officials to bear false witness against a parent." (Hardwick v. County of
   Orange (9th Cir. 2017) 844 F.3d 1112, 1119.)
12 • "[T]o the extent that [plaintiff] has raised a deliberate-fabrication-of-evidence
13 claim, he has not adduced or pointed to any evidence in the record that supports it.
14 For purposes of our analysis, we assume that, in order to support such a claim,
15 [plaintiff] must, at a minimum, point to evidence that supports at least one of the
16 following two propositions: (1) Defendants continued their investigation of [plaintiff]
17 despite the fact that they knew or should have known that he was innocent; or (2)
18 Defendants used investigative techniques that were so coercive and abusive that
19 they knew or should have known that those techniques would yield false
20 information." (Devereaux, supra, 263 F.3d at p. 1076.)
21 • "[T]he Constitution prohibits the deliberate fabrication of evidence whether or not
22 the officer knows that the person is innocent. The district court erred by granting
23 judgment as a matter of law to Defendants because, in this case involving direct
24 evidence of fabrication, Plaintiff was not required to show that [defendant] actually
25 or constructively knew that he was innocent." (Spencer v. Peters (9th Cir. 2017) 857
26 F.3d 789, 800, internal citations omitted.)
27
28                                      12

1    • "The Devereaux test envisions an investigator whose unlawful motivation is
2    illustrated by her state of mind regarding the alleged perpetrator's innocence, or
3    one who surreptitiously fabricates evidence by using coercive investigative methods.
4    These are circumstantial methods of proving deliberate falsification. Here,
5    [plaintiff] argues that the record directly reflects [defendant]'s false statements. If,
6    under Devereaux, an interviewer who uses coercive interviewing techniques that
7    are known to yield false evidence commits a constitutional violation, then an
8    interviewer who deliberately mischaracterizes witness statements in her
9    investigative report also commits a constitutional violation (K..... attributing
10   Plaintiffs of affirmative to answer to Donovan's irrelevant claim of PDR failure to
11   admit the usefulness of 5 FU, Methotrexate, Cytoxan, Vepesid in Ovarian cancer
12   Chemotherapy). Similarly, an investigator who purposefully reports that she has
13   interviewed witnesses, when she has actually only attempted to make contact with
     them, deliberately fabricates evidence." (Costanich, supra, 627 F.3d at p. 1111.)
14   • "[N]ot all inaccuracies in an investigative report give rise to a constitutional claim.
15   Mere 'careless[ness]' is insufficient, as are mistakes of 'tone.' Errors concerning
16   trivial matters cannot establish causation, a necessary element of any § 1983 claim.
17   And fabricated evidence does not give rise to a claim if the plaintiff cannot 'show the
18   fabrication actually injured her in some way.'" (Spencer, supra, 857 F.3d at p. 798,
19   internal citations omitted.)
20   • "In light of long-standing criminal prohibitions on making deliberately false
21   statements under oath, no social worker could reasonably believe that she was
22   acting lawfully in making deliberately false statements to the juvenile court in
23   connection with the removal of a dependent child from a caregiver." (Marshall v.
24   County of San Diego (2015) 238 Cal.App.4th 1095, 1113 [190 Cal.Rptr.3d 97],
     footnotes omitted.)
25   • "[P]retrial detention can violate the Fourth Amendment not only when it precedes,
26   but also when it follows, the start of legal process in a criminal case. The Fourth
27

28                                        13

··00265

··· 000024

Amendment prohibits government officials from detaining a person in the absence
of probable cause.

... Then, too, a person is confined without constitutionally adequate justification."
(Manuel v. City of Joliet (2017) — U.S. — [137 S.Ct. 911, 918, 197 L.Ed.2d 312],
internal citation omitted.)

•"Deliberately fabricated evidence in a prosecutor's file can rebut any presumption
of prosecutorial independence [i.e., that filing of a criminal complaint immunizes
investigating officers because it is presumed that the prosecutor filing the complaint
exercised independent judgment in determining that probable cause for an
accused's arrest exists at that time]. ... In sum, if a plaintiff establishes that officers
either presented false evidence to or withheld crucial information from the
prosecutor, the plaintiff overcomes the presumption of prosecutorial independence
and the analysis reverts back to a normal causation question." (Caldwell, supra, 889
F.3d at p. 1116, internal citation omitted.

Impression in the minds of those who observe them as true and genuine.

Wherefore; Petitioner most respectfully request the Hon Presiding ALJ to order
MBOC's abuse of the process and misuse of records never submitted in New York
and deleted before the NY Court of appeal

Respectfully submitted; dated 10/21/2021

Mahmood Yoonessi

6790 Crest Rd,

Rancho Palos Verdes Ca 90275

Myoonessi75@gmail.com

Ph; 310.303-1671

14

•  ·00266

··  000025

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658

04/21/2021  13:46     4242069843              M YOONESSI  SV                              PAGE 02/11

*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*                            JUN 2 0 2003

Decided and Entered: June 20, 2003                      Case # 92009

In the Matter of MAHMOOD
YOONESSI,                                    DECISION AND ORDER
                          Petitioner,             ON MOTION

     v
STATE BOARD FOR
PROFESSIONAL MEDICAL
CONDUCT et al.,
                          Respondents.

Motion to strike portions of appendix and for further relief.

Upon the papers filed in support of the motion and the papers filed in opposition
thereto, it is

ORDERED that the motion to strike portions of the appendix is granted, without
costs, to the extent that the following pages in the appendix and all references thereto in
petitioner's brief are stricken:

Group 1. Pages A482, A488, A493, A509, A513, A549, A574, A776, A879 -
A908, A911, A913, A914, A946, A1031, A1054, A1093, A1094, A1114, A1204, A1325
- A1365, A2384 - 2390, A2401, A2402, A2404, A2409, A2417, A2418, A2421, A2434,
A2435, A2439 - A2442, A2454, A2500 - A2506, A2533 - A2542, A2563 - A2572,
A2602, A2662 - A2666, A2675 - A2699, A2709, A2727, A2736, A2807- A2832, A2837
- A2841, A2850, A2864, A2988, A2989, A3059 - 3066, A3365 - A3367.

Group 2. Pages A1714 - A1776, A2132 - A2140, A2148 - A2151, A2153 -
A2160, A2166 - A2168, A2242 - A2251, A2253, A2255 - A2272, A2280 - A2283,
A2286 - A2297, A2302 - A2308, A2314 - A2316, A2319 - A2323, A2328 - A2330,
A2330 - A2531, A3386 - A3427, A3437, A3555 - A3562.

Group 3. Pages A2087, A2089 - A2105, A2115 - A2131, A2146, A2165, A2652 -
A2653, A3430 - A3436, A3438 - A3440, A3442 - A3446, A3449 - A3466.

Group 4. Pages A455, A1009, A1206, A1429, A1510, A1777, A2086, A2106,
A2114, A2141, A2144, A2147, A2152, A2161, A2348, A2382, A2399, A2472, A2582,
A2654, A3009, A3152, A3278, A3368.

Group 5. Pages A3639 - A3678. Petitioner shall file and serve a corrected brief
and appendix on or before July 7, 2003, and it is further

ORDERED that the proceeding is removed from the September 2003 term and set
down for the October 2003 term, and it is further

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658
04/21/2021   13:46    4242069843           M YOONESSI  3V                        PAGE 03/11

ORDERED that respondent's time to file and serve their brief is extended to
August 1, 2003.

CARDONA, P.J., PETERS, MUGGLIN, ROSE and LAHTINEN, JJ., concur.

ENTER:

Michael J. Novack
Clerk of the Court

ASSOCIATED REPORTERS INT'L., INC.    12/03/2001, Buffalo, NY, In the Matter of M. Yoonessi MD

```
 1            MR. COLLINS:   I just want to be clear

 2    that in other words that the documents -- some

 3    of the documents that have now been received

 4    into evidence are not the same -- I just want

 5    to be clear -- not the same as the documents

 6    that were provided either to your office or

 7    Tarantino's office.

 8            MR. DONOVAN:   No, they're the same.

 9    The committee members will be getting fewer

10    pages.  You'll see in some of them --

11            MR. COLLINS:   Judge, you just

12    instructed him -- excuse me.  I didn't mean to

13    interrupt you.

14            MR. DONOVAN:   No.  Go ahead.

15            MR. COLLINS:   So we're going to be

16    getting a list from Mr. Donovan of those pages

17    that have been removed from the exhibits.

18            ALJ TROST:   Before you leave, you can

19    get that list from him so you have it tonight,

20    but I ask you to prepare a better list for

21    tomorrow for the panel members, as well.

22            MR. DONOVAN:   Right.

23            ALJ TROST:   He's speaking about the

24    copies that the panel members take home with

25    them.
```

00269

000028

Table of Contents
Writ Petition 2022

Decision & order of ALJ Cox

## BEFORE THE
## MEDICAL BOARD OF CALIFORNIA
## DEPARTMENT OF CONSUMER AFFAIRS
## STATE OF CALIFORNIA

### In the Matter of the Petition for Reinstatement by:

### MAHMOOD YOONESSI, Petitioner.

### Agency Case No. 800-2020-073101

### OAH No. 2021080903

### PROPOSED DECISION

Administrative Law Judge Juliet E. Cox, State of California, Office of Administrative Hearings, heard this matter on November 18, 2021, by videoconference.

Petitioner Mahmood Yoonessi was present for the hearing, representing himself.

Deputy Attorney General Brenda P. Reyes represented the Department of Justice, Office of the Attorney General.

The matter was submitted for decision on November 18, 2021.

### FACTUAL FINDINGS

1. Petitioner Mahmood Yoonessi received Physician's and Surgeon's Certificate No. C 50545 on March 1, 2001. The Medical Board of California (Board)

revoked this certificate effective June 23, 2003, as described more fully below in Findings 6 and 7.

