1

2

3    Mahmood Yoonessi,MD

4    6790 Crest Rd
     Rancho Palos Verdes Ca 90275
5

6    Ph : 3105413937|Fax: 4242069843

7    Em: <Myoonessi75@gmail.com>

8

9         UNITE STATES DISTRICT COURT OF CALIFORNIA Eastern
                              DIVISION

10

11                                          Case No.: 2:23-cv-
                                            00023  $TLN$  $OB$
12   Mahmood Yoonessi,                      Resubmission of Default Motion
13           Plaintiff,                     Notice ,Judgment, Complaint ,
                                            reassertion of all claims thereof, to
14   vs.                                    the alternative Jury Trials
15   Letitia James,W.Prasifka,K.Wilcox      pursuant to constitutional
16   Merrill Tisch,                         AmendmentsVI,VII,IV,XIV,Requet
17   A.Antosh.D.Kredentser                  for referral to
                                            CongressionalOversight Cmmittees
18
19   All personally,Univ of
20   Buffalo,Chase Bank,Med Bds of Ca
     &Ohio
21

22

23

24

25

26

27

28

I

1
2
3                                          Petitioner filed a petition for Review,
4                                 Evaluation, Investigation of Andrew
5   Cuomo, Merryl Tisch, Gavin Newsom,,Kyle Wilcox and Lynette Antosh ,MBOC
6   (Medical board of Ca),their Retaliatory actions' Devastating effects on Women's:
7   Ovarian and Cervical Cancer Research, Soaring Drug Costs, Disabilities and Drug
8   addictions. Recent Senate Oversight Committee disclosed the grave consequences of
9   inattention.Recent Senate hearing confirmed  what petitioner has Claimed;stated
10  for over two decales namely:
11  *Merk charges Americans $6,900 for Januvia,the  French Pay$ 200,
12  *J7J CHARGES American $79,000 for Stelara, Britishpay 16,000 ,
13  *Bristol Myers Sq Co Charges Americans$7,100 for Eliquis,Canadians pay 900 ,
14  *Bristol Myers Squibb Co drove petitioner out of business for its Taxol fraud
15  profited $6.3 Billions,
16  * petitioner informed the Court of  what was at stake  in PARP inhibitors marketing
17  Fraud  in Ovarian Cancer cases;;"What is at Stake?"
18                    Four Phase III trials of PARP inhibitors in ovarian Cancer treatment
19  have been conducted; SOLO -1 A: total of 391 women were randomly assigned, 260 to
20  olaparib (66.7%) and 131 to placebo (33.5%);A recent descriptive analysis of long-
21  term overall survival (OS) in the SOLO-1 trial showed that maintenance Olaparib
22  led to clinically meaningful, but not statistically significant, improvement in
23  OS(overall survival) in patients with newly diagnosed advanced ovarian cancer and
24  a BRCA mutation,
25
26                    Phase III PAOLA- 1/ENGOT-ov25 trial: Olaparib plus bevacizumab
27  (bev) as maintenance therapy in patients (pts) with newly diagnosed, advanced
28  ovarian cancer (OC) treated with platinum-based chemotherapy (PCh) plus bev
    Results: 537 pts were randomized to olaparib plus bev and 269 to pbo plus bev. Pt
    characteristics were well balanced. Median follow-up was 22.7 m in the olaparib
    arm and 24.0 m in the pbo arm. PFS was significantly increased in the olaparib
    arm. PFS2 is immature.,

             Results from the PRIMA/ENGOT-OV26/GOG-3012 trial: Prospective
    evaluation of the tolerability and efficacy of niraparib dosing based on baseline body
    weight and platelet count: NDICATIONS AND USAGE 1.1 First-Line Maintenance

                              Pg23          Pg25

                                   2

1
2
3   Treatment of Advanced Ovarian Cancer ZEJULA is indicated for the maintenance
4   treatment of adult patients with advanced epithelial ovarian, fallopian tube, or
5   primary peritoneal cancer who are in a complete or partial response to first-line
6   platinum-based chemotherapy.
7             **Veliparib with First-Line Chemotherapy and as Maintenance Therapy**
8   **in Ovarian Cancer; VELIA/GOG-3005 Clinical Trials**
9             CONCLUSIONS; Across all trial populations, a regimen of carboplatin,
10  paclitaxel, and veliparib induction therapy followed by veliparib maintenance
11  therapy led to significantly longer progression- free survival. The independent value
12  of adding veliparib during induction therapy without veliparib maintenance was
13  less clear.
14            PARP inhibitors Maintenance therapy are considered least Cost
15  effective, **TATEMENT OF THE CASE**
16            1.       ASCO Published Rapid Guideline Update on PARP Inhibitors in
17  Ovarian Cancer(By Brandon May;November 25, 2022);An ASCO guideline rapid
18  update is revising guidance for the use of poly (ADP-ribose) polymerase (PARP)
19  inhibitor therapy for the management of ovarian cancer to include updated
20  considerations for the use of several different PARP inhibitor therapies based on
21  recent phase III clinical trial data.[1] The new update revises recommendations from
22  prior guidance published in 2020.[2]Elise C. Kohn, MD
23
24  2..The American Association of University Professors "1940 Statement "provides;
25  "After the expiration of a probationary period, teachers . . . should have permanent
26  or continuous tenure, and their service should be terminated only for adequate
27  cause . . . or under extraordinary circumstances because of financial exigencies.",17.
28  As of July 2020 the NY Website, MBOC, NPDB have all failed to update their
    information, and there is not a single reference to;* NY Unanimous Peer Review
    Committee Report of Feb 10, 2009, recommendation to restore Ny License
    118540*NY Committee on the Profession Report and Recommendation restore Ny
    License 118540*Merryll Tatsch's fraudulent report of Oct 2012, denial of NY nurses
    license No 310221 belonging to two innocent nurses18. Attorneys Khouri, Idell, Dr
    Thorpe ,MBOC disregard the California Supreme court's Ruling in Hall v.Board
    examinersin ;( Hall v. Committee of Bar Examiners, 25 Cal.3d 730 [L.A. No. 31071.
    Supreme Court of California. November 27, 1979.] ,19. The accusers (Khouri, Idell

and Thorpe) ignore, repeats the sobering story of Mark Colin Sodersten;
53Cal.Rptr.3d572, 146 Cal.App.4th, 146Cal.App.4th1163 (Cal.App.Dist.5 01-17-
2007):"...Lessons learned In Re Mark Sodersten: As the United States Supreme
Court has observed, "Society wins not only when the guilty are convicted but when
criminal trials are fair; our system of the administration of justice suffers when any
accused is treated unfairly." (Brady v. **Maryland** (1963) 373 U.S. 83,
87 [10 L.Ed.2d 215, 83 Sc.D. 1194] (Brady).),


3. The Laws of void judgments; a judgment may not be rendered in violation of
constitutional protections. The validity of a judgment may be affected by a failure to
give the constitutionally required due process notice and an opportunity to be heard.
Earle v. McVeigh, 91 US 503, 23 L Ed 398. See also Restatements, Judgments ' 4(b).
Prather v Lloyd, 86 Idaho 45, 382 P2d 910 ;( N.B; myoonessi, MDPC was never
charged, served, appeared anywhere in the past two decades), a void judgment is
not entitled to the respect accorded a valid adjudication, but may be entirely
disregarded, or declared inoperative by any tribunal in which effect is sought to be
given to it. It is attended by none of the consequences of a valid adjudication. It has
no legal or binding force or efficacy for any purpose or at any place. ... It is not
entitled to enforcement ... All proceedings founded on the void judgment are
themselves regarded as invalid. NY Merrill Tisch, Attorneys Khouri,
Idell, Dr Thorpe) have not denied their "Abuse of Discretion", that led them to
denial of determinations of "Peer Review Committee" 'and "Committee on
Profession" in "Complete Absence of AH Jurisdictions",


*for protection/Compensation of a "Whistleblower",


*for such other relief as the court may deem necessary, just or proper. Respectfully


"To support a § 1983 claim of judicial deception, a

plaintiff must show that the defendant deliberately or recklessly made false
statements or omissions that were material to the finding of probable cause."

4

1  Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126 (9th Cir. 2002). The court
2
3  determines the materiality of alleged false statements or omissions. Butler v. Elle,
4  281 F.3d 1014, 1024 (9th Cir. 2002).

5  Plaintiffs contend that defendants "embellished" the affidavit by using the language
6  "permeated with fraud," "lifetime of crime," and "criminal enterprise," and that
7  Moore misrepresented the nature of Robert Womack's "rap" sheet by calling him a
8  "career criminal." (Opp'n to Moore at 24.) However, none of these terms were
9  material to the finding of probable cause. The term "permeated with fraud" only
10  appears on the first page of the 24-page affidavit. In context, it is used as an
11  abstract term of art that summarizes the material facts found on the other 23 pages.
12  A judge's finding of probable cause would not turn on this one characterization.
13
14          Conclusion/Relief/Prayer, wherefore: *Plaintiff(s) are entitled to
15  general damages according to proof (over $2Billion; to be paid by States of New
16  York, California,Ohio   *for punitive and exemplary damages, Pre and Post
17  Judgment interest, *for attorneys 'Fees and cost of the suit, *For Default Judgment
18  against defaulted parties(including Chase  and L.Antosh
19
20  Respectfully
21
22
23      M.yoonessi,
24
25
26
27
28

5

# Table of content: Exhibits to updated Motion Comp Response
# Opposition to Delays

| Ex No; Document Name | Page | Date |
|---|---|---|
| FDA Hearing unproven $900,0000/yr | 1 | 11/16/23 |
| Media and Senate Hearing | 1/1 | 2/7/24 |
| Senate hearing; J&J CEO, | 1 | 2/8/24 |
|           Merk CEO | | |
|           BMS Co CEO, | | |
| PARP inhibitors OOP Expenses, | 1 | 10/10/2016 |
| FDA ,Keytruda  and other, | 1 | 3/11/21 |
| BMS Co and Fraud, | 1 | 5/3/2007 |
| Cient 9, and BMS Co and Taxol  and | | |
| Respondent K.Wilcox, | 1 | 3/5/24 |
| BMS Co And Taxol Fraud, Spitzer, and | 1 | 2/4/2002 |
| Wilcox team, | 1 | 1996 |
| NEJM and Taxol fraud, | | |
| FBI  Office of Public Corruption, | 1 | 4/13/2012 |
| Default motion Re submitted, Re asserted, | 1-.. | 3/22/24 |
| 1st Am Complaint re submitted, Re asserted | 1-… | 2/15/24 |
| Only Patients A & B Were considered | 1 | June 2002 |
| Atty James, Claims and COA Record | 1….. | 6/23/2003 |

| | | |
|---|---|---|
| Atty James and Wilcox and holder of License No 310221, | 1.... | 2/8/2013 |
| Chase and Lynette Antosh, | 2....... | 11/5/2019, |
| K. Blocher and MBOC, | 1.... | 2023 |
| Delays are to costly | 1..... | 11/27/2001 to 3/22/2024 |

We use cookies.  Learn More                                    Accept

**Health Law & Business**
Nov. 16, 2023, 8:56 AM PST

# FDA Hearing Targets Unproven $900,000 Drug for Deadly Cancer (1)

By Fiona Rutherford and Robert Langreth

- Folotyn was cleared in 2009 but efficacy trial is years late
- FDA hearing Thursday to review delayed lymphoma drug studies

The cancer drug Folotyn, one of the most expensive in the US, received a short-cut approval from US regulators to treat a rare form of lymphoma 14 years ago, but officials still don't have conclusive evidence it works.

Companies cleared to sell drugs through an "accelerated approval" pathway are supposed to promptly conduct follow-up studies to confirm their medicine is effective. But former and current owners of Folotyn, now an Acrotech Biopharma drug, have pushed back the deadline to complete that work at least 10 times, according to a summary of their correspondence with regulators. Acrotech doesn't expect to complete its study until 2030.

Instances like these have put the US Food and Drug Administration under pressure. On Thursday, the agency is holding a public hearing about Folotyn and another lymphoma drug approved through the accelerated pathway in 2014, Beleodaq. That drug, also owned by Acrotech, won't have final data showing it works until the end of this decade.

The pathway is intended to benefit patients, and not as "an incentive program for the pharmaceutical industry," Richard Pazdur, director of FDA's Oncology Center of Excellence, said at the panel meeting.

The accelerated approval pathway — in which the FDA accepts smaller, less-conclusive studies instead of the larger trials normally required — has made some companies billions of dollars. While that isn't the case for Acrotech's drugs because they treat the rare lymphoma, Folotyn costs around $900,000 a year, according to GoodRx. The drug has had four price increases since January 2022, it notes.

02.07.2024

# MEDIA ADVISORY: HELP Committee to Hold Hearing on Outrageous Cost of Prescription Drugs, CEOs to Testify

WASHINGTON, Feb. 7 – The Senate Health, Education, Labor, and Pensions Committee, chaired by Sen. Bernie Sanders (I-Vt.), will hold a hearing Thursday, February 8 at 10:00 a.m. ET titled, "Why Does the United States Pay, by Far, the Highest Prices in the World for Prescription Drugs?" with the CEOs of Bristol Myers Squibb, Johnson & Johnson, and Merck all testifying.

The CEO of Bristol Myers Squibb, Chris Boerner, agreed to testify in early January. Last week, after a subpoena vote was scheduled, Johnson & Johnson CEO Joaquin Duato and Merck CEO Robert Davis reconsidered their original positions and agreed to give testimony.

"The simple truth is that the American people are sick and tired of paying, by far, the highest prices in the world for prescription drugs," said Sanders. "I look forward to a very productive hearing, and hope very much that the CEOs of these major pharmaceutical companies will take a serious look at these incredible price discrepancies and work with us to substantially reduce the prices they charge the American people for these and other prescription drugs."

Today, Merck charges diabetes patients $6,900 for Januvia when that exact same product can be purchased for $900 in Canada and $200 in France. Johnson & Johnson charges Americans with arthritis $79,000 for Stelara, while that same product can be purchased for $16,000 in the United Kingdom. Bristol Myers Squibb charges patients in America $7,100 for Eliquis, while that same product can be purchased for $900 in Canada and just $650 in France.

Due to the high cost of prescription drugs, one out of four Americans cannot afford the medicine their doctors prescribe. Meanwhile, the pharmaceutical industry has spent, over the past 25 years, some $8.5 billion on lobbying and over $700 million on campaign contributions.

In 2022, Johnson & Johnson made nearly $18 billion in profits, paid its CEO over $27 million in compensation and spent over $17 billion on stock buybacks and dividends. That same year, Merck made $14.5 billion in profit, handed out over $7 billion in dividends to its wealthy stockholders, and paid its CEO over $52 million in compensation. Last year, Bristol Myers Squibb made $6.3 billion in profits, while recently spending over $12 billion on stock buybacks and dividends and giving its CEO over $41 million in compensation.

Under the chairmanship of Sanders, the HELP Committee has focused, among other isssues, on lowering drug prices in America. The committee has already heard testimony from four pharmaceutical CEOs representing Moderna, Eli Lilly, Novo Nordisk, and Sanofi.

Sanders and the committee were pleased that the CEO of Moderna committed during a HELP Committee hearing that Moderna would set up a patient assistance program so that no one in America would have to pay for their COVID vaccine out of pocket. In a separate HELP Committee hearing last year, the CEO of Eli Lilly committed to Chairman Sanders that his company would not raise prices on existing insulin products after a prior commitment to substantially lower prices for the insulin they manufacture.

**Hearing Details**
**What:** Hearing of the Committee on Health, Education, Labor, and Pensions to consider "Why Does the United States Pay, by Far, the Highest Prices in the World for Prescription Drugs?"
**When:** 10:00 a.m. ET, Thursday, February 8, 2024
**Where:** Room 430, Dirksen Senate Office Building. The hearing will also be livestreamed on the HELP Committee's website and Sanders' social media pages.
**Who:**
Panel I
Joaquin Duato, *Chief Executive Officer, Johnson & Johnson*
Robert Davis, *Chief Executive Officer, Merck*
Chris Boerner, *Chief Executive Officer, Bristol Myers Squibb*

Panel II
Peter Maybarduk, J.D., *Access to Medicines Director, Public Citizen*
Tahir Amin, LL.B., *Chief Executive Officer, Initiative for Medicines, Access & Knowledge*
Darius Lakdawalla, Ph.D., *Director, Research, University of Southern California Schaeffer Center*

News about C-Span News/Senate Hearing And Drug Cost And Brist...

bing.com/news



**CNBC** · 2d · on MSN

J&J, Merck and Bristol Myers CEOs defend high drug prices in Senate hearing, as Biden tries to...

The push to cut drug prices is one of those rare hot-button issues that unites the two...

    

**THE HILL** · 2d · on M

Sanders grills drug company CEOs over high prices in hearing

Drug company CEOs were in the hot seat Thursday, as Sen. Bernie Sanders (I-Vt.) sought to harness the anger over high drug prices into action. ...

REUTERS · 2d · on MSN

US Senate Democrats grill pharma CEOs on drug prices

2d · on MSN

Senate panel grills pharmaceutical company execs over prescription drug prices



See more news                    Feedback

C-SPAN.org

https://www.c-span.org/video/?533414-1/... ▾

**Pharmaceutical Company CEOs Testify on Prescription Drug Prices**



Web 3 days ago · Pharmaceutical CEOs from Johnson & Johnson, Merck, **and Bristol Myers** Squibb testify on **cost** of prescription **drugs** before the **Senate** Health, Education, Labor, and Pensions committee....

EXPLORE FURTHER

Pharma CEOs press case against **drug** price negotiation as ...    biopharmadive.com

Former owner and **CEO** of pharmaceutical company charged ...    irs.gov

House Democrats find in three-year investigation that **drug** ...    washingtonpost.com

McKesson to pay shareholders $141 mln in generic **drug** ...    reuters.com

Why we're suing Team Biden to lower Americans' prescription ...    nypost.com

Recommended to you based on what's popular · Feedback

 MSN

https://www.msn.com/en-us/money/news/j-j-merck-and... ▾

**J&J, Merck and Bristol Myers CEOs defend high drug prices in ...**

Web Senators to question Merck, J&J **and Bristol Myers** Squibb CEOs over high U.S. **drug** pricing Story by Annika Kim Constantino · 6h The push to cut **drug** prices is one of those rare hot ...

New York Times

https://www.nytimes.com/2024/02/08/us/politics/... ▾

**J&J, Merck and Bristol Myers Squibb CEOs Defend Drug Prices at ...**

Web 3 days ago · The three executives who testified — Joaquin Duato of Johnson & Johnson, Robert M. Davis of Merck and Christopher Boerner of **Bristol Myers** Squibb — ...

**Videos of C-SPAN News/Senate Hearingand Drug Cost and Bristol ...**

bing.com/videos

    

---

Trending on Bing ⓘ

 Oklahoma judge resigns

 Donald Trump...    NEW

 Adele calls out Jason Kelce

 Finland president...    NEW    

 James Carville on Biden

 'Star Wars Episode 1' in...

 Hungary president resigns

Feedback

Microsoft Bing

c-span news/Senate hearingand drug cost and Bristol Myers CEO

Mahmood          9096

SEARCH    COPILOT    NEWS    IMAGES    VIDEOS    MAPS    SHOPPING    ⋮ MORE    TOOLS

About 41,500 results

An official website of the United States government
Here's how you know ⌄

FULL TEXT LINKS



> Gynecol Oncol. 2021 Mar;160(3):793-799. doi: 10.1016/j.ygyno.2020.12.015. Epub 2020 Dec 27.

# Total and out-of-pocket costs for PARP inhibitors among insured ovarian cancer patients

Margaret I Liang [1], Ling Chen [2], Dawn L Hershman [3], Grace C Hillyer [4], Warner K Huh [5], Allison Guyton [6], Jason D Wright [7]

Affiliations
PMID: 33375989    PMCID: PMC7902421    DOI: 10.1016/j.ygyno.2020.12.015
Free PMC article

## Abstract

**Objective:** To evaluate total and out-of-pocket costs for poly(ADP-ribose) polymerase (PARP) inhibitors and differences based on insurance characteristics.

**Methods:** We identified ovarian cancer patients who were prescribed niraparib, olaparib, or rucaparib from the MarketScan (2014-2017) and Surveillance, Epidemiology, and End Results (SEER)-Medicare (2014-2016) databases. Drug costs were estimated for a 30-day supply. Descriptive statistics and Wilcoxon rank sum tests were performed.

**Results:** 590 commercially insured beneficiaries from MarketScan and 213 SEER-Medicare beneficiaries were prescribed PARP inhibitors for a median 112 days. For commercially insured beneficiaries, median total cost was $13,342 (IQR $12,022-$14,256). Median out-of-pocket cost was $44 (IQR $0-$120) and PARP inhibitors accounted for a median 90.8% of patients' total out-of-pocket drug spending. High-deductible health plan was not associated with higher out-of-pocket costs (N = 570; median $0 vs. $45, P = 0.87). For SEER-Medicare beneficiaries, median total cost was $12,798 (IQR $11,704-$13,180). Median out-of-pocket cost was $370 (IQR $2-$1234) and PARP inhibitors accounted for a median 99.0% of patients' total out-of-pocket drug spending. Out-of-pocket costs were lower for dual-eligible patients with supplemental Medicaid prescription coverage (N = 209; median $1 vs. $911, P < 0.001).

**Conclusions:** Although insurers are responsible for a large proportion of PARP inhibitor costs, out-of-pocket costs for PARP inhibitors account for a majority of patients' drug spending. SEER-Medicare beneficiaries had higher out-of-pocket costs than patients with commercial insurance, which was offset for those with supplemental Medicaid prescription coverage.

**Keywords:** Cost of illness; Female genital neoplasms; Health expenditures; Health insurance.

Copyright © 2020 Elsevier Inc. All rights reserved.

PubMed Disclaimer

## Figures

# FDA calls meeting to weigh quick cancer approvals, threatening Merck, BMS and Roche

By Angus Liu

Mar 11, 2021 12:39pm

( bladder cancer )  ( FDA advisory committee )  ( liver cancer )  ( PD-1/L1 )



The FDA is convening a three-day meeting of its oncology advisory committee to discuss the fate of six accelerated approvals for PD-1/L1 inhibitors from Merck, Bristol Myers Squibb and Roche. (FDA)

As part of an industry-wide review, the FDA persuaded PD-1/L1 players Merck & Co., Bristol Myers Squibb, Roche and AstraZeneca to remove four indications on the labels of cancer drugs, after the failure of post-marketing studies. But the agency wasn't so sure about six others, so it's calling for some external input.

In what promises to be a heated deliberation, the FDA will convene experts on its oncologic drugs advisory committee to a three-day meeting in late April to discuss six indications that had been added to drug labels on an accelerated basis but that ultimately failed confirmatory trials, it said in a public notice (PDF (https://public-inspection.federalregister.gov/2021-05202.pdf)) filed Thursday.

The expert panel will discuss data on three indications for Merck's Keytruda, two for Roche's Tecentriq and one for Bristol Myers' Opdivo. The FDA doesn't have to follow an advisory committee's recommendation, but it typically does.

**RELATED: Merck follows Bristol's suit, pulling Keytruda's SCLC nod. Is the FDA's accelerated approval reckoning finally here? (https://www.fiercepharma.com/marketing/merck-follows-bristol-s-suit-pulling-keytruda-s-sclc-nod-fda-accelerated-approval)**

The first item on the agenda will be Tecentriq's conditional nod in combination with Bristol Myers' chemotherapy Abraxane in PD-L1-positive triple-negative breast cancer.

The drug earned that go-ahead based on data showing that the regimen could stave off cancer progression. But a confirmatory trial dubbed IMpassion131 found (https://www.fiercepharma.com/marketing/esmo-roche-s-mixed-results-put-tecentriq-s-triple-negative-
riginal paclitaxel drug couldn't extend the lives of newly diagnosed TNBC

WEBINAR

Developing and Manufacturing Minitablets to Extend Drug Lifecycle

February 28, 2024 | 11:00am ET

Register Today

During this webinar, industry experts will navigate the intricate journey of drug development, exploring how minitablets have redefined formulation strategies, efficacy, and patient-centric solutions as well as options for lifecycle management.

dder cancer uses of Keytruda and Tecentriq in patients who are not eligible y lackluster overall survival findings from the Keynote-361 ytruda-chemo-combo-shows-survival-trend-but-can-t-top-chemo-bladder-second-line setting and IMvigor130 study in the front-line for Tecentriq.

front-line, cisplatin-ineligible bladder cancer to patients who met certain l rates in patients with low PD-L1 levels.

ncer nods for Keytruda and Opdivo, after their confirmatory trials failed. The roesophageal junction adenocarcinoma will also be discussed, given that it sly treated and newly diagnosed patients.

ks away from FDA bladder cancer nod zi-double-flop-astrazeneca-walks-away-from-fda-bladder-cancer-nod-

tions after misses in confirmatory trials. These include Keytruda and Opdivo and AstraZeneca's Imfinzi in previously treated bladder cancer.

```
GET /eSCL/ScannerStatus HTTP/1.1
Host: localhost
```

```
GET /eSCL/ScannerStatus HTTP/1.1
Host: localhost
```

# Department of Justice

**FOR IMMEDIATE RELEASE**
**WEDNESDAY, MAY 30, 2007**
**WWW.USDOJ.GOV**

**AT**
**(202) 514-2007**
**TDD (202) 514-1888**

## Bristol-Myers Squibb Pleads Guilty to Lying to the Federal Government About Deal Involving Blood-Thinning Drug

### Bristol-Myers Squibb to Pay $1 Million Criminal Fine; Illegal Actions Threatened to Delay Generic Competition for Drug

WASHINGTON — The Department of Justice announced today that Bristol-Myers Squibb Company (BMS) has agreed to plead guilty and pay a $1 million criminal fine for lying to the federal government about a patent deal involving a popular blood-thinning drug. The Department said that BMS's illegal actions threatened to reduce competition for the drug Plavix that could have reduced the cost of blood-thinning drugs sold to heart attack, stroke and other patients.