    2.     In September 2020 petitioner applied for reinstatement of his revoked certificate.

## Education and Professional Experience

    3.     Petitioner graduated from medical school in 1965. He immigrated to the United States after receiving his medical degree, and completed a postgraduate internship and residency in obstetrics and gynecology in 1973.

    4.     Petitioner became board-certified in gynecology 1975, and received a certificate of special competence in gynecologic oncology in 1980.

    5.     Petitioner practiced as a gynecologist in Buffalo, New York, between 1976 and 2002. He has not practiced medicine since 2002.

## Disciplinary Actions

    6.     The New York State Board of Professional Medical Conduct revoked petitioner's New York medical license in June 2002, upon findings that petitioner had committed gross negligence in treating several patients. In addition, the New York State Board of Professional Medical Conduct found that petitioner had committed fraud and acts of "moral unfitness," and described him as "beyond rehabilitation."

    7.     The Board revoked petitioner's California physician's and surgeon's certificate, as described in Finding 1, because of the New York action described in Finding 6.

    8.     Petitioner has not been reinstated to medical licensure in any state.

00271

000002

## Rehabilitation

9.     Petitioner presented no evidence of rehabilitation. Instead, petitioner testified to the effect that he continues to believe that he was and is a brilliant physician who has experienced great injustice.

## Professional References

10.    Petitioner presented a letter of support from his wife, Shams Alemozzafar, M.D., who believes that petitioner "deserves the relief after two decades of Punishments." Petitioner also presented a letter of support from a medical school classmate, Houshang Moayeri, M.D. Dr. Moayeri expresses no knowledge about why petitioner lost his New York or California medical licenses, but describes petitioner as "a Physician of the highest moral Character, who has dedicated his life to the Science and practice of Gynecologic Oncology."

## LEGAL CONCLUSIONS

1.     The matters stated in Findings 1, 2, 6, and 7 establish petitioner's eligibility to apply for reinstatement. (Bus. & Prof. Code, § 2307, subd. (b)(1).) Petitioner bears the burden of proving, using clear and convincing evidence, that the public interest favors the Board's permitting him to resume the practice of medicine.

2.     In determining whether to grant the petition, the Board may consider all of petitioner's activities before and since his license revocation, as well as the reasons for revocation, his rehabilitative efforts, and his professional ability. (Bus. & Prof. Code, § 2307, subd. (e).)

3

**00272**

000003

3.      In light of the matters stated in Findings 6 and 8, the matters stated in
Findings 9 and 10 do not establish petitioner's rehabilitation. He must not practice
medicine.

## ORDER

The petition by Mahmood Yoonessi for reinstatement of his revoked physician's
and surgeon's certificate is denied.

DATE:   12/01/2021

*Juliet C. Cox*

JULIET E. COX

Administrative Law Judge

Office of Administrative Hearings

4

*Table of Contents*
*Writ Petition 2022*

*NYOPMC ,Ohio & Chase manufactured Evidence*

78

Inter.m Reappointment

Organization: _At Joseph Hosp_

000204

Name: _Mahmood Nooress. M.J_

**~~INITIAL/SICKNESS:~~** If any of the following questions are answered _YES,_ please provide a full ~~explanation on a separate sheet of paper.~~ [Please provide a copy of current health ~~assessment, including PPD testing, completed within past 12 months]~~

Date of last Health Assessment on file: _____

Date of last PPD Testing on file: (7) Skin test    Results: _had BCG before_

1. Have you ever had, or are currently under treatment for a physical or mental health condition, including alcohol or drug dependence, that affects or is reasonably likely to affect your ability to perform professional or medical staff duties appropriately?
   ☐ Yes    ☒ No

2. Have you at any time since your last (re) appointment been hospital or received any other type of institutional care for health problems?    ☐ Yes    ☒ No

ADDITIONAL COMMENTS:

_____

_____

~~DISCIPLINARY ACTIONS:~~ Since your last (re)appointment, have any of the following ever been, or are any currently in the process of being, involuntarily denied, revoked, suspended, reduced, limited, placed on probation, not renewed, or voluntarily relinquished in this state or in any other state. If YES, please provide a **full explanation** on a separate sheet of paper.

|  |  | Yes | No |
|---|---|---|---|
| 1. | Medical license in New York State or any other state? | ☐ | ☒ |
| 2. | DEA Registration? | ☐ | ☒ |
| 3. | Academic appointment? | ☐ | ☒ |
| 4. | Membership or affiliation on any health care facility staff? | ☐ | ☒ |
| 5. | Clinical Privileges in any health care facility? | ☐ | ☒ |
| 6. | Prerogatives/rights on any health care facility staff? | ☐ | ☒ |
| 7. | Professional society membership or fellowship board certification? | ☐ | ☒ |
| 8. | Any other type of professional sanction? | ☐ | ☒ |
| 9. | Professional Liability Insurance? | ☐ | ☒ |
| 10. | Have there been any misdemeanor or felony criminal charges brought against you? | ☐ | ☒ |
| 11. | Any professional misconduct proceedings or findings? | ☐ | ☒ |
| 12. | Have there been any previously successful or currently pending challenges to any licensure or registration (state or district, DEA) or the voluntary/involuntary relinquishment of such licensure or registration? | ☐ | ☒ |

PRIVILEGES:

|  | Yes | No |
|---|---|---|
| Do you wish to request any change (addition/deletion) from current privileges? | ☐ | ☒ |

If yes, please indicate: _____

455

000212

**Obstetrics and Gynecology**

255 Linwood Avenue
Buffalo, New York 14209

Office: 716-884-3945
Fax:   716-884-3946

File: _____ Name: Joan _____   Age: 60 ys. D.O.B.: _____

Race: B (W) As AI   Referred By: Dr. _____   1st visit: ☐   Revisit: ☒

Reason For Visit: _____

| Past Hx | Medical: H.D. ☐ H.C.V.D. ☐ | Surgical: A.P.P. ☐ T&A ☐ Chol | Gyn: A.H. ☐ V.H. ☐ |
|---|---|---|---|
| | | | U.S.O. ☐ B.S.O. ☐ L.N.I. ☐ |
| | | | V ( ) ☐ |

Menstrual formula: age 12   Last Menstrual Period: 1974   Previous Menstrual Period: _____
Allergies: Codeine   Last Pap: _____   Last Wt. Check _____ Last Mammogram: _____
Medications: _____

Chemotherapy: ActD ☐ Adria ☐ Bleo ☐ CP ☐ CTX ☐ DDP ☐ DTIC ☐ 5Fu ☐ Hydrea ☐ IF ☐ MTX ☐ VCR ☐ VP16 ☐
Depo-Provera ☐ Ergamison ☐ Interferon ☐ Others _____

Height ____ Weight ___ lbs. BP ___/___ MMHG PR ___/min. RR ___/min. Temperature _____

| | | NEG | NORM | Abent | CLEAR | Cyst. Ch | Masses | SOFT | Describe Findings |
|---|---|---|---|---|---|---|---|---|---|
| General Appearance | 1 | | ✗ | | | | | | |
| SKIN | 2 | ✓ | | | | | | | |
| HEAD AND NECK | 3 | ✓ | | | | | | | |
| E.N.T | 4 | ✓ | | | | | | | |
| CHEST & LUNGS | 5 | | | | ✗ | | | | |
| HEART | 6 | | ✓ | | | | | | |
| R. BREAST | 7 | ✓ | | | | | | | |
| L. BREAST | 8 | ✓ | | | | | | | |
| ABDOMEN | 9 | | | | | | ✗ | ✓ | |
| LIVER/SPLEEN | 10 | ✓ | | | | | | | |
| LYMPH NODES | 11 | ✓ | | | | | | | |
| EXT. GENITALIA | 12 | ✓ | | | | | | | |
| URETHRA | 13 | ✓ | | | | | | | |
| RECTUM/ANUS | 14 | ✓ | | | | | | | |
| VAGINA | 15 | | ✓ | | | | | | |
| CERVIX | 16 | | | ✗ | | | | | |
| UTERUS | 17 | | | ✗ | | | | | |
| R. ADNEXA | 18 | | | ✗ | | | | | |
| L. ADNEXA | 19 | | | ✗ | | | | | |
| OTHERS, EXT | 20 | | | | | | | | ALOPECIA  YES   NO |

**LAB DATA**

CBC: wbc ___ hct: ___ plt: ___

U/A: gluc: ___ bld: ___ Ketone: nit: prot: ___ pH: ___ Leuco: ___

EKG:

CHEMISTRY

| ALP | | NA |
|---|---|---|
| BI | | PO4 |
| BUN | | SGOT |
| CA | | SGPT |
| CL2 | | TPROT |
| CO2 | | ALB |
| CR | | GLO |
| GLU | | UA |
| K | | CHOL |

**IMPRESSION:**
1. 60 yrs. old ___ female with problems: _____
2.

| DISPOSITION: | Lab Studies | EKG | Chemotherapy | off. proc | SURGERY, RT & OTHERS |
|---|---|---|---|---|---|
| ADMIT: | CBC, PL | PT | x-ray | H&N | ActD  DDP/MTX | Colp. | Type: AH(R-T).VH.USO.BSO.LND |
| Hospital: | SMA17 | PTT | CT | Chest | Adria  DTIC/VCR | Bx: Cx | S.STAG.L.SCOPE.V(R-P-T) |
| Return app. | CA125 | AFP | Scan | Abd | Bleo  5Fu  VP16 | Vag. V. | AN(G-L) |
| 1 2 3 4 5 6 7 8 9 | CEA | SCCA | US | Pelvis | CP  Hyd  Depo-P | Ut. Eco. | HOSP: Bgh.Dgh.Nfm.Olv.Stmh.Sh |
| 10 11 12 w. m. y. | HCG | | MRI | Oth | CTX  IF  Int. | LEEP | Sign: M.Yoonessi M.D. |

00275
00275

000131

Office AU #
Purchaser:
Purchaser Account: 6554221249
Operator I.D.: cs0122543
00 0808
11-24
121(8)
cs0124085
MAHMOOD YOONESSI

PAY TO THE ORDER OF   ***"LOS ANGELES COUNTY SUPERIOR COURT"***
***BY THE BENEFIT OF MAHMOOD YOONESSI (EXT. MON'***

**"Eighteen thousand dollars and no cents"***

**CASHIER'S CHECK**

SERIAL #:  0090802755
ACCOUNT#:  4861-505295

October 13, 2009

**"$18,000.00"**

WELLS FARGO BANK, N.A.
333 S SPRING ST
LOS ANGELES, CA 90013
FOR INQUIRES CALL: (480) 394-3122

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

VOID IF OVER US $  18,000.00
**NON-NEGOTIABLE**

**Purchaser Copy**

3)5

FCA262

MARINE MIDLAND PAYMENT SERVICES, INC.