According to the two-count criminal charge filed today in the U.S. District Court in Washington, D.C., in 2006, BMS and another company, Apotex Inc., were engaged in litigation over the validity of the patent for Plavix and were negotiating a settlement of that litigation. At the time, BMS was subject to a separate consent decree – for unrelated conduct – with the Federal Trade Commission (FTC) that required BMS to submit any proposed patent settlements for review and approval by the FTC. The FTC warned BMS that it would not approve a settlement of the Plavix litigation if BMS agreed not to launch its own generic version of Plavix that would compete against Apotex for generic sales. After nevertheless entering into such an agreement, BMS concealed it from and then lied about its existence to the FTC. The Department charged BMS with filing two false statements to the FTC as part of its effort to hide part of its agreement with Apotex.

"BMS is charged with both lying to the federal government and with taking steps to conceal its false statement – both serious felonies," said Thomas O. Barnett, Assistant Attorney General in charge of the Department's Antitrust Division. "The seriousness of the offenses is compounded by the fact that BMS' obstructive conduct occurred in connection with the FTC's review of a proposed patent settlement affecting the cost of a lifesaving drug sold to tens of millions of Americans."

Plavix, a patented pharmaceutical, is the most widely prescribed blood-thinning drug in the world. Approximately 48 million Americans take Plavix daily to prevent potentially fatal blood clots. The drug was approved for sale in the United States in November 1997.

The Department alleges that, at a meeting in 2006, a former senior BMS executive made oral representations to Apotex with the purpose of causing Apotex to conclude that BMS would not launch its own generic version of Plavix in the event that the parties reached a final settlement agreement. The Department further alleges that these representations ultimately resulted in an understanding between BMS and Apotex that BMS would not launch its own generic version of Plavix. Finally, the Department charged that BMS took steps deliberately to mislead the FTC by first concealing and then later lying about the existence of its representations to and understanding with Apotex Inc.

BMS – an international pharmaceutical company headquartered in New York, N.Y – participates in the sale and marketing of Plavix in the United States through the Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership. In 2006, the Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership sold more than $3.5 billion of Plavix in the United States.

BMS has agreed to plead guilty to two violations of the federal False Statements Act and to pay a fine of $1 million – the maximum fine permitted for these violations by statute.

This case is part of an ongoing investigation being conducted by the Antitrust Division's National Criminal Enforcement Section with the assistance of the New York Field Office of the Federal Bureau of Investigation. Anyone with information about this matter should contact the Antitrust Division's National Criminal Enforcement Section at 202-307-6694.



WIKIPEDIA
The Free Encyclopedia

# *Client 9: The Rise and Fall of Eliot Spitzer*

***Client 9: The Rise and Fall of Eliot Spitzer*** is a documentary directed by Alex Gibney about former New York Governor Eliot Spitzer and the sex scandal that derailed his political career.[2] It premiered at the 2010 Tribeca Film Festival on April 24, 2010;[3] on iTunes and Magnolia On Demand on October 1, 2010;[4] and in movie theaters in limited release on November 5, 2010.[5]

Gibney made the film with on-camera cooperation from Spitzer.[6] The director also shared ideas and information with writer Peter Elkind, who wrote the book "Rough Justice: The Rise and Fall of Eliot Spitzer".[7]

## Contributors

- "Angelina" – Escort, Co-Worker of Ashley Dupré at Emperors Club VIP (portrayed by Wrenn Schmidt)
- Mike Balboni – Deputy Secretary for Public Safety to Governor Spitzer
- Wayne Barrett – Senior Editor, *The Village Voice*
- Richard Beattie – Legal Counsel to the Independent Directors of AIG
- Zana Brazdek– Formerly of Emperors Club VIP
- Joe Bruno – NY Senate Majority Leader, 1994-2008
- David Brown – Former Staff Lawyer to Attorney General Spitzer
- Lloyd Constantine – Former Spitzer Advisor
- Fred Dicker – *New York Post* State Editor
- Darren Dopp – Communications Director to Attorney General Spitzer
- Peter Elkind – Author of *Rough Justice: The Rise and Fall of Eliot Spitzer*
- Karen Finley – Performance Artist
- Robert Graham – Former Gen Re Counsel
- Maurice "Hank" Greenberg – Former Chairman and CEO of AIG
- Noreen Harrington – Former Executive, Stern Asset Management
- Scott Horton – Professor, Columbia Law School
- John Houldsworth – Former CEO of Gen Re Subsidiary
- Ken Langone – chairman and CEO of Invemed Associates

| Client 9: The Rise and Fall of Eliot Spitzer | |
|---|---|
|  | |
| Theatrical release poster | |
| **Directed by** | Alex Gibney |
| **Produced by** | Alex Gibney |
| | Jedd Wider |
| | Todd Wider |
| | Maiken Baird |
| **Starring** | Eliot Spitzer |
| **Cinematography** | Maryse Alberti |
| **Edited by** | Plummy Tucker |
| **Music by** | Peter Nashel |
| **Distributed by** | Magnolia Pictures |
| **Release date** | November 5, 2010 |
| **Running time** | 118 minutes |
| **Country** | United States |
| **Language** | English |
| **Box office** | $189,416[1] |

States Accuse Drug-Maker Bristol of Illegal Monopoly to Protect High Prices for Cancer-...   Page 1 of 2



001307

*C782*

| OFFICE OF THE AG | PROGRAMS & SERVICES | NEWS & ALERTS | PUBLICATIONS | CONTACT US | SEARC |
| --- | --- | --- | --- | --- | --- |
| REGISTERING WITH US | CAREER OPPORTUNITIES | LINKS TO STATE SITES | | | |

## States Accuse Drug-Maker Bristol of Illegal Monopoly to Protect High Prices for Cancer-Fighting Drug Taxol

June 4, 2002
02-066
FOR IMMEDIATE RELEASE
(916) 324-5500

(SACRAMENTO) – Attorney General Bill Lockyer today joined in a multi-state antitrust complaint accusing pharmaceutical manufacturer Bristol-Myers Squibb, Inc. (Bristol) of illegally keeping cheaper, generic versions of its cancer-fighting drug Taxol off the market.

"We believe Bristol abused the patent process to stifle competition and create an illegal monopoly for its cancer-fighting drug Taxol," Lockyer said. "Bristol profited by artificially controlling the marketplace and should refund these ill-gotten gains and be prevented from repeating this kind of conduct. We know the State of California was forced to pay more for cancer treatment drugs than if a cheaper, generic version of Taxol had been available to choose from."

The complaint was filed jointly in the U.S. District Court in Washington, D.C., by Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Ohio, Maryland and Florida are leading the multi-state action.

In 1992, the U.S. Food and Drug Administration gave Bristol five years of exclusive marketing rights for Taxol. Paclitaxel, the actual pharmaceutical ingredient in Taxol, was discovered by the National Cancer Institute and developed and tested at taxpayer expense. Paclitaxel is used in treating ovarian, breast and a variety of other cancers. In 1993, the company told a congressional committee that a patent could not be created for paclitaxel and that "near-term generic competition for Taxol is a certainty".

The antitrust complaint alleges that Bristol delayed entry of a generic version of its drug until 2000 by fraudulently securing patents that had no legal validity. As a result, cancer patients and state governments were forced to pay nearly a third more for Taxol treatments. Bristol's sales of Taxol have totaled at least $5.4 billion since 1998. A standard course of treatment using the name brand drug can cost from $6,000 to $10,000 per patient. It is estimated that California spent more than $4 million at state medical facilities.

The action is the latest taken by Attorneys General against illegal marketplace manipulation, improper patent monopolization and wholesale price fixing, which result in higher drug prices for consumers.

# # # #

**BACK**





# The New England Journal of Medicine

©Copyright, 1996, by the Massachusetts Medical Society

Volume 334     JANUARY 4, 1996     Number 1

## CYCLOPHOSPHAMIDE AND CISPLATIN COMPARED WITH PACLITAXEL AND CISPLATIN IN PATIENTS WITH STAGE III AND STAGE IV OVARIAN CANCER

WILLIAM P. McGUIRE, M.D., WILLIAM J. HOSKINS, M.D., MARK F. BRADY, B.S., PAUL R. KUCERA, M.D., EDWARD E. PARTRIDGE, M.D., KATHERINE Y. LOOK, M.D., DANIEL L. CLARKE-PEARSON, M.D., AND MARTIN DAVIDSON, M.D.

Abstract  *Background.* Chemotherapy combinations that include an alkylating agent and a platinum coordination complex have high response rates in women with advanced ovarian cancer. Such combinations provide long-term control of disease in few patients, however. We compared two combinations, cisplatin and cyclophosphamide and cisplatin and paclitaxel, in women with ovarian cancer.

*Methods.* We randomly assigned 410 women with advanced ovarian cancer and residual masses larger than 1 cm after initial surgery to receive cisplatin (75 mg per square meter of body-surface area) with either cyclophosphamide (750 mg per square meter) or paclitaxel (135 mg per square meter over a period of 24 hours).

*Results.* Three hundred eighty-six women met all the eligibility criteria. Known prognostic factors were similar in the two treatment groups. Alopecia, neutropenia, fever, and allergic reactions were reported more frequently in the cisplatin–paclitaxel group. Among 216 women with measurable disease, 73 percent in the cisplatin–paclitaxel group responded to therapy, as compared with 60 percent in the cisplatin–cyclophosphamide group (P=0.01). The frequency of surgically verified complete response was similar in the two groups. Progression-free survival was significantly longer (P<0.001) in the cisplatin–paclitaxel group than in the cisplatin–cyclophosphamide group (median, 18 vs. 13 months). Survival was also significantly longer (P<0.001) in the cisplatin–paclitaxel group (median, 38 vs. 24 months).

*Conclusions.* Incorporating paclitaxel into first-line therapy improves the duration of progression-free survival and of overall survival in women with incompletely resected stage III and stage IV ovarian cancer. (N Engl J Med 1996;334:1-6.)

©1996, Massachusetts Medical Society.

A STANDARD therapy for women with advanced epithelial ovarian cancer in the United States is an alkylating agent plus cisplatin. Cisplatin-based combination therapy has been found to be more effective than alkylating agents alone[1] or combinations without cisplatin,[2,3] when measured by clinical response rates and progression-free intervals. However, the evidence of benefit in overall survival is less compelling.[4] When alkylating agents or combinations not containing plati-

num were used in advanced ovarian cancer, the anticipated average response rate was 40 to 50 percent (10 to 20 percent complete pathological response), with a median survival of 12 to 15 months. In women treated with cisplatin combinations as primary therapy, the response rates are 60 to 80 percent, with complete responses being most common in women who have had adequate surgical therapy.[5]

The only large prospective, randomized study comparing cisplatin with a cisplatin-containing combination in advanced ovarian cancer suggested that cisplatin by itself is as effective as platinum-based combinations[5] and is less toxic and less likely to lead to secondary tumors. Nevertheless, an overview of randomized therapeutic trials suggested that platinum-based combinations are better than cisplatin alone.[7] In patients with advanced ovarian cancer, a combination of cisplatin and cyclophosphamide is now standard treatment. Unfortunately, long-term disease control with this regimen occurs in less than 10 percent of women with incompletely resected stage III disease and less than 5 percent of women with stage IV disease.[8]

After cisplatin emerged as an active drug in epithelial ovarian cancer, over a decade passed before another

From the Department of Medicine, Emory University, Atlanta (W.P.M.); the Gynecologic Service, Department of Surgery, Memorial Sloan-Kettering Cancer Center, and the Department of Obstetrics and Gynecology, Cornell University Medical College, New York (W.J.H.); the Gynecologic Oncology Group Statistical Office, Roswell Park Cancer Institute, Buffalo, N.Y. (M.F.B.); the Division of Gynecologic Oncology, Department of Obstetrics and Gynecology, Oregon Health Sciences University, Portland (P.R.K.); the Department of Obstetrics and Gynecology, Division of Gynecologic Oncology, University of Alabama at Birmingham, Birmingham (E.E.P.); the Division of Obstetrics and Gynecology, Indiana University School of Medicine, Indianapolis (K.Y.L.); the Division of Gynecologic Oncology, Department of Obstetrics and Gynecology, Duke University School of Medicine, Durham, N.C. (D.L.C.-P.); and the Department of Pathology and Area Laboratory Sciences, Walter Reed Army Medical Center, Washington, D.C. (M.D.). Address reprint requests to Dr. McGuire at the GOG Administrative Office, Suite 1945, 1234 Market St., Philadelphia, PA 19107.

Supported by grants from the National Cancer Institute to the Gynecologic Oncology Group Administrative Office (CA 27469) and the Gynecologic Oncology Group Statistical Office (CA 37517).





**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

April 13, 2012

Mr. Mahmoud Yoonessi
6790 Crest Rd, Rch Palos Vrd
California 90275

Dear Mr. Yoonessi:

        Your recent communication to the Federal Bureau of
Investigation, Public Corruption Unit (PCU), has been received.

        The PCU's primary function is program management,
policy formulation, training and other administrative duties and
responsibilities pertaining to the Public Corruption Program and
several other subprograms. The review of potential public
corruption and related allegations is reserved for the
appropriate field office.

        Accordingly, the PCU has not reviewed your materials.
However, we have promptly forwarded your information to the Los
Angeles field office for review. If appropriate, you may be
contacted by the Los Angeles field office if further information
is needed.  Should you wish to provide any additional information
related to this matter, please furnish the specific details
directly to the Los Angeles Division located at FBI Los Angeles
Field Division, Suite 1700 FOB 11000 Wilshire Blvd. Los Angeles, CA
90024.

                                    Sincerely yours,

                                    Richard Mark Denholm II /CGP

                                    Richard Mark Denholm II
                                    Unit Chief
                                    Public Corruption Unit

| | |
|---|---|
| 1 | Mahmood Yoonessi |
| 2 | _____ (Full Name) |
| 3 | myoonessi75@gmail.com _____ (Email) |
| | 6790 crest Rd |
| 4 | _____ (Address Line 1) |
| 5 | Rancho Palos Verdes  Ca 90275 _____ (Address Line 2) |
| 6 | 3103031671 _____ (Phone Number) |
| | X |
| 7 | _____ in Pro Per |
| | (indicate Plaintiff or Defendant) |

**FILED**

FEB 1 5 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
Eastern Division

| | |
|---|---|
| 11 | Mahmood Yoonessi,MYoonessi MDPC |
| 12 | _____, |
| 13 | Plaintiff, |
| 14 | vs. |
| 15 | Letitia James,Esq,William Prasifka, ~~Kyle Wilcox,Merryll Tisch,Lynette .Antosh,~~ |
| 16 | "M.Ahern,N.Mceachin,RVancouveringEst |
| 17 | Real Parties in interest" _____, |
| 18 | Defendant(s). |

Case No.: 2:23-CV-00023-TLN-DB

_____'s
(indicate Plaintiff or Defendant)

**NOTICE OF MOTION AND
MOTION FOR Default
JUDGMENT PURSUANT TO
FED. R. CIV. P. 55**(repated)

**Hearing Date: o3/22/2024____
Hearing Time:** ___10:00Am___

**Judge:** Hon D.Barnes Mag Judge
_____
(Judge's name)

**Place:** Courtroom27 USDist East Ct
_____
(courtroom number)

## TO THE HONORABLE COURT AND TO ALL PARTIES:

St

PLEASE TAKE NOTICE that on __March/22/2024__ at10:00Am____,
(date)                          (time)

or as soon thereafter as this matter may be heard in the above-entitled Court

located at __US District Court Eastern Division 501 "I" St,Sacrament Ca 95814__
(address of the Court in which the motion is being made)

Mahmood Yoonessi (and myoonessi,mdpc)                    Plaintiff
_____, the _____
(your name)                                        (indicate Plaintiff or Defendant)

in this case will move this Court for Default judgment, pursuant to Federal Rule

of Civil Procedure . This motion is based on this notice, the memorandum of

points and authorities filed herein, the declaration(s) filed by ____Plaintiff____,
                                                                 (indicate Plaintiff or Defendant)

the exhibits filed herein, the statement of uncontroverted facts and conclusions of

law, the pleadings previously filed in this action, and any oral argument permitted

at the hearing on this motion.

   This motion is made following the conference of counsel pursuant to Local

Rule 7-3 which took place on ____N/A____.
                                (date)

DATED: February 8/2024 _____

                  By: _____
                         (sign)                3/10/2024

                       Mahmood Yoonessi
                       (print name)

                       ____Plaintiff____ in Pro Per
                       (indicate Plaintiff or Defendant)

1    Mahmood Yoonessi
     _____ (Full Name)
2
     myoonessi75@gmail.com      (Email)
3    6790 Crest Rd
     _____ (Address Line 1)
4    Rancho Palos Verdes ca 90275
     _____ (Address Line 2)
5    3103031671
     _____ (Phone Number)
6    X
     _____ in Pro Per
7    (indicate Plaintiff or Defendant)

8

9                    **UNITED STATES DISTRICT COURT**
                     **CENTRAL DISTRICT OF CALIFORNIA**
10                           Eastern division

11                                    Case No.: 2:23-cv-00023 TLN DB  PS
                                               _____
12
     ~~Mashmood Yoonessi~~            ,       **MEMORANDUM OF POINTS**
13                                            **AND AUTHORITIES IN SUPPORT**
                     Plaintiff,               **OF MOTION FOR Default**
14                                            **JUDGMENT PURSUANT TO**
              vs.                             **FED. R. CIV. P. 55** to the alt Jury Trial
15   Letitia James Esq,William Pradsifka,Kyle
     ~~Wilcox,Lynette  Antosh~~
16   and                                      **Hearing Date:**   March/22/2024
     "M.Ahern,N.Mceachin,R.Vancouvering                        _____
17   Estate;Real parties in interest "     ,  **Hearing Time:** 10:00 Am
                                                             _____
18                   Defendant(s).            **Judge:** Hon D.Barnes
                                                       _____
19                                                       (Judge's name)
                                              **Place:** Courtroom 27USDist Ct E.D Sacramento
20                                                     _____
                                                       (courtroom number)
21   //

22   //

23   //

24   //

25   //

26   //

27

28
     *Revised: March 2019*
     *Form Prepared by Public Counsel.*
     *© 2013, 2019 Public Counsel.  All rights reserved.*        1

1

2

# I. **INTRODUCTION**

3

*(Include a brief statement of the facts and the procedure in the case that are relevant to this motion.)*
On or about 4/29/22 plaintiff ,duly sworn, filed a writ petition under ccp 1094.5/1085 in

4

Sacramento Superior Court. ;Hon Letitia James filed a general Demurrer on behalf of University of
Buffalo(and no others).The motion was sustained(not appealable),.

5

The Case was removed to this honorable court. All defendants have
defaulted .Atty Maguire filed a motion on behalf of Hon Atty James

6

for a delay of proceeding.He claimed Merryll Tisch, who was sued in
New York on January 9/2014; accused of Altering Plaintiff's Medical

7

License No to 310221(from 118540;gross alteration of the
record,knowingly,willfully,maliciously;an act under 18 USCA 1519).

8

She was served;did not answer;defaulted in State Court proceedings.

9

Said alteration of Plaintiff''s New York License No from 118540;
MedicalLicense) to two unsuspecting nurses License numbers;Mrs

10

Ahern and Mceachin, provided her Jurisdiction over the case and gave
her the opprtunity to override the ruling of of a three Physician

11

Member panel and "Committee on Profession;from 2009).

12

14 years later she requested,was granted more time for
Explanation;she has failed;she committed Fraud;made false

13

Representation; knowingly,wllfully ,maliciously ;to damage Plaintiffs,

As well as State University of NY at Buffalo and other faculty members

14

15

That became the focal point of then UB president(late Steve Sample's
1988 Notice of Discipline )and

16

Late UB president Greiner's fraulent claims in
Termination of plaintiff from his full time Tenured Position

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in Support of Motion for Default Judgment

# II. <u>STANDARD OF REVIEW</u>

Default judgment is appropriate if there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. *See*

Fed. R. Civ. P. 55(a). The moving party bears the initial burden of establishing

there is no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To

defeat the motion for Default judgment, the responding party must present

admissible evidence sufficient to establish any of the elements that are essential to

the moving party's case and for which that party will bear the burden of proof at

trial. *See id.*; *Taylor v. List*, 880 F. 2d 1040, 1045 (9th Cir. 1989). The Court may

grant Default judgment if the motion and supporting materials, including the

facts considered undisputed, show the movant is entitled to Default judgment and

if the responding party fails to properly address the moving party's assertion of fact

as required by Rule 56(c). *See* Fed. R. Civ. P. 56(e).

The responding party cannot point to mere allegations or denials contained

in the pleadings. It is not enough for the non-moving party to produce a mere

"scintilla" of evidence. *Celotex Corp.*, at 252. Instead, the responding party must

set forth, by affidavit or other admissible evidence, specific facts demonstrating the

existence of an actual issue for trial. *See KRL v. Moore*, 384 F. 3d 1105, 1110 (9th

Cir. 2004). Please See also;Anderson v.Liberty Lobby .Respondents  ignored said Motion , Did not  file responsive answers,this motion ensued

1

2

# III. <u>ARGUMENT</u>

3    Please see the table of Authorities,Arguments  section of Opposition document and all

4    supporive documents submitted with original complaint;,they all are hereby incorporated by
     refernce selcted pages re submitted .The Court on its own motion Canceled the Nov 27,2023

5    oral arguments. Attorneys K.A.Blocher,R.L.Lynch  failed to disclose their conflict of interest
     as well as  circumstances /facts surrownding Resignation of  Defaulting Respondent  William

6    Prasifka and  his case  captioned Prasifka v.K.Wilcox.Said attorneys ignored ,disregarded
     Local Rules iof this Court regarding their apppearances,Withdrawals ,representations of

7    Mr Wilcox and Prasifka    (please see attached)

8

9

10

11

12

13

14

15

16

17

18

19

20                        .

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in Support of Motion for Default Judgment

Mahmood Yoonessi
_____ (Full Name)

myoonessi75@gmail.com _____ (Email)

6790 Crest Rd
~~Rancho Palos Verdes ca 90275~~ (Address Line 1)

_____ (Address Line 2)

3103031671 _____ (Phone Number)

X _____ in Pro Per
(indicate Plaintiff or Defendant)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Eastern Division

Case No.: 2:23-CV-00023-TLN-DB

Mahmood Yoonessi
_____ ,

Plaintiff,

vs.

Letitia James,Esq,William Pradsifka,
Merryll Tisch,Kyle Wilcox,Lynette Antosh

_____

_____ ,

Defendant(s).

**DECLARATION IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT PURSUANT TO FED. R. CIV. P. 55**

**Hearing Date:** 03/22/2024 _____

**Hearing Time:** 10:00Am _____

**Judge:** Hon D.Barnes _____
(judge's name)

**Place:** Courtroom 27 _____
(courtroom number)

I, Mahmood Yoonessi _____ , declare as follows:
(print name)

1.    I am the The Plaintiff _____ in the above-entitled case.
(indicate Plaintiff or Defendant)

2.    I have personal knowledge of the following facts, and, if called as a witness, I could and would competently testify thereto.

3.    I discussed and attempted to resolve the issues raised in this motion with the opposing counsel in this case on (*date*): 9/11/2001 to  5/18/2023 ~~Respondents Attorneys do not wish~~ to discuss the case with people without attorneys

*Revised: March 2019*
*Form Prepared by Public Counsel.*
© *2013, 2019 Public Counsel.*
*All rights reserved.*

1

1 . _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _ 02/08/2024                    Rancho Palos Verdes  Ca
              (date of signing)                    (city, state of signing)

_Mahmood Yoonessi 3,10,2024_
(signature)

Mahmood Yoonessi
(name)

Plaintiff _____ in Pro Per
(indicate Plaintiff or Defendant)

3
Declaration in Support of Motion for Defult Judgment

1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**
10         **CENTRAL DISTRICT OF CALIFORNIA**

2:23-cv-00023 TLN DB

Case No.: _____

11    Mahmood Yoonessi

12    _____,

13              Plaintiff,              **(PROPOSED) JUDGMENT**
                                        **GRANTING MOTION FOR**
14         vs.                          **Default JUDGMENT**
      Letitia James, William Prasifka, Merryl Tisch,   **PURSUANT TO**
15    ~~Kyle Wilcox, Ltnette Tosh~~     **FED. R. CIV. P. 55**

16    _____

17    _____,

18              Defendant(s).

19

20   Having considered ___Mahmood Yoonessi___'s Motion for Default Judgment and
                        (indicate Plaintiff or Defendant)

21   finding good cause therefore,

22         IT IS HEREBY ADJUDGED that _____'s Motion for
                                      (indicate Plaintiff or Defendant)

23   Default Judgment is GRANTED.

24

25   Dated: _____      Signed: _____

26                                       Deborah Bames
                                  Hon. _____
27                                            (Judge's name)

28

*Revised: March 2019*
*Form Prepared by Public Counsel.*
*© 2013, 2019 Public Counsel.*
*All rights reserved.*

                              (Proposed) Judgment

1   Mahmood Yoonessi _____ (Full Name)

2   _____myoonessi75@gmail.com_____ (Email)

3   6790 Crest Rd _____ (Address Line 1)

4   Rancho Palos Verdes Ca 90275 _____ (Address Line 2)

5
3103031671 _____ (Phone Number)

6   ___X_____ in Pro Per

7   (indicate Plaintiff or Defendant)

8

9                UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11   Mahmood Yoonessi                    Case No.:_____
                                                 2:23-CV-00023 TLN DB
12   _____,

13           Plaintiff,                 **PROOF OF SERVICE BY MAIL**

14           vs.