No. W 0067860

10-2
220

University Gynecologists & Obstetricians

REMITTANCE FOR
Acct. #775-Special Fund"

June 17, 1988
DATE OF ISSUE
VOID AFTER ONE YEAR FROM DATE OF ISSUE

PAY

TO
THE
ORDER
OF

U.B. Foundation
Account #0310-198683

COPY — NOT NEGOTIABLE

AUTHORIZED SIGNATURE

NEG 4 WE 8087

PAYABLE THROUGH MARINE MIDLAND BANK, N.A.

447

00277

# CAPITAL DISTRICT
# HEMATOLOGY ONCOLOGY ASSOCIATES

317 South Manning Blvd • Suite 310 • Albany, New York 12208 • (518) 489-0044 • FAX (518) 489-3591

March 11, 2001



Kenneth J. Spooner
Assistant Director of Investigations
Office of Professional Medical Conduct
Department of Health, State of New York
433 River Street, Suite 303
Troy, New York 12180-2299

Re: OPMC Expert Review
    Mahmood Yoonessi, MD
    33D-BU-99-07-8437A

Dear Mr. Spooner,

Enclosed please find my completed report regarding the records of Dr. Yoonessi.  If you
have any questions, I can be reached at my office.

Yours truly,

Daniel C. Kredentser, MD



DANIEL C. KREDENTSER, MD, FRCSC, FACOG
Diplomate of the American Board of Obstetrics and Gynecology and Gynecologic Oncology

000014
00278

E193

[illegible]

10/24/97 Came to Unit, discussing [illegible] of [illegible] Category discharge. Dr. Cohen [illegible] of Pt in secretions & labored breathing. Dr. Cohen discussing pts condition & [illegible]. See flow sheet for details. Jennifer [illegible] RN

1100 VSS. Neuro status unchanged. Fa[mily] here. Pt will be transferred to ICC Unit. Jennifer [illegible] RN

10-24-97 Vs: Temp 37.3 BP 95/54

8pm entubated on venti mask
Receiving Morphine IV drip Infusion: at 4 mg/h
The order reads titrate to comfort; the nurse states it has not been titrated since 3 pm
Pupils: myotic
Chest: rhonchi both lungs fields
[illegible]
Abd soft
Last B.S.: 306 BUN 42
Na 149 Cl 114
Ca 7.3 Alb: 2.5↓

A 002941

Dr Cohen has convinced the family That Pt has a terminal condition. he has promised them that Morphine drip would be titrated to pain (which is not being done)
I have discussed options c̄ Pt's family: will transfer Pt to Dr Cohen's service, AV J. [redacted] states he understood from Dr Cohen that this is a case of Euthanasia, with [illegible] that he agrees

000150

000077

00279

# *State of New York*
## *Court of Appeals*

*Decided and Entered on the*
*ninth day of January, 2014*

**Present,** HON. JONATHAN LIPPMAN, *Chief Judge, presiding.*

---

SSD 78
In the Matter of Mahmood
Yoonessi,
         Appellant,
     v.
Merryl H. Tisch, et al.,
        Respondents.

---

    Appellant having appealed in the above title;

    Upon the papers filed and due deliberation, it is

    ORDERED, that the appeal is dismissed without costs, by the Court sua sponte, upon the ground that the order appealed from does not finally determine the proceeding within the meaning of the Constitution.

                         Andrew W. Klein
                         Clerk of the Court

2-13

00280

| Matter of Mahmood Yoonessi v Merryl H. Tisch |
|---|
| Motion No: |
| Slip Opinion No: 2014 NY Slip Op 60363 |
| Decided on January 09, 2014 |
| Court of Appeals Motion Decision |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This motion is uncorrected and subject to revision before publication in the Official Reports. |

## In the Matter of Mahmood Yoonessi,

### Appellant,

### v

## Merryl H. Tisch, et al.,

### Respondents.

Appeal dismissed without costs, by the Court sua sponte, upon the ground that the order appealed from does not finally determine the proceeding within the meaning of the Constitution.

DEPARTMENT OF HEALTH                    JUL 2 4 1998

**584 Delaware Avenue    Buffalo, New York 14202**

237

ra A. DeBuono, M.D., M.P.H.                              Karen Schimke
.mmissioner                                             Executive Deputy Commissioner

July 22, 1998

RECEIVED
JUL 2 9 1998

Mr. John Friedlander
Chief Executive Officer
CGF Health System
901 Washington Street
Buffalo, New York 14203

Re: Office of Professional Medical Conduct
Case #: 44B-BU-97-07-3161B
Patients: Johnee Mae Lemmons
Irene Kalcuzny – MR # 388-341
E.S. – MR # 1099960
Virginia Slesz – MR # 662526
Admission Date: 3/6/96
Carolyn Adesan – MR # 813967
Admission Date: 12/96
(Buffalo General Hospital)

Attending: Dr. Yooxessi

Dear Mr. Friedlander:

Pursuant to Section 230 of the Public Health Law, please provide this office by **August 5, 1998** with a complete, certified copy of the medical record of the patients named above (patient authorization is not required).

Please make a complete copy of the entire record, certify that it is a true, exact and complete copy, and forward to my attention. I can be reached at (716) 847-4326.

A certification form is enclosed for your convenience.

Sincerely,

Dorothy Ciccarella
Investigator
Office of Professional Medical Conduct

DC: cen
Enc.

7/29/98 Return Completed Information to
Michele Annunziata (Professional Affairs #

343 84                                              00282

*Table of Contents*
*Writ Petition 2022*
*The "Decision and Order of Hon Judge Glownia: ignored,

*The Unanimous vote of NYSt.Ed Dept 3 member Panel; ignored,

*The majority vote of NY COP; ignored,

*The manufactured NY Med License No; 310221, by Letitia James and William Prasifka's stands!



November 5, 2019

My Montecito VI, LLC
PO Box 12025
San Bernardino, CA 92423
Attn: Mr. Mahmood Yoonessi

Re:     Reference Number 200267387
        Property: 1804-1844 & 1813-1891,12th St.; 1812-1892 11th St
        Riverside, CA 92507

Dear Mr. Yoonessi:

We are responding to your October 23, 2019 complaint to the Consumer Financial Protection Bureau
(CFPB), about the loan application for your commercial property referenced above.

As a matter of clarification, please understand that the loan request that is the subject of your complaint
was not approved by Chase despite your contention to the contrary in your complaint submitted to the
CFPB.

While we regret that our loan declination letter of October 23, 2019 may have caused some confusion as
to the basis of the loan denial, please understand that during the course of our performing due diligence
while processing your loan request, we learned of significant negative information involving you, including
charges made against you that resulted in the loss of your license to practice medicine in the states of
New York, California and Texas. This information was carefully considered as part of our decision to
decline your loan request.

We are in the process of refunding in full, your loan application fee. If you have any further questions
regarding the loan denial, please contact the undersigned.

Sincerely,

Lynnette Antosh

Commercial Term Lending
Regional Sales Manager
(949) 475-7243

00283



B537



A Special Term of the New York State Supreme Court, at the Erie County Courthouse in the City of Buffalo on the 28 day of November 2001

STATE OF New York SUPREME COURT        COUNTY OF ERIE

MAHMOOD YOONESSI, MD.     ORDER TO SHOW

                                              CAUSE

        Petitioner,              [Index No. 11085-2001

    Vs.

ANTONIA C. NOVELLO, COMMISSIONER        New York STATE
DEPARTMENT OF HEALTH

                    Respondent,

Present Hon, Justice Joseph Glownia

        Upon reading and filing the verified petition of Mahmood Yoonessi, M.D. duly verified the 28th day of November, 2001, and the exhibits thereto, let the Respondent, Antonia C. Novello, Commissioner of the New York State Department of Health, show cause before this Court to be held in the County of Erie at the Erie County Courthouse Part 18 on December 14, 2001 at 9:30 am o'clock of the day or as soon thereafter as counsel can be head of judgment pursuant to Article 78 of the New York Civil Practice Law and Rules saying the summary suspension of Petitioner's medical license until a determination can be made of the charges lodged by Respondent Commissioner against Petitioner and for such other further and different relief as may be equitable, and it is

        ORDERED, that in the meantime and until the determination of the proceeding brought on by this order to show cause and verified petition, the Respondent Commissioner of the New York State Department of Health is hereby stayed enjoined, and restrained from enforcing the summary suspension of Petitioner's medical license and said suspension is in all respects stayed.

        Sufficient cause appearing therefore, let service of a copy of this order and the papers upon which it is based upon the Respondent pursuant to the provisions of Section 307 of the New York Civil Practice Law and Rules on or before the 80 day of November 2001 be deemed good and sufficient service thereof.