15   Letitia James,William Prasifka,Merryll Tisch,
     Kyle Wilcox,,Lynette Antosch

16   _____

17   _____,

18           Defendant(s).

19

20   Shams Alemozaffar
     I, _____, declare as follows:

21           (name of person serving documents)

22                     420 S.Hamel Rd,Los Angeles Ca 90048  and 6790 Crest Rd
     My address is ___Rancho Palos Verdes Ca 90275_____

23   _____, which is located in the

24

25   county where the mailing described below took place.

26

27   On ___02/08/2024_____, I served the document(s) described as:
              (date of mailing)

28

1
2
- Notice of Motion and Motion for Default Judgment Pursuant to Fed. R. Civ. P. 55

3
4
- Memorandum of Points and Authorities in Support of Motion for Default Judgment Pursuant to Fed. R. Civ. P. 55

5
6
- Declaration in Support of Motion for Default Judgment Pursuant to Fed. R. Civ. P. 55

7
8
- Statement of Uncontroverted Facts and Conclusions of Law Pursuant to Local Rule 55

9
10
- Proposed Judgment Granting Motion for Default Judgment Pursuant to Fed. R. Civ. P. 55

11
12
on all interested parties in this action by placing a true and correct copy thereof in

13
a sealed envelope, with first-class postage prepaid thereon, and deposited said

14
envelope in the United States mail at or in ___Rolling Hills  Estate_____,

15
(city and state of mailing)

addressed to:    Please see attached

16

17    Daniel R Mguire 350 Main St ste 300a  (name)         _____ (name)
       Buffalo NY 14202(for L.J&M.Tisch
18     Kyle Wilcox 30 E BroadSt 28th Floor  (address)       _____ (address)
       Columbus Ohio 43215
19     William Prasifka 455 Golden Gate Ave  (address)      _____ (address)

20     _Lynette Antosh;6711 North High St ,chase bank,columbus Ohio 43215_____  (address)

21

22
        I declare under penalty of perjury that the foregoing is true and correct.

23
Executed on   02/08/2024   Torrance Ca 92505_____,
                   (date)                      (city and state of signing)

24

25                                    _____ 3.10.2024
                                              (sign)

26                          Shams Alemozaffar_____
                                 (print name)

27

28

**FILED**

FEB 15 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

| | |
|---|---|
| Name | Mahmood Yoonessi, |
| | MYoonessi,MdPC |
| Street Address | ~~6790 Crest Rd~~ |
| City and County | Rancho Palos Verdes |
| State and Zip Code | Ca 90275 |
| Telephone Number | ~~3103031671~~ |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

~~Mahmood Yoonessi,MYoonessi,MDPC~~

_____

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

Letitia James,William Prasifka,Kyle Wilcox, Merrill
Tisch,Lynette Antosch,all personally,Medical
Boards of California,New York,Ohio,University of
Buffalo,Chase Bank ,and Does 1-10

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

**Complaint for Violation of Civil
Rights** (First Amendment)
(Non-Prisoner Complaint)

Case No. 2: 23-CV-00023-TLN-DB

*(to be filled in by the Clerk's Office)*

Jury Trial:   ☒ Yes   ☐ No
              *(check one)*

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in *forma pauperis*.

---

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Mahmood Yoonessi,MYoonessi,MDPC |
| Street Address | 6790 Crest Rd |
| City and County | Rancho Palos Verdes  Ca |
| State and Zip Code | Ca,90275 |
| Telephone Number | 310.303-1671 |
| E-mail Address | myoonessi75@gmail.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Letitia  James |
| Job or Title (if known) | Attorney |

2

| | |
|---|---|
| Street Address | 28 Liberty St,19th Floor |
| City and County | New York,NY 10005 |
| State and Zip Code | New York |
| Telephone Number | 212-416-8469 |
| E-mail Address (if known) | <gavin.mccabe@ag.ny.gov> |

☒ Individual capacity  ☐ Official capacity

**Defendant No. 2**

| | |
|---|---|
| Name | Kyle Wilcox,, |
| Job or Title (if known) | Attorney |
| Street Address | 41 South High St,Suite 2495 |
| City and County | Columbus |
| State and Zip Code | Ohio 43215 |
| Telephone Number | 614.340-5558 |
| E-mail Address (if known) | <rplynch@grsm.com> |

☐ Individual capacity  ☐ Official capacity
X

**Defendant No. 3**

| | |
|---|---|
| Name | Merrill Tisch |
| Job or Title (if known) | Unknown |
| Street Address | Main Place Tower,Suite 300a |
| City and County | Buffalo ,Erie |
| State and Zip Code | New York |
| Telephone Number | 716-853-8419 |
| E-mail Address (if known) | <daniel.maguire@ag.ny.gov.ny> |

☐ Individual capacity  ☐ Official capacity
X

**Defendant No. 4**

| | |
|---|---|
| Name | Medical Boards of California and Ohio (represented by Kristin Blocher) |
| Job or Title | Unknown |

3

(if known)

Street Address     _3 ParkCenter Dr_ Suite200 _____

City and County    Sacramento

State and Zip Code  _CA95825_____

Telephone Number    _916-565-2900-6546

E-mail Address      __<Kblocher@grsm.com>_____
(if known)          _

 <sup>xx</sup> Individual capacity  ☐ Official capacity
Defendant No 5;Lynette Antosh; 6711 North High Stl
Chase Bank;Commercial Lending ;Columus Ohio 43215

**II. Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any
rights, privileges, or immunities secured by the Constitution and [federal laws]." Under
*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388
(1971), you may sue federal officials for the violation of certain constitutional rights.

 A. Are you bringing suit against *(check all that apply)*:

   ⌐ Federal officials (a *Bivens* claim)  (under color of Law

   ☐ State or local officials (a § 1983 claim) (Under Color of Law

 B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or
   immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If
   you are suing under section 1983, what federal constitutional or statutory right(s)
   do you claim is/are being violated by state or local officials?

   Constitutional rights violations(Const Amendments I,II,IV,V,VI & XIV _____

   Extortion;Violations of18 USCA875-879,Perjury;18USCA1621,Mutilation,Alteration of Records
   (18 USCA 1519,Forgery &Defamation,Due Process violation,Conversion,Assumpsit

 C. Plaintiffs suing under *Bivens* may only recover for the violation of certain
   constitutional rights. If you are suing under *Bivens*, what constitutional right(s)
   do you claim is/are being violated by federal officials?

   Anendments I,IV,V,VI,XIV violations _____

   _____

   _____

4

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

_Punished Plaintif for Non use of Taxol and Carboplatin at the time they were not approved

_Took over my Medical Office at 355 Linwood Ave In Buffalo New York,Knowingly altered The Office;a historical site have failed to Pay The Mortgage and Interest(Breach of Contract

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

President Steve Sample was a Very Powerful,Well connected :nationally and Internationally Known,Who ignored my Tenured Status,to replce me with Dr Steve Piver ,Pay bribes or be fired

B.    What date and approximate time did the events giving rise to your claim(s) occur?

It began shortly after Sept 11.2001 and continues

C.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

It is undisputed that no one else in the country or the World at large has been subjected to discipline ;(to include loss of a tenured University Professor Ship based on fraudulent claims of a Canadian(Dr DC Kredentser)and Alteration,Mutilation,Fabrication of the Records of now Known,Six(B-H),or Nine (ALJ Trost claim),or Tem(Ktredenser without recvords)

5

_____
_____
_____
_____
_____
_____
_____
_____

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and
state what medical treatment, if any, you required and did or did not receive.

Loss of my Tenured Associate professorship,Salay,Benefits,Retirement income,
  *Loss of my Office building without being paid based on Morgage note,

  *Been denied Mortgage Loans based on Fraudule claims of defendant L.Antosch

_*Permanent loss of my Medical Licenses in New Yor,California,and Ohion based on No evdence
(no reliable ,Probative Evidence no conformity with Law)
  *Denied $968000 my accountant F .Law said University owed me,
  *Denied $75,000 UUP,University of Buffalo claimed they will pay,
  Denied My Medicaid Payments (over$105,000),Denied my FPP overage money
  given to UB Foundation and Endowment Fund
_*Whistle blower Compensation

## V.    Relief

State briefly what you want the court to do for you.  Make no legal arguments. Do not
cite any cases or statutes.  If requesting money damages, include the amounts of any
actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis
for these claims.
  Two Billion  Dollars plus Punitive damages(Libel Per Se)
____Demanding Jury Trial of all causes of action and damages(Consttutional Amendment VI)___

_____
_____
_____
_____
_____
_____
_____

6

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my
knowledge, information, and belief that this complaint: (1) is not being presented for an
improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the
cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for
extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support
after a reasonable opportunity for further investigation or discovery; and (4) the
complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-
related papers may be served.  I understand that my failure to keep a current
address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing        February 8th 2024

Signature of Plaintiff    _Mahmood Yoonessi  Mahmood Yoonessi 3/10, 2024_

Printed Name of Plaintiff    Mahmood Yoonessi

7



## SUMMARY

00 1156 126
45.r

26

Respondent's license to practice medicine in New York State should be revoked. This penalty would be justified solely on the testimony of his own expert witness, other physician witnesses he presented, and the testimony of Dr. Kredentser concerning Patients A, B, and chemotherapy. The Committee is requested to state that they would revoke his license on this evidence alone, and then state what penalty they would impose based on all the evidence. It is obvious this Respondent will appeal any adverse Committee decision. Part of his appeal will contest the fact that he was not permitted to cross examine Dr. Kredentser ad infinitum. A statement of penalty based on the portion of the case he did cross examine the witness and based on his own witnesses might make the appeal process more expeditious.

Respondent is a gynecologic oncologist, and most of these patient cases involve advanced ovarian cancer. Respondent's lack of appropriate care of patients began, in most cases, when he first met them and was about to perform surgery. He failed to perform adequate pre-operative evaluations which are necessary to determine the risks to the patient and to obtain the patient's informed consent. Mismanagement then continued, regarding the scope of the operative procedure he undertook, often resulting in prolonged or complicated post-operative courses or death.

Respondent administered a unique chemotherapy regimen to patients consisting of 7, 8, or 9 chemotherapeutic agents. This regimen has not been validated by any independent scientific study and is not in use in any cancer center or by any other physician. Finally, concerning end-of-life decision making, Respondent was inappropriate and abusive with both patients, their family members, and other physicians.

000058

 

STATE OF NEW YORK : DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

---

IN THE MATTER

OF

MAHMOOD YOONESSI, M.D.

---

EXHIBITS IN EVIDENCE IN FULL, BUT SOME PAGES
OMITTED FROM HEARING COMMITTEE COPIES

| No. | Exhibit Description | Pages in Hearing Committee Member copies |
|---|---|---|
| 7. | Patient B – Buffalo General Hospital record | cover-121, 232-482 |
| 8. | Patient C – Our Lady of Victory Hospital record | cover-140, 268-336 |
| 11. | Patient D – St. Joseph's Hospital record | 1-260, 779-837, 947-1243, 1292-1296, 1976-1977 |
| 18. | Patient F – Our Lady of Victory Hospital record | 1-247, 342-350, 504-510 |
| 20. | Patient G – Buffalo General Hospital record | cover-6, 25-28, 61-69, 94, 99, 149-156, 158-159 190, 215, 279-405 |
| 21. | Patient H – Mercy Hospital of Buffalo record | cover-84, 163-225, 229-275 |



584 Delaware Avenue, Buffalo, New York 14202



Antonia C. Novello, M.D., M.P.H.
Commissioner of Health

Dennis P. Whalen
Executive Deputy Commissioner

July 12, 1999

**PERSONAL AND CONFIDENTIAL**

Mahmood Yoonessi, M.D.
355 Linwood Avenue
Buffalo, New York 14209

RE: PMC #: 44B-BU-97-07-3161B

Dear Dr. Yoonessi:

The New York State Department of Health, Office of Professional Medical Conduct, is investigating a complaint filed with this Office against you.

Pursuant to Section 230-10(L) of the Public Health Law (see below), I hereby request **a complete certified copy** of the medical records on the patients listed below:

1. Johnny Mae Lemons
2. Irene Kaluzny
3. Elizabeth Steinbroner
4. Virginia Slisz
5. Betty Pieleck
6. Genevieve Sznolke
7. Faith Wheaton

This request is made pursuant to *Public Health Law Section 230-10(L)* which states:

> The board or its representatives may examine and obtain records of patients in any investigation or proceeding by the board acting within the scope of its authorization.

This should include physician's notes, laboratory tests, physician's orders, medication sheets and all other documents in the patient file. When copying laboratory reports, please ensure that the complete lab report is copied and that all data is visible and legible. Any written explanation of the record may accompany the file but cannot be accepted in lieu of it. **Each medical record must have a separate, signed certification attached to it which attests that the copy being forwarded to this Office is a complete and exact one.** For your convenience, enclosed are certification forms that must be completed and returned with the requested records. **The records are due in this Office by July 26, 1999.** If you have any questions, please contact me at 716-847-4326. Thank you for your attention to this matter.

Sincerely,

Dorothy Ciccarella
Investigator
Office of Professional Medical Conduct

DC/bp

Enclosure

Case 2:23-cv-00023-TLN-SCR   Document 41   Filed 03/18/24   Page 41 of 116
Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658
04/21/2021  13:46   4242069843          M YOONESSI SY                                PAGE 02/11

*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

JUN 2 3 2003

Decided and Entered: June 20, 2003                        Case # 92009

_____

In the Matter of MAHMOOD                    **DECISION AND ORDER**
YOONESSI,                                   **ON MOTION**

                              Petitioner,

          v

**STATE BOARD FOR
PROFESSIONAL MEDICAL
CONDUCT et al.,**

                              Respondents.
_____

        Motion to strike portions of appendix and for further relief.

        Upon the papers filed in support of the motion and the papers filed in opposition
thereto, it is

        ORDERED that the motion to strike portions of the appendix is granted, without
costs, to the extent that the following pages in the appendix and all references thereto in
petitioner's brief are stricken:

        Group 1. Pages A482, A488, A493, A509, A513, A549, A574, A776, A879 –
A908, A911, A913, A914, A946, A1031, A1054, A1093, A1094, A1114, A1204, A1325
– A1365, A2384 – 2390, A2401, A2402, A2404, A2409, A2417, A2418, A2421, A2434,
A2435, A2439 – A2442, A2454, A2500 – A2506, A2533 – A2542, A2563 – A2572,
A2602, A2662 – A2666, A2675 – A2699, A2709, A2727, A2736, A2807– A2832, A2837
– A2841, A2850, A2864, A2988, A2989, A3059 – 3066, A3365 – A3367.

        Group 2. Pages A1714 – A1776, A2132 – A2140, A2148 – A2151, A2153 –
A2160, A2166 – A2168, A2242 – A2251, A2253, A2255 – A2272, A2280 – A2283,
A2286 – A2297, A2302 – A2308, A2314 – A2316, A2319 – A2323, A2328 – A2330,
A2530 – A2531, A3386 – A3427, A3437, A3555 – A3562.

        Group 3. Pages A2087, A2089 – A2105, A2115 – A2131, A2146, A2165, A2652 –
A2653, A3430 – A3436, A3438 – A3440, A3442 – A3446, A3449 – A3466.

        Group 4. Pages A455, A1009, A1206, A1429, A1510, A1777, A2086, A2106,
A2114, A2141, A2144, A2147, A2152, A2161, A2348, A2382, A2399, A2472, A2582,
A2654, A3009, A3152, A3278, A3368.

        Group 5. Pages A3639 – A3678. Petitioner shall file and serve a corrected brief
and appendix on or before July 7, 2003, and it is further

        ORDERED that the proceeding is removed from the September 2003 term and set
down for the October 2003 term, and it is further

00373

Appellant's Ex. P

ORDERED that respondent's time to file and serve their brief is extended to August 1, 2003.

CARDONA, P.J., PETERS, MUGGLIN, ROSE and LAHTINEN, JJ., concur.

ENTER:

*Michael J. Novack*

Michael J. Novack
Clerk of the Court

00374

Group 1

| Pages referred to in 6-23-03 order | Significance, Relevance to the Petitioner's case | Exhibit # | Location in the Record---Pg. #. |
|---|---|---|---|
| A482 | Crucial evidence, Pt. B's chemotherapy of July 5, 1989 was done in the hospital, not Petitioner's office as Mr. Donovan and Dr. Kredentser claimed | 5 | 34 |
| A488 | Pt. B's chemotherapy order of 7-12-89 from B.G.H. | 5 | 45 |
| A493 | Chemotherapy IV order sheet 8-9-89 | 5 | 66 |
| A509 | Chemotherapy orders 8-30-89 | 5 | 385 |
| A513 | Chemotherapy orders 9-8-89 | 5 | 390 |
| A549 | Chemotherapy orders 3-2-90 | 5 | 307 |
| A574 | Discharge summary 3-14->15-90 | 5 | 317 |
| A776 | I.H.A. approval for Pt. B's admission to B.G.H. | 5 | 467 |
| A879 | O.R. Report from B.G.H.—Panel ruled on this without review | 5 | 615 |
| A908 | Does not exist in the appendix | | |
| A911 | Disability Certificate – Patient B | 5 | 648 |
| A913 | I.H.A. approval form dates 6-25-92 | 5 | 649 |
| A914 | I.H.A. approval form and referral | 5 | 650 |
| A946 | Chemotherapy order sheet – Pt. B—3-3-90 | 5 | 171 |
| A1031 | Analysis of an exhibit #10 containing false, fraudulent information | | |
| A1054 | History and physical findings Pt. D; 6-22-94 | 9 | 167 |
| A1093 | History of physical findings - Pt. D. 7-27-94 | 9 | 138 |
| A1094 | The remainder of history of physical Pt. D.; 7-27-94 | 9 | 139 |
| A1114 | EKG report; Pt. D—subject of monitoring debate | 9 | 118 |
| A1204 | Undeniable proof that? on exhibit #10 (A1033) is fraudulent | 9 | Deleted by the State |
| A1325 – A1365 | A1325-A1356; previously submitted, uncontested by the State proves fraudulent nature of State Exhibit #13 and the falsehood that the? represents | | |

1

003775

Appellant's Ex. P

| | | | |
|---|---|---|---|
| | (A1207—R.,O.A 7331). The State had these documents withheld, concealed them during the hearings.<br>A1357—is in State exhibit #12 Pg. 263<br>A1358—is Pg. 1148 of the transcript. It clearly shows Dr. Kredentser did not have the foggiest idea about the Taxol use and approval process.<br>A1359—Biopsy report of a neck node Pt. E. for cancer, State Exhibit #12, pg. 196<br>A1360—Chemotherapy record 6-17-97.<br>A1361 & A1362—History of physical report Pt. E; 6-17-97<br>A1363—consent of chemotherapy of 6-17-97.<br>A1364—Chemotherapy record of 6-17-97 Pt. E. | <br><br><br><br><br><br><br><br><br><br><br>12<br><br>12<br><br>12<br><br>12 | <br><br><br><br><br><br><br><br><br><br><br>188<br><br>189, 190<br><br>191<br><br>321 |
| A2384 – A2390 | Crucial document proving the fraudulent nature of State's claim that history and physical for 2-19-92 or 2-19-86 for Pt. E was phantom. This history and physical refers to status post port-a-cath insertion with Head and neck examination—the evidence withheld, concealed proves head and neck exam of 2-18-92 was negative and patient had an appointment in the office, submitted into evidence, uncontested—these documents are included in Petitioner's prior submissions to the court –A2388 is a page from State Exhibit #12 (pg. ) | | |
| A2401<br>A2402<br>A2404 | Is the actual copy of A2402 (State exhibit 4 pg. 50).<br>It proves beyond a shadow of a doubt that part of the information on this order sheet is missing from the State's submission (namely | | |

00376

Appellant's Ex. P

| | | | |
|---|---|---|---|
| | evidence to the head of the line indicating that the nurse or someone on 8/28 at 1600 took this order off and patient was on Dilaudid 1-2 mg IV q2-3h prn for pain. This further proves that someone (Dr. Steven Goodnaugh) ___ authored Pt. A's DNR form and signed his name and the Petitioner's name on that document (A2406 of State Exhibit 4, pg. 9); ordered 5-10 mg Morphine Sulfate IV q 10 min (not as needed) and forged Petitioner's signature (A2408, State Exhibit 4, pg. 53) and sometime later the same day declared the patient incapacitated because of multi-organ system failure (A2407, pg. 10). There is no indication as to what happened to the large dose of Morphine Sulfate. This was reported to the office of inspector general of the State of New York on July 30th, 2002 and to the Erie County Assistant DA (Mr. Schwegler). A2404 is part of State Exhibit #4 (Pg. 115) | | |
| A2409 | Is the handwritten pathology report authored by Dr. ▓▓▓▓▓, the pathologist at D.M.H.; specifically prepared for Patient A's family's review and used it in the course of discussion of treatment options with family by the Petitioner. This report was concealed. It is in the patient's D.M.H. record. | | |
| A2417 | Face sheet Pt. A's D.M.H. report | State Exhibit #3 | Pg. 2 |
| A2418 | Is a page from State Exhibit #3 | | |
| A2421 | Handwritten report from pathologist, Dr. Victor, part of Pt. A's record. | | |
| A2434 | Definition of adenomyoma and adenomyosis previously submitted | | |

3

00377

Appellant's Ex. P

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658
Case 2:23-cv-00023-TLN-SCR    Document 47    Filed 03/18/24    Page 46 of 116
04/21/2021   13:46   4242069843    M YOONESSI  SY                    PAGE 07/11

| | | | |
|---|---|---|---|
| A2435 | Textbook definition of adenomyoma and adenomyosis— previously submitted | | |
| A2439-A2442 | Lab reports from D.M.H. (Ca125 elevation of 129.3) and its significance; discussed at length in testimonies and referred to in D&O: 02-188 | | |
| A2454 | Clearance summary by Dr. C. Lewis from Patient A's record at D.M.H. part of the record | | |
| A2500-A2506 | Consent for chemotherapy Pt. B with Taxol in 1995 | | |
| A2533 | History and physical Pt. B from 1-6-95 | State Exhibit 5 | 665-66 |
| A2542 | A2536-2537-2538-2540-2541-2542 | 5 | 657-658, 619-639-640-641 |
| | A2535 is the face sheet from hospital admission of 2-6-95, Pt. B, BGH A2539 is the pre-op note by UB residents and students dated 2-6-95 | | |
| A2563 | Serial Ca 125 report 10/31/95-12/27/95-1/23/96 –3/5/96 | | |
| A2572 | Showing normalization of Pt B's Ca 125 in October and December 1995, and a rise in January 1996 with further increase on March 5, 1996; proof of patient's disease reactivation and justification for surgery of March 1996; concealed by the State. A2564; A2565— CT scan report Pt. B at BGH 2/26/96 | | |
| A2566 | CXR report; Patient from BGH 3/5/96 | | |
| A2567,A2568 | History and physical Patient B dated 3/7/96 | | |
| A2569 | Consent for exploratory laparatomy of 3/5/96 signed 1405 pm | | |
| A2570- A2572 | Pathology report from BGH for Patient; Diagnosis—recurrent and metastatic carcinoma | | |
| A2602 | Petitioner's pre-op report patient | | |

4

00378

Appellant's Ex. P

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658
04/21/2021 13:46 4242069843 M YOONESSI SY PAGE 08/11
Case 2:23-cv-00023-TLN-SCR Document 47 Filed 03/18/24 Page 47 of 116

|  | 5/11/93 | 8 |  |
|---|---|---|---|
| A2662 - A2666 | A2662; Ca 125 level PT. D 4/25/94 | 9 | 309 |
|  | A2663- A2664: Dr. Meceda's OR report Pt. D 4/25/94 | 9 | 40-41 |
|  | A2665- A2666: first 2 pages of OR report Pt. D. 4/25/94 |  |  |
| A2675-A2699 | All consent forms are ordered stricken; signed dated and witnessed and part of the record Pt. D. | 9 | 32 |
|  | A2699 consent for laparotomy and colostomy Pt. D. 3/6/95 |  | 33,34,178,170,166,204,187,153,151,140,137,129,125,100,96,93 88,58, 48,270,267,263, 251 |
| A2709 | History and Physical Pt. D. 6/8/94 | 9 | 183 |
| A2727 | Chemotherapy sheet; 10/12/94 | ?10 | 111 |
| A2736 | CT scan of A&P with IV contrast; revealing pelvic cystic mass | 11 | 89 |
| A2807-A2832 | History and physical, chemotherapy records Pt. D. marked with ? on State Exhibit #13 for period of time from 12/15/91 – 5/11/93 from State exhibit 12 previously submitted as TE/30-162 and chemotherapy orders from O.L.V. Hospital for 1992. |  |  |
| A2837-A2841 | Lab work from OLV Hospital and chemotherapy and other consent forms 1/13/92 | 9 | 407,408-409 and concealed. |
| A2850 | Consent for transfusion OLV hospital 9/4/97 |  |  |
| A2864 | History and physical 12/5/92 Pt. E marked with ? on State Exhibit #13. Submitted previously and uncontested.. |  |  |
| A2988-A2989 | Pages from State exhibits with their page numbers 459 |  |  |
| A3059-A3066 | Pre op and op note, consent forms for surgery and chemotherapy. Cardiac ejection fraction of |  |  |