Signed this 28 day of November 2001, Buffalo New York.

ENTERED: Hon.Joseph Glownia     Justice Supreme Court     Erie County

GRANTED: Nov. 28, 2001

                    000317                                    B537    00284

                                                        000450



**151**

# The University of the State of New York

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF PROFESSIONAL RESPONSIBILITY
STATE BOARD FOR MEDICINE
-----------------------------------------X

In the Matter of the Application of

**MAHMOOD YOONESSI**

for the restoration of his license to
practice as a physician in the State of
New York.

-----------------------------------------X

**REPORT OF
THE PEER
COMMITTEE
CAL. NO. 22853**

MAHMOOD YOONESSI, hereinafter known as the applicant, was previously licensed to practice as a physician in the State of New York by the New York State Education Department on or about November 21, 1973.  Said license was revoked, effective June 13, 2002, by the Office of Professional Medical Conduct (OPMC), New York State Health Department (DOH), as the result of a professional misconduct proceeding.

The applicant has applied for restoration of his license.

## BACKGROUND INFORMATION

The written application, supporting papers provided by the applicant and papers resulting from the investigation conducted by the Office of Professional Discipline (OPD) have been compiled by the prosecutor from OPD into a packet that has been distributed to this Peer Committee in advance of its meeting and also provided to the applicant.

*00285*

*000372*

000

**MAHMOOD YOONESSI   (22853)**          **164**

presented to show that the applicant had gained any insight unto the events that led to his revocation, and added that no evidence had been presented to show that he would do anything differently now than he did when he treated those patients.   She emphasized that there was no indication that the public would be safe should the applicant's license be restored.

In his closing remarks, the applicant stated that he had practiced medicine with an unblemished record for over twenty-five years, and that he had been schooled in his discipline of gynecology oncology for over thirty years.

He stated that the majority of physicians practicing in the field have not had that level of training or experience.   He reiterated his continuing belief that had administered the proper, FDA approved, chemotherapy drugs to his patients and that if he had used the drugs suggested by BPMC's experts at his disciplinary hearing then he would have exposed them to greater risk.   He concluded by stating that he feels that he has met the requirement for continuing education and has proven himself to be a competent physician. '

<div align="center">

**RECOMMENDATION**

</div>

We have reviewed the entire record in this matter, including the written materials received before and during our meeting.   In arriving at our recommendation, we note that, in a licensure restoration proceeding, the burden is on the applicant to



000385

**165**

MAHMOOD YOONESSI   (22853)     ,

demonstrate that which would compel the return of the license.
<u>Greenberg v. Board of Regents of University of New York</u>, 176 A.D.
2d, 1168, 575 N.Y.S. 2d 608, 609.     In reaching our
recommendation, we consider whether the applicant demonstrates
sufficient remorse, rehabilitation and reeducation.   However, we
are not necessarily limited to such formulaic criteria but may
consider other factors, particularly the seriousness of the
original offense and, ultimately, our judgment as to whether the
health and safety of the public would be in jeopardy should the
application be granted.

The courts have ruled that an applicant in these proceedings
does not have to admit past wrongdoing the applicant does not
believe he committed.     Petitioner need not surrender his
contention that he is innocent of the original charges in order
to be readmitted to his profession.   <u>Melone v. State Educ. Dep't,
581 N.Y.S.2D 894, 896 (N.Y. App. Div., 1992)</u>.   Therefore, in
cases where an applicant denies his guilt to the original
misconduct, the criterion of remorse is undercut and limited in
its usefulness.   In these circumstances, we instead must consider
the other criteria, including particularly whether the public is
better served by the restoration of licensure or not.

In that regard, while this applicant is entitled to deny his
past guilt, we still look for some acknowledgment from the
applicant of the seriousness of the public record and his need to 

**MAHMOOD YOONESSI   (22853)**   **166**

convince us of his trustworthiness to have his license restored.

In this case the applicant steadfastly maintains his innocence of the charges which led to his revocation of licensure. This was demonstrated throughout the hearing by his documentary and testimonial evidence; notwithstanding, we took pains to refrain from relitigating this issue.

Because remorse is not an issue, we must examine other factors. With respect to the issue of re-education, we are impressed with the amount and breadth of the CME he has taken, and that it has been obtained over a period of time and not just since the filing of his application for relicensure.

We see that the applicant has achieved some insight by recognizing the primacy of the patient's wishes when it comes to medical decisions, which was an issue in the original BPMC case.

He has set reasonable goals for his return to medicine, which include both research and teaching. Recognizing his physical limitations, and the amount of time since he last performed surgery, he does not intend to engage in it again. This dovetails with our concerns over this aspect of his possible practice.

Therefore, for the foregoing reasons, we unanimously recommend that the revocation of the applicant's license to practice medicine in the State of New York be stayed, at which time the applicant be placed on probation for five years under

00288

000387

-- 16 --

**MAHMOOD YOONESSI   (22853)**

$167$

the terms of probation annexed hereto, made a part hereof, and marked as Exhibit A.   Said terms shall include, among other things, a restriction on performing surgery during the period of probation, and that any practice of medicine during that period be confined to an Article 28 facility as defined by the New York Public Health Law.

We also unanimously recommend that said stay of revocation and period of probation shall only commence if and when the applicant returns to the practice of medicine in the State of New York, and that the applicant shall notify the Director, Office of Professional Medical Conduct (OPMC), of his intention to return to the practice of medicine in the State of New York, by certified mail, return receipt requested, addressed to said Director at OPMC 433 River Street - Suite 303, Troy, New York 12180-2299 at least thirty (30) days prior to his return to practice.

Respectfully submitted,

Florence Kavaler, M.D.,
                            Chairperson
Joyce H. Lowinson, M.D.

Krishna RS Gujavarty, M.D.

_signature_   2/10/09

Chairperson                 Dated

00289

000388

171

November 23, 2011   306

Mahmood Yoonessi, M.D: 6790 Crest Road
Rancho Palos Verdes, Ca. 90275

Dear Dr. Yoonessi:

The Committee on the Professions considered your application for the restoration of your physician license at its December 9, 2009 meeting.

The Committee has completed its draft report and recommendations. That recommendation is set forth in the enclosed draft report.

Section 24.7(a) (2) (i) of the Rules of the Board of Regents allows you, if you wish, to submit a written response to the Committee's recommendation to the Board of Regents. Such response must be received in this office no later than 15 calendar days from the postmark of this letter and may not contain any new evidentiary material.

I want to emphasize that the Committee action constitutes a recommendation. I anticipate that, at its meeting on December 12 -13, 2011, the Board of Regents will review the entire matter and make a final determination. You will be notified shortly thereafter in writing of the Board's decision.

As noted above, I have enclosed a draft version of the written report of the Committee on the Professions. You will receive the final report along with the Commissioner's Order after the Regents have made their determination.

Sincerely, Kathleen L. Werther, Esq.

Enclosures                                               cc: Walter Ramos

Case Number: CP-11-26              December 2, 2011

THE UNIVERSITY OF THE STATE OF NEW YORK   the State Education
Department

Report of the Committee on the Professions Application for Restoration of Physician
License

Re: Mahmood Yoonessi

Mahmood Yoonessi, Rancho Palos Verdes, California, 90275, petitioned for
restoration of his physician license. The chronology of events is as follows:

08/19/69    Issued license to practice medicine in Iran

11/21/73    Issued license number 310221 to practice as a physician in New York
            State.

00290

000389




| 11/26/01 | charged with professional misconduct by the Bureau of Professional Medical conduct of the New York State Health Department. |
| --- | --- |
| 06/06/02 | License revoked after charges of negligence, gross negligence, and fraudulent practice, failure to maintain records, moral unfitness, and lack of proper consent were sustained. |
| 12/18/03 | Article 78 proceeding dismissed by the Appellate division, Third Department. |
| 03/21/05 | United States District Court for the Western district of New York dismissed law suit alleging violations of constitutional rights. |
| 07/21/05 | Application submitted for restoration of physician license. |
| 01/06/06 | Decision of United States District Court for the Western district of New York affirmed by the United States Court of Appeals, Second Circuit. |
| 09/27/07 | Peer committee restoration review. |
| 02/10/09 | Report and recommendation of Peer Committee. |
| 12/09/09 | Committee on the Professions meeting with applicant. |
| 12/02/11 | Report and Recommendation of Committee of the Professions. |

Disciplinary History. (See attached disciplinary documents). On June 5, 2002, a Hearing committee for the board of Professional Medical conduct (BPMC) found Dr. Yoonessi to be guilty of 26 of 30 specifications of misconduct involving 8 different patients while practicing gynecological oncology in Buffalo, and revoked his license to practice medicine in New York State. He was found guilty of, among other things, prescribing an unorthodox and inappropriate chemotherapy regime for 5 of the patients, performing unwarranted and contraindicated surgery on at least 8 occasions, failing to obtain adequate informed consents for chemotherapy and surgery, improperly ignoring "Do Not Resuscitate" orders, and failing to properly examine or document examinations of some of the patients. He was also found guilty of providing fraudulent information on an application for reappointment to a hospital by denying knowledge of an action pending against him by the Office of Professional Medical Conduct.

On July 22, 2005, Dr. Yoonessi submitted the instant application for restoration of his physician license.