5

00379

Appellant's Ex. P

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV006658
Case 2:23-cv-00023-TLN-SCR    Document 4-2    Filed 03/18/21    Page 48 of 116
04/27/2021  13:46    4242069843    M YOONESSI SY                                                    PAGE 09/11

| | 64/&ER positivity report of Pt F's tumor. | | |
|---|---|---|---|
| A3365-A3377 | The OB/GYN Peer review/quality assurance committee report dated March 14, 1994 signed by chairman and chair of quality assurance coordination office. | | |

## GROUP 2

| Page Reference 6/23/03 Order | Relevance, significance to Petitioner's case | Location in the R.O.A. |
|---|---|---|
| | | |
| A1714-A1776 | Leucovorin, 5Fu effectiveness (A1714) original report of NCI on HexaCAF regimen (A1715). USPDI book 1997 edition with National Consensus (A1716-17) on NA Iodide (Iodopen [A1718]) Methotrexate (A1719), 5Fu (A1720), Progestins (A1421-22), Hexalen (Altretamine [A1423]). Text book definition of character of menstrual flow (A1724). Textbook definition of endometriosis and adenomyoma (A1425-A1726) Methotrexate (A1426-27) high dose, 5Fu (A1728-29). The editorial list of USPDI (A1730-A1740) their recommended indications for Methotrexate (A1741), 5Fuk (1742), Hexalen (A1743), Adriamycin (A1744), Progestins and thromboembolism (A1745-A1747), Leuamisole, Ergamisol (A1748). Iodopen (A1749-A1751), Carboplatin (A1752), Taxol (A1753), PDR Editorial Staff (A1754) and their admission PDR is published by Thompson PDR in Cooperation with participating manufacturers. The FDA rules of approval of drugs (A1757-59). A1760-76; FDA approval process for Carboplatin (A1761), Taxol (A1762) Doxil (Doxorubicin Liposome [A1770-A1776]) | |
| A2132-40 | Information available on the web site. Dr. | |

00380

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Apr 27 3:17 PM-21CV001658
Case 2:23-cv-00023-TLN-SCR   Document 42   Filed 03/18/24   Page 49 of 116
04/21/2021  13:46   4242069843   M YOONESSI  SV                    PAGE  10/11

|          | Dillon's AHPIA insures RPCI oncologists |  |
|----------|------------------------------------------|--|
| A2148-A2151 | Wall Street Journal; Trial Judge at FDA approving cancer treatments can be an ordeal. | |
| A2153-A2160 | Definitions of consultation (A2153), informed consent (A2154), Standard of care for ovarian cancer (A2155-59), expert witness (A2160) From American College of Obstetricians and Gynecologists. | |

## GROUP 3

| Page reference in 6/23/03's order | Relevance, Significance to Petitioner's Case | Exhibit # | Location in R.O.A. Pg. # |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## GROUP 4

| Page reference in 6/23/03's order | Relevance, Significance to Petitioner's Case—Defense | Exhibit # | Location in R.O.A. Pg. # |
|---|---|---|---|
| A455 | Analysis of State Exhibit #6 for the years 1989-1995. The Panel wrote decision and the State prepared this document without securing the Pt. B's Hospital record. | | Mr. Donovan's admission he never produced Pt. B's hospital record in the years of 1989-1995 |
| A1009 | For the record it should be noted that expert witness's testimony (pgs. 1201-1209) clearly establishes that both Mr. Donovan and Dr. Kredentser referred to different page numbers in the 1995-hospital record. | | Page removed ▨▨▨ this affidavit |
| A1206 | Analysis of DOH exhibit #13; heading | | Page |

7

00381

Appellant's Ex. P

| | | | removed |
|---|---|---|---|
| A1429 | Analysis of Patient G's Chemotherapy chart, heading | | Page removed |
| A1510 | Chemotherapy GOG Protocols 111, 114, 132, FDA approval for Carboplatin and Taxol US. Pharmacopoeia and PDR | | Page removed |
| A1777 | Journal articles and book references submitted at hearing but ignored | | Page removed |
| A2086 | Commissioner's actions, are they legal and defensible? | | Page removed |
| A2106 | Mr. Donovan's actions and statements regarding standard for chemotherapy and 1st and 2nd line chemotherapy of ovarian cancer. | | Page removed |
| A2114 | Dr. W. Dillon, Chair of the Board of Governors and executive Committee of AHPIA | | Page removed |
| A2141 | The department of Health would not release the M&M record of patients cared for by physicians insured by Dr. Dillon's insurance company | | Page removed |
| A2144 | Attachment to subpoenaed information from DOH | | |
| A2147 | With current fiscal problems…..Why FDA? | | Page removed |
| A2152 | ACOG's definition of consulting and ethics | | Page removed |
| A2161 | Dr. Kredentser's Credibility | | Page removed |
| A2348 | Confusions related to Patient B's record | | Page removed. |
| A2382 | Patient E's Port-a-Cath insertion record | | Page removed |

00382

8

Appellant's Ex. P

# Search Results for Medical Doctor and Special Faculty Permit

**This information is updated Monday through Friday - Last updated: JUL-13-2009**

**To see all the information for a licensee, click on the highlighted name. This will also include disciplinary actions if any are present.**

| Name | Type | Number | Address | City | Zip | County |
|------|------|--------|---------|------|-----|--------|
| KREDENTSER DANIEL C | A | 36470 | 22 FOREST ROAD | ST JOHNS NEWFOUNDLAND | A1C 2C1 | OUT OF COUNTRY |

Record 1

First Previous

***Disclaimer***
*All information provided by the Department of Consumer Affairs on this web page, and on its other web pages and internet sites, is made available to provide immediate access for the convenience of interested persons. While the Department believes the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore, the Department makes no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither the Department, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information. Other specific cautionary notices may be included on other web pages maintained by the Department. All access to and use of this web page and any other web page or internet site of the Department is governed by the Disclaimers and Conditions for Access and Use as set forth at California Department of Consumer Affairs' Disclaimer Information and Use Information.*

Back    |    Return to Main License Listing

R 42

READ INSTRUCTIONS ON REVERSE SIDE

CUT OFF THIS STRIP

# The University of the State of New York

THIS IS TO CERTIFY THAT

## THE STATE EDUCATION DEPARTMENT
HAS REGISTERED

YOONESSI MAHMOOD
APT 5K
1545 RHINELANDER AVE
BRONX N Y                    10461

FOR PRACTICE IN NEW YORK STATE AS A(N)

PHYSICIAN

118540
LICENSE NO.

12/31/74
BIENNIUM ENDS

SIGNATURE OF REGISTRANT

ASSOCIATE COMMISSIONER

READ INSTRUCTIONS

ON REVERSE SIDE

CUT OFF THIS STRIP

246667

444

1           MR. COLLINS:   I just want to be clear
2      that in other words that the documents -- some
3      of the documents that have now been received
4      into evidence are not the same -- I just want
5      to be clear -- not the same as the documents
6      that were provided either to your office or
7      Tarantino's office.
8           MR. DONOVAN:   No, they're the same.
9      The committee members will be getting fewer
10     pages.  You'll see in some of them --
11          MR. COLLINS:   Judge, you just
12     instructed him -- excuse me.  I didn't mean to
13     interrupt you.
14          MR. DONOVAN:   No.  Go ahead.
15          MR. COLLINS:   So we're going to be
16     getting a list from Mr. Donovan of those pages
17     that have been removed from the exhibits.
18          ALJ TROST:   Before you leave, you can
19     get that list from him so you have it tonight,
20     but I ask you to prepare a better list for
21     tomorrow for the panel members, as well.
22          MR. DONOVAN:   Right.
23          ALJ TROST:   He's speaking about the
24     copies that the panel members take home with
25     them.

**LETITIA JAMES, ESQ.**
**Attorney General of the State of New York**
**Daniel R. Maguire, Pro Hac Vice**
**Gavin McCabe (Bar No. 130864)**
**Assistant Attorney General**
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
Telephone: (716) 853-8419
Fax: (716) 853-8571
E-mail: Daniel.maguire@ag.ny.gov

*Attorneys for Defendants Letitia James, SUNY*
*Buffalo and Merryl Tisch*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MAHMOOD YOONESSI,**<br><br>Plaintiff,<br><br>v.<br><br>**LETITIA JAMES, WILLIAM J. PRASIFKA, KYLE WILCOX, AND MERRILL TISCH**<br><br>Defendants. | Case No. 2:23-cv-00023-TLN-DB<br><br>**NEW YORK STATE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Judge: Hon. Deborah Barnes<br>Action Filed: January 6, 2023 |



IN THE MATTER

of the

Application of MAHMOOD YOONESSI for restoration of his license to practice as a physician in the State of New York.

Case No. CP-11-26

It appearing that the license of MAHMOOD YOONESSI, to practice as a physician in the State of New York, was revoked by Order of the State Board for Professional Medical Conduct dated June 5, 2002, and he having petitioned the Board of Regents for restoration of said license, and the Regents having given consideration to said petition and having reviewed the record, and having disagreed with and rejected the recommendations of the Peer Committee and the Committee on the Professions, for the reasons set forth in the attached written decision, now, pursuant to action taken by the Board of Regents on October 9, 2012, it is hereby

ORDERED that the petition for restoration of License No. 310221, authorizing MAHMOOD YOONESSI to practice as a physician in the State of New York, is denied.

IN WITNESS WHEREOF, I, John B. King, Jr., Commissioner of Education of the State of New York for and on behalf of the State Education Department, do hereunto set my hand and affix the seal of the State Education Department, at the City of Albany, this ___ day of _____ 2013.



REDACTED
Commissioner of Education

000088    000393



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF PROFESSIONAL DISCIPLINE
(212) 921-3872

1411 BROADWAY – TENTH FLOOR
NEW YORK  NEW YORK 10018



March 1, 2013

ahmood Yoonessi, Physician
EDACTED

Re: Application for Restoration

ir Dr. Mahmood:

Enclosed please find the Commissioner's Order regarding Case No CP-11-26, which is in reference to the oration of license number 310221. This order and any decision contained therein goes into effect five (5) days r the date of this letter.

Very truly yours.

LOUIS J. CATONE, Director
Office of Professional Discipline
By: REDACTED

ARIANA MILLER
Supervisor

\M/nbm
>sure
**TIFIED MAIL – RRR**

 

## Office of the Professions

# Verification Searches

The information furnished at this web site is from the Office of Professions' official database and is updated daily, Monday through Friday. The Office of Professions considers this information to be a secure, primary source for license verification.

---

### License Information *

---

**06/22/2020**

**Name :** YOONESSI MAHMOOD
**Address :** WILLIAMSVILLE NY
**Profession :** MEDICINE
**License No:** 118540
**Date of Licensure :** 11/21/1973
**Additional Qualification :**
**Status :** LICENSE REVOKED
**Registered through last day of :**
**Medical School:** TEHRAN POLYTECHNIC INST    **Degree Date :** 09/01/1965

---

(Use your browser's back key to return to licensee list.)

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

**Note:** The Board of Regents does not discipline *physicians(medicine), physician assistants,* or *specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.

---

Further information on physicians may be found on the following external sites (The State Education Department is not responsible for the accuracy or completeness of information located on external Internet addresses.):

American Board of Medical Specialties

American Medical Association:
- For the general public: AMA Physician Select, On-line Doctor Finder
- For organizations that verify physician credentials: AMA Physician Profiles

American Osteopathic Association, AOA-Net

Association of State Medical Board Executive Directors-(A.I.M."DOCFINDER")

New York State Department of Health Physician Profiles

The following sites provide additional information concerning the medical profession:

CLEAR (Council on Licensure, Enforcement and Regulation)

Federation of State Medical Boards



# CAPITAL DISTRICT
# HEMATOLOGY ONCOLOGY ASSOCIATES

317 South Manning Blvd • Suite 310 • Albany, New York 12208 • (518) 489-0044 • FAX (518) 489-3591

## EVALUATION OF MEDICAL RECORDS

### Mahmood Yoonessi M.D.

At the request of Mark Fantauzzi, Assistant Counselor for the Office of Professional Medical Conduct, State of New York, I have reviewed 10 case records of patients cared for by Dr. Mahmood Yoonessi. For each case examined the entire hospital record for all the admissions in question were reviewed in detail. In addition for those patients followed in Dr. Yoonessi's office, the office records as provided were reviewed in detail. In addition the report of interviews held between the Office of Professional Medical Conduct and Dr. Yoonessi were also reviewed as were those interviews with patients or other physicians involved with these cases. In addition, in regards to Dr. Yoonessi's chemotherapy protocol, I have reviewed a copy of his paper that had been submitted to the European Journal of Gynecology Oncology. In a detailed search of the literature using Medline search, I was unable to find any other reference to this chemotherapy regimen. In addition, I reviewed standard texts utilized by gynecologic oncologists from 1979 to the present and found no reference to this specific protocol.

In analyzing the medical records of these 10 cases, the progress notes rendered by Dr. Yoonessi in the medical records charts were often illegible and when they could be deciphered were often uninformative regarding the patients' current condition. The notes were often untimed and their place in the medical record could only be inferred. He often failed to provide an adequate description of the condition of these severely ill patients. His thoughts and treatment plans were often nonexistent or vague. Dr. Yoonessi uses preprinted office forms with check boxes for history and physical examination. As one examines these closely, they seem to be filled out in a proforma manner with little thought to the patient's current condition. Dr. Yoonessi failed to keep any chemotherapy flow charts regarding the patient's treatment, blood counts, or serial physical examinations. This made following the patients clinical course extremely difficult.

Each case will be reviewed separately.

### Case #1: Johnny Mae Lemons, MR #960033, Buffalo General Hospital, Buffalo NY.

1.  CASE SUMMARY:

The patient was a 74 year old African American woman who was admitted to Buffalo General Hospital on September 16, 1997 with shortness of breath. She was known to have had a large ovarian tumor and had been previously seen by Dr. Yoonessi 6/96 at which time she was noted to have a 34 x 26 x 19 cm cystic pelvic abdominal mass. She had refused treatment for this condition in 1996. She was admitted under the care of Dr. L. Sifontes, who felt that the patient's admitting condition was poor with a guarded prognosis. He felt that the most appropriate care was to make the patient comfortable and try to encourage her to have fluid removed. A Gyn oncology consultation was obtained from Dr. Yoonessi. During her hospitalization she made it clear to the nursing staff and to Dr. Sifontes that she did not want any invasive procedures performed, including placement of an NG tube. She also refused a CT scan of the abdomen and pelvis. On 9/18/97 she was made DNR by her

**DANIEL C. KREDENTSER, MD, FRCSC, FACOG**
Diplomate of the American Board of Obstetrics and Gynecology and Gynecologic Oncology

359



000060



Questions

1) Was there appropriate documentation in the chart relative to Dr. Yoonessi's communication with the patient and the family regarding the diagnosis and his plan of treatment? Dr. Yoonessi documents in his consultation and in the progress notes that he discussed this situation with the patient and her niece. He did not always document their response.

2) Was there appropriate documentation of consent for surgery by the patient and her family? The only clear documentation in the chart was that the patient refused repeatedly any invasive treatment. There was no documentation for surgical consent.

3) Was there sufficient documentation relative that Dr. Yoonessi's communication with the admitting physician and nursing staff relative to the rationale for surgery? In Dr. Yoonessi's original consultation he recommended exploratory laparotomy. He recommended this as the only medical treatment option. He did not discuss Hospice care or the patient's prior refusal for surgery. It had been clearly documented on 9/18 that the patient did not want any invasive procedure or resuscitation. Dr. Yoonessi does not address this in his consultation. He apparently did communicate with Dr. Sifontes on 9/22/97 at which time Dr.Sifontes felt that the patient needed Swan-Ganz catheter and resuscitation prior to any definitive treatment.

4) Was it appropriate for Dr. Yoonessi to schedule surgery for the patient? No it was not appropriate to schedule surgery on this patient for all of the above reasons. Paramount to this was her constant refusal of any invasive procedure for over a year prior to this presentation. Although Dr. Yoonessi asked for consents from the patient and niece, there is no documentation that surgery was every scheduled.


### Case #2: Irene Kaluzny, MR #388341 Buffalo General Hospital, Buffalo, NY

1. CASE SUMMARY

The patient is a 68 year old white female admitted to Buffalo General Hospital with a 3 month history of abdominal swelling. She also reported a 10 lb weight gain over the 2 months prior to admission. She denied any urinary tract or gastrointestinal symptoms. Physical exam on admission revealed a large pelvic abdominal mass. CT Scan showed ascites and bilateral pelvic masses. Barium enema showed a partially obstructing lesion involving the mid-sigmoid. Her pre admission CA 125 was elevated to 1000. The patient underwent exploratory laparotomy on August 20, 1992. At the time of surgery there were 5 liters of ascites noted within the peritoneal cavity. There were small diaphragmatic implants. There was extensive tumor involvement in the omentum and bilateral ovarian mass on the right measuring 5 x 6 inches and the left measuring approximately 5 inches. There were implants on the sigmoid colon and also in the mesentery of the small bowel. The patient underwent a bilateral salpingo oophorectomy, omentectomy, pelvic and periaortic lymphadenectomy and tumor reductive surgery. A portacath catheter was also placed. The patient's post-operative course was unremarkable. She did have problems with recurring ascites. She was started on chemotherapy on the 7th post operative day and this consisted of CisPlatin 50 mgs. Cyclophosphamide 300 mgs and Medroxyprogesterone acetate 500 mgs. The patient was discharged home on the 8th post-operative day. A cardiac ejection fraction obtained during that hospitalization was 46% with no focal wall motion abnormalities. The patient subsequently received a total of 16 cycles of chemotherapy prior to her terminal admission March 1993. It is difficult to ascertain the exact treatment regimen that the patient received as Dr. Yoonessi did not keep chemotherapy flow sheets, which is standard procedure. However as best can be gleaned from his chart, her chemotherapy is summarized below:



example. on 9/18 it was difficult to ascertain whether this should have been Cis Platin at 50 mgs or 150 mgs. In addition often times the physical exam was rudimentary and appears to be by rote. Vital signs are often not documented in the chart prior to chemotherapy.

Case #3: Elisabeth Steinbroner. Medical Record #1099960, Buffalo General Hospital. MR #1008245 DeGraff Memorial Hospital

I. CASE SUMMARY

The patient was a 76 year old who presented to DeGraff Memorial Hospital with post menopausal bleeding of less than one days duration. She otherwise was without complaints. The patient's past medical history was remarkable for severe coronary artery disease. She underwent a coronary bypass in ?996. Following this operation the patient developed renal failure and had been on dialysis ever since. She also was suffering from depression after the onset of this complication. She refused to eat for approximately 6 months and was fed through a feeding tube. Physical exam on admission was positive for scattered rhonchi at both lung bases. In addition pelvic examination revealed blood in the vagina and the uterus enlarged to 4 fingerbreadths above the pubis and fixed posteriorly. The patient had mild lower abdominal tenderness and vague adnexal tenderness. The patient's Hgb on admission was 12.9. The patient was described by the admitting nurse as being confused and disoriented. Admitting cardiogram showed normal sinus rhythm with occasional premature ventricular contractions, non specific ST-T wave changes and left ventricular hypertrophy. Her chest x-ray showed cardiomegaly. The patient underwent a D&C with the uterus sounding to 10 cm. Submucosal leiomyomata were felt and there was a large 

iount of bleeding noted by the operators. Dr. Yoonessi and Dr. Lewis. The pathology was benign with no evidence of carcinoma. On 8/21 post operatively the patient was quite drowsy. The nurses noted that there was only a small amount of vaginal bleeding. However in the note of Dr. Lewis dated 8/22/97 she noted that the patient was still having vaginal bleeding and she discussed this with Dr. Yoonessi and the family. It had been arranged for the patient to undergo dialysis the next day and following that she was going to be readmitted for total abdominal hysterectomy. A note by the nursing staff on 8/22 following Dr. Lewis's note. notes a very scant amount of bloody drainage on the peri pad. The patient was readmitted 8/23 after having undergone dialysis at the Niagara Renal Care Center. A note from the nursing staff dated 11 p.m. to 7 a.m. 8/23 to 8/24 said. "no vaginal bleeding noted this shift". The patient's Hgb was stable throughout. Dr. Yoonessi saw the patient and her family on 8/24/97 and made a recommendation for surgery. His note states. "they seem to understand the proposed procedure". The husband, rather than the patient, signed all consents. although there is no documentation that the patient was incompetent. On 8/25 Dr. Lewis discussed with the family and answered their questions regarding the treatment options and surgery. The patient told Dr. Lewis that she would prefer not to have surgery and to stop her dialysis and to be placed on Hospice care. The patient was seen at 2 p.m. by Dr. Yoonessi. The note from the nurse states that the patient and the family wanted to proceed with surgery as planned. The patient was taken to the operating room on 8/25/97 where she underwent exploratory laparotomy. total abdominal hysterectomy, bilateral salpingo oophorectomy and appendectomy. During the course of her surgery the operators felt that there was purulent ascites. They felt that this may have come from a perforated appendix. The patient was also noted to have leiomyomata. There were no complications during the surgery. Blood loss was noted to be 400 ccs. Final pathology report revealed leiomyomata, focal adenomyosis. The tubes and ovaries were unremarkable. The appendix showed some obliteration of the distal lumen but no evidence of appendicitis. The fluid was negative for infection. The itient was seen by Dr. Yoonessi on 8/26/97 and was noted to have a stable first post op day. The patient, jwever. is noted by the nursing staff to be quite lethargic. Her pedal pulses were not present. Her feet



Was there adequate evaluation of the patient prior to the surgery of 8/21/97? No, the patient was not evaluated by the appropriate medical consultants. She should have been seen by nephrology and cardiology and perhaps psychiatry to evaluate her mental status. Her competence was never addressed in her medical chart.

2. Was the surgery performed on 8/21/97 indicated? Yes, the patient did require an evaluation of her endometrial cavity by D&C.

3. Was the patient a good candidate for the surgery performed on 8/25/97? No. As discussed above

4. Prior to the surgery of 8/25/97 should alternative options such as hormonal treatment have been utilized? The patient had very little bleeding and a stable Hemoglobin. Given her multiple medical problems the best course of action was probably to do nothing. There was no pathology to treat and therefore I would not have recommended any further treatment at this time.

5. During the surgery of 8/25/97 should Dr. Yoonessi have proceeded with the abdominal hysterectomy? If Dr. Yoonessi felt that there was acute appendicitis requiring appendectomy then he should not have proceeded with TAH, BSO. However this is a rather odd question in the fact that he should not have proceeded with exploratory laparotomy.

6. Was it appropriate to perform the surgery on 8/25/97? No. See discussion above.

7. Taking into account the discussion with the patient and the family on 8/25/97 is the documentation of informed consent clear? The informed consent on this patient is extremely difficult to ascertain. Her husband signed the majority of her documents. There was no documentation however that this patient was incompetent. Furthermore the discussions that had been undertaken between the patient and Dr. Lewis at one time had lead the patient to believe that she had carcinoma and made her refuse any surgery. However when she was approached by Dr. Yoonessi after that discussion and told that she did not have cancer, then she agreed to go forward with the surgery. None of this makes sense from a medical standpoint. Furthermore Dr. Yoonessi did not document his discussion with the patient and her family and the next note in the chart is that of his operative note. Although a patient or her designate may sign a consent form, that does not constitute an informed consent. A patient must be told of the risks and potential benefits and treatment options for this to be a true informed consent. This was never documented on the patient's chart. Based on the patient's prior medical history and her refusal for surgery noted once in this chart, I doubt that she would have proceeded with a surgical remedy. Documentation of the discussions regarding informed consent would have been extremely important in this case because given the lack of any meaningful pathology and the lack of any meaningful bleeding, I am not sure why any person would have agreed to this operation when presented with the risks, benefits and options.