Recommendation of Peer Committee. (See attached Report of the Peer Committee). The Peer committee (Kavaler, Gujavarty, Lowinson) convened on September 25, 2007 to consider Dr. Yoonessi's application for restoration of his physician license. In its report dated February 10, 2009, the committee voted


00291
000390



The overarching concern in all restoration cases is the protection of the public. Education Law §6511 gives the Board of Regents discretionary authority to make the final decision regarding applications for the restoration of a professional license. Section 24.7 of the Rules of the Board of Regents charges the COP with submitting a recommendation to the Board of Regents on restoration applications. Although not mandated by law or regulation, the Board of Regents has instituted a process whereby a Peer Committee first meets with an applicant for restoration and provides a recommendation to the COP. A former licensee petitioning for restoration has the significant burden of satisfying the Board of Regents that there is a compelling reason that licensure should be granted in the face of misconduct that resulted in the loss of licensure. There must be clear and convincing evidence that the petitioner is fit to practice safely, that the misconduct will not recur, and that the root causes of the misconduct have been addressed and satisfactorily dealt with by the petitioner. It is not the role of the COP to merely accept, without question. the arguments presented by the petitioner but to weigh and evaluate all of the evidence submitted and to render a determination based upon the entire record.

<u>Majority Opinion:</u> The majority of the COP agrees with the recommendation made by the Peer Committee, that Dr. Yoonessi receive a stay of revocation, effective upon his return to practice in New York State, subject to a 5 year period of probation under the terms specified by the Peer Committee, but with a few modifications. The COP recommends that, during probation, Dr. Yoonessi be allowed to practice in an approved group setting as an alternative to practicing in an Article 28 facility, and recommends a tolling provision for periods of time when he is not practicing in New York State. The majority of the COP found, as set forth by the Peer Committee, that Dr. Yoonessi. although maintaining his innocence of most of the underlying charges of misconduct, as he is entitled to do (<u>Melone v. State Education Department. 182 A.D.2d 875.878</u>), has presented sufficient proof to support his request for restoration of his license. He has attended yearly medical meetings related to oncology and has taken an extensive number of courses to maintain his knowledge so as to be able to return to his profession. Furthermore, he practiced for approximately 20 years successfully without incident prior to the loss of his license. He also has done volunteer work at clinics in California. In addition, the majority feels that he has set reasonable goals for himself and that he will not be a threat to the public with the restrictions set forth in the probationary terms. The COP agrees with the Peer Committee in recommending 5 years of probation since Dr. Yoonessi has not practiced since 2001.

Based on the foregoing, a complete review of the record. and their meeting with him. the majority of the COP votes to recommend that the order of the Commissioner of the Health revoking Dr. Yoonessi's physician license be stayed, if and when he returns to practice medicine in the State of New York, that he then be placed on probation for 5 years in accordance with the Terms of Probation of the Committee of the Professions set forth in Exhibit "A" annexed hereto, and that. upon satisfactory completion of the probationary term, his license be fully restored.

000392



**The** 176

**University of the** **State of New York**
**Education** **Department**

IN THE MATTER

of the

Application of MAHMOOD
YOONESSI for restoration of his
license to practice as a physician in
the State of New York.

Case No. CP-11-26

It appearing that the license of MAHMOOD YOONESSI, to practice as a physician in the State of New York, was revoked by Order of the State Board for Professional Medical Conduct dated June 5, 2002, and he having petitioned the Board of Regents for restoration of said license, and the Regents having given consideration to said petition and having reviewed the record, and having disagreed with and rejected the recommendations of the Peer Committee and the Committee on the Professions, for the reasons set forth in the attached written decision, now, pursuant to action taken by the Board of Regents on October 9, 2012, it is hereby

ORDERED that the petition for restoration of License No. 310221, authorizing MAHMOOD YOONESSI to practice as a physician in the State of New York, is denied.



IN WITNESS WHEREOF, I, John B. King, Jr., Commissioner of Education of the State of New York for and on behalf of the State Education Department, do hereunto set my hand and affix the seal of the State Education Department, at the City of Albany, this 8th day of February 2013.

00293

REDACTED
Commissioner of Education

000393

Case No. CP-11-26

It appearing that the license of MAHMOOD YOONESSI, to practice as a physician in the State of New York, was revoked by Order of the State Board for Professional Medical Conduct dated June 5, 2002, and he having petitioned the Board of Regents for restoration of said license, and the Regents having given consideration to said petition and having reviewed the record, and having disagreed with and rejected the recommendations of the Peer Committee and the Committee on the Professions, for the reasons set forth in the attached written decision, now, pursuant to action taken by the Board of Regents on October 9, 2012, it is hereby

VOTED that the petition for restoration of License No. 310221, authorizing MAHMOOD YOONESSI to practice as a physician in the State of New York, is denied.



000394

 

Case 2:22-cv-00023-TLN-SCR     Document 1     Filed 01/06/23     Page 333 of 352

## Office of the Professions

## Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

### License Information *

03/16/2021

**Name :** MCEACHIN NIA MALIKA
**Address :** UPPER MONTCLAIR NJ
**Profession :** LICENSED PRACTICAL NURSING
**License No:** 310221
**Date of Licensure :** 06/05/2012
**Additional Qualification :** Not applicable in this profession
**Status :** NOT REGISTERED
**Registered through last day of :** 07/20

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants,* or *specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.



00295

000395



## Office of the Professions

## Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

### License Information *

03/16/2021

**Name :** AHERN MAUREEN M
**Address :** DEER PARK NY
**Profession :** REGISTERED PROFESSIONAL NURSING
**License No:** 310221
**Date of Licensure :** 10/20/1978
**Additional Qualification :**
**Status :** REGISTERED
**Registered through last day of :** 07/23

\* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

- Use your browser's back key to return to licensee list.
- You may search to see if there has been recent disciplinary action against this licensee.
- Note: The Board of Regents does not discipline *physicians(medicine), physician assistants, or specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.



00296

000396



B532

١٧٨

CERTIFICATE OF INCORPORATION

OF

M. YOONESSI, M.D., P.C.

Under Sections 402 and 1503 of the Business Corporation Law

IT IS HEREBY CERTIFIED THAT:

(1)   The name of the proposed corporation is:

      M. YOONESSI, M.D., P.C.

(2)   The purpose or purposes for which this corporation is formed
      are as follows:

      A.   To engage as a professional service corporation in the
           practice of medicine under the laws of the State of New
           York through individuals authorized by law to render such
           services as individuals.

      B.   Incident to and in furtherance of the above purposes, to
           invest the corporation's funds in real estate, mortgages,
           stocks, bonds, or any other type of investments.

      C.   Except as otherwise prohibited under Sections 402 and
           1503 of the Business Corporation Law, the corporation, in
           furtherance of its corporate purposes set forth above,
           shall have all of the powers enumerated in Section 202 of
           the Business Corporation Law, subject to any limitations
           provided in the Business Corporation Law, or any other
           statute of the State of New York.

(3)   The name and address of the individual who is to be the
      original shareholder, director, and officer of the
      corporation is as follows:

| Name | Residence | Profession | License or Certificate No. |
|------|-----------|------------|----------------------------|
| Mahmood Yoonessi, M.D. | 212 Crestwood Court Amherst, NY 14221 | Physician | 118540 |



EXHIBIT
V

000002
B532

00297



B533



(4)  Attached to this Certificate of Incorporation is the
     certificate of the licensing authority certifying that the
     above shareholder, director, and officer is authorized by law
     to practice the profession which the corporation is being
     organized to practice.

(5)  The office of the corporation is to be located in the Town of
     Amherst, Erie County, State of New York.

(6)  The aggregate number of shares which the corporation shall
     have authority to issue is 200 shares of common stock,
     the same class.

(7)  The Secretary of State of the State of New York is designated
     as agent of the corporation upon whom process against it may
     be served.  The post office address to which the Secretary of
     State shall mail a copy of any process against the
     corporation served upon it is:

              c/o Gross, Shuman, Brizdle & Gilfillan, P.C.
              465 Main Street, Suite 600
              Buffalo, New York 14203

(8)  The number of directors which the corporation shall have be
     fixed in the By-Laws.

(9)  The Corporation shall have such officers as shall be fixed in
     the By-Laws.  All such officers shall be elected and removed
     only by the shareholders.

(10) The undersigned incorporator is over the age of twenty-one
     years.

IN WITNESS WHEREOF, this Certificate has been subscribed this _____
day of January, 1989, by the undersigned who affirm that the
under the penalty of perjury.

Names and Addresses of Incorporator          Signature

Mahmood Yoonessi, M.D.
212 Crestwood Court
Amherst, NY  14221
                                        Mahmood Yoonessi, M.D.

000003
B533

00298

PAGE 04/13                    M YOONESSI 2V          4242069843          10/29/2020 09:30

000446

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF SACRAMENTO
## GORDON D SCHABER COURTHOUSE

### MINUTE ORDER

DATE: 09/02/2022                    TIME: 09:00:00 AM          DEPT: 32

JUDICIAL OFFICER PRESIDING: James P. Arguelles
CLERK: D. Ward
REPORTER/ERM: L. McKee #12810
BAILIFF/COURT ATTENDANT: J. Gonzales

CASE NO: **34-2022-80003877-CU-WM-GDS**CASE INIT.DATE: 04/29/2022
CASE TITLE: **Mahmood Yoonessi, M.D. vs. William Prasifka**
CASE CATEGORY: Civil - Unlimited

---

**EVENT TYPE:** Hearing on Demurrer - Writ of Mandate

---

**APPEARANCES**
M. Yoonessi, M.D, P.C, self represented Petitioner, appeared remotely via video.
Tal Matar Elmatad, counsel, present for Respondent(s) remotely via video.

Nature of Proceedings: Demurrer to Petition for Writ of Mandate

The above-entitled matter came before this Court with the above-named counsel present.

The Court heard argument from the respective parties with regard to the tentative ruling issued on September 2, 20222.

Following argument, the Court affirmed the tentative ruling.

The demurrers for lack of subject matter jurisdiction, failure to state a valid cause of action and misjoinder of parties are sustained without leave to amend.