Case #4  Virginia Slisz  MR #662526, Buffalo General Hospital

1. CASE SUMMARY.

The patient, at the time of admission, was a 57 year old white female with a history of ovarian cancer. She underwent a total abdominal hysterectomy and bilateral salpingo oophorectomy, omentectomy and pelvic lymphadenectomy for stage III pap serous adenocarcinoma of the ovary on 6/14/89. Post operatively she received chemotherapy with Dr. Yoonessi's regimen of Adriamycin, CisPlatin, Cytoxan, 5 FU, Methotrexate, VP 16 and Depot Provera. She received a total of 8 months of chemotherapy and was taken to the operating room for 'Second Look' surgery on 2/24/90. At that time she was found to have 2 areas of implants in the upper abdomen and one at the base of the bladder. Following this she received



performed 2/95, the patient was asymptomatic and the abnormality was found on CT Scan. There was ascites that was positive for carcinoma. There was no clear cut indication for the surgery 2/95 Since she was asymptomatic, it would be difficult for the surgery to make her feel any better. Given the fact that she had intraperitoneal radiation therapy, the risks of complications from this surgery were quite high. Predictably the patient did develop a bowel complication requiring a second surgery  In regards to the operation of 3/6/96, again the patient was asymptomatic and was found to have a rising CA 125 indicative of recurrent disease. She had only recently completed chemotherapy. The surgery of 2/95 was not clearly indicated.  The surgery of 3//96 was definitely not indicated. There was no clear cut therapeutic goal to be achieved. If she could not undergo optimal tumor reduction 2/95, then there was little chance of her having any benefit from tumor reductive surgery 3/96. Furthermore given the difficulty of the surgery 3/96, any Gyn oncologist would be loathe to take this patient back to the operating room for minimal or no therapeutic benefit. It is interesting to note that Dr. Yoonessi himself did not feel that there were any postoperative therapies that would be of particular benefit to the patient.  Even though he carefully describes a discussion with the patient in his operative report, he fails to get a true informed consent in that he did not explain to the patient the possible consequences of further surgery in an abdomen that had already undergone this many insults.  If Dr. Yoonessi truly believed that there was no role for post operative chemotherapy or radiation therapy, then the performance of this operation was futile.  The decision to perform surgery 3/96 therefore departed from generally accepted standards of care.  The standard of care both in 2/95 and 3/96 would have been to re-institute chemotherapy.  By moving to exploratory laparotomy in an asymptomatic patient with diffuse intraperitoneal disease, Dr. Yoonessi departed from the generally accepted medical standards for Gyn oncology.  Even if we accept secondary tumor reductive surgery as a matter of judgment, when Dr. Yoonessi discovered extensive disease both in the operation on 2/95 and 3/96 he should have simply done a biopsy and closed the abdomen. This would probably have precluded all of the patient's complications.  Since the patient was not obstructed at either procedure, he needlessly jeopardized this patient's life and performed extensive bowel resection, which essentially left this patient a bowel cripple.  These decisions represent a departure from the generally accepted medical standards.

In addition the choice of chemotherapy given to this patient deviated from the standard of care both in 1989 through 1995 and again from 1995 through 1996. This has been outlined thus far in this report. In addition, Dr. Yoonessi appears to have placed the patient on Ergamisol as maintenance therapy. Ergamisol is not indicated for use in ovarian cancer so this would be an off label indication. In addition, there has never been any documentation that maintenance chemotherapy has any value in the prevention of recurrence. The use of Ergamisol in this situation is a departure from the standard of care.

Questions:

1. Was the patient a good candidate for surgery on 3/7/96?  The patient was physiologically stable. However a WBC was down to 2.8, Hgb: 9.5.  In addition her prior treatment history suggested that this surgery would be extremely difficult with very little benefit as noted above.

2. Was the surgery indicated?  As noted above, I do not believe that either the surgery of 2/95 or that of 3/96 were indicated and in fact detracted from the patient's quantity and quality of life.

## Case #5. Betty Pieleck, MR #148749 Our Lady of Victory Hospital, Lackawanna NY 14218.

1. CASE SUMMARY

The patient is a 67 year old with a 6 month history of increasing lethargy, weight loss and increasing abdominal girth.  She was noted to have ascites and a lower abdominal mass on admission to Our Lady of



000067

surgical specialty/Gyn oncology facility may always refer to surgery interacted to evaluate the patient prior to the surgery precludes getting an informed consent for the surgical procedure. Failure to evaluate the patient preoperatively and to explain to her the risks and potential benefits of surgery and the alternatives is a deviation from the standard of care.

The patient was given a full bowel prep in spite of the fact that her barium enema showed a complete bowel obstruction. A bowel obstruction would be an absolute contraindication to the bowel prep and the administration of this bowel prep would be a deviation from the accepted standard of care. Knowing that the patient had a preoperative bowel obstruction would most likely necessitate a colostomy at least temporarily postoperatively.

The patient's colostomy was matured at an interval post op. The generally accepted standard is to mature colostomies at the time of the original surgical procedure. However it has been the practice in the past to mature these later for patients with known bowel obstructions. However the failure to adequately treat the bleeding colostomy edge, failed to meet the standard of care. Dr. Yoonessi did attempt to coagulate this bleeder but he was unsuccessful. However he was not available following this for a period of 4 days. He did not designate coverage either in the progress notes or in the orders. His assumption that the patient would be cared for by the primary physician or the other consultants on this case was misplaced. If Dr. Yoonessi had given proper sign out for coverage, the bleeding colostomy edge would have been handled expeditiously. Failure to designate a covering physician departs from the accepted standards of care. This patient subsequently required several other consultants to correct her bleeding and coagulopathy. This needlessly put her through an upper endoscopy as well.

Questions:

1. Was the surgery performed on 5/11/93 indicated? Although this was an extremely high risk patient, the surgery was indicated.

2. Was the documentation of the operative report of the surgery 5/11/93 adequate? Yes, the documentation was adequate. Failure to document the amount of residual disease is a major oversight by a Gyn oncology surgeon.

3. When Dr. Yoonessi was unavailable on 5/15/93 was there sufficient documentation relative to arrangement for coverage? As noted above there is no documentation regarding coverage during his absence.

4. Was the treatment rendered by Dr. Yoonessi during the admission of 5/11/93 within accepted standard of treatment? For the reasons stated above, there were several major deficiencies in the care rendered by Dr. Yoonessi. The failure to adequately evaluate the patient pre operatively, to give appropriate informed consent, and failure to be available for several days post operatively all fail to meet the standard of care.

### Case #6 Genevieve Szmolke, MR #191025 Our Lady of Victory Hospital, Lackawanna NY

I. CASE SUMMARY

The patient is a 66 year old white female, Jehovah's Witness who presented with a pelvic abdominal mass and ascites. She was seen in consultation by Dr. Yoonessi and it was recommended to her by Dr. Yoonessi that she undergo exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy for her presumed ovarian carcinoma. In his own operative note Dr. Yoonessi states that he



000069

/ 2

open to confusion due to their chicken scratch nature. It was extremely difficult for me to follow his chemotherapy protocol. In addition the informed consent was more perfunctory than informed.

o. Was there adequate monitoring of the patient while receiving chemotherapy? There appears to have been adequate monitoring.

## Case #7  Faith Wheaton, MR #255963, Mercy Hospital.

### 1. CASE SUMMARY

The patient is a 59 year old who was admitted to Mercy Hospital under the care Dr. Tariq Malik. She had been seen June 1992 at which time her exam was negative. She was admitted 12/16/93 with a history of abdominal and pelvic discomfort. She was noted to have a large pelvic mass and a 'frozen' pelvis. An ultrasound was obtained which showed bilateral hydronephrosis consistent with obstructive uropathy. There was ascites noted and there was thickening of the bladder wall, an enlarged uterus and a left ovary enlarged to approximately 4 cm in size. The right ovary appeared normal. CT Scan showed small bilateral pleural effusions, ascites, and bilateral hydronephrosis. There was a large pelvic mass noted, the size not detailed on CT Scan. After undergoing preoperative clearance and a full bowel prep, the patient was taken to the operating room on 11/23/93 by Dr. Yoonessi and Dr. Malik. At the time of surgery, the patient was noted to have ascites. She had multiple tumor implants on the surface of the liver and tumor implants in the omentum. In the recto-sigmoid area there was tumor appearing to invade the bowel and compromising the lumen of the recto-sigmoid. The distal part of the small bowel was massively involved with tumor and the wall was infiltrated by tumor. Both ovaries were enlarged and had the appearance of metastatic tumors according to Dr. Yoonessi's note. The patient underwent extended hysterectomy, bilateral salpingo oophorectomy. As noted above, the distal ureters were obstructed with marked hydronephrosis. The ovaries were sent for frozen section and unfortunately the site of origin of the tumor could not be delineated. It was felt that the sigmoid colon could be the site of origin and the patient underwent a resection of the sigmoid colon. The patient then underwent a resection of the distal ileum and right colon. It is interesting to note however that the sequence of events dictated in the operative report are not the same sequence that the pathologist recorded the specimens. She noted that the right ovarian tumor contained a malignant neoplasm, differential diagnosis including ovarian stromal tumor, metastatic carcinoma and hematopoietic malignancy. The second frozen section was from the proximal ileum and the pathologist commented that the malignant neoplasm differential diagnosis included hematopoietic malignancy. A metastatic lesion could not be excluded. The next two frozens were from the ileum and cecum and the right iliac lymph nodes. These were reported as malignant neoplasm favoring lymphoma. Finally the colon was received and labeled "F" and frozen section was returned as malignant neoplasm favoring hematopoietic malignancy such as lymphoma. The omentum and liver were then biopsied by Dr. Yoonessi. At that time he was about to close the patient but the anesthesiologist noted that the patient was not putting out any urine. Dr. Yoonessi felt that the patient had undergone intraoperative obstruction of her ureters. The bladder was opened and attempts to insert catheters into the ureters were made. There was no urine output from the ureters and Dr. Yoonessi felt that both ureters needed to be re-implanted into the bladder. Dr Yoonessi was able to reimplant the left ureter into the bladder, however the right ureter could not reach the bladder and therefore he interposed a loop of small bowel. This left the patient with 4 bowel anastomoses.

Final pathology report showed a high grade, non Hodgkin's, large cell lymphoma in all the specimens. The patient did well initially post operatively but on 11/26/93 she developed a fever. She progressed to having a greenish out put from her pelvic drain. IVP, gastrographic intestinal studies and CT Scan showed no convincing evidence of a leak in any of the anastomosis. On 11/28/93 the patient had some left lower quadrant tenderness and crepitations and increasing drainage from the pelvic drain. Dr.



000071

12

family. This made a difficult situation almost unbearable for the family. They ultimately fired Dr Yoonessi from this case probably for the above reasons. In addition, all of the consultants should have realized that the fever and leukocytosis could have been on the basis of lymphoma alone. In addition preoperative evaluation prior to the first surgery and prior to the colostomy were substandard.

4. Does the documentation indicate that there was acceptable appropriate communication between Dr. Yoonessi and the other physicians involved in this case? No. It appears that they communicated but it does not appear that they understood what each other was saying. They seem to be constantly at odds with one another. Towards the end of the hospitalization it appears that Dr. Yoonessi was not realistic regarding the prognosis of this patient. In addition Dr. Yoonessi fails to take personal responsibility for many of the situations and blames the other consultants for the deteriorating condition of his patient. This certainly did not improve the communications. However the post operative care of the patient is a moot point. Once Dr. Yoonessi had decided to proceed with this extensive procedure on this obviously advanced lymphoma, the ultimate poor outcome of this case was already decided.


## Case #8  Eleanor Josefiak, MR #064250 ST. Joseph Hospital, Cheektowaga, NY

### 1. CASE SUMMARY

The patient is a 68 year old originally admitted 4/25/94 with the presumptive diagnosis of ovarian carcinoma based on positive cytology. Physical exam was remarkable for ascites, abdominal mass and pleural effusions. The patient was taken to the operating room 4/25/94 where she underwent exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy, small bowel resection, sigmoid resection, pelvic and periaortic node dissection and omentectomy. At the time of surgery she was noted to have 5 liters of ascites present. The omentum was infiltrated with tumor. There was extensive seeding of the right hemidiaphragm. The sigmoid colon was infiltrated with tumor causing narrowing of this segment. The distal ileum and the appendix also showed extensive carcinomatosis with "evidence of invasion and obstruction". Although the amount of residual disease was not noted, it states that 95% of the gross tumor was removed. Final pathology report revealed a papillary serous adenocarcinoma of the ovary with extensive metastases throughout the abdomen. Again I did not see evidence of a pre operative assessment in the chart by Dr. Yoonessi. The patient had an extremely rocky postoperative course. She required bilateral chest tube placement for her pleural effusions. These unfortunately were placed on post op day 0 and 1 rather than intra operatively. The patient's postoperative course was complicated by bowel obstruction that eventually resolved with conservative management and she was discharged home on the 41st postoperative day. She was started on chemotherapy while hospitalized, receiving her first dose of chemotherapy on 5/17/94 and 5/24/94 consisting of CisPlatin and Cyclophosphamide. She also received DepoProvera. The patient then received chemotherapy on a weekly basis as per the following chart.



The care is not only in the face of a DNR order not only failing to meet the standards of care but is also assault. Dr. Yoonessi was aware of her wishes and failed to abide by these. This is not only unethical but also incomprehensible.

Questions:

1 Was the treatment rendered by Dr. Yoonessi during the admission of 4/24, 12/4/94 and 1/16/95 within the acceptable standards? The treatment rendered by Dr. Yoonessi 12/4/94 was within acceptable standards. The treatment rendered on the admission 1/16/95 was not within acceptable standards as detailed above.

2. Was the chemotherapy regimen for this patient appropriate? The chemotherapy regimen used by Dr. Yoonessi does not meet acceptable standards. This chemotherapy has never been utilized to my knowledge outside of Dr. Yoonessi's practice. It has never been tested in randomized trials. He uses multiple drugs in sub-therapeutic doses. His failure to outline to his patients the alternative treatments including standard chemotherapy every 3 weeks with Cytoxan and Carboplatin were not outlined to the patient and therefore informed consent was not obtained. This fails to meet the standard of care.

3. Were the cardiopulmonary resuscitative efforts by Dr. Yoonessi on 3/7/95 appropriate in view of the DNR order? No these were inappropriate and failed to meet the standard of care as noted above.

Case #9 Joan Gutkowski , MR #879683 Buffalo General Hospital, MR#541996 Mercy   Hospital

1. CASE SUMMARY

The patient is a 65 year old who originally underwent exploratory laparotomy, total abdominal hysterectomy and bilateral salpingo oophorectomy, omentectomy in 1992. This was followed by chemotherapy with the regimen utilized by Dr. Yoonessi including CisPlatin, 5 FU, Leucovorin, Adriamycin, Methotrexate and Cytoxan. She underwent a second look procedure on 9/10/92 that was positive for persistent disease. A peritoneal catheter was placed. The patient received intraperitoneal P-32 on 9/24/92. The pretreatment scan showed loculation of the fluid in the pelvis and therefore the patient only received only 15 millicuries of P-32. She also received chemotherapy at the end of 1992. She represented with a left supraclavicular node on 6/13/97. This was aspirated and it was positive for metastatic carcinoma. The patient was restarted on chemotherapy 6/17/97 with essentially the same regimen that she had been treated with in 1992. The patient's last chemotherapy in the office was 9/26/97. The patient was admitted to Mercy Hospital on 10/17/97 with a history of a poor appetite and a one week history of severe throat pain. She also complained of diarrhea, weakness, breathing difficulty and low grade fever. She was admitted to the ICU under the service of Dr. Villacorta. She was seen in consultation by Dr. Yoonessi. Physical exam on admission revealed a Hgb of 6.3, WBC 300.Plts 11,000, Potassium 2.6. CO2 12. Creatinine 2 and BUN 32. Her protime was elevated at 22. The patient was seen in consultation by Infectious Disease and by Medical Oncology. A discussion was undertaken on admission regarding do not resuscitate. The patient seemed agreeable to this. The patient was given the appropriate antibiotic, blood products and treatment at Mercy Hospital. However they requested liquid Lithium and Mellaril and this was not available and transfer to Buffalo General Hospital was therefore arranged by Dr. Yoonessi.

The patient was received at Buffalo General Hospital on the Psychiatric Unit. Shortly after her admission she was noted to be physiologically unstable and she was seen by the SICU team. The patient was immediately transferred to the ICU and within 2 hours she was intubated, placed on a ventilator and a Swan-Ganz catheter was placed for monitoring her cardiac function. The patient was maintained on broad spectrum antibiotics and tube feeding. On 10/22/97 the patient was extubated. The family had indicated

especially regarding criminal activity) in the hospital chart. This action failed to meet the standard of care for a Gyn oncologist.

Case 2:22-cv-00023-TLN-SCR   Document 47   Filed 03/18/24   Page 67 of 116

Questions:

1. Was the treatment rendered by Dr. Yoonessi during the admission of 10/17/97 at Mercy Hospital within acceptable standards? In general, his management during the admission at Mercy Hospital was acceptable.

2. Was the treatment rendered by Dr. Yoonessi during the admission of 10/19/97 at Buffalo General Hospital within acceptable standards? Dr. Yoonessi transferred the patient for psychiatric care to Buffalo General Hospital. On arrival there the patient was in respiratory distress and required immediate transfer to the SICU. There appears to be some major inconsistency unless the patient's problems develop during the ride from Mercy to Buffalo General Hospital. While in the ICU the patient was under the care of the ICU team and Dr. Yoonessi essentially did not render care.

3. Was Dr. Yoonessi's order of 10/23/97 to cancel Hospice consult appropriate? No. The patient and her family had previously stated desires for DNR. At this appoint it appeared that the patient would not survive her hospitalization. Hospice consult was definitely appropriate.

4. Does the documentation indicate that there was acceptable and appropriate communication between the Dr. Yoonessi and the other physicians on the case? The documentation at Buffalo General shows a physician. Dr Yoonessi, lacking in common courtesy with a general inability to communicate with his peers. Discussion regarding euthanasia is inappropriate as noted above. It should also be noted that Dr. Yoonessi dictated a 4 page discharge summary on Mrs. Gutkowski dated 2/27/97. In this document he reiterates the entire interaction with the ICU team and the family.

5. Does the documentation indicate that there was acceptable and appropriate communication between Dr. Yoonessi and the family regarding the patient's care? The nursing notes from 10/24/97 relate a picture of Dr. Yoonessi discussing the situation with the family and essentially making them feel guilty regarding their decisions. It is not up to a physician to decide whether a patient or the patient's proxy is making the proper decisions. It is only up to them to give the parties informed consent. His communication with the patient and family was definitely inappropriate.

6. Was the chemotherapy regimen for this patient acceptable? No. Please see discussions regarding other patients.

7. Was the documentation of the chemotherapy regimen adequate? No. Again Dr. Yoonessi failed to keep adequate flow charts, which may have given rise to this patient receiving excess chemotherapy during September and early October.


### Case #10. Kathleen Kaiser, MR#362709, Mercy Hospital of Buffalo

I. CASE SUMMARY

The patient is a 49 year old who presented to the Emergency room at Mercy Hospital on 7/26/00 with acute epigastric pain. Physical exam on admission revealed a morbidly obese female in moderate distress secondary to pain. Her abdomen was distended and she was tender to percussion over the epigastric area and in the left lower quadrant. A CT Scan was performed that showed a 15 cm ovarian mass with extensive intra abdominal carcinomatosis. The patient developed acute respiratory distress 7/27 at 1700 hours and required intubation. She was admitted to the ICU and a Swan-Ganz catheter was placed. The patient was resuscitated and ultimately taken to the operating room on 7/28/00 where she underwent



800.523.7887          02/05/2002, Cheektowaga, NY, In the Matter of M. Yoonessi MD    Associated Reporters Int'l, Inc.

*C696*

1    KREDENTSER - CROSS / PATIENT E - STERNBERG

2        acute bronchial pneumonia as the -- as one of

3        the microscopics.  Acute mild ischemic

4        myocardial changes and some fibrosis of the

5        heart.  She also has metastatic carcinoma of

6        the ovary, and then they talk about --

7            DR. STERNBERG:   Just a second.  Let's

8        talk about this, this -- she has -- what did

9        you say about carcinoma of the ovary?

10           THE WITNESS:  She had metastatic

11       carcinoma of the ovary involving a node in her

12       neck.

13           DR. STERNBERG:   You're not suggesting

14       to me that -- there was no other evidence of

15       carcinomatosis anywhere.  You're not suggesting

16       to me that that caused her death.

17           THE WITNESS:  No, absolutely not.

18           DR. STERNBERG:  Okay.  What was the

19       cause of her death?  Morphine intoxication?

20           THE WITNESS:  No.

21           DR. STERNBERG:   That's what they

22       signed it out for.

23           THE WITNESS:   I think the cause of

24       her death -- when she presented to Buffalo

25       General and she ᴴᴳ respiratory failure, I

· 000171

000077

169

KALEIDA
HEALTH

☐ Buffalo General Hospital
☐ Children's Hospital of Buffalo
☐ DeGraff Memorial Hospital
☐ Millard Fillmore Gates Circle Hospital
☐ Millard Fillmore Suburban Hospital
☐ Other:

RA TAJCZAK    MARY
NR   702408                    PT  92488501
DOB  01/08/1943              AGE  58        SEX  F
ATT  PATEL, VINOD R MD
REF  UNKNOWN, DOCTOR
FC   A              ET      ADM DT  12/14/01
THE BUFFALO GENERAL HOSPITAL

**EMERGENCY DEPARTMENT PHYSICIAN'S
HISTORY & TREATMENT RECORD Page 2 of 4**

Medical Decision Making:

Vaginal bleeding        **109**

CBC

Imaging:

Interpreted by: _____

EKG:

Procedure/Treatment/Additional Note:

Called Dr. Sulausta, would be here to do biopsy

Monitor:

| LAB | | BLOODGAS | | UA | |
|---|---|---|---|---|---|
| WBC | | PO₂ | | WBC | |
| HGB | | pH | | RBC | |
| HCT | | PCO₂ | | GLUCOSE | |
| PLAT | | FO₂ | | PROTEIN | |
| **CHEM** | | HCO₃ | | **MICROSCOPIC** | |
| Na | | TCO₂ | | ☐ BLOOD | |
| K | | BE | | ☐ URINE | |
| Cl | | SAT | | ☐ SP GRV | |
| TCO₂ | | **COAGULATION** | | ☐ CASTS | |
| CA | | ☐ CC ☐ CATH | | ☐ THROAT | |
| BUN | | LEUKS | | ☐ SCICHLAUTION | |
| CREAT | | NITRITES | | Other: | |
| GLUCOSE | | UROBILI | | | |
| ALK PHOS | | PROTEIN | | | |
| SGOT/AST | | PH | | | |
| SGPT/ALT | | BLOOD | | | |
| LIPASE | | SP GRAV | | | |
| AMYLASE | | KETONES | | | |
| TROPONIN | | BILI | | | |
| TOTAL BILI | | GLUCOSE | | | |
| CK | | **URINE** | | **PREGNANCY** | |
| | | | | HCG | |
| | | | | ☐ Positive ☐ Negative | |
| PT | | | | | |
| PTT | | | | QUANT | |

☐ See Continuation Note

Impression:

Rx:

Primary Physician: _____

Condition on Disposition:  ☐ Good/Improved   ☐ Critical   ☐ Home  ☐ Transfer  ☐ Expired

Disposition time: _____        Time noted at department _____

(24)



# The New England
# Journal of Medicine

©Copyright, 1996, by the Massachusetts Medical Society

Volume 334        JANUARY 4, 1996        Number 1

## CYCLOPHOSPHAMIDE AND CISPLATIN COMPARED WITH PACLITAXEL AND CISPLATIN IN PATIENTS WITH STAGE III AND STAGE IV OVARIAN CANCER

William P. McGuire, M.D., William J. Hoskins, M.D., Mark F. Brady, B.S., Paul R. Kucera, M.D., Edward E. Partridge, M.D., Katherine Y. Look, M.D., Daniel L. Clarke-Pearson, M.D., and Martin Davidson, M.D.

**Abstract** *Background.* Chemotherapy combinations that include an alkylating agent and a platinum coordination complex have high response rates in women with advanced ovarian cancer. Such combinations provide long-term control of disease in few patients, however. We compared two combinations, cisplatin and cyclophosphamide and cisplatin and paclitaxel, in women with ovarian cancer.

*Methods.* We randomly assigned 410 women with advanced ovarian cancer and residual masses larger than 1 cm after initial surgery to receive cisplatin (75 mg per square meter of body-surface area) with either cyclophosphamide (750 mg per square meter) or paclitaxel (135 mg per square meter over a period of 24 hours).

*Results.* Three hundred eighty-six women met all the eligibility criteria. Known prognostic factors were similar in the two treatment groups. Alopecia, neutropenia, fever, and allergic reactions were reported more frequently in the cisplatin–paclitaxel group. Among 216 women with measurable disease, 73 percent in the cisplatin–paclitaxel group responded to therapy, as compared with 60 percent in the cisplatin–cyclophosphamide group (P=0.01). The frequency of surgically verified complete response was similar in the two groups. Progression-free survival was significantly longer (P<0.001) in the cisplatin–paclitaxel group than in the cisplatin–cyclophosphamide group (median, 18 vs. 13 months). Survival was also significantly longer (P<0.001) in the cisplatin–paclitaxel group (median, 38 vs. 24 months).

*Conclusions.* Incorporating paclitaxel into first-line therapy improves the duration of progression-free survival and of overall survival in women with incompletely resected stage III and stage IV ovarian cancer. (N Engl J Med 1996;334:1-6.)

©1996, Massachusetts Medical Society.