Pursuant to Cal. R. Ct. 3.1312, counsel for SUNY Buffalo shall serve and then lodge a judgment of dismissal for the court's signature.



---

1  **LETITIA JAMES, ESQ.**
   **Attorney General of the State of New York**
   **Tal Matar Elmatad, State Bar No. 320978**
2  **Assistant Attorney General**
   28 Liberty Street
3  New York, NY 10005
   Telephone:  (212) 416-6318
4  Fax:  (518) 650-9401
   E-mail:  tal.elmatad@ag.ny.gov
5
   *Attorneys for Respondent State University of New*
6  *York at Buffalo*

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                      **COUNTY OF SACRAMENTO**

9
   | MAHMOOD YOONESSI, M.D. AND M. | |
10 | YOONESSI, M.D., P.C. | |

11 |                       Petitioners, | |

   |              v.                     | Case No. 34-2022-80003877 |
12
   | **WILLIAM PRASIFKA, ANDREW CUOMO,** | Assigned to Judge James P. |
13 | **DANIEL KREDENSTER, STATE UNIVERSITY** | Arguelles |
   | **OF NEW YORK AT BUFFALO, THE MEDICAL** | |
14 | **BOARD OF CALIFORNIA, AND DOES 1-50** | **JUDGMENT OF DISMISSAL** |
   |                          | **FOLLOWING SUSTAINING** |
15 |                      Respondents. | **OF DEMURRER WITHOUT** |
   |                          | **LEAVE TO AMEND** |
16
17
18

19        Pursuant to the Court's Order dated September 2, 2022, sustaining Respondent State

20  University of New York at Buffalo's Demurrer to Petitioners' Write of Mandamus without leave

    to amend:
21
          **IT IS ORDERED, ADJUDGED, AND DECREED** that Petitioners' Mahmood
22
    Yoonessi, M.D., and M. Yoonessi, M.D., P.C.'s Writ of Mandamus is dismissed with prejudice
23
    as to Respondent State University of New York at Buffalo, and that judgment be entered in favor
24
    of Respondent State University of New York at Buffalo.

25
    Dated:
26

27                             By: _____
                                   Hon. James P. Arguelles
28                                 Judge of the Superior Court               00300

    Judgement of Dismissal Following Sustaining of Demurrer Without Leave to Amend

**A1**





| | |
|---|---|
| **MEDICAL BOARD**<br>OF CALIFORNIA<br><br>Protecting consumers by advancing high quality, safe medical care. | **Enforcement Program**<br>2005 Evergreen Street, Suite 1200<br>Sacramento, CA 95815-5401<br>Phone: (916) 263-2525<br>Fax: (916) 263-2473<br>www.mbc.ca.gov |

Gavin Newsom, Governor, State of California | Business, Consumer Services and Housing Agency | Department of Consumer Affairs

December 7, 2020

TO WHOM IT MAY CONCERN:

I, WILLIAM PRASIFKA, Executive Director of the Medical Board of California, do hereby certify that MAHMOOD YOONESSI, M.D., whose address of record is 9 BOBBIE LANE, WILLIAMSVILLE, NY 14221, was issued Physician's and Surgeon's Certificate Number C 50545 by the Board on March 1, 2001. Said certificate is REVOKED.

I further certify that disciplinary action was taken against this certificate as follows: On August 23, 2002 a FULL OUT OF STATE SUSPENSION ORDER-NO PRACTICE was issued, and on October 16, 2002 an ACCUSATION was filed against Doctor YOONESSI. On June 10, 2003 a PETITION FOR RECONSIDERATION was filed, and on June 23, 2003 an ORDER DENYING PETITION FOR RECONSIDERATION AND REQUEST FOR STAY was issued, and a DECISION became effective which read: REVOKED. On July 22, 2003 a PETITION FOR A WRIT OF MANDATE AND REQUEST FOR A STAY was filed and on December 24, 2003 an ORDER DENYING PETITION FOR WRIT OF MANDATE was issued. On November 29, 2009 a PETITION FOR REINSTATEMENT was filed, and on November 11, 2008 the PETITION FOR REINSTATEMENT WAS DENIED. On November 13, 2008 a DECISION became effective which read: PETITION FOR REINSTATEMENT OF REVOKED CERTIFICATE DENIED.

Respectfully submitted,

*William Prasifka*

WILLIAM PRASIFKA,
Executive Director of the
Medical Board of California

**SECTION 162 OF THE BUSINESS AND PROFESSIONS CODE:**
The certificate of the officer in charge of the records of any board in the department that any person was or was not on a specified date, or during a specified period of time, licensed, certified or registered under the provisions of law administered by the Board, or that the license, certificate or registration of any person was revoked or under suspension, shall be admitted in any court as prima facie evidence of the facts therein recited.



**A1**

**P. -00301**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SACRAMENTO**
720  Ninth Street
**Sacramento, CA 95814-1380**
http://www.saccourt.ca.gov

**NOTICE TO FILING PARTY - RETURNED DOCUMENTS**

**Case Title:  Mahmood Yoonessi, M.D. vs. William Prasifka**

**Case Number:  34-2022-80003877-CU-WM-GDS**

We are unable to process the attached papers for the reasons indicated below:
Document Rejected: Motion in Limine
Pursuant to Local Rule 2.12, Motions in Limine are to be made to the assigned trial judge. No trial is
scheduled for this case.

It is the responsibility of the filing party to review any applicable statute, California Rules of Court,

California Code of Civil Procedure, and Sacramento Superior Court Local Rules prior to submitting

documents.

This form is to be returned if documents are resubmitted for processing.

Papers returned to:  Mahmood Yoonessi, M.D.

Clerk of the Court,

*/s/ I. Romo*

Date:  09/07/2022                                            By: _____.

Returned via:                                                                                    Deputy

Return By Mail
_____

003 302

**AFFIDAVIT OF SERVICE**

Index #: _____ 34-2022-80003877
Date Filed: _____
Court Date: _____
Assigned Justice: _____

**SUPERIOR COURT**
**STATE OF CALIFORNIA, COUNTY OF SACRAMENTO**

File No.: _____

*Mahmood Yoonossi, M.D., M. Yoonossi, M.D., P.C.*

*VS.*

*Plaintif(s)/Petitioner(s)*

*William Prasifka, et al.*

*Defendant(s)/Respondent(s)*

STATE OF New York , COUNTY OF ALBANY      SS.:
_____ James Perone _____, being duly sworn deposes and says. Deponent is not a party herein, is over 18 years of age and resides in New York. On __ Monday, May 16, 2022 __ at __ 12:18 PM .
at __ 353 Broadway, Albany, NY 12246 __ deponent served the within

**Writ of Mandamus with Petitioner's Declaration, Memorandum of Law in Support of the Writ of Mandamus and Supporting Papers**

on: _____ __State University Construction Fund_____
_____ Defendant _____ therein named.

PORATION   By delivering to and leaving with__ **Harry McLellan, authorized to accept** _and that deponent knew the person so served to be the
#1  ☒       authorized agent of the corporation, and said person stated that he/she was authorized to accept service on behalf of the corporation.

A description of the Defendant, or other person served, or spoken to on behalf of the Defendant is as follows:

DESCRIPTION   Sex: __Male__   Color of skin   __White__   Color of hair __S + P / black__   Age: __36 - 50 Yrs.__   Height: __5' 4" - 5' 8"__
#2  ☒       Weight: __160 - 200 Lbs__   Other Features.
(use with #1, 2 or 3)

#3  WIT FEES   $ the authorized witness fee and / or traveling expenses were paid (tendered) to the recipient.
    ☐

#4  OTHER
    ☐

vorn to before me on this 16th day of May 2022

Heather Mongesato
Notary Public, State of New York
No. 01MO6261464
Qualified in Albany County
Commission Expires May 14, 2024



James Perone    00304

Job # S1977076

# Service of Process Cover Sheet

**FOR DOS USE ONLY**

(1) Indicate the name of the entity or person to be served. (*See Note 1 below*):

*MERRYL H.TISCH, CHAIR SUNY BD OF TRUSTEES*
*STATE UNIVERSITY PLAZA,353 BROADWAY,ALBANY NEW YORK12246*
HonDrMerrylH.Tisch of State University of New York

(2) If serving a *domestic entity* or an *authorized foreign entity*, staple the DOS search page(s) (the "Current Status Information" and, if applicable, the "Filing History Information" and/or the "Name History Information") for the entity to be served to this cover sheet

(3) Indicate the Section of Law under which service is made. Check only one box. (*See Note 2 below*):

**Domestic or Authorized Foreign Entities** (Applicable fee: $40.00)
- ☐ Business Corporation Law §306
- ☐ Not-for-Profit Corporation Law §306
- ☐ Limited Liability Company Law §303
- ☐ Partnership Law §121-109(a) (LP's)
- ☐ Partnership Law §121-1502 (foreign LLP's)
  (*must serve a Deputy Secretary of State*)
- ☐ Partnership Law §121-1505 (LLP's)
- ☐ Real Property Law §339-n
- ☐ General Associations Law §19
  (*must serve a Deputy Secretary of State*)

- ☑ Other: specify section of law PHL230,Educatio
  and applicable fee (☑ $40 or ☐ other $_____)

**Unauthorized Foreign Entities** (Applicable fee: $40.00)
- ☐ Business Corporation Law §307
- ☐ Not-for-Profit Corporation Law §307
- ☐ Limited Liability Company Law §304
- ☐ Partnership Law §121-109(b) (LP's)

**Suspended Entities** (Applicable fee: $40.00)
- ☐ Business Corporation Law §306-A (suspended BC's)
- ☐ Limited Liability Co. Law §301-A (suspended LLC's)
- ☐ Partnership Law §121-104-A (suspended LP's)
- ☐ Partnership Law §121-1506 (suspended LLP's)

**Vehicle and Traffic Law** (Applicable fee: $10.00)
- ☐ Vehicle and Traffic Law §253 (non-resident)
- ☐ Vehicle and Traffic Law §254 (former resident)

(4) Indicate the manner in which the applicable fee is paid:
- ☐ Drawdown Account (_____)   ☑ Check   ☑ Credit Card   ☐ Debit Card   ☐ Cash   ☐ Other
- ☐ Exempt pursuant to Executive Law §96(10) - process served on behalf of a political subdivision of the State

(5) Indicate the name and address of the Process Server: *Heather FROM SERVICe Requested by MAHMOOD YOONESSI 6790 CREST RD, RANCHO PALOS VERDES CA 90275*

(6) Staple this cover sheet (with the DOS search page(s), if serving a domestic entity or an authorized foreign entity) to the process.