A STANDARD therapy for women with advanced epithelial ovarian cancer in the United States is an alkylating agent plus cisplatin. Cisplatin-based combination therapy has been found to be more effective than alkylating agents alone[1] or combinations without cisplatin,[2,3] when measured by clinical response rates and progression-free intervals. However, the evidence of benefit in overall survival is less compelling.[4] When alkylating agents or combinations not containing platinum were used in advanced ovarian cancer, the anticipated average response rate was 40 to 50 percent (10 to 20 percent complete pathological response), with a median survival of 12 to 15 months. In women treated with cisplatin combinations as primary therapy, the response rates are 60 to 80 percent, with complete responses being most common in women who have had adequate surgical therapy.[5]

The only large prospective, randomized study comparing cisplatin with a cisplatin-containing combination in advanced ovarian cancer suggested that cisplatin by itself[6] is as effective as platinum-based combinations[6] and is less toxic and less likely to lead to secondary tumors. Nevertheless, an overview of randomized therapeutic trials suggested that platinum-containing combinations are better than cisplatin alone.[7] In patients with advanced ovarian cancer, a combination of cisplatin and cyclophosphamide is now standard treatment. Unfortunately, long-term disease control with this regimen occurs in less than 10 percent of women with incompletely resected stage III disease and less than 5 percent of women with stage IV disease.[8]

After cisplatin emerged as an active drug in epithelial ovarian cancer, over a decade passed before another

From the Department of Medicine, Emory University, Atlanta (W.P.M.); the Gynecology Service, Department of Surgery, Memorial Sloan-Kettering Cancer Center, and the Department of Obstetrics and Gynecology, Cornell University Medical College, New York (W.J.H.); the Gynecologic Oncology Group Statistical Office, Roswell Park Cancer Institute, Buffalo, N.Y. (M.F.B.); the Division of Gynecologic Oncology, Department of Obstetrics and Gynecology, Oregon Health Sciences University, Portland (P.R.K.); the Department of Obstetrics and Gynecology, Division of Gynecologic Oncology, University of Alabama at Birmingham, Birmingham (E.E.P.); the Division of Obstetrics and Gynecology, Indiana University School of Medicine, Indianapolis (K.Y.L.); the Division of Gynecologic Oncology, Department of Obstetrics and Gynecology, Duke University School of Medicine, Durham, N.C. (D.L.C.-P.); and the Department of Pathology and Area Laboratory Sciences, Walter Reed Army Medical Center, Washington, D.C. (M.D.). Address reprint requests to Dr. McGuire at the GOG Administrative Office, Suite 1945, 1234 Market St., Philadelphia, PA 19107.

Supported by grants from the National Cancer Institute to the Gynecologic Oncology Group Administrative Office (CA 27469) and the Gynecologic Oncology Group Statistical Office (CA 37517).

60)



FILED

FEB 15 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

1  Mahmood  Yoonessi, M.D,

2  M.Yoonessi,M.D PC

3  Plaintiff/Petitioner(s)

4  6790 Crest Rd

5  Rancho Palos Verdes, Ca 90275

6  Phone #: 310.303-1671

7  Before the Ca Cd Ct Ed

8  United States District Court of California

9  Eastern Division

| Mahmood Yoonessi, Myoonessi, MDPC | Case No.:2-23-CV-00023 TLN Db |
|---|---|
| | Pleading Title |
| Plaintiff(s), | Opposition to order of dismissal |
| vs. | Of 1/16/2024 |
| Kyle Wilcox,Letitia James,D.Kredentser,M.Tisch William Prasifka(MBOC),Lynette Antosh( Chase Bank) | Before Hon D.Barnes Mag Judge,Courtroom 27 |
| | Date: March,22/2024 |
| Defendant(s),Respondent(s) | Time ;10:00Am |

10  Mahmood Yoonessi, Myoonessi, MD PC, M.Ahern, N.M.Mceachin,

11  R.VancouveringJr.MD's Estate; Real Parties in Interest,

12  6790 Crest Rd

13  Rancho Palos Verdes Ca 90275

14  Email: myoonessi75@gmail.com

15  Ph.: 3105413937

16  Pro Se Petitioner(s).

1

1    To the Court , Defendants/Respondents and their attorneys of

2    Record;

3    Please take notice that on March 22/2024 at 10:00 Am or as soon

4    thereafter hat this matter may be Heard  by the above entitled

5    court,located at 501 I st, Sacramento Ca in Courtroom 27 before the

6    honorable Judge Deborah Barnes,Plaintiff,Petitioner(s)will present Its

7    Application for a Default  judgment ,on all causes of action  against

8    each and every defaulted Defendant/ Respondent.Plaintiff's Default

9    motion ,Supporting Documents,the entire Record are hereby /shall be

10   Incorporated/referenced in support of this opposition to dismissal order

11   of Jan16,2024.Plaintiff has requested,is entitled to "Jury Trial"

12   At the time and place of hearing,plaintiff will present proof of the

13   following matters:

14   1.Defendant William Prasifka(MBOC) ,was not a Minor or incompetent

15   person or in Military service ,or otherwise exempted under the "Soldiers

16   and Sailors,Civil Right Act of 1940(See declaration of Plaintiff

17   Mahmood Yoonessi,MD),

18   2.The Court Case Summary ,Deadline Hearing  and Docket report

19   identify Atty Kristin A. Blocher  as attorney of Record For  Defendants

20   William Prasifka and Medical Board of California with no responsive

21   answers filed

22   3. Defendant Kyle Wilcox ,was not a Minor or Incompetent person or in

23   Military service or otherwise exempted under the "Soldiers and Sailors,

2

1   Civil Right Act of 1940(See declaration of Plaintiff Mahmood

2   Yoonessi,MD),

3   4.The Court Case Summary ,Deadline Hearing and Docket report

4   identify Atty Kristin A. Blocher as attorney of Record For Defendants

5   Kyle Wilcox with no responsive answers filed, A second request for

6   Expansion of time was requested to provide Mr Wilcox ample

7   opportunity to file responsive answers; he failed to file ;Defaulted.Mr

8   Wilcox submitted his Fabrications to the Supreme Court of Ohio ,but

9   here claimed he failed to submit his fabrication, Alteration of records

10   (18 USCA 1519).

11   5.Defendant Lynette Antosh of Chase Bank ,was not/is not a Minor or

12   incompetent person or in Military service or otherwise exempted under

13   the "Soldiers and Sailors, Civil Right Act of 1940(See declaration of

14   Plaintiff Mahmood Yoonessi,MD);she failed to respond ,retaliated

15   against plaintiffs by:

16   *Disallowing, interfering, obstructing acquisition of commercial loans

17   on City Promenade, Highland Hills, Gilbert ,then raising their

18   Respective loan interest rates(from 4.125% to 8.51%),

19   *Unlawfully acting as collection Agent(Seizure for Taxes),

20   *Awarding $8,500 to a vendor who fraudulently claimed she Is owed

21   deposited downpayment money despite the fact she never delivered

22   under the terms of the contract of sale,did not attempt to deliver, Did

23   not innforme availability of the swim suite pool, subject of

24   sale/purchase

3

1  *Discriminating against and abusing an elderly person (under

2  California Welfare&Institution Code section 15610.30.

3  * She committed all of that by misrepresenting ,claiming petitioner's

4  NY,Ca , Texas Medical License had been revoked

5  6.The Court Case Summary, Deadline Hearing  and Docket report

6  identify no  attorney of Record For  Defendants Antosh and  no evidence

7  was produced to show that Plaintiff was ever licensed to practice

8  Medicine in the State of Texas, as she claimed

9  7. Defendants Letitia James, Merryll Tisch, State University of New

10  York, were  not/are not  Minor or incompetent persons or in Military

11  service or otherwise exempted under the "Soldiers and Sailors,Civil

12  Right Act of 1940(See declaration of Plaintiff Mahmood Yoonessi,MD),

13  8.Defendants Letitia James, Merryll Tish, State University of New

14  York, admitted that Plaintiff was a fulltime tenured University of

15  Buffalo Associate professor  but failed to produce Evidence that his

16  University Tenured Position was legally terminated or his Teaching,

17  Research ,patient care performance  was questioned, or he was paid for

18  his services ,despite the fact that Slavery  was outlawed in the United

19  states of America,

20  *New York defendants,respondents,James,Tisch ,Kredentser did not

21  deny that Plaintiff's NY Medical License No Was 118540 and not

22  310221, that  Merryl Tisch failed to restore in the absence of all

23  jurisdiction, by committing fraud.

24  9.New York defendants failed to disclose ;

4

1   *That they Knew (petitioner as well as Dr Ted Rutkowski had informed
2   Dr Viguera Anesthesiolgy chair at BGH )that Dr S. Goodnough was a
3   drug addict, partly responsible for the death of patient no 9(J.W),
4   patient No #3(E.S),to satisfy his drug Supplies and forge Petitionner's
5   signature on more than one occasion(Morphine order,DNR form),

6   *That Dtr Kredentser was not trained in Gyn Oncology At Stanford,

7   *That Dr Kredentser was not licensed to practice .Medicine in NY in
8   1991,

9   * That Dr Kredentser was discovered by Attys Sheridan(J and D), Drs
10  J. Malfetano, Steve Piver to cover up their crimes and smear petitioner,

11  *They never produced JML(Pt No1;Kredentser's list),K.K(Kredentser Pt
12  No 10),

13  *Despite k.Wilcox's claim,Petitioner never performed a D&C on Pt
14  H(Kredentser no 7,

15  *Eventhough Dr Kredentser claimed pt H was admitted to Mercy
16  Hospital by dr Malik Dec16,1993 And k.Wilcox claims petiotioner
17  performed D&C on her on Nov 18,1993

18  10.Notice of this Application has been served as required by Rule
19  55(b)(2)

20  11..Notice of this Application for Default Judgment by the Court has
21  been served ,by Mail On all defendants ,

22  12.The above named defendants have failed to respond to the
23  complaint and each cause of action,

5

1   13.This Application is based on this Notice ,the attached Sworn

2   Declaration,the pleadings,Files,selectively chosen by the court

3   submissions of L.James, ,Mboc,K.Wilcox and other matters that may be

4   presented at Hearing,

5   14.The referenced Notice of dismissal makes it clear that the Court

6   Was not informed that Attorney Van Buren Concacted all

7   accusations,Findings of Facts,Conclusions of Law without ever

8   appearing in the case against Petitioner in Buffalo or disclosing where

9   he got all his factitious theories from(See Attorney Donovan's confession

10  the he was the Third lawyer in the case and never disclosed who Van

11  Buren was.`(court's dismissal Analysis Paragraph 2 line three )

12  15, The referenced Notice of dismissal makes it clear that the Court

13  Was not informed that The Second circuit Ruling (Yoonessi v.OPMC

14  162Fed Appx;2006 cited by the court(Footnote 3pg 7)referred to

15  Hachamovitch's case ( case of Hachamovitch v.Debuono ) and

16  articulatedtheFramework o f NY Physicians Discipline.The second

17  circuits makes it clear that : "…On July 26,1991,Chapter 606 of the

18  State of New York transferred responsibility for medical disciplinary

19  Proceedings from the Education Department,s Board of Regents to the

20  Department of Health."

21  The dismissal makes it clear that the court did not recognize the non

22  disclosure of July 26,1991 Ruling invalidates Merrill Tisch and John

23  Kings refusal to honor the Reviewing Board and COP's was against the

24  law.

6

16. Lastly the Court's dismissal disregards the Laws of Void Judgment(Myoonessi,MDPC never charged.

Most respectfully submitted

MYoonessi,MD PC

Plaintiff/Petitioners

6790 Crest Rd

Rancho Palos Verdes, Ca 90275

Phone #: 310.303-1671

## CONCLUSION

It is respectfully submitted that there is substantial evidence before the board to conclude that petitioner has remained updated and has improved/advanced his knowledge of medicine, in general, and gynecologic oncology, in particular. The Attorney General's baseless attack on petitioner's competency should be rejected. Petitioner further requests this Honorable tribunal to determine the followings are questions of facts to be decided  by a jury of petitioner's peers in a court of unlimited jurisdiction with opportunities for discovery, producing and cross examining witnesses: a) Is petitioner suffering from psychological problems?  Is Medical Board of California endowed with such unusual capabilities to diagnose psychological problems without proper training and Testing such as: MMPI; Minnesota Multiphasic Personality Inventory (MMPI), Milton Clinical Multiaxial Inventory (MCMI), Edwards Personal Preference Schedule (EPPS), Eysenk Personality

1    Questionnaire (EPQ)? Is CMB defaming petitioner/ is this Libel per Se

2    within the meaning of Law? b) Did Patient E died of Morphine

3    Intoxication or Sepsis(CMB's claim) C) Did patient E receive Morphine;

4    Subject of a Forged Order? d) Did patient C dye because of Hemothorax

5    or Metabolic derangement (CMB's Claim)? e) Did patient D dye of fluid

6    overload or cancer (CMB's claim)? e) Did patient G dye of Metastatic

7    Cancer (CMB claim) or treatable cardiac arrhythmia?

8    Dated August 14, 2008        Respectfully submitted,

9                        Mahmood Yoonessi, M.D.

10                        6790 Crest Rd.

11                        Ranchos Palos Verdes, CA 90275

12                        310-547-3937

13    6790 Crest rd, Rancho Palos Verdes ,
14    Ca 90275

15    Phone: 310-541-3937   Fax: 310-541-3937

16

17                        6790 Crest Rd.

18                        Ranchos Palos Verdes, CA 90275

19                        310-547-3937

20

21

22

1        **CERTIFICATE OF SERVICE**

2    I, Mahmood Yoonessi, the petitioner, do hereby certify that on

3    Feb8/2024 I filed the original of the case opposition to dismissal: Index

4    No:2:23-cv-000231/16/2024v

5    * Hon Ckerk of the Court.District Court of Ca Eastern Division at 530 I

6    St Sacramernto Ca suit  4-200 ,sacramento ca 95814-2322

7    * Letitia James Esq; 28 Liberty St New York,NY 10005

8    * William Prasifka/MBOC 455 Golden Gate Ave ,SanFrancisco ca 94102

9    *Kyle Wilcox 30 East Broad St Columbus Ohio 43215

10   Merrill Tisch 353 Broaway Ave Albany NY 12246

11   Lynette Antosh 6711 North High St Columbus Ohio 43215 .

12   Respectfully submitted,                    Mahmood Yoonessi, MD.

13

14        **TABLE OF AUTHORITIES**

15   1. U.S. Constitutional amend. I, IV, V, VI, VII, and XIV.

16   2. CA Const. Article 1 ,

17   3. CA Const. Article VI section 18.

18   4. N.Y Const. Article I §1,§2,§3,§8,§9.1,§11,§12..,§16,§17N.Y Const.
19      Article VI, §3a,§b,§5.a,§22e,§23.a,§24.

20   5. Title VII of the Civil Rights Act of 1964, 1991, 42 USC, § 2000 E-
21      2, et.seq.

22   **Federal Cases**

23   *1. Daubert v. Merrell Dow Pharmaceuticals (92-102), 509 U.S. 579*
24   *(1993),*

1   3. Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215
2   (1963).

3   4. United States v. Bagley, 473 U.S. 667; 105 S. Ct. 3375; 87 L. Ed. 2d
4   481; 1985

5   5. Morse v.Fusto; 2d circ; 9/11/2015

6   6. In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148;
7   2003 U.S. 2003, Decided, Motion denied by In re: Lupron Mktg. & Sales
8   Practices Litig., 2004 U.S. Dist.

9   7. Bristol-Myers Squibb Co. v. Ben Venue Labs. 90 F. Supp. 2d 522.

10  8. Bush v. Schiavo, 885 So. 2d 321

11  9. Caperton v. A. T. Massey Coal Co., 556 U.S. 868 (2009),

12  10.42 U.S. Code § 11101,

13  11. Sections 12-27, 29 USC, and Sections 52 and 53.

14                      New York Cases

15  1. Frontier Insurance Co v.State of New York 146 Misc.2d 237,550
16  N.Y.S.2d 243

17                      California Cases

18  1. Mahdavi v. Superior Court, 166 Cal. App. 4th 32; 82 Cal. Rptr. 3d
19  121; 2008

20  2. John v.LACSC; Ca Supreme court S222726 5/15/2016; Ex C

21  3. Schiff v. Prados, 92 Cal. App. 4th 692; 112 Cal. Rptr. 2d 171; 2001
22  Cal. App.

23  4. People v. Privitera, 23 Cal. 3d 697, 153 Cal. Rptr. 431, 591 P.2d 919,
24  1979 Cal.

25  5. MARK COLLIN SODERSTEN on Habeas Corpus.2007 Cal. App.
26  LEXIS 57,*; 146 Cal. App. 4th 1163; 53 Cal. Rptr. 3d 572; 2007

27  6. Carey v.King 856 F.2d1439, 1440(1988),

28  7.Marsey's Law

8. Nelson *v.* Pearson Ford Co., 186 Cal. App. 4th

983 (Cal. Ct. App. 2010)

California Business and Profession Codes

1. Ca B and P codes § 141 and §2229©, 2305, 2307 Ca B and P codes §

2230.5, Ca B and P codes § 2310 (c)

2. Ca B and P codes § 2337

   Bill Lockyer former Attorney General's Opinion No: 03-1201, April

   28, 2004)

New York Statutes

NY CRR Chapter 606

Hachamovitchv.Debuono Second circuit Docket No97-9065

CPLR § 4514, CPLR § 7804 (e), § 5602(a)(1) NY PHL ¶¶ 2980-

2994,Education Law § 6510(3) (c), 6530 § 32 , Public Health Law (PHL)

§230(10) (c), PHL Article 29-B , PHL § 2962,PHL § 2963-2966, PHL §

2965(c),PHL § 2968,PHL § 2974 ,State Administrative Procedure Act §

302,State Administrative Procedure Act § 303New York Regulations,

NYCPR §51.11(e), 10 NYCPR §51. 9

Table of Medical Authorities, References

1. R.P.C.I. Protocol PPC 862, Weekly CisPlatin followed by
Cytoxan, Adriamycin, CisPlatin in Stage III, IV Ovarian
Carcinoma, 1986. B27-43; A 279-303;a.Small Residual disease
after PPC 862: PPC 858

Lg. Residual disease, a) PPC 858 Appendix B. b.Velban, Bleo,
Etoposide

c.    M.T X 300 mg, M2 + L.C.V. – 5Fu 200mg, M2 days, 2,3,4

D.    BM Harvest, High dose C. H. I. P. E.    T.N.F. F.   Others.

11

2. GOG Protocol 111: Surg (suboptimal Cytoreduction) followed by Cytoxan + CisPlatin VS Taxol + CisPlatin followed by 2nd look off study (Opened 4-13-90, closed 3-2-92) B27-43; A279-303.


3. GOG Protocol 114: Cytoreductive surgery (no previous chemotherapy or radiation) followed by (B27-43; A279-303)

a.     CisPlatin + Cytoxan

b.     CisPlatin +Taxol

c.     Carboplatin followed by CisPlatin + Taxol followed by Reassessment laparotomy and activated 8-3-92 - closed 9-20-93.


4. GOG Protocol 132: surgery followed by CisPlatin VS Taxol VS Taxol +CisPlatin followed by 2nd look reassessment-> residual disease of progression: off study GOG Protocol, Activated March 20, 1992, closed May 9, 1994. B27-43; A279-303.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

0A549 - T55

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Mahmood Yoonessi, M.D., | : | |
| Appellant-Appellant, | : | |
| | : | No. 23AP-160 |
| v. | : | (C.P.C. No. 21CV-1658) |
| State Medical Board of Ohio, | : | (REGULAR CALENDAR) |
| Appellee-Appellee. | : | |

---

D E C I S I O N

Rendered on January 18, 2024

---

*On brief:* Dinsmore & Shohl, L.L.P., *Todd W. Collis,
Daniel S. Zinsmaster,* and *Gregory A. Tapocsi,* for
appellant. **Argued:** *Gregory A. Tapocsi.*

*On brief: Dave Yost,* Attorney General, *Grant Wilson,* and
*Kyle C.* Wilcox, for appellee. **Argued:** *Grant Wilson.*

---

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Mahmood Yoonessi, M.D., appeals the judgment of the Franklin County
Court of Common Pleas affirming the order of the State Medical Board of Ohio (hereinafter
"SMBO"), denying his motion to supplement the administrative record and permanently
denying his application to reinstate his license to practice medicine in Ohio. He argues that
the court committed legal error by refusing to allow him to introduce evidence that was not
part of the record before the SMBO, and that the SMBO's notice of opportunity hearing was
deficient because the action was based upon charges that were not included in that notice.

{¶ 2} Yoonessi is originally from Iran and he completed his first
obstetric/gynocological residency there in 1966. He was licensed to practice medicine in
Ohio in 1972, but his Ohio license expired in 1974 after he moved to New York. His Ohio
license lapsed in 1976, and he has not practiced in Ohio nor held a medical license in Ohio

Franklin County Ohio Court of Appeals Clerk of Courts- 2024 Jan 18 12:41 PM-23AP000160

**0A549 - T56**

No. 23AP-160                                                                                           2

at any point thereafter. Yoonessi worked as an associate obstetric/gynocological professor at the State University of New York—Buffalo, as well as in private practice for many years, but that relationship ended in 2002 amid a dispute about whether he was required to comply with a work rule regarding employment at certain area hospitals. Around that same time, Yoonessi began to be investigated by the New York Medical Board ("NYMB") for negligence and other issues relating to patient care from 1989 through 2000. After a 10-day hearing, the NYMB issued a 32-page order on June 5, 2002 revoking Yoonessi's New York license. That decision was allowed to remain in place by the New York Supreme Court in December 2003. The California Medical Board also revoked Yoonessi's license that same year. Yoonessi applied to have his New York license reinstated in 2005 with limited success; but ultimately, in 2013, the New York Board of Regents denied restoration of Yoonessi's New York license at a hearing for which he asserts he did not receive notice and did not have the ability to appear.

{¶ 3}  In April 2020, Yoonessi applied to have his Ohio license restored. A hearing was held on November 30, 2020 before a hearing examiner of the SMBO, at which Yoonessi testified on his own behalf. Yoonessi contends that at that hearing he was precluded from introducing "*certain mitigating relevant evidence concerning the facts that served as the basis for the New York Board's allegations.*" (Emphasis sic.) (Brief of Appellant at 5.) On February 9, 2021, the hearing examiner issued a report and recommendation endorsing permanent denial of Yoonessi's application. (Mar. 15, 2021 Report & Recommendation, attached to Notice of Appeal at 1-32.) The SMBO considered and ratified the report and recommendation by a 10-0-2 vote at its March 10, 2021 regular meeting. (Mar. 10, 2021 Excerpt, attached to Notice of Appeal at 1-3.)

{¶ 4}  Yoonessi filed a timely notice of appeal with the SMBO and the Franklin County Court of Common Pleas on March 15, 2021, and the trial court issued an order affirming the SMBO's order. (Feb. 16, 2023 Decision and Entry.) This timely appeal followed.

{¶ 5}  Yoonessi's merit brief asserts two assignments of error with the trial court's judgment, and in his reply brief, Yoonessi for the first time asserts a new assignment of error. We begin our analysis of this case by rejecting Yoonesi's supplemental assignment of error. Yoonessi's reply brief contends that pursuant to *TWISM Ents., L.L.C. v. State Bd.*

Franklin County Ohio Court of Appeals Clerk of Courts- 2024 Jan 18 12:41 PM-23AP000160

D.R.25
motion: 23

1   Robert P. Lynch Jr. (OH Bar 0072037)
    (Pro Hac Vice)
2   **Gordon Rees Scully Mansukhani, LLP**
3   41 South High Street, Suite 2495
    Columbus, Ohio 43215
4   T: (614) 364-0980
5   F: (614) 360-2130
    rplynch@grsm.com
6   Attorneys for Defendant
7   Kyle Wilcox

8              IN THE UNITED STATES DISTRICT COURT
9               EASTERN DISTRICT OF CALIFORNIA

10  MAHMOOD YOONESSI,              )   Case No. 2:23-cv-00023-TLN-DB
11                                 )
                                   )
12  Plaintiff,                     )   ***DEFENDANT KYLE WILCOX'S***
                                   )   ***SECOND MOTION FOR***
13                                 )   ***EXTENSION OF TIME***
14  vs.                            )   JUDGE TROY L. NUNLEY
15                                 )
                                   )
16  LETITIA JAMES, et al.,         )   MAGISTRATE JUDGE
17                                 )   DEBORARH BARNES
                                   )
18  Defendants.                    )   Complaint filed; January 6, 2023
19                                 )   Motion filed: August 10, 2023
                                   )
20
21                         **NOTICE:**
22         Defendant Kyle Wilcox respectfully notifies this Honorable Court regarding
23  the Motion for Extension of Time and moves for an extension of time to respond to
24  Plaintiff's Motion for Summary Judgment under Fed. R. Civ. P 6(b)(1)(A) and
25  notices the motion for a hearing on October 27, 2023 at 10:00am.
26
27
28                    ·1—Motion for Extension of Time

1

**MOTION:**

2    Defendant Kyle Wilcox moves this Honorable Court for an order extending

3   time to respond to Plaintiff's Motion for Summary Judgment filed on August 10,

4   2023. Wilcox requests that the Court grant him 30 days after the Court rules upon

5   Wilcox's Motion to Dismiss to respond to Plaintiff's Motion for Summary

6   Judgment. In the alternative, Wilcox requests that the Court deny Plaintiff's motion

7   for summary judgment. Plaintiff's Motion for Summary Judgment fails to

8   articulate any facts or causes of action related to Defendant Kyle Wilcox. It

9   appears that Plaintiff has simply attached various documents to his motion

10  captioned as a motion for summary judgment and which does not establish any

11  claims against Wilcox.

12    Under Fed. R. Civ. P. 6(b)(1)(A), the Court "may, for good cause, extend the

13  time: with or without motion or notice…if a request is made, before the original

14  time or its extension expires."