(7) (a) If serving a domestic entity or an authorized foreign entity, deliver *two (2) duplicate copies* of the process being served (with this cover sheet and the DOS search page(s) stapled thereto) and the applicable fee.

    (b) If serving an unauthorized foreign entity or a suspended entity, or if serving under the Vehicle and Traffic Law, deliver one copy of the process being served (with this cover sheet stapled thereto) and the applicable fee. (*See Note 3 below*)

---

Note 1: If you attach DOS search page(s). and there is a conflict between the name of the entity as indicated in space "(1)" above and the name on the attached DOS search page(s), *the name provided on the attached DOS search page(s) will control*. Additionally, if you attach DOS search page(s), and space "(1)" above is left blank, *the entity named in the attached DOS search page(s) will be served*.

Note 2: If you attach DOS search page(s), and there is a conflict between the section of law indicated in space "(3) above and the section of law applicable to the type of entity described in the attached DOS search page(s), *the section of law applicable to the entity will control*.

Note 3: If you are serving an unauthorized foreign entity or a suspended entity, or if you are serving under the Vehicle and Traffic Law, you, or the person on whose behalf service is being made, may also be required to mail notice of service and a copy of the process to the entity or person being served. *The Department of State does not make any such mailing*. See the applicable section of law for further information.

---

**FOR DOS USE ONLY**

Service of Process Unit Search Results:  ☐ Records Located   ☐ No Records Located   ☐ Entity Name has Changed   ☐ Merged Out
☐ Other:_____

**Reason for Rejection:**
- ☐ Copies do not Match   ☐ 2 Copies Required   ☐ Court/Forum not within NYS   ☐ Payment not Received or Method not Indicated
- ☐ Other:_____   Date of Rejection:_____   Rejected by:_____

DOS-0277(Rev. 3/08 )

00305

Related Case 2

# In the Central District Court of California; Riverside(Eastern Division)





|  |  |  |
|---|---|---|
| Petitioner/Plaintiff, | ) | EDS-220325-000-3305 |
|  |  | CV-22-02276-CAS(JCx) |
| Mahmood Yoonessi .Myoonessi.MD pc and MY Montecito | ) | NO. |
| **Vs.** | ) |  |
|  | ) |  |
| Gloria D·Gray , Gina Franco and DOES 1-50 | ) |  |
| **Respondents/Defendants** | ) |  |
|  | ) |  |

1

2 ## NOTICE OF REMOVAL

3

4      State   Court   Defendants   Mahmood   Yoonessi,   and   MY
5   Montecito  hereby give notice of removal of the action from the State
6   Courts  of California Counties of LA ,Riverside. to the United States
7   District Court for the Central  District of  California Riverside(Eastern

(JCx),CLOSED,DISCOVERY,MANADR,REMANDED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:22-cv-02276-FMO-JC

Caine and Weiner Company, Inc. v. MY Montecito Inc Sh et al
Assigned to: Judge Fernando M. Olguin
Referred to: Magistrate Judge Jacqueline Chooljian
Case in other court: Superior Court of CA County of Los Angeles,
              15N06376
Cause: 28:1441 Notice of Removal - Fraud

Date Filed: 03/31/2022
Date Terminated: 05/31/2022
Jury Demand: None
Nature of Suit: 370 Other Fraud
Jurisdiction: Federal Question

**Plaintiff**

**Caine and Weiner Company, Inc.**        represented by  **Steven L Friedland**
                                                Steven L Friedland Law Offices
                                                21210 Erwin Street
                                                Woodland Hills, CA 91367
                                                818-908-6860
                                                Fax: 866-813-4491
                                                Email: steven.friedland@caine-weiner.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MY Montecito Inc Sh**        represented by  **MY Montecito Inc Sh**
                                                  6790 Crest Road
                                                Rancho Palos Verdes, CA 90275
                                              PRO SE

**Defendant**

**Mahmood Yoonessi**        represented by  **Mahmood Yoonessi**
                                                  6790 Crest Road
                                                Rancho Palos Verdes, CA 90275
                                              310-541-3937
                                              PRO SE

**Defendant**

**Does**
*1-50*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/31/2022 | 1 | NOTICE OF REMOVAL from Superior Court of CA County of Los Angeles, case number 15N06376 with Conformed copy of summons and complaint. Case assigned to Judge Christina A. Snyder, Discovery to Magistrate Judge Jacqueline Chooljian. Filing fee $402 PAID, filed by Defendants Mahmood Yoonessi, MY Montecito Inc Sh. (Attachments: # 1 Civil Cover Sheet) (car) (Entered: 04/07/2022) |

| 03/31/2022 | 2 | CERTIFICATE of Interested Parties filed by Defendants MY Montecito Inc Sh, Mahmood Zoonessoodzar. (Entered: 04/05/2022) |
|---|---|---|
| 03/31/2022 | | CONFORMED COPY of COMPLAINT against Defendants Does 1 to 10 inclusive, MY Montecito Inc Sh., filed by Plaintiff Caine and Weiner Company, Inc. Filed in State Court on 4/22/2015 Submitted with Exhibit A to Notice of Removal 1 (car) (Entered: 04/08/2022) |
| 03/31/2022 | | CONFORMED COPY OF PROOF OF SERVICE OF SUMMONS AND COMPLAINT Executed by Plaintiff Caine and Weiner Company, Inc., upon Defendant MY Montecito Inc Sh served on 5/18/2015, answer due 6/8/2015. Service of the Summons and Complaint were executed upon John Doe, Occupant in compliance with California Code of Civil Procedure by substituted service at home address and by also mailing a copy.Original Summons NOT returned. Filed in State Court on 7/6/2015 Submitted with Attachment Exhibit C to Notice of Removal 1 (car) (Entered: 04/08/2022) |
| 04/08/2022 | 3 | NOTICE OF ASSIGNMENT to District Judge Christina A. Snyder and Magistrate Judge Jacqueline Chooljian. (car) (Entered: 04/08/2022) |
| 04/08/2022 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 04/08/2022) |
| 04/08/2022 | 5 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 04/08/2022) |
| 04/15/2022 | 6 | [NOTICE OF CLERICAL ERROR ISSUED ON 4/15/2022, SEE DOCKET ENTRY NO. 7] ORDER RETURNING CASE FOR REASSIGNMENT by Judge Christina A. Snyder. ORDER case returned to the Clerk for random reassignment pursuant to General Order 21-01. Case randomly reassigned from Judge Christina A. Snyder to Judge Ronald S.W. Lew for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:22-cv-02276-RSWL(JCx). (aco) Modified on 4/15/2022 (aco). (Entered: 04/15/2022) |
| 04/15/2022 | 7 | NOTICE OF CLERICAL ERROR: Due to clerical error the following scanned document and docket entry have been corrected as indicated below, Re: Returning Case for Reassignment w/i division (CV-89), 6 . Incorrect judge's initials were indicated on this document and docket entry. The correct judge's initials are RSWL. On all documents subsequently filed in this case, please substitute the initials RSWL after the case number in place of the initials of the prior judge so that the case number will read 2:22-cv-02276-RSWL (JCx). This is very important because documents are routed to the assigned judge by means of the initials. (Attachments: # 1 CV89) (aco) (Entered: 04/15/2022) |
| 04/19/2022 | 8 | ORDER RETURNING CASE FOR REASSIGNMENT by Judge Ronald S.W. Lew. ORDER case returned to the Clerk for random reassignment pursuant to General Order 21-01. Case randomly reassigned from Judge Ronald S.W. Lew to Judge Fernando M. Olguin for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:22-cv-02276 FMO(JCx). (rn) (Entered: 04/19/2022) |
| 04/29/2022 | 9 | TEXT ONLY ENTRY by Chambers of Judge Fernando M. Olguin. This matter has been assigned to District Judge Fernando M. Olguin. The Court refers counsel to the Court's Initial Standing Order found on the Court's Website under Judge Olguin's Procedures and Schedules. Please read this Order carefully. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (gga) TEXT ONLY ENTRY (Entered: 04/29/2022) |
| 05/04/2022 | 10 | NOTICE OF DISCREPANCY AND ORDER: by Judge Fernando M. Olguin, ORDERING Application for Permission for Electronic Filing; Proof of Service - Acknowledgment of Service; Statement of Consent (CV-11) submitted by Plaintiff Caine and Weiner Company, Inc. received on 4/19/2022 is not to be filed but instead rejected. Denial based on: Documents missing signature. Statement of Consent (CV-11) form not applicable in this discovery case. (et) (Entered: 05/04/2022) |