15    Wilcox requests that the Court grant additional time of 30 days to respond to

16  Plaintiff's Motion for Summary Judgment after the Court rules upon the Motion to

17  Dismiss as the Motion may be dispositive of Plaintiff's claims. Moreover,

18  Plaintiff's motion for summary judgment is premature because Wilcox has not

19  even answered or plead in response to the Complaint. In the alternative, Wilcox

20  requests that the Court deny Plaintiff's Motion for Summary Judgment filed on

21  August 10, 2023 as there is no legal causes of action against Wilcox and no facts

22  alleged against Wilcox. This is Wilcox's second request for an extension of time.

23  Moreover, Plaintiff will not be prejudiced by the extension of time. Therefore,

24  Wilcox requests that the Court grant the Motion for Extension of Time.

25

26

27

28

2—Motion for Extension of Time

000041

Respectfully submitted,

KRISTIN BLOCHER, Esq. (CA Bar 283730:06/2012)
**Gordon Rees Scully Mansukhani, LLP**
3 Parkcenter Drive, Suite 200
Sacramento, California 95825
T: (916) 565-2900
F: (916) 920-4402
kblocher@grsm.com

By:    *Robert P. Lynch Jr.*
ROBERT P. LYNCH JR. (OH Bar 0072037)
(Pro Hac Vice)
**Gordon Rees Scully Mansukhani, LLP**
41 South High Street, Suite 2495
Columbus, Ohio 43215
T: (614) 364-0980/F: (614) 360-2130
rplynch@grsm.com

Attorneys for Defendant
Kyle Wilcox

**000042**
3—Motion for Extension of Time

**CHASE** 🏦

*2 1*

November 5, 2019

My Montecito VI, LLC
PO Box 12025
San Bernardino, CA 92423
Attn: Mr. Mahmood Yoonessi

Re:    Reference Number 200267387
       Property: 1804-1844 & 1813-1891,12th St.; 1812-1892 11th St
       Riverside, CA 92507

Dear Mr. Yoonessi:

We are responding to your October 23, 2019 complaint to the Consumer Financial Protection Bureau (CFPB), about the loan application for your commercial property referenced above.

As a matter of clarification, please understand that the loan request that is the subject of your complaint was not approved by Chase despite your contention to the contrary in your complaint submitted to the CFPB.

While we regret that our loan declination letter of October 23, 2019 may have caused some confusion as to the basis of the loan denial, please understand that during the course of our performing due diligence while processing your loan request, we learned of significant negative information involving you, including charges made against you that resulted in the loss of your license to practice medicine in the states of New York, California and Texas. This information was carefully considered as part of our decision to decline your loan request.

We are in the process of refunding in full, your loan application fee. If you have any further questions regarding the loan denial, please contact the undersigned.

Sincerely,

Lynnette Antosh

Commercial Term Lending
Regional Sales Manager
(949) 475-7243

# CHASE ⬦

**2₁**

**Executive Office**
Mail Code OH4-7120
3415 Vision Dr.
Columbus, OH 43219

November 7, 2019

Mahmood Yoonessi
My Montecito, Inc.
6790 Crest Rd.
Rancho Palos Verdes, CA 90275-5495

**Here's information about your loan application**

Dear Mahmood Yoonessi:

We are responding to your complaint to the Consumer Financial Protection Bureau about a loan application for your commercial property. Thank you for sharing your concerns.

We aim to give exceptional service and regret any confusion caused by our explanation. Enclosed is a copy of our response we sent you on November 5, 2019, addressing your concerns.

Thank you for banking with us. If you have questions, please call us at 1-877-658-5560 and reference case number ECW191024-03479. We accept operator relay calls. Our office hours are Monday through Friday from 7 a.m. to 8 p.m. and Saturday from 8 a.m. to 5 p.m. Central Time.

Sincerely,

Executive Office
1-877-658-5560
1-866-535-3403 Fax (Free of charge from any Chase branch)
chase.com

cc:    Consumer Financial Protection Bureau, Complaint ID 191023-4491997

Enclosure

Esta comunicación contiene información importante. Si tiene alguna pregunta o necesita ayuda para traducirla, comuníquese con nosotros llamando al 1-877-658-5560, de lunes a viernes de 7 a.m. a 8 p.m., sábados de 8 a.m. a 5 p.m. hora del Centro.

# M Gmail

Mahmood Yoonessi <myoonessi75@gmail.com>

---

## Final underwriting
1 message

---

**Foster, Brian C** <brian.foster@chase.com>                                                    Wed, Oct 16, 2019 at 1:19 PM
To: Mahmood Yoonessi <myoonessi75@gmail.com>

We are ready to submit the loan for final underwriting/approval and issuance of a Commitment Letter.  Please call as we need to lock rate.

Brian C. Foster | Executive Director |Commercial Term Lending | J.P. Morgan Chase

Direct 310.341.1906| FAX 866.494.8151| Toll Free 866.898.0966| brian.foster@chase.com

Visit my homepage at  **CTL Brian Foster**

Alternate Contact for new loans and pricing:  Valeri Frial | 310.341.1907 | Valeri.Frial@chase.com

Alternate Contact for loans in process:  Morgan Levoy | 310-341-1908 | Morgan.T.Levoy@chase.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

This message is confidential and subject to terms at:https://www.jpmorgan.com/emaildisclaimer including on confidentiality, legal privilege, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# ◣◢ Gmail

Mahmood Yoonessi <myoonessi75@gmail.com>

---

## Appraisal Report - 1824 12th St. and 1812 11th St. Riverside

1 message

---

**Levoy, Morgan T** <morgan.t.levoy@chase.com>                                    Wed, Oct 16, 2019 at 10:06 AM
To: Mahmood Yoonessi <myoonessi75@gmail.com>

Hi Yoonessi,

Your appraisal came in for 1824 12th St. and 1812 11th St. property. The value came in at $15,600,000.

Thank you.

**Morgan LeVoy** | CTL Client Specialist | Commercial Term Lending | Commercial Banking | **Chase** | 2121 Rosecrans Avenue, Suite 2300,
El Segundo, CA 90245 | T: 310 341 1908 | F: 855 344 2446 | morgan.t.levoy@chase.com

This message is confidential and subject to terms at:https://www.jpmorgan.com/emaildisclaimer including on confidentiality,
legal privilege, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this
message and notify the sender immediately. Any unauthorized use is strictly prohibited.



My Montecito VI
6790 Crest Rd
Rancho Palos Verdes, CA 90275

Date: 11/27/2018

**Commercial Term Lending**
Brian Foster
(310) 341-1906
brian.foster@chase.com

Reference number: 200143373

## Letter of Intent

Thank you for giving us the opportunity to help you finance the property at 1812 11th St, 1824 12th St, Riverside, CA 92507.

Please confirm you wish to apply for a loan based on the proposed loan terms by signing and returning this Letter of Intent (LOI) with a deposit* of $11,875.00 **within 10 days** of the date of this LOI. If you have any questions while reviewing this LOI, please contact your Client Manager.

Please also see page 2 for important information about next steps.

### Proposed loan terms

After our preliminary underwriting review of the information you provided, we propose the following terms subject to final credit approval.

**General terms**

| | |
|---|---|
| Loan amount: | $9,500,000.00 |
| Loan description: | Fixed for 84 months, then rate/payment adjusts semi-annually |
| Purpose: | Refinance |
| Loan term: | 360 months |
| Amortization: | 360 months |
| Recourse: | Nonrecourse with carve outs |
| Prepayment premium: | 5-5-4-4-3-2-1 Chase Retention Prepayment Premium |
| Maximum loan-to-value: | 65% |
| Minimum debt service coverage ratio: | 1.20:1 |

**Interest and fees**

| | |
|---|---|
| Fixed interest rate (subject to rate lock): | 4.840% 4.78% |
| Adjustable interest rate: | 6m LIBOR plus 2.250% |
| Interest accrual method: | 30/360 |
| Floor rate: | 2.500% |
| Rate cap: | 9.840% |
| Processing fee: | $11,875.00 |
| Origination fee: | $0.00 |

Sincerely

JPMorgan Chase Bank, N.A.

Accepted by Sponsor or Principal _____  Date 11/29/2018

\* Deposit is (i) refundable if proposed loan denied, (ii) non-refundable if loan application withdrawn or if you fail to provide requested information, or (iii) credited against your Processing Fee and other lender fees/closing costs shown on final settlement statement for approved/funded loan.

≡ **M** Gmail 　　　　Q Search mail

Compose

| | |
|---|---|
| **Inbox** | 5,402 |
| Starred | |
| Snoozed | |
| Sent | |
| **Drafts** | 78 |
| [Imap]/Drafts | |
| Notes | |
| More | |

 Mahmood 　　　+

No Hangouts contacts
Find someone

## Emerald Point Refinance  Inbox ×

**Foster, Brian C**
Dr. Yoonessi- I wanted to follow up with you on this loan request. My of

**Foster, Brian C**
Dr. Yoonessi- Unfortunately I have miss placed your phone number as

**Foster, Brian C**
Dr. Yoonessi- The items that are missing: 1) Rent roll to include tenant

**Foster, Brian C** <brian.foster@chase.com>
to Myconessi75@gmail.com

Dr. Yoonessi-

We received rent roll and I saw the property. Can you tell me a little abou

　　　1) How long have you been an investor with apartment build
　　　2) Do you own other apartment buildings in Riverside?
　　　3) If so, how many buildings? Units?

Thank you,

Brian C. Foster
J.P. Morgan Chase
310-341-1906

**From:** Foster, Brian C
**Sent:** Friday, November 16, 2018 12:22 PM
**To:** 'Myconessi75@gmail.com' <Myconessi75@gmail.com>
**Subject:** FW: Emerald Point Refinance
**Importance:** High

Reference number: 200143373

## Conditions to know and next steps to take

- Prior to Final Underwriting, applicant to provide current copy of insurance premiums.

- Prior to ordering appraisal, applicant must provide a letter of explanation for the difference between the actual collected rents stated in the prior year's operating history and the annualized rents based on the provided rent roll. The letter of explanation must be satisfactory to lender's underwriting department.

- At application submission, applicant(s) to provide the following information: (1) current rent rolls for all Chase financed properties; (2) operating statements for the last fiscal year-end for all Chase financed properties; (3) real estate schedule including vesting, ownership percentage, and annual income, expense, and debt service information; (4) personal financial statement, including explanatory footnotes for items covered in the real estate schedule (real estate investments should be reported on a gross asset basis, reflecting applicant's percentage share of the assets and liabilities in these investments); (5) current account statement(s) to verify liquidity; (6) resume of the sponsor evidencing real estate experience; and (7) Succession Plan. The information must be approved by lender's Key Relationship Group prior to final credit decision.

- Prior to final credit decision, a Phase 1 environmental report (Phase 1) will be ordered by lender at an estimated cost to applicant of $[**insert fee amount**] unless the applicant provides a Phase 1 report which is acceptable to lender's environmental risk management department. The Phase 1 must be approved by lender's environmental risk management department prior to final credit decision.

- Prior to ordering appraisal, applicant must provide an itemized capital improvement list for 2016, 2017 and YTD 2018. Capital improvement list must be approved by lender's underwriting department prior to ordering appraisal.

## Your Chase team

Please contact your Chase team if you have any questions about this LOI, locking your interest rate, sending in your deposit or ordering the appraisal.

- Client Manager – Brian Foster at (310) 341-1906 / brian.foster@chase.com
- Client Associate – Valeri Burgess at (310) 341-1907 / valeri.frial@chase.com
- Client Specialist – Morgan LeVoy at (310) 341-1908 / morgan.t.levoy@chase.com

# CHASE ⬟

# Commercial Term Lending
# Debit Authorization

| Instructions | Please confirm that your bank allows automated clearing house (ACH) withdrawals from this account. |
|---|---|

## Section 1: Borrower and bank account information

| Borrower name: | My Montecito VI |
|---|---|

| Account type: | ☐ Savings  ☐ Checking | Account no. | 1458957972 |
|---|---|---|---|

| Name on account: | MY Montecito VI, Inc |
|---|---|

| Bank name: | Wells Fargo | Bank city: | R.P.V | Bank state: | Ca |
|---|---|---|---|---|---|

| Bank routing no. (not required for Chase accounts): | 122 000247 |
|---|---|

```
⑈0⑆23456789⑈ 0⑈23456789012⑈ ⑆0⑈23
   Bank Routing        Bank Account      Check
     Number              Number         Number
```

## Section 2: Loan and debit information

| Loan no.: | 200143373 | Type of deposit/ fee: | Application Fee | Amount: | $ | 11,875.00 |
|---|---|---|---|---|---|---|
| | | Type of deposit/ fee: | | Amount: | $ | |
| | | | | Total: | $ | 11,875 |

## Section 3: Authorization and Certification

I authorize JPMorgan Chase Bank, N.A. including its affiliates, agents, successors and assigns (Lender) to initiate a one-time debit from my account for the amount(s) specified above, on or after the authorization date below.

If the account is a business checking account, I represent and warrant that I am duly authorized to initiate debits to the account on behalf of the business, and I understand and agree that:

- the origination of ACH transactions to the above account must comply with applicable law.
- if a payment is rejected for non-sufficient funds (NSF),
  - Lender may, at its discretion, attempt to process one or more debits within 180 calendar days, and
  - each attempt will be initiated as a separate transaction from the authorized payment.

This authorization will remain in full force and effect until Lender has received written notification of termination from me in such manner that affords Lender and the bank a reasonable opportunity to act.

I hereby certify that the account information and all other information are true and correct.

| Signature(s) ✎ Don ahmad yacheri | Authorization date: 11,29,2018 |
|---|---|

| Bank use only: | SID: **O242002** | CC: | **459174** |
|---|---|---|---|



289 CTL
10/19/17 (rev. 09/17/18)
JPMorgan Chase Bank, N.A. Member FDIC. All products and services provided by JPMorgan Chase Bank, N.A. and its affiliates.    Page 1 of 1



# Commercial Term Lending
# Credit Authorization Release, Financial and Personal Certification

| Loan number(s): | 200143373 |
| --- | --- |

## Section 1: General information

| Legal name:<br>(first, middle, last) | MAHMOO     YOONESSI | Phone 📞 | 310-303-1671 |
| --- | --- | --- | --- |
| Social Security no.: | 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 | Date of birth: | 08/01/1940 |

Home address:
(No PO box)

6790 Crest Rd

Street

| Rancho Palos Verdes | Co | 90275 |
| --- | --- | --- |
| City | State | Zip |

| Country (if above is not U.S.): | U.S.A | No. of years at home address: | 14 |
| --- | --- | --- | --- |

## Section 2: Certification and Agreement

By signing below, I authorize JPMorgan Chase Bank, N.A., including its affiliates, agents, successors and assigns  to:

- obtain my credit report from one or more consumer credit reporting agencies for the renewal, modification, extension, review, collection, servicing or administration of the loan(s) listed above,
- use this report with all loans and guaranties with us, notwithstanding any discharge in  bankruptcy I received for any loan,
- verify my bank records, credit history and other necessary information without notice and on a continuing basis,
- answer questions about its credit experience with me and share credit report information with its affiliates, and
- use a photocopy of this certification to verify one or more of my credit references.

I also authorize consumer credit reporting agencies to give you my credit report.

I certify that:

- the personal information and documents I have given to you  are true and correct as of their dates or, if undated, as of the date below, including tax reporting, and all financial reports and
- there has been no related material adverse change that I have not already disclosed in writing.

I agree that you can disclose related information you obtain about me and this certification, to a loan applicant, prospective borrower or guarantor, and their representatives, employees and affiliates for the loan(s), and:

- any intentional or negligent misrepresentation of such information and documentation can result in civil liability and/or criminal penalties including fine, imprisonment or both, and
- I am liable for financial damages to you and any other person or entity that may suffer a loss by relying on any such misrepresentation.

By signing below, I represent and warrant that the above authorization and the information provided is true and correct.

| Signature ✒️ | _Mahmoud Yoonessi_ | Date: | 11, 29, 2018 |
| --- | --- | --- | --- |



| | | LLC-1A | File # _____ |

## State of California
### Secretary of State

## Limited Liability Company
## Articles of Organization - Conversion

**IMPORTANT — Read all instructions before completing this form.**    This Space For Filing Use Only

**Converted Entity Information**

1. Name of Limited Liability Company  (The name must include the words Limited Liability Company or the abbreviations LLC or L.L.C. The words Limited and Company may be abbreviated to Ltd. and Co., respectively.)

MY MONTECITO VI, LLC

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

3. The limited liability company will be managed by (check only one):

[✓] One Manager      [ ] More Than One Manager      [ ] All Limited Liability Company Member(s)

4. Initial Street Address of Limited Liability Company's Designated Office in CA | City | State | Zip Code

2601 DEL ROSA SUITE 115      SAN BERNARDINO      CA      92404

5. Initial Mailing Address of Limited Liability Company, if different from Item 4 | City | State | Zip Code

6. Name of Initial Agent For Service of Process  (Item 6. List a California resident or a California registered corporate agent that agrees to be your initial agent for service of process in case the LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. Item 7. If the agent is an individual, list the agent's business or residential street address in California. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file. Item 8: If the converting entity is a CA limited partnership, enter the mailing address of the agent, if different from Item 7, or if the agent is a California registered corporate agent.)

DEBORAH M BLAZE

7. If an Individual, Street Address of Agent for Service of Process in CA | City | State | Zip Code

2601 DEL ROSA SUITE 115      SAN BERNARDINO      CA      92404

8. Mailing Address of Agent for Service of Process | City | State | Zip Code

2601 DEL ROSA SUITE 115      SAN BERNARDINO      CA      92404

**Converting Entity Information**

9. Name of Converting Entity

MY MONTECITO VI, INC.

10. Form of Entity     S CORP     | 11. Jurisdiction     CA     | 12. CA Secretary of State File Number, if any     3486082

13. The principal terms of the plan of conversion were approved by a vote of the number of interests or shares of each class that equaled or exceeded the vote required. If a vote was required, the following was required for each class:

The class and number of outstanding interests entitled to vote     AND     The percentage vote required of each class

COMMON STOCK     10000 SHARES                          100%

**Additional Information**

14. Additional information set forth on the attached pages, if any, is incorporated herein by this reference and made part of this certificate.

15. I certify under penalty of perjury that the contents of this document are true. I declare I am the person who executed this instrument, which execution is my act and deed.

MAHMOOD YOONESSI, PRESIDENT

_____     Type or Print Name and Title of Authorized Person
Signature of Authorized Person

_____     Type or Print Name and Title of Authorized Person
Signature of Authorized Person

LLC-1A (REV 01/2014)                                        APPROVED BY SECRETARY OF STATE

**Opus**Bank   BUILD YOUR MASTERPIECE

March 19, 2015

**Via U.S. Mail**

MY Montecito Inc SH
Attention: Mahmood Yoonessi, M.D.

2601 Del Rosa, Suite 115
San Bernardino, California 92404

6790 Crest Road
Rancho Palos Verdes, California 90275

**Re:     MY Montecito Inc SH Demand for Refund for Phase 1 Environmental Site Assessment
Report for 6160 Arlington Avenue, Riverside, California 92504.**

Dear Mr. Yoonessi:

This letter responds to your letter communication dated March 7, 2015 directed to Opus Bank's
("Opus") Appraisal department. Thank you for your communication. You are requesting that Opus refund
the funds collected for a Phase 1 Environmental Site Assessment Report (the "Report") conducted on the
property known as 6160 Arlington Avenue, Riverside, California 92504.

After a thorough review of the Report, the Notice of Inspection filed by the Santa Ana Regional
Water Quality Control Board, and BA Environmental's Phase II Subsurface Investigation, we will not be
issuing you a refund of the funds collected for the Report. The allegations made in your communication
are without merit. Based on your allegations as presented in your communication, it is apparent that your
attention should be redirected to the Santa Ana Regional Water Quality Control Board for the purposes of
remediating any environmental liabilities that may arise from contamination on the property that is the
subject of the Report.

We wish you success in your efforts to resolve this matter.

Sincerely,

Andres Gallardo
Vice President and Assistant General Counsel

Dr. Mahmood Yoonessi                                                      Page      7

|  | Amount |
|---|---|
| Accounts receivable transactions | |

| 10/17/2018 | Payment received from Essra Mostafavi  for outstanding balance   - Thank you!. Check No. CC payment | ($8,642.00) |

Total payments and adjustments                                       ($8,642.00)

Balance due                                                          $8,617.00

### Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| David R. Isola | 19.60 | 240.00 | $4,704.00 |
| Doyle Graham | 18.20 | 215.00 | $3,913.00 |
| Doyle Graham | 16.40 | 0.00 | $0.00 |

# CHASE O

Cardmember Services
P.O. Box 15299
Wilmington, DE 19850-5299

**Questions?**

📞 1-800-849-3574
📠 1-888-643-9624
We accept operator relay calls

05132 DMS 056 001 25223 NNNNNNNNNNNN DISP0003
**DR MAHMOOD YOONESSI**
6790 CREST RD
RANCHO PALOS VERDES CA 90275-5495

September 08, 2023

# Update:  **Here's an update on your dispute(s)**

Your account ending in 8530

Dear DR MAHMOOD YOONESSI:

We appreciate your business and want to keep you updated with the latest information about the charge(s) you disputed.

| Transaction Post Date | Merchant Name | Transaction Amount |
|---|---|---|
| 07/09/2023 | IN *CALIFORNIA HOME SPAS, | $8,000.00 |

**Here's what you need to know**
- You do not have to pay for any disputed amount(s) while we research the dispute.
- We gave you a temporary credit for the disputed amount(s), including any related interest charge(s). You'll see this credit now at chase.com and on one of your next two billing statements.
- The merchant(s) can provide information supporting the charge(s) during the next two billing periods. If they do not respond during that period, our credit(s) will remain on your account.

Please save all documentation and receipts related to your dispute(s). This could include:
- Original sales receipt(s), credit receipt(s), proof of return or cancellation, or
- A record of correspondence with the merchant acknowledging the billing error.

The documentation you provide us may greatly influence our ability to resolve the dispute in your favor.

If you have questions, please call us at 1-800-849-3574. We're available Monday through Friday from 9 a.m. to 9 p.m. Eastern Time.

We appreciate your business.

Sincerely,

Customer Service
Chase Cardmember Services

CLAIM ID: C-20230908-10244

6790 Crest Rd.
Pls Vrds Est, CA 90275

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*Domestic Mail Only; No Insurance Coverage Provided*

For delivery information visit our website at www.usps.com®

OFFICIAL

| Postage | $ | |
| Certified Fee | | Postmark |
| Return Receipt Fee (Endorsement Required) | | Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To Lyketa Arnold Manager/Commercial Mortgage Dpt
Chase Bank
677 N. High St
Columbus, Ohio 43215

Mahmood Yoontessi
6790 Crest Rd.

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*Domestic Mail Only; No Insurance Coverage Provided*

Delivery Information visit our website at www.usps.com®

| Postage | $ | |
| Certified Fee | | Postmark |
| Return Receipt Fee (Endorsement Required) | | Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

William Proszka, Atty
455 Golden Gate Ave
San Francisco, Ca 94102

See Reverse for Instructions

---

To: Lyketa Arnold
Manager, Commercial Mortgage Dpt
Chase Bank
677 N. High St
Columbus, Ohio 43215

#718
#710-C

W William Proszka, Atty
455 Golden Gate Ave
San Francisco, Ca 94102

Dr. Shams Yoonessi
6790 Crest Rd.
Rch Palos Vrd, CA 90275

CERTIFIED MAIL

7020 2450 0001 0932 7495

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL

UNITED STATES
POSTAL SERVICE

Retail

U.S. POSTAGE PAID
FCM LG ENV
TORRANCE, CA 90505
AUG 08, 2023

$5.94
R2305M147851-02

43215

RDC 99

Lynette Antog
Place Commerce Pending
...

NIXIE    430    52 1

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 90275549590    *2646-02564-15-23

90275>5495    UTF

ZZ09/15/23

1    **PARKER IBRAHIM & BERG LLP**
     JOHN M. SORICH #125223
2    John.Sorich@piblaw.com
     MARIEL GERLT-FERRARO #251119
3    Mariel.Gerlt-Ferraro@piblaw.com
4    695 Town Center Drive, 16th Floor
     Costa Mesa, California 92626
5    Telephone: 714.361.9550
     Facsimile: 714.784.4190
6
7    Attorneys for Defendants
     JPMorgan Chase Bank, N.A., erroneously sued as "Chase Bank"; and
8    Lynnette Antosh, erroneously sued as "Lynette Antosch"

9                          UNITED STATES DISTRICT COURT

10                        EASTERN DISTRICT OF CALIFORNIA

11

12   Mahmood Yoonessi,MYoonessi,MDPC,        CASE NO: 2:23-cv-00023-TLN-DB

13                    Plaintiff,             **NOTICE OF INTERESTED PARTIES
                                             (FRCP RULE 7.1) AND CORPORATE
14                    v.                      DISCLOSURE STATEMENT**

15   Letitia James, William Prasifka, Kyle Wilcox,
     Merrill Tisch, Lynnette Antosh, all personally,
16   Medical Boards of California, New York, Ohio,
     University of Buffalo, Chase Bank, and Does 1-
17   10,
18                    Defendants.

19
20   **TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND TO ALL PARTIES
21   AND THEIR ATTORNEYS OF RECORD:**

22        **PLEASE TAKE NOTICE** that defendant JPMorgan Chase Bank, N.A., erroneously sued

23   herein as "Chase Bank" ("**Chase**"), and Lynnette Antosh, erroneously sued herein as "Lynette

24   Antosch" ("**Antosh**"), hereby submit the following notice of interested parties and corporate

25   disclosure statement pursuant to Federal Rules of Civil Procedure, Rule 7.1.