| 05/04/2022 | 11 | STATEMENT OF CONSENT TO PROCEED before United States Magistrate Judge by defendant Mahmood Yoonessi. (iv) (Entered: 05/05/2022) |
| 05/11/2022 | 12 | PROOF OF SERVICE Executed by Plaintiff Caine and Weiner Company, Inc., upon Defendant MY Montecito Inc Sh served on 5/3/2022, answer due 5/24/2022; Mahmood Yoonessi served on 5/3/2022, answer due 5/24/2022. in compliance with statute not specified by personal service.Original Summons NOT returned. (iv) (Entered: 05/20/2022) |
| 05/31/2022 | 13 | ORDER by Judge Fernando M. Olguin remanding case to Superior Court of the State of California for the County of Los Angeles, Case number 15N06376 Case Terminated. Made JS-6 (rolm) (Entered: 06/01/2022) |
| 06/01/2022 | 14 | TRANSMITTAL of documents to Superior Court of CA, County of Los Angeles. A certified copy of the order of remand and a copy of the docket sheet from this court was sent to Superior Court of CA, County of Los Angeles. (rolm) (Entered: 06/01/2022) |
| 06/15/2022 | 15 | Receipt of Copy of Remand Transmittal Letter from Los Angeles Superior Court, Case No. 15N06376, acknowledged on 6/6/2022. (iv) (Entered: 06/16/2022) |
| 06/15/2022 | 17 | Mail Returned addressed to Mahmood Yoonessi re Order to Remand Case to State Court 13 . (lom) (Entered: 06/30/2022) |
| 06/15/2022 | 18 | Mail Returned addressed to MY Montecito Inc Sh re Order to Remand Case to State Court 13 . (lom) (Entered: 06/30/2022) |
| 06/15/2022 | 19 | Mail Returned addressed to Mahmood Yoonessi re Letter of Transmittal - Remand to Superior Court (G-17) 14 . (lom) (Entered: 06/30/2022) |
| 06/22/2022 | 16 | Receipt of Copy of Remand Transmittal Letter from Los Angeles Superior Court, Case No. 15N06376, acknowledged on 6/6/2022. (iv) (Entered: 06/22/2022) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 12/30/2022 15:07:11 | | |
| **PACER Login:** | my000155 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-02276-FMO-JC End date: 12/30/2022 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**United States District Court**
Central District of California
**Office of the Clerk**

Cristina M. Squieri Bullock
Chief Deputy of Administration
350 West 1st Street, Suite 4311
Los Angeles, CA 90012

**Kiry K. Gray**
District Court Executive / Clerk of Court
350 West 1st Street, Suite 4311
Los Angeles, CA 90012

**Sara Tse Soo Hoo**
Chief Deputy of Operations
255 East Temple Street, Suite TS-134
Los Angeles, CA 90012

June 1, 2022

  Superior Court of CA, County of Los Angeles
   12720 Norwalk Blvd.
   Norwalk, CA 90650

Re:  Case Number:      2:22−cv−02276−FMO−JC
      Previously Superior Court Case No.      15N06376
      Case Name:      Caine and Weiner Company, Inc. v. MY Montecito Inc Sh et al

Dear Sir/Madam:

      Pursuant to this Court's ORDER OF REMAND issued on      5/31/2022      , the above−referenced case is hereby remanded to your jurisdiction.

      Attached is a certified copy of the ORDER OF REMAND and a copy of the docket sheet from this Court.

      Please acknowledge receipt of the above by signing the enclosed copy of this letter and returning it to the location shown below. Thank you for your cooperation.

United States Courthouse
255 East Temple Street, Suite TS134
Los Angeles, CA 90012

Respectfully,

Clerk, U.S. District Court

By:   /s/ Rebeca D Olmos
       Deputy Clerk
       (213) 894−2749

*Encls.*
*cc: Counsel of record*

Receipt is acknowledged of the documents described above.

Clerk, Superior Court

By: _____
       Deputy Clerk

_____
Date

G-17 (02/19)   LETTER OF TRANSMITTAL − REMAND TO SUPERIOR COURT

Mahmood Yoonessi, Pro Se

6790 Crest Rd, Rancho Palos Verdes Ca 90275

Ph: 310.541-3937, Fax No; 4242069438

EMAIL:MYOONESSI75@GMAIL.COM

## UNITED STATES DISTRICT COURT
## CENTRAL DICTRICT OF CALIFORNIA

**Castle and Palace LLC**

        Petitioner(s),

vs.,

MAHMOOD YOONESI AND

CLERK OF COUNTY COURT

DEFENDANTS,RESPONDENTS

Case No.NY 2017-000009

**EXHIBITS TO**

**NOTICE OF REMOVAL**

**PURSUANT TO 42 USC1331**

**AND 1332**

## Table of Contents
## Petitioner's Exhibits to Notice of Removal

| Exhibit Name | Document Name | Page Number | Date |
|---|---|---|---|
| Hogan willig notice | Notice of mot hearing | 0000-1 | 5/11/2022 |
| Checks claimed sent | Checks alleged | 000002- | 8/26/14 |
| Cashed | payments(unconfirmed) | 000007 | 8//26/14-8/24/15 |
| FedEx Nov16 2015 | FedEx? | 000008 | 11/16/2015 |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:22-cv-06431-SVW-GJS | Date | October 7, 2022 |

| | |
|---|---|
| Title | In The Mattter of the Application of Castle and Palace, LLC v. Yoonesa et al |

## JS - 6

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| Paul M. Cruz | N/A | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**      IN CHAMBERS ORDER REMANDING CASE TO SUPERIOR COURT

Pursuant to 28 U.S.C. section 1446(a), the Court orders that the case be remanded because it has been improperly removed from New York state court: "A defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." Therefore, as it was filed in New York, this action may not be removed to federal district court in California.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

MIME-Version:1.0 From:cacd_ecfmail@cacd.uscourts.gov To:noreply@ao.uscourts.gov Message-Id:<34719257@cacd.uscourts.gov>Subject:Activity in Case 2:22-cv-06431-SVW-GJS In The Mattter of the Application of Castle and Palace, LLC v. Yoonesa et al Order to Remand Case to State Court Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**
The following transaction was entered on 10/12/2022 at 12:15 PM PDT and filed on 10/7/2022

| | |
|---|---|
| **Case Name:** | In The Mattter of the Application of Castle and Palace, LLC v. Yoonesa et al |
| **Case Number:** | 2:22-cv-06431-SVW-GJS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/07/2022**

| | |
|---|---|
| **Document Number:** | 8 |

**Docket Text:**
**ORDER by Judge Stephen V. Wilson remanding case to Erie County Court of New York, Case number NY 2017-000009 Case Terminated. Made JS-6 (rolm)**

**2:22-cv-06431-SVW-GJS Notice has been electronically mailed to:**
**2:22-cv-06431-SVW-GJS Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**
Mahmood Yoonesa
6970 Crest Rd
Rancho Palos Verdes CA 90275

(GJSx),CLOSED,DISCOVERY,MANADR,REMANDE

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:22-cv-06431-SVW-GJS

In The Mattter of the Application of Castle and Palace, LLC v. Yoonesa
et al
Assigned to: Judge Stephen V. Wilson
Referred to: Magistrate Judge Gail J. Standish
Case in other court: Erie County, County Court, 17-000009
Cause: 28:1441 Notice of Removal

Date Filed: 09/05/2022
Date Terminated: 10/07/2022
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**In The Mattter of the Application of Castle
and Palace, LLC**

V.

**Defendant**

**Mahmood Yoonesa**

represented by **Mahmood Yoonesa**
6970 Crest Rd
Rancho Palos Verdes, CA 90275
310-541-3937
Fax: 424-206-9438
PRO SE

**Defendant**

**Erie County Clerk**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/05/2022 | 1 | NOTICE OF REMOVAL filed by Defendant Mahmood Yoonesa from Los Angeles Superior Court, case number State of New York Erie County with copy of complaint. Case assigned to Judge Stephen V. Wilson, Discovery to Magistrate Judge Gail J. Standish. Filing fee $402 Paid. (jtil) (Entered: 09/12/2022) |
| 09/12/2022 | 2 | NOTICE OF ASSIGNMENT to District Judge Stephen V. Wilson and Magistrate Judge Gail J. Standish. (jtil) (Entered: 09/12/2022) |
| 09/12/2022 | 3 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (jtil) (Entered: 09/12/2022) |
| 09/12/2022 | 4 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (jtil) (Entered: 09/12/2022) |
| 09/15/2022 | 5 | FINANCIAL ENTRY: Received $402.00 into the registry of the Court from Mahmood Yoonessi. Re: Notice of Removal, 1 . Receipt number Pay.gov Tracking Id: 271IL962. (chs) (Entered: 09/15/2022) |
| 09/19/2022 | 6 | PROOF OF SERVICE UNDER FRCP 5(b)(2)(D) Executed by Defendant Mahmood Yoonesa. (aco) (Entered: 10/03/2022) |

| 10/03/2022 | 7 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: Service of Summons and Complaint Returned Executed (21 days) 6 . The following error(s) was/were found: Document lacks required signature. No name of party served on the document. Document also includes incomplete ADR-01 form and incomplete CV-11D form as attachments. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (aco) (Entered: 10/03/2022) |
|---|---|---|
| 10/04/2022 | 10 | Opposition to Attorney Novak's Withdrawal demand for disclosure filed by defendant Mahmood Yoonesa. (Attachments: # 1 Part 2)(aco) (Entered: 10/13/2022) |
| 10/07/2022 | 8 | ORDER by Judge Stephen V. Wilson remanding case to Erie County Court of New York, Case number NY 2017-000009 Case Terminated. Made JS-6 (rolm) (Entered: 10/12/2022) |
| 10/12/2022 | 9 | TRANSMITTAL of documents to Erie County Court of New York. A certified copy of the order of remand and a copy of the docket sheet from this court was sent to Erie County Court of New York. (rolm) (Entered: 10/12/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/19/2022 06:40:46 | | | |
| PACER Login: | my000155 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:22-cv-06431-SVW-GJS End date: 10/19/2022 |
| Billable Pages: | 2 | Cost: | 0.20 |