26        The undersigned, counsel of record for Chase and Antosh, certifies that the following listed

27   party (or parties) may have a pecuniary interest in the outcome of this case. These representations are

28   made to enable the Court to evaluate possible disqualification or recusal.

                                                1
     NOTICE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

1  *Interested Parties and Corporate Disclosure Statement*

2      JPMorgan Chase Bank, N.A., is a wholly owned subsidiary of JPMorgan Chase & Co., which

3  is a publicly held corporation. JPMorgan Chase & Co. does not have a parent corporation and no

4  publicly held corporation owns ten percent (10%) or more of its stock. However, The Vanguard Group,

5  Inc., an investment adviser which is not a publicly held corporation, has reported that registered

6  investment companies, other pooled investment vehicles and institutional accounts that it or its

7  subsidiaries sponsor, manage or advise have aggregate ownership under certain regulations of ten

8  percent (10%) or more of the stock of JPMorgan Chase & Co.

9

10  DATED: February 29, 2024         **PARKER IBRAHIM & BERG LLP**

11

12                                  By:  */s/ Mariel Gerlt-Ferraro*
                                        JOHN M. SORICH
13                                      MARIEL GERLT-FERRARO
                                        Attorneys for Defendants
14                                      JPMORGAN    CHASE    BANK,    N.A.,
                                        ERRONEOUSLY SUED AS "CHASE BANK";
15                                      AND LYNNETTE ANTOSH, ERROENOUSLY
                                        SUED AS "LYNETTE ANTOSCH"
16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

1   ROBERT P. LYNCH JR. (SBN: 0072037)
    rplynch@grsm.com
2   KRISTIN A. BLOCHER (SBN: 283730)
    kblocher@grsm.com
3   GORDON REES SCULLY MANSUKHANI, LLP
    3 Parkcenter Drive, Suite 200
4   Sacramento, CA 95825
    Telephone: (916) 830-6546
5   Facsimile: (916) 920-4402

6   Attorneys for Defendant
    MEDICAL BOARDS OF CALIFORNIA
7

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  MAHMOOD YOONESSI AND MYOONESSI, MD )   CASE NO. 2:23-cv-00023-TLN-DB
    PC,                                  )
12                                       )   **CERTIFICATE OF SERVICE**
                        Plaintiff,       )
13                                       )
                                         )   Complaint Filed: January 6, 2023
14           vs.                         )
                                         )
15  LETITIA JAMES; WILLIAM PRASIFKA; KYLE )
    WILCOX; MERRILL TISCH; MEDICAL BOARDS )
16  OF CALIFORNIA; OHIO STATE UNIVERSITY  )
    OF NEW YORK AT BUFFALO; CHASE BANK;   )
17  and DOES 1-10;                        )
                                          )
18                      Defendants.       )
                                          )
19
20
21
22
23
24
25
26
27
28

-1-
CERTIFICATE OF SERVICE

*Gordon Rees Scully Mansukhani, LLP*
*3 Parkcenter Drive, Suite 200*
*Sacramento, CA 95825*

ROBERT P. LYNCH JR. (SBN: 0072037)
rplynch@grsm.com
KRISTIN A. BLOCHER (SBN: 283730)
kblocher@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
3 Parkcenter Drive, Suite 200
Sacramento, CA 95825
Telephone: (916) 830-6546
Facsimile: (916) 920-4402

Attorneys for Defendant 
MEDICAL BOARDS OF CALIFORNIA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MAHMOOD YOONESSI AND MYOONESSI, MD PC,

Plaintiff,

vs.

LETITIA JAMES; WILLIAM PRASIFKA; KYLE WILCOX; MERRILL TISCH; MEDICAL BOARDS OF CALIFORNIA; OHIO STATE UNIVERSITY OF NEW YORK AT BUFFALO; CHASE BANK; and DOES 1-10;

Defendants.

CASE NO. 2:23-cv-00023-TLN-DB

**CERTIFICATE OF SERVICE**

Complaint Filed: January 6, 2023

-1-

CERTIFICATE OF SERVICE

# MEDICAL BOARD
## OF CALIFORNIA

Protecting consumers by advancing high quality, safe medical care.

**Enforcement Program**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone (916) 263-2525
Fax (916) 263-2473
www.mbc.ca.gov

Gavin Newsom, Governor, State of California | Business, Consumer Services and Housing Agency | Department of Consumer Affairs

December 7, 2020

TO WHOM IT MAY CONCERN:

I, WILLIAM PRASIFKA, Executive Director of the Medical Board of California, do hereby certify that MAHMOOD YOONESSI, M.D., whose address of record is 9 BOBBIE LANE, WILLIAMSVILLE, NY 14221 was issued Physician's and Surgeon's Certificate Number C 50545 by the Board on March 1, 2001. Said certificate is REVOKED.

I further certify that disciplinary action was taken against this certificate as follows: On August 23, 2002 a FULL OUT OF STATE SUSPENSION ORDER-NO PRACTICE was issued, and on October 16, 2002 an ACCUSATION was filed against Doctor YOONESSI. On June 10, 2003 a PETITION FOR RECONSIDERATION was filed, and on June 23, 2003 an ORDER DENYING PETITION FOR RECONSIDERATION AND REQUEST FOR STAY was issued, and a DECISION became effective which read: REVOKED. On July 22, 2003 a PETITION FOR A WRIT OF MANDATE AND REQUEST FOR A STAY was filed and on December 24, 2003 an ORDER DENYING PETITION FOR WRIT OF MANDATE was issued. On November 29, 2009 a PETITION FOR REINSTATEMENT was filed, and on November 11, 2008 the PETITION FOR REINSTATEMENT WAS DENIED. On November 13, 2008 a DECISION became effective which read: PETITION FOR REINSTATEMENT OF REVOKED CERTIFICATE DENIED.

Respectfully submitted,

WILLIAM PRASIFKA,
Executive Director of the
Medical Board of California

**SECTION 162 OF THE BUSINESS AND PROFESSIONS CODE:**
The certificate of the officer in charge of the records of any board in the department that any person was or was not on a specified date, or during a specified period of time, licensed, certified or registered under the provisions of law administered by the Board, or that the license, certificate or registration of any person was revoked or under suspension, shall be admitted in any court as prima facie evidence of the facts therein recited.



deficiency in homologous recombination repair (HRD).

Preclinical studies have shown that the inhibition of angiogenesis leads to hypoxic environments within the tumor, potentially leading to a *BRCA*-like phenotype.[5] This supposition contributed to the design of PAOLA-1, a phase III randomized placebo-controlled trial, which looked at the benefit of the addition of the PARP inhibitor olaparib for 24 months to patients with advanced-stage epithelial ovarian cancer receiving cytotoxic chemotherapy with bevacizumab given as maintenance therapy (15 mg/kg every 3 weeks) for up to 15 months.

## Closer Look at PAOLA-1

**PAOLA-1 RANDOMLY** assigned patients with advanced-stage epithelial ovarian cancer who were receiving cytotoxic chemotherapy with a platinum-taxane combination, either as neoadjuvant treatment or

**TABLE 1:** Ongoing or Recently Completed Trials of Maintenance Therapy in Advanced Ovarian Cancer

| Trial | Agents | Patient Population | Arms |
|---|---|---|---|
| DUO-O (AGO-OVAR23/ ENGOT-OV46; ClinicalTrials. gov identifier NCT03737643) | Olaparib Durvalumab | Non–*BRCA*-mutated tumor  Low-grade serous disease excluded | CP/bevacizumab/placebo/ placebo  CP/bevacizumab/ durvalumab/placebo  CP/bevacizumab/ durvalumab/olaparib  *BRCA*-mutant arm: CP/durvalumab/olaparib ± bevacizumab |
| FIRST (ENGOT-OV44; NCT03602859) | Niraparib Dostarlimab Bevacizumab optional | *BRCA*-mutant–guaranteed niraparib arm  Mucinous excluded | CP/placebo/placebo  CP/placebo/niraparib  CP/dostarlimab/niraparib |
| KEYLYNK-001 (ENGOT-OV43; NCT03740165) | Olaparib Pembrolizumab Bevacizumab optional | Non–*BRCA*-mutated tumor  All histologies | CP/placebo/placebo  CP/pembrolizumab/ placebo  CP/pembrolizumab/ olaparib |
| ATHENA (GOG3020/ ENGOT-OV45; NCT03522246) | Rucaparib Nivolumab | Maintenance after chemotherapy  Stage III/IV, high-grade  Response to platinum | Placebo/placebo  Placebo/nivolumab  Placebo/rucaparib  Nivolumab/rucaparib |
| iMagyn050 (GOG 3015/ ENGOT-OV39; NCT03038100) | Bevacizumab Atezolizumab | Stage III (with macroscopic residual disease after surgery), stage IV, or neoadjuvant therapy | CP/bevacizumab/placebo  CP/bevacizumab/ atezolizumab |
| PRIMA (GOG 3012/ ENGOT-OV26; NCT02655016) | Niraparib | Stage III/IV | Platinum-based chemotherapy/niraparib  Platinum-based chemotherapy/placebo |

CP = carboplatin/paclitaxel.

C00333

Subgroup, a preplanned progress... performed in which the hazard rat... calculated. In patients with muta... the addition of olaparib to bevaci... HR = 0.31, 95% CI = 0.20–0.47). An... the myChoice HRD Plus assay was... compared to those who had homol... ("HRD-negative") tumors. Olaparib... showed improved progression-free... HRD-positive without a *BRCA* muta... HR = 0.43, 95% CI = 0.28–0.66) com... ative (median = 16.6 vs 16.2 months,...

PAOLA-1 provides further evidence... inhibitor in the front-line mainten... vanced-stage epithelial ovarian can... aspects of the design of PAOLA-1 is... received active maintenance with b... the other recently positive phase III... strategy, the control arm was placeb...

Patients with mutations in *BRCA1* or ... benefit from the addition of a PARP i... in PAOLA-1 and other studies (SOLO-... there was not a third arm in the PAOL... This leaves us to question whether a P... acizumab would be superior to a PARP... therapy in the intent-to-treat populat... completed studies are trying to answe...

This is even more important when we l... tated tumors. It is important to note t... flawed in terms of analytic interpretat... sons. In SOLO-1, the inclusion criteria... all tumors in SOLO-1 had a *BRCA* muta... bevacizumab with their first-line chem... sion-free survival at 3 years was 60%, w... though slightly higher (approaching 70... of olaparib maintenance alone, it is no... the olaparib combination with bevaci... single-agent olaparib in patients with ... the slightly higher progression-free su...

## Other Subgroup Consideration...

**IN A PRESPECIFIED** subgroup analy... interesting findings in patients wh... somatic *BRCA* mutation. In these pati... 24-month progression-free survival (52... being statistically significant (HR = 0.43,... of patients in the prespecified subgrou... most benefit from the combination of o... not clear whether these results are bei... if olaparib alone provided the marked i...

In PRIMA,[6] the myChoice HRD Plus assa... off score of 42. In patients with tumors... a *BRCA* mutation, the magnitude of ben... to that with the combination of olaparib... CI = 0.31–0.83). Of course, the benefit in... the active bevacizumab arm, not a place... based on how its myChoice HRD Plus a... of patients with tumors with non-*BRCA*... repair mutations (eg, RAD51C, RAD51D)... results of PAOLA-1 in the HRD-positive g... sive, but one must consider how much o... by olaparib alone.

In PAOLA-1, HRD-negative tumors were... clinical studies, to respond similar to a *B*... treated with antiangiogenic therapeutic... the addition of a PARP inhibitor to bevac...

Appellant's Ex 255

TRENDING     Pride Month    Lottery Tickets    Presidential Candidates    I-Team Tips    ...

UCLA

# Jury Finds Ex-UCLA Gynecologist Accused of Sexual Misconduct Guilty of 5 Counts

James Heaps served as a gynecologist/oncologist, affiliated with UCLA, for nearly 35 years.

By City News Service and **Jonathan Lloyd** • Published October 20, 2022 • Updated on October 20, 2022 at 4:55 pm



In this Aug. 3, 2020, file photo, former UCLA Gynecologist Dr. James Heaps, center, appears in Los Angeles Superior Court listening as Deputy DA Morgan Mallory, right, addresses the Judge.

Jurors announced they've reached a verdict Thursday in the trial of a former campus gynecologist affiliated with UCLA who was indicted on nearly two dozen sexual misconduct counts involving seven patients.

Heaps faced 21 felony counts of sexual abuse in the criminal case.

He was found guilty on five counts, and not guilty of seven.

He was found guilty of three counts of sexual battery, and two counts of sexual penetration. He was found not guilty of several other counts of sexual battery and penetration, and not guilty of sexual exploitation.

> ## *Get Southern California news, weather forecasts and entertainment stories to your inbox. Sign up for NBC LA newsletters.*

The jury was hung on the remaining counts.

James Heaps served as a gynecologist/oncologist, affiliated with UCLA, for nearly 35 years. At various times during those three decades, he saw patients at the Ronald Reagan UCLA Medical Center and at his office at 100 Medical Plaza.



**FEB 7, 2022**
UCLA Settles Gynecologist Sex Abuse Suit for $243.6 Million



**OCT 20, 2022**
Pursuit Driver Out of San Diego Comes to Stop on Onramp Near LAX

More than 500 lawsuits were filed against Heaps and UCLA, accusing the school of failing to protect patients after becoming aware of the misconduct.

UCLA ended Heaps' employment and notified law enforcement of the allegations against him on June 14, 2018. He was arrested an charged in June 2019, and more women came forward to report allegations of sexual misconduct.

More than 500 lawsuits were filed against Heaps and UCLA, accusing the school of failing to protect patients after becoming aware of the misconduct.

The lawsuits alleged that UCLA actively and deliberately concealed Heaps' sexual abuse of patients. UCLA continued to allow Heaps to have unfettered sexual access to female patients -- many of whom were cancer patients — at the university, plaintiffs' attorneys alleged in the suits.



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr Andrew Cuomo, Atty
The Capitol (State Capitol Building)
Albany, NY 12224

9590 9402 1363 5285 6155 20

2. Article Number (Transfer from service label)
7021 0950 0001 5129 7722

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
11/8/21
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Atty Alan Castill,
23152 Verdugo Drive Ste 201
Laguna Hills, Ca 92653

9590 9402 1363 5285 6155 68

2. Article Number (Transfer from service label)
7008 1300 0000 2642 0795

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X BARJYC44 ☐ Agent ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
Co-W  11/09/21
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Daniel Casey Kadentsen, MD
217 S. Manning Blvd
Ste 310
Albany, NY 12208

9590 9402 1363 5285 6155 51

2. Article Number (Transfer from service label)
15 0640 0006 0143 6904

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X COMO ☐ Agent ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
11/9/21
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

Dinsmore & Shohl LLP
Client Billing and Payment History
as of 9/13/2023

**Billing History:**

| Client | Client Name | | Phase | Bill Date | Bill Number | Total Billed | Total Paid | Total AR |
|---|---|---|---|---|---|---|---|---|
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 4/22/2020 | 4457143 | $1,503.00 | ($1,503.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 5/20/2020 | 4479944 | $4,354.00 | ($4,354.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 6/19/2020 | 4500760 | $7,916.45 | ($7,916.45) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 7/21/2020 | 4529009 | $4,077.10 | ($4,077.10) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 8/21/2020 | 4549414 | $3,684.00 | ($3,684.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 9/15/2020 | 4560671 | $2,070.00 | ($2,070.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 10/19/2020 | 4583338 | $1,295.00 | ($1,295.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 11/18/2020 | 4613186 | $6,877.07 | ($6,877.07) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 12/14/2020 | 4623812 | $16,939.60 | ($16,939.60) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 1/27/2021 | 4644972 | $648.92 | ($648.92) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 2/25/2021 | 4662438 | $68.00 | ($68.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 3/30/2021 | 4698292 | $6,020.00 | ($6,020.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 4/27/2021 | 4710742 | $5,849.00 | ($5,849.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 6/10/2021 | 4758921 | $18,482.77 | ($18,482.77) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 7/19/2021 | 4794812 | $6,223.00 | ($6,223.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 12/14/2022 | 5194978 | $485.00 | ($485.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 3/27/2023 | 5250753 | $1,728.00 | ($1,728.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 5/15/2023 | 5293644 | $15,257.50 | ($15,257.50) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 5/4/2023 | 5304914 | $5,108.29 | ($5,108.29) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 6/7/2023 | 5315698 | $7,078.00 | ($7,078.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 8/22/2023 | 5363443 | $270.00 | ($270.00) | $0.00 |
| 126223 | Mahmood Yoonessi, M.D. | 1 | App. for Reinst/Appeal | 9/10/2023 | 5393193 | $5,598.00 | ($6.21) | $5,591.79 |
| | | | | | | $121,532.70 | ($115,940.91) | $5,591.79 |

**Payment History:**

| Payment Narrative | Date | Check # | Amount |
|---|---|---|---|
| My Montecito Inc. | 4/1/2020 | 1656 | $4,000.00 |
| My Montecito Inc. | 7/21/2020 | 1673 | $7,916.45 |
| My Montecito Inc. | 11/6/2020 | 1696 | $11,000.00 |
| My Montecito Inc. | 12/30/2020 | 1706 | $25,000.00 |
| My Montecito Inc. | 4/21/2021 | E-Check | $7,536.69 |
| My Montecito Inc. | 5/10/2021 | E-Check | $5,849.00 |
| My Montecito Inc. | 8/2/2021 | E-Check | $24,705.77 |
| My Montecito Inc. | 2/15/2023 | 1760 | $485.00 |
| My Montecito Inc. | 3/13/2023 | Wire | $20,000.00 |
| My Montecito Inc. | 6/30/2023 | 1766 | $7,078.00 |
| My Montecito Inc. | 9/6/2023 | 1770 | $2,370.00 |
| | | | $115,940.91 |

ORANGE COUNTY BAR ASSOCIATION
**MANDATORY FEE ARBITRATION COMMITTEE**
Post Office Box 6130, Newport Beach, California 92658
Telephone: 949-440-6700  Facsimile: 949-440-6710

In the Matter of the Arbitration of

MAHMOOD YOONESSI

PETITIONER

and

RAOUL J. SEVERO

RESPONDENT

OCBA CASE NO.:      FB-023-6858

**ARBITRATION AWARD**

**Recitals and Findings:**

1. Attorney: RAOUL J. SEVERO          ☐ was present    ☒ was not present and

   ☐ was not represented by counsel  ☒ was represented by Attorney:   GRENVILLE PRIDHAM

2. Client: MAHMOOD YOONESSI          ☒ was present    ☐ was not present and

   ☒ was not represented by counsel  ☐ was represented by Attorney:

3. Total Amount in Dispute per Petition: $  25,000.00

4. This arbitration is  ☒ Advisory only ☐Binding (pursuant to ☐pleadings ☐written stipulation dated: _____ )

5. Pursuant to  ☒ notice dated  JUNE 8, 2023          ☐ stipulation dated _____

   the arbitration hearing was held on  JULY 27, 2023          at the following location:

   ORANGE COUNTY BAR ASSOCIATION

   4101 WESTERLY PLACE

   NEWPORT BEACH, CA  92660

6. The hearing of this matter was held before  ☐ a single arbitrator  ☒ a three arbitrator panel.

7. ☐Attorney ☐Client failed to appear at the arbitration hearing.

   The failure to appear was  ☐ willful  ☐ not willful  ☐ no finding on this issue.

8. A **Statement of Decision** of the issues presented in this arbitrated dispute is attached.

**Award.**

### Arbitration Filing Fee

a.   Total filing fee (see Petition):     $ _____1,250.00_____

☒ filing fee prepaid by Client   ☐ filing fee prepaid by Attorney

### Attorney Fees, Costs and Interest Charges

b.   Total attorneys' fees and costs that should have been charged:                                $ ____0.00____

c.   Pre-Award interest is [ ] is not ☐ awarded to Attorney in amount of:          **+**     $ _____

d.   **Total Attorney Fees, Costs and Interest Charges**                     (item "b" plus item "c")  $ ____0.00____
(insert amount of item "b" PLUS amount of item "c" at item "d")

### Client Payments and Credits

e.   Amounts paid to Attorney by or for the benefit of Client:                              $ ___25,000.00___

f.   Amount of filing fee prepaid by Client:                                    **+**     $ ___1,250.00___

g.   Portion of filing fee Client should pay:                                    **-**     $ _____0.00_____

h.   Pre-Award interest is ☒ is not ☐ awarded to Client in amount of:        **+**     $ ___2,856.45___

i.   **Total Client Payments and Credits**        (item "e" plus item "f" minus item "g" plus item "h")  $ ___29,106.45___
(insert amount of item "e" PLUS amount of item "f" MINUS amount of item "g" PLUS amount of item "h" at item "i")

### Payments, Refunds and Adjustments

j.   Neither Attorney nor Client shall make any further payment or refund to the other.            ☐
(Check box "j" only if amount of item "d" and amount of item "i" are equal)

k.   Attorney shall **refund** to Client:                              (item "i" minus item "d")  $ ___29,106.45___
(Complete item "k" only if amount of item "d" is less than amount of item "i")

Payment of this award shall be by the following **responsible attorney(s):**

(1)  Attorney: _|_____RAOUL J. SEVERO___ SBN__78104____|

(2)  Attorney: _|_____ SBN_____

l.   Client(s) shall **pay** to Attorney:                              (item "d" minus item "i")  $ _____
(Complete item "l" only if amount of item "d" is greater than amount of item "i")

Dated: _Sept. 11, 2023_

| ERIC S. BLUM | (Signature of Presiding Arbitrator) |
| --- | --- |
| (Name of Presiding Arbitrator) | |
| ERIN EZRA | (Signature of Panel Arbitrator) |
| (Name of Panel Arbitrator) | |
| JAMES BLOOR | (Signature of Panel Arbitrator) |
| (Name of Panel Arbitrator) | |

Statement of Decision

Yoonessi v. Khouri, Case No. DC-022-6838

On March 28, 2023, at 2:00 pm, a hearing was held in this advisory arbitration before N. Fred Thiagarajah, presiding arbitrator, Lauren Johnson, attorney arbitrator and William Osier, lay arbitrator. The hearing took place in person at the office of the Orange County Bar Association. Petitioner Mahmood Yoonessi appeared on his own behalf. Respondent Michael Khouri appeared on his own behalf but also brought Steven Finley (his current associate) and Scott Ezzati (his former associate) to the hearing.

Mr. Yoonessi retained Mr. Khouri in December 2021 for representation to obtain reinstatement of his license to practice medicine in California, including making all applications to the Board, representation in administrative hearings, filing a writ of mandate and negotiations with the Attorney General's Office. The agreement was memorialized via email. The parties disagree on whether there is a written retainer agreement. Respondent also contends the agreement between the parties was a "true retainer" and therefore non-refundable. The parties also dispute the amount of services provided.

Issue 1 – Signed Agreement

There is no dispute that the parties had an agreement about the scope of services to be provided and that agreement was made by email. However, there is no signed agreement as required by Business and Professions Code section 6148. Respondent contends that the email response from Petitioner stating "I agree" constitutes his signature. We disagree and in any event, there is no corresponding signature from the Respondent. Respondent also contends that this is the way many of the agreements with clients are formed in his office. The fact that Respondent typically does business this way does not persuade us that this is a signed fee agreement pursuant to the rules required by BP 6148.

Issue 2 – True Retainer / Quantum Meruit

Despite Respondent's contention that his agreement contains a "true retainer", we do not believe this is a "true retainer" as contemplated by law. However, this issue is moot since there is no signed fee agreement as required by BP 6148, and therefore Respondent is only entitled to fees under a quantum meruit basis.

Issue 3 – Services Provided

Petitioner argues that Respondent's office did nothing on this matter. Respondent contends that he and his associates did work on Petitioner's matter. Respondent also estimated that his associates did approximately 16 hours of work and he valued their time at $425/hour. When questioned as to how he came up with that estimate of 16 hours, Respondent said that estimate is based partially on memory and partially on what he thinks it would have taken to review the records / to do the work in this case. We agree that Respondent's associates did some work on this matter but the problem is that nobody in Respondent's office kept any records, timesheets, or anything in writing that reflects what work they did or when they did it. Respondent himself conceded that his office did not even keep track of when phone calls were made or what the content of those calls were about. Other than Respondent's memory, there is no evidence of any document review, communications with

Petitioner or anyone else, legal research, etc. Respondent indicated that his associates reviewed approximately 160 pages of documents plus a box of documents from the Petitioner. No other details were provided as to the scope or nature of the work. We find that an attorney can review approximately 50 pages of documents in an hour and therefore 160 pages will require 3.2 hours of work. We double that amount to take into account any extra work done in excess of reviewing the 160 pages described in the hearing. Respondent values his associates time at $425/hour. At the time Petitioner retained Respondent's law office, both of these associates had less than one year of experience as a lawyer and that one year of experience was divided between criminal law and administrative law. We do not find that a rate of $425 per hour for a one-year associate to be reasonable for the work performed in this matter. Instead, we believe that $325 per hour is a reasonable rate for the associates in this matter.  6.4 hours x $325/hour is $2080.

### Conclusion

We also find that Respondent should be responsible for the filing fee in this case, as this arbitration could have been avoided had Respondent provided Petitioner an accounting for his firm's work and a refund of the unearned fees, as required by State Bar rules.

Final Award - Respondent will pay $13,670 to Petitioner